IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| Abigale L. Miller | : | Case No. 10-28606-TPA |
| | : | |
| | : | |
| Debtors | : | Chapter 11 |
| | : | |
| | : | FILED |
| | : | 3/3/15 9:22 am |
| | : | CLERK |
| | : | U.S. BANKRUPTCY |
| | : | COURT - WDPA |
| | : | |
| | : | |
| | : | |

**CERTIFICATION OF TRANSCRIPT**

*AND NOW*, this *3rd* day of *March, 2015*, it is hereby **CERTIFIED** that the accompanying transcript of the proceeding held on *February 1, 2013* in regards to, Status Conference on Amended Chapter 11 Plan and Disclosure Statement at Document No. 210 and 211, In the above captioned matter is the official transcript of record. This Certification is preliminary and the transcript is subject to appropriate correction following a complete review of its content by the Court.

_____
Thomas P. Agresti, Judge      jah
United States Bankruptcy Judge

```
              IN THE UNITED STATES BANKRUPTCY COURT
            FOR THE WESTERN DISTRICT OF PENNSYLVANIA


IN RE:                        .    Chapter 11
                              .
Abigale L. Miller,            .
                              .
        Debtor.               .    Bankruptcy #10-28606 (TPA)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

                     U.S. Steel Tower, 54th Floor
                           600 Grant Street
                         Pittsburgh, PA 15219
                          February 1, 2013
                             1:32 p.m.


     TRANSCRIPT OF STATUS CONFERENCE HEARING ON AMENDED CHAPTER 11
                   PLAN AND DISCLOSURE STATEMENT
              BEFORE THE HONORABLE THOMAS P. AGRESTI
                  UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:

For The Debtor:                    Donald R. Calaiaro, Esq.
                                   Calaiaro Valencik
                                   428 Forbes Ave.-Ste. 900
                                   Pittsburgh, PA 15219

                                   David Valencik, Esq.
                                   Calaiaro Valencik
                                   428 Forbes Ave.-Ste. 900
                                   Pittsburgh, PA 15219

For The U.S. Trustee:              Joseph M. Fornari, Jr., Esq.
                                   Office of the U.S. Trustee
                                   1001 Liberty Ave.-Ste. 970
                                   Pittsburgh, PA 15222

Audio Operators:                   Doug Basinski
```

In The United States Bankruptcy Court For The Western District of Pennsylvania I, the undersigned Deputy Clerk, U.S. Bankruptcy Court in and for said District, DO HEREBY CERTIFY that this copy has been compared with the original thereof and that it is a complete and correct copy of such original as it appears of record and on file in my office.
IN TESTIMONY WHEREOF I have hereunto set my hand at Pittsburgh in said District, this 12th day of January, 20 17

Deputy Clerk, U.S. Bankruptcy Court

Transcribing Firm:        Writer's Cramp, Inc.
                          63 Dakota Drive
                          Hamilton, NJ 08619
                          609-588-8043

Proceedings recorded by electronic sound recording, transcript produced by transcription service.

3

1         THE CLERK: Judge Agresti is ready to begin. All
2   rise, please.
3         THE COURT: Good afternoon. Please be seated. All
4   right, this is the time set for the hearing in the matter of -
5   - status conference in the matter of Abigale L. Miller, Case
6   #10-28606. We'll take appearances at this time. Mr.
7   Calaiaro.
8         MR. CALAIARO: Donald Calaiaro and David Valencik
9   for the Debtor.
10        THE COURT: Okay, and we have the Debtor here as
11  well?
12        MR. CALAIARO: Pursuant to your order, Abby Miller
13  is here, Your Honor.
14        THE COURT: Good. Mr. Fornari.
15        MR. FORNARI: Your Honor, Joseph Fornari for the
16  U.S. Trustee.
17        THE COURT: Okay. Well, here's -- I have some
18  concerns about this case. I'm glad the U.S. Trustee is here,
19  to be honest with you. There seems to be -- to have been an
20  epiphany since the Court scheduled this status conference.
21  All of a sudden $288,000 appears in counsel's bank account,
22  amended plans are filed, 100% to Unsecured Creditors. But
23  back in December we went through a plan confirmation hearing
24  and there wasn't one word about the new contracts and the
25  monies. And if it wasn't for me channel surfing one night and

1  seeing Abigale Miller's ultimate dance competition on one of
2  the TV stations, and how -- the American Idol with judges and
3  Ms. Miller being on TV, and then seeing some ads for *The*
4  *Maniac is Back*, I realized that there's an awful lot of money
5  coming into this plan, this case, and it hasn't been
6  disclosed.  So I scheduled these hearings and all of a sudden
7  we have the epiphany.  Mr. Calaiaro, I'm disappointed that it
8  took my order for you to disclose this.
9           MR. CALAIARO:  Your Honor --
10          THE COURT:  Go ahead.
11          MR. CALAIARO:  -- from what I can tell the Court is
12 we did not get the money until I think December 21st.
13          THE COURT:  I don't -- that doesn't matter.  These
14 contracts were entered in July –
15          MR. CALAIARO:  I'm aware of that.
16          THE COURT:  -- before you filed the amended plan.
17 You filed the amended plan in August of 2012.  These deals
18 were struck in July, and there's no mention in the amended
19 plan at all about $25,000 per episode and extensions into
20 2013.
21          MR. CALAIARO:  I will say to the Court that as of
22 right now we still do not see the money that --
23          THE COURT:  Where did the 288,000 come from?
24          MR. CALAIARO:  Well, according to everything that
25 we've done in our research to try and get ready for the

5

1   hearing today, according to those contracts, Ms. Miller should
2   have earned, by December 31st, around $900,000.  The best --
3              THE COURT:  Okay.
4              MR. CALAIARO:  -- we can tell you is that the
5   production company gets the money and it chose not to disburse
6   the money to Ms. Miller, and by a preliminary discussion -- we
7   are nowhere near the end of this discussion --
8              THE COURT:  Okay, let me stop you there.  You're
9   missing the point.  The point is you knew about all these
10  contracts and they weren't disclosed anywhere.  I didn't
11  know -
12             THE COURT:  They're date --
13             MR. CALAIARO:  -- about them until --
14             THE COURT:  Well, then -- all right, I'm saying you
15  being your client.
16             MS. MILLER:  I didn't even know about them.
17             THE COURT:  And she can shake her head and protest
18  all she want and go through her TV face, that's not going to
19  affect me, ma'am, and I'd prefer you stop it, okay.  Let's be
20  a little stoic here.  These are very serious problems you
21  have, and a failure to disclose.  You allowed the Court -- you
22  manipulated, it appears, your attorneys to go forward, and Mr.
23  Calaiaro, I think you had an obligation to vet it a little bit
24  and make sure you got good information from her so when you
25  filed the August 27th documents there was some notification to

1   the Court.  And as late as the December hearings you gave the
2   Court some indication that these deals were in progress or a
3   real likelihood.  That's the problem.  I mean, I -- granted,
4   there may be a lot of unknowns as to the payment stream and
5   things like that and the actual time you get a check from the
6   producers in Hollywood or wherever, but the question here is
7   disclosure, and there was none of it until the Court scheduled
8   this status conference.
9              MR. CALAIARO:  I can only tell you that when we
10  first met Mrs. Miller, it was clear to us that while her
11  father was alive he ran the business day to day.  It was clear
12  to us that she got into a situation where her building was
13  scheduled for a tax sale and she had no idea how she got
14  there.  It was clear to us that she was very talented as a
15  dance instructor, but she lacked a lot of what I would call
16  the regular day-to-day ability to run a business.
17             In my experience, since I've known Ms. Miller, I think
18  that the production company has been handling her and telling
19  her what to do.  As we tried to find out about these potential
20  contracts, we were told that the production company hired
21  somebody to look out for her best interests, whatever that
22  meant, and only after we pressed were we able to get these
23  contracts in December.
24             THE COURT:  Come on, Mr. --
25             MR. CALAIARO:  And I will tell you --

                                                                    7

1            THE COURT:  -- she signed them in July of 2012.
2            MR. CALAIARO:  There's no doubt about it --
3            THE COURT:  She --
4            MR. CALAIARO:  -- she did.
5            THE COURT:  You mean she didn't know about them?
6    She didn't know what she signed?  She didn't have copies of
7    them given to her?  She couldn't have told you about it?  Is
8    that what you're telling me?  I find that hard to believe.
9            MR. CALAIARO:  The best case scenario would have
10   been that even before she signed them she would have talked to
11   us about them.  A better case scenario was after she signed
12   them she would have given us copies.  She didn't understand
13   that she had to get Bankruptcy Court involvement in the
14   contracts, and we never got copies of the contracts until we
15   pressed for them.  And once we pressed for them we got a great
16   deal of resistance from the production company about getting
17   them.
18           THE COURT:  Well, all right, here -- you're missing
19   the point.  You're missing the point again.  You're going --
20   you're not responsive to the Court's inquiries, and maybe --
21   what I'm saying is you knew about it.  The fact that you
22   didn't have the document -- she signed it.  She knew this was
23   in the offering.  I mean, it's pretty clear -- you know, this
24   goes from August 1st, 2012, through October 1st, 2012, one,
25   two, three, four, five, six, seven, eight, nine, ten.

8

1         MS. MILLER:  I never seen any of that money.
2         THE COURT:  That's $25,000 an episode.  That's
3    $250,000 that she is contracted for.  Come August -- come
4    December when the hearing took place, she should have let the
5    Court know, let you know so you could advise the Court that
6    she had performed for at least 25 -- $250,000 worth of
7    services that she was owed for, even if she didn't have the
8    money, even if she didn't have the contract.  I'm talking
9    about disclosure to the Court.
10        This is an honor system.  You know, I can't be -- if it
11   wasn't for me just sitting down and channel surfing one night
12   and coming across it, I would have never thought -- I would
13   have just -- your plan ostensibly would have never been
14   revised, amended, and you would have sought to get the ballots
15   in place for the -- that were deficient back in December.  I
16   would have confirmed a plan, and the Unsecured Creditors would
17   be paid over five years and the Debtor would have $288,000, at
18   least, in her pocket that wasn't disclosed to the Court.
19   That's the point I'm making.
20        MR. CALAIARO:  You know, I understand the Court's
21   position.  The Court can be assured that before we got here we
22   have already discussed this issue with Ms. Miller.  We've
23   discussed what I think to be shortcomings in the case in
24   disclosure of this stuff as it happened.  We've discussed
25   these issues with Ms. Miller.  We have her cooperation and her

9

1  attention.  We're still trying to find out additional
2  information we'd like the Court to have, but we don't have it
3  yet.
4              THE COURT:  Well, it sounds like -- I mean, if --
5  all things being equal, technically you have a 100% plan that
6  can be paid in full on the date I sign a confirmation order.
7              MR. CALAIARO:  That's correct, we have the money in
8  our escrow account.
9              THE COURT:  Okay, so -- all right, no, no, no, but
10 you don't get my point, though.  That -- all things being
11 equal, that's what you have.  It's still -- that doesn't
12 eliminate the disclosure issue problem we had, okay.  That's
13 the -- had we had full disclosure up to this point, I'd be
14 signing a confirmation order today and I'd be giving kudos and
15 plaudits to Ms. Miller for getting the case resolved and
16 getting her life in order and business on track and good luck.
17 I'll watch, I don't know, TNT or Lifestyle, whatever station
18 that stuff's on, every time I do some channel surfing I'll
19 stop and linger for a little bit, and good luck in your
20 future.  The problem here is the fact that it looks to the
21 Court as if she was hiding the ball, and until she got caught,
22 we wouldn't have known about this.  That's what I'm concerned
23 about.  All right, I don't know if -- Mr. Fornari, anything to
24 add at this point?
25             MR. FORNARI:  One point, Your Honor, thank you.  I

1  discussed with Mr. Calaiaro before the hearing began that the
2  disclosure statement does state that $288,000 were placed in
3  his escrow account in December 2012, yet the monthly operating
4  report for that same month does not report that as income;
5  it's not shown anywhere.  So we at least need an amended
6  report in December, if not the previous reports.  Thank you,
7  Your Honor.
8         THE COURT:  All right, well, not only that, the
9  disclosure statement says she has cash of 37 -- $30,000 on
10 hand.  You know, who knows, it sounds like she's got 288,000
11 on hand, you know.  So there's a lot of internal
12 inconsistencies --
13        MR. FORNARI:  That's accurate.
14        THE COURT:  -- in the most current plan.  So all
15 right, well --
16        MR. CALAIARO:  Your Honor, I think the disclosure
17 statement does reflect that escrow account.
18        THE COURT:  Okay, I think it does, too.  I don't
19 know where else I would have gotten it from.  But it's in
20 there.  But it also says she's got $30,000 on hand.  It sounds
21 like she's got maybe 30,000 plus 288, or a total of 288, or --
22        MR. CALAIARO:  No, no, it's 30 plus the 288.
23        THE COURT:  All right.  Well, I think on hand should
24 be 318,000, or whatever 30 plus 288 is, okay.  But there's
25 some -- yeah, there's some -- I don't know.  All right, well,

11

1   I'm just -- yeah, I don't know what to do at this point. All
2   right, I'll take a look at it. Anything else, Mr. Calaiaro?
3           MR. CALAIARO: No, Your Honor. At this juncture
4   we're prepared to move forward and pay the Unsecured Creditors
5   in full as soon as you authorize us to do so.
6           THE COURT: I understand that. I understand that.
7   That the least is what would be expected here is that you
8   comply immediately to the commitment you made in this second
9   amended plan. All right, very good. The Court will take
10  another look at it. Thank you.
11          MR. CALAIARO: Thank you, Your Honor.
12          THE CLERK: All rise, please.
13  (Court adjourned)
14
15                      CERTIFICATION
16  I certify that the foregoing is a correct transcript from the
17  electronic sound recording of the proceedings in the above-
18  entitled matter.
19
20
21  *[Signature: Lewis Parham]*                    3/2/15
22
23  _____                 _____
24  Signature of Transcriber                       Date