**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **2:14-cr-19** |
| | ) | |
| **MICHAEL J. FREE** | ) | |

## TENTATIVE FINDINGS AND CONCLUSIONS

This matter is before the Court for resentencing on remand from the U.S. Court of Appeals for the Third Circuit. The Court has considered carefully the directives of that Court's remand Opinion, *United States v. Free*, 839 F. 3d 308 (3d Cir. 2016), along with the supplemental sentencing documents filed by the parties, and the entire record otherwise before the Court, including the trial record, the prior sentencing submissions of the parties, and the various filings of the Probation Office, and makes the following Tentative Findings and Conclusions:

**Base Offense Level**

The Base Offense Level is 6, U.S.S.G. § 2B1.1(a)(2)

**Adjustments**

+ 14 Levels due to intended Loss Amount, U.S.S.G. § 2B1.1(b)(1)(H)

+2 Levels, fraud in the course of a bankruptcy proceeding, U.S.S.G. § 2B1.1(b)(9)(B)

**Departures**

The Court believes that a Departure of +2 Levels, fraud in violation of specific judicial and administrative orders, U.S.S.G. § 2B1.1(b)(9)(C), Application Notes 8



(A), (C) would ordinarily apply in this case. Based on the extraordinary level of the Defendant's deception and his repeated, blatant violations of the directives and orders of the United States Bankruptcy Court for this District and the appointed Trustee of the bankruptcy estate, consistent with the referenced Application Note, the Court finds and concludes that such upward Departure would be both warranted and appropriate. The Court would observe that as it noted at the time of the initial sentencing hearing, the reason that such Department was not applied as an additional upward adjustment at the original sentencing proceeding was the fact that no prior notice of its potential application had been provided in the Presentence Report, Addenda, or by the Court. The Court finds and concludes that the situation present here would be the exceptional case referenced in the Application Note where the upward enhancements of U.S.S.G. 2B1.1(b)(9) may be applied cumulatively as a Departure, rather than separately. However, the Court also finds and concludes that regardless of whether such a Departure applies in this case, the Court would nonetheless consider the severity and compound nature of the Defendant's deceptive conduct and his violations of the Bankruptcy Court's and the Trustee's Orders in applying the factors under 18 U.S.C. § 3553(a), particularly as to the "seriousness of the offense". The Court will not apply a cumulative U.S.S.G. 2B1.1(b)(9) Departure here, but will consider such matters as part of the § 3553(a) analysis.

**Total Offense Level**

Total Offense Level 22, 41-51 months of imprisonment, fine of $15,000 to $150,000. The Court notes that the "grouping" provisions of the Advisory Guidelines

would apply, and the Advisory Guidelines sentencing matters set forth in these Tentative Findings and Conclusions applies as to each count of conviction in this case.

In support of the above, and in consideration of the record before the Court, the Court rejects the contention of the Defendant that the appropriate measure of the "loss amount" applicable here is the ultimate, actual loss to the bankruptcy creditors, namely zero. Instead, based on the provisions of Application Note 3 to U.S.S.G. § 2B1.1, the Court finds and concludes that the Defendant purposely intended and sought to inflict pecuniary harm in an amount of at least $400,000 on the bankruptcy estate and ultimately the creditors by his active concealment of multiple assets of the bankruptcy estate, most specifically his various and numerous firearms, real estate and vehicles.[1] *See* § 2B1.1(b)(1). The credible evidence in the record is that the Defendant knew at the time of his repeated concealment of those assets (and his diversionary tactics regarding them) that he would go to, and intended to go to, any necessary length to protect his concealed assets from any possibility of Trustee liquidation. The Court finds and concludes that the fair and reasonable inference that can and should be drawn from the lengths the Defendant went to conceal his assets,

[1] Pursuant to 18 U.S.C. § 3742(g)(1), the Court believes that the 2014 Guidelines Manual would apply, as such were the Guidelines in place at the time of the first sentencing and the changes to the Loss Table in the 2016 Manual were more than explanatory. *See, e.g.*, *United States v. Norwood*, 566 Fed. App'x 123, 127 (3d Cir. 2014); *United States v. Edwards*, 439 Fed. App'x 112, 117 (3d Cir. 2011); *United States v. Wise*, 515 F.3d 207, 219-20 (3d Cir. 2008). Under the 2014 Guidelines Manual, the loss ranges under § 2B1.1(b)(1) were demarcated at: more than $400,000 (+14 levels), more than $1,000,000 (+16 levels) and more than $2,500,000 (+18 levels). Based on the findings noted in these Tentative Findings—specifically, the fact that the Defendant intended to inflict pecuniary harm in an amount of at least $400,000 and probably more than $1,000,000—a +16 upward adjustment could apply under the 2014 Guidelines Manual. However, on this record, the Court can say with confidence that the intended loss amount was between $400,000 and $1,000,000, and certainly at least $550,000, so the Court finds and concludes that +14 enhancement is appropriate under either the 2014 or 2016 Manual.

and to evade the reach and directives of the Bankruptcy Court, the Trustee, and even the Westmoreland County (PA) Sheriff who had been dispatched to recover his concealed firearms, was that he in actuality thought and believed that his assets were at a real risk of liquidation to satisfy his creditors along with the expenses of the bankruptcy, and he intended to deprive the Trustee and creditors of them.[2]

The Court draws that inference, and the inference that the Defendant's intentions and purposes were quite clear, namely to inflict pecuniary harm in the amounts noted on the creditors and the bankruptcy estate. His conduct demonstrates that he fully intended to deprive the bankruptcy estate and the creditors protected by that estate of any dominion and control over the concealed assets. The Court finds the testimony of the Bankruptcy Trustee to be both credible and accurate, especially in terms of the specific warnings delivered to the Defendant that he cannot and must not do anything to transfer assets of the estate. The Defendant well and truly knew thereby that any conduct by him contrary to those instructions was not only unlawful, but also directly and precisely contrary to the rights of the Trustee to control of those assets for the benefit of the estate. Therefore, the Defendant's actions contrary to those obligations and specific instructions were intended to deprive the estate, the Trustee, and ultimately the creditors, of their tangible interest in those assets, and to inflict a tangible pecuniary harm on the bankruptcy estate and ultimately the

[2] Even if, as a logical matter, the Defendant could not in actuality have intended to cause a loss greater than his debts (or even debts plus expenses of the Trustee), given that his scheduled debts exceeded $600,000, that calculation still puts the "loss" within the range stated in these Tentative Findings.

creditors. That interest is not hypothetical or intangible, but pecuniary and tangible in all respects.

As the referenced Application Note provides, even if the Defendant believed that the possibility of pecuniary harm to those legally-cognizable interests was remote given the initial surplus of assets over debts in his initial bankruptcy schedules, his actions, as persistent and pervasive as they were, strongly demonstrate that it was both his intention to take no chances, and his purpose to cause the above-described harm in the event that any such assets were necessary to satisfy his creditors—especially as to his extensive historic gun collection. Beyond that, as the record establishes here, primarily due to the Defendant's conduct, the administrative expenses of the bankruptcy administration by the Trustee soared, ECF No. 102 at 59, so as that all unfolded, neither the Defendant nor anyone else had any reasonable basis to be confident that there would be and could be no pecuniary harm to the creditors[3].

Based on the trial record, and the matters set forth in the Presentence Report and various Addenda, the Court finds by at least a preponderance of the evidence that the Defendant both intended pecuniary harm to result, and also that the Defendant purposely sought to inflict pecuniary harm on his creditors should certain assets have become necessary to satisfy his outstanding obligations, such that—under either the 2014 Guidelines or the 2016 Guidelines—the Defendant's actions in concealing assets and liquidating them to his, rather than the estate's, benefit, amount to an

[3] Given the pervasiveness with which the Defendant pursued his course of duplicitous activity in this case, no presumption of accuracy should attach to his own valuations set out in his schedules.

"intended loss" for 2B1.1 purposes in an amount of at least $400,000. *See* valuations of converted items as set out at Presentence Report ¶¶ 18 ($63,760), 20 ($37,070), 21 ($40,995), 23 ($16,500), 25 ($205,995), ECF No. 102 at 62 (confirming post-conviction auction sale of ten firearms for a cumulative sales price of $640,000), along with the valuations set out in the record and summarized at page 11 of ECF No. 86 (Government Sentencing Memorandum), all of which are supported by the record before the Court in these proceedings, and all of which the Court finds by at least a preponderance of the evidence. The Court also notes that in its Opinion in this case, our Court of Appeals explained that the definition of "intended loss" in the 2016 Guidelines is "narrow[er]" than the definition in the 2014 Guidelines.[4] 839 F. 3d at 320 n.90. But even if the Defendant could argue that he did not purposely seek to inflict the range of $550,000 and $1,500,000 of pecuniary harm on his creditors under the 2016 Guidelines, the Court would still find by a preponderance of the evidence that he intended such harm to result under the 2014 Guidelines in an amount of at least $400,000 to $1,000,000.[5]

[4] The 2014 Guidelines define "intended loss" as "the pecuniary harm that was intended to result from the offense . . . includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 Application Note 3(A)(ii) (2014). The 2016 Guidelines narrow the definition of "intended loss" to "pecuniary harm that the defendant purposely sought to inflict . . . includ[ing] intended pecuniary harm that would have been impossible or unlikely to occur." U.S.S.G. § 2B1.1 Application Note 3(A)(ii) (2016); *see also* 839 F. 3d at 320 n.90. For the reasons set forth at length in these Tentative Findings, the Court finds and concludes by at least a preponderance of the evidence that the Defendant's conduct fulfills both standards.

[5] The figures set out above total $1,004,320. On top of that there were real estate interests and vehicles sold. But then, according to the Presentence Report, some cash was paid back to the Trustee by the Defendant for reasons other than the purchase of assets. All in, the Court believes this fully supports a finding of an intended loss amount of at least $550,000. At the upper end there is a record basis to conclude that the intended loss fell somewhere between $1,000,000 and $1,500,000, but the top number the Court would find with the requisite level of evidentiary confidence is $1,000,000.

Beyond that, and separately and distinctly, our Court of Appeals in this case, relying on *United States v. Feldman*, 338 F. 3d 212 (3d Cir. 2003), specifically directed that in the bankruptcy fraud context, this Court is to also consider the gain that the Defendant may have sought for himself from committing his crime. 839 F. 3d at 323-24. On that score, the record is even clearer. The credible evidence at trial demonstrated that the Defendant actually and actively concealed from the Trustee, and as to a significant number of firearms the Sheriff's deputies dispatched by the Bankruptcy Judge, a staggering degree of assets of obvious importance to him—the guns, the homes and the vehicles. Particularly as to the firearms, their centrality to the Defendant was revealed in the virtual travelogue of the Defendant's residence entered into evidence at trial showing them on display, the photographs of the special storage room where the Defendant concealed a large store of his firearm inventory from the Sheriff's deputies, and the documentary evidence of his transactions involving high-value firearms introduced at trial. That record also leads to the strong inference that the Defendant sold certain of those assets after being told not to do so, and then turned around and applied those very same cash proceeds to the purchase by him of other assets of his from the estate. He in essence "churned" those assets he could not sell lawfully in order to preserve to himself other assets he knew were at risk of liquidation. In the Court's estimation, there can be no doubt that the Defendant sought, and until this prosecution had achieved, a direct pecuniary gain to himself of an amount well in excess of $550,000 as broken out above, which beyond his intent

to cause a pecuniary loss was an intent, and near-success, in achieving a direct pecuniary gain to himself in those amounts[6].

On top of all of that, and for the sake of completeness and conformity with the remand Opinion of our Court of Appeals, the Court believes it appropriate to address its sentencing position if in fact for 2B1.1 purposes, the "loss" in this case were zero. If that were the case, 2B1.1(a)(2) combined with 2B1.1(b)(9) would peg the Offense Level at 10 under either the 2014 or 2016 Sentencing Guidelines, whether the Court did or did not apply the Application Note "cumulative" departure under subsection (b)(9). If that were the applicable Total Offense Level computation, the Court would, and hereby gives formal notice that it would, either "depart" upward from the Advisory Guidelines recommended sentence, or in consideration of the sentencing factors under 18 U.S.C. § 3553(a), "vary" upward above the calculated Advisory Guidelines sentence in order to appropriately reflect the seriousness of the Defendant's conduct here, his failure to show respect for the law as evidenced by his serial deception carried all the way through to his testimony at the first sentencing hearing, and to provide adequate deterrence from further criminal conduct, primarily by others. Under either measure (Departure or Variance), the Court believes that the

[6] The court of appeals, in its *Feldman* Opinion and in its Opinion remanding the case to this Court for resentencing, did not make a specific reference to the provisions of U.S.S.G. 2B1.1, App. Note 3B, which seems to stand for the proposition that "gain" is considered only as a proxy for pecuniary loss in those cases where the Court concludes that there is a loss but it is very difficult to calculate it with any degree of precision. For the reasons noted above, this Court has concluded that the Defendant in fact intended a direct, pecuniary loss to the estate and ultimately the creditors within the contours of 2B1.1 and that such "loss" is determinable with sufficient specificity to apply a +14-level adjustment. But even if there was no "actual" loss, the Court also specifically and separately addresses the concepts of "intended loss" and "gain to the defendant" given the express directions to do so by our Court of Appeals.

calculated Advisory Guideline Range as set forth at pages 1-2 above reflects sentencing considerations consistent with these § 3553(a) factors.

As this Court noted the first time around, beyond the havoc the Defendant's conduct imposed on the administration of the bankruptcy is the apparent disdain that he demonstrated for his obligations to be square with the Bankruptcy Court and the Trustee, especially after the Trustee, in no uncertain terms, laid the law down (figuratively and literally) when he instructed and implored the Defendant not to sell any of his stuff without Trustee approval. While it appears from the record advanced by the Defendant via counsel that the goal of this bankruptcy, perhaps in hindsight wholly miscalculated, was to shield certain commercial real property from state court foreclosure, neither this Defendant, nor any bankruptcy debtor, gets to write their own version of customized rules as to their obligations relative to estate assets. That is what the Defendant did here. He has posited that he received bad legal advice along the way from his bankruptcy lawyers both in terms of going into bankruptcy and then as to how to behave while in bankruptcy. Maybe so, but there can be no doubt as to what he was told by the Trustee in terms of not selling assets without Trustee approval, and the record reveals that he nonetheless proceeded full steam ahead with the scheme that led to his conviction by a jury. All of that, combined with the record evidence laid out above, says to this Court that a sentence based on the Advisory Guidelines calculation for a "zero" loss (6-12 months of imprisonment or alternate sentence given "Zone B" application), and a fine of $4,000 to $40,000, would fail to

fulfill a central tenet of § 3553(a)—namely, that the sentence imposed be "sufficient" to fulfill the purposes of sentencing[7].

Further, the Court specifically finds that the testimony offered by the Defendant at the initial sentencing hearing as to (1) his actions relative to the warnings he received from the Trustee, (2) his actions in liquidating his firearms to his benefit, and (3) his actions relative to concealing a large cache of firearms from the Westmoreland County Sheriff who had been dispatched to secure them for the benefit of the Trustee, was incredible, and it therefore is not accepted by the Court. The Court would note that due to the Defendant's false testimony at that hearing, the +2 level upward adjustment for obstruction of justice as provided by U.S.S.G. § 3C1.1 would ordinarily be applicable here. At the initial sentencing hearing, the Court declined to apply that adjustment essentially out of recognition that its application had just become apparent and therefore there was no fair warning ahead of time (although no warning really should be needed of the obligation to testify truthfully in federal court, especially after having been convicted on six criminal counts directly tied to lying to a federal court). The Court will not apply the upward adjustment as a formal part of the Guidelines calculation in light of the position of the United States

[7] Now, to be sure, the Court also believes that there are things in the 3553(a) analysis that cut in the Defendant's favor. At the end of the day, it appears that notwithstanding the Defendant's chicanery, the creditors will come out whole, all of the administration expenses will be paid, and there will be at least some leftovers. Further, the Defendant has no criminal record that the Court finds of significance for purposes of sentencing (notwithstanding the seemingly aggressive criminal prosecution of the Defendant by state authorities for what appears to be his willful failure to fulfill orders for residential light fixtures by customers of his lighting business). Finally, while what the Defendant did is quite serious by any measure, it also did not involve any sort of physical violence or threats of such violence to others. The Court would also hope that the convictions here, and the sentence to follow, will greatly reduce the possibility that the Defendant will again interact with the criminal justice system, and the "need to protect the public" from further criminal conduct by him would seem to be reduced.

that it will not seek that enhancement. Nonetheless, the Court finds and concludes that such upward adjustment would be fully supported and justified by the record here, and does believe that it is appropriate to give the Defendant's blatantly obstructive conduct some level of consideration in applying the 3553(a) sentencing factors, particularly as to the "promote respect for the law" factor.

For each of these reasons, the Court will sentence the Defendant with the consideration of an Advisory Sentencing Guidelines Total Offense Level of 22, Criminal History Category I. Bond is subject to revocation at the time of sentencing.

So **ORDERED** this 25th day of January, 2017.

BY THE COURT:

*/s/ Mark R. Hornak*
Mark R. Hornak
United States District Judge

cc: Stephen A. Lowers
U.S. Probation Officer

James R. Wilson
U.S. Attorney's Office

Martin A. Dietz
Counsel for Defendant