IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA,

        Plaintiff,

          vs.

MICHAEL J. FREE,

        Defendant.

Criminal Action

No. 14-00019

_____

Transcript of SENTENCING HEARING held on Thursday, January 26, 2017, in the United States District Court, 700 Grant Street, Pittsburgh, Pennsylvania, before The Hon. Mark R. Hornak, United States District Judge

APPEARANCES:

For the Government:        James R. Wilson, Esq.
                          United States Attorney's Office
                          700 Grant Street, Ste. 4000
                          Pittsburgh, PA  15219

For the Defendant:         Martin A. Dietz, Esq.
                          The Mitchell Building
                          304 Ross Street, Ste. 505
                          Pittsburgh, PA  15219

Court Reporter:           Deborah Rowe, RMR, CRR
                          700 Grant Street, Ste. 5300
                          Pittsburgh, PA  15219
                          (412) 471-2510

Proceedings recorded by mechanical stenography; transcript produced by computer-aided transcription

GOVT EX. 2

1               P R O C E E D I N G S

2               (1:56 p.m.; in open court, Defendant present:)

3               THE COURT:  Good afternoon, everybody.  We're here

4      this afternoon in the case of the United States of America

5      versus Mr. Michael Free pending on the docket of the Court at

6      14-CR-0019.  Will counsel for the United States please enter

7      his appearance?

8               MR. WILSON:  Good afternoon, Your Honor.  James

9      Wilson on behalf of the United States.

10              THE COURT:  Good afternoon, Mr. Wilson.  And who's

11     seated with you at counsel table today?

12              MR. WILSON:  Your Honor, I hope the Court remembers

13     the Special Agent from the FBI, Sean Langford.  Also here is

14     the forensic accountant, Lisa Ubinger, seated in the gallery,

15     Your Honor.

16              THE COURT:  Good afternoon, Mr. Langford.  Good

17     afternoon, Miss Ubinger.  And will counsel for Mr. Free

18     please enter his appearance?

19              MR. DIETZ:  Martin Dietz on behalf of Mr. Free

20     seated next to me at counsel table.

21              THE COURT:  Mr. Dietz, good to see you, and good

22     afternoon, Mr. Free.

23              Mr. Dietz and Mr. Wilson, other than any need you

24     might have to call witnesses or anything like that, do you

25     have an objection if we handle today's proceedings with

1   everyone keeping their seat at counsel table?  Does that work

2   for you, Mr. Wilson?

3             MR. WILSON:  Fine.  Thank you, Your Honor.

4             THE COURT:  Does that work for you, Mr. Dietz?

5             MR. DIETZ:  Yes, Your Honor.

6             THE COURT:  Mr. Free and counsel, if everyone would

7   slide the microphones in so we can make sure we hear

8   everyone, that would be great.

9             Mr. Free, as we get started today, there are a

10  number of questions I need to go over with you.  So I am

11  going to ask my deputy to administer an oath.  You can keep

12  your seat, sir.

13            (The Defendant was duly sworn.)

14            MR. BABIK:  Please state your name for the record.

15            THE DEFENDANT:  Michael James Free.

16            MR. BABIK:  Thank you.

17            THE COURT:  Mr. Free, as we get started today,

18  there are several matters I want to confirm on the record.

19  Just to confirm, you are represented by a lawyer.  That

20  lawyer is Mr. Martin Dietz.  And Mr. Dietz is seated right

21  next to you at counsel table; is that correct, sir?

22            THE DEFENDANT:  That's correct.

23            THE COURT:  And Mr. Free, do you understand that

24  you're here in Federal court today for sentencing by this

25  Court?

1              THE DEFENDANT:  Yes, sir.  I do.

2              THE COURT:  And have you had enough time and

3    opportunity to talk about today's hearing in your case with

4    your lawyer, Mr. Dietz?

5              THE DEFENDANT:  Yes, Your Honor.

6              THE COURT:  And are you satisfied with the job that

7    Mr. Dietz has done for you as your lawyer?

8              THE DEFENDANT:  Yes, Your Honor.

9              THE COURT:  Okay.  Mr. Free, let me ask you this,

10   sir.  Are you now or in the recent past been under the care

11   of a doctor or psychiatrist, psychologist or therapist?

12             THE DEFENDANT:  Doctors.

13             THE COURT:  Okay.  Are you currently under the care

14   of a medical doctor?

15             THE DEFENDANT:  Yes, sir.

16             THE COURT:  Could you generally tell us the

17   situations that you're receiving medical care for?

18             THE DEFENDANT:  Your Honor, many years ago I was

19   hit by a drunk driver head on.  The young fellow that hit me

20   was killed instantly, and I got hurt very, very bad, wasn't

21   expected to live.

22             My knees were broken.  My right ankle was cut in

23   half.  But the main thing is my femur bone was broke at the

24   hip and came out my pelvis.  It broke my pelvis in half more

25   or less.  My pelvis is severely distorted, which prevents me

 1    from getting an artificial hip, which I need.  My left leg is

 2    four inches shorter.

 3            My -- also my right arm was severed.  Dr. Selim

 4    El-Attrache re-attached my arm for me.  I have a lot of

 5    problems with my hand and so on, but I'm lucky to have an

 6    arm.  And I'm in the American Medical Journal, by the way,

 7    for that.  I can move my fingers.

 8            I'm also in need of a right shoulder surgery.  I'm

 9    also in need of -- a severe hernia that I need to address, I

10    need to have taken care of.

11            Since I turned -- I had to drop my health insurance

12    a few years ago.  I couldn't afford it any more.  It got so

13    expensive, but now I'm eligible for Medicare.  So I can maybe

14    get some of these things taken care of.  The pelvis is a real

15    problem and so on.

16            I've also been seeing a urologist.

17            THE COURT:  Neurologist?

18            THE DEFENDANT:  Urologist.

19            THE COURT:  Urologist?

20            THE DEFENDANT:  Urologist, yes.  I think that's

21    probably about it.

22            THE COURT:  Okay.  I appreciate that, Mr. Free.

23    Let me ask you this, sir.  Are you taking any medicines or

24    medication for any of those things or anything else?

25            THE DEFENDANT:  Doctor -- I mean, Your Honor, when

1    I was in the hospital, I got addicted to morphine in the

2    hospital.  I was there for three and a half months.  And --

3                THE COURT:  This is at the time of the accident?

4                THE DEFENDANT:  After the accident, yes, sir.  I've

5    never used drugs.  I've never done anything.  I've never

6    smoked a cigarette or anything.  So I'm reluctant to take

7    anything.  I do take some Aleve and so on.

8                And sometimes doctors are reluctant, based on the

9    fact that I had an addiction to morphine that was prescribed

10   to me in the hospital -- I never purchased it outside of a

11   hospital or anything like that.  I was in -- but so sometimes

12   they're reluctant to prescribe any kind of medication.  They

13   tell me to just take some Aleve and do the best you can,

14   which I do.

15               THE COURT:  And Aleve is an over-the-counter

16   anti-inflammatory pain medication?

17               THE DEFENDANT:  Yes.  It seems to work the best for

18   me.  Yes, sir.

19               THE COURT:  Okay.  Let me ask you this, Mr. Free.

20   As a result of the situations that you've explained in some

21   detail, taking Aleve or anything else, is any of that causing

22   you today to have any difficulty at all in understanding

23   what's going on around you?

24               THE DEFENDANT:  No, Your Honor.

25               THE COURT:  Okay.  I appreciate that, Mr. Free.

1  Mr. Dietz, based on everything you know, do you have any

2  doubts as to Mr. Free's competence to participate in today's

3  hearing?

4          MR. DIETZ:  No, Your Honor.

5          THE COURT:  Okay.  Thank you, Mr. Dietz.

6  Mr. Wilson, based on everything you know, do you have any

7  doubts as to Mr. Free's competence to participate in today's

8  hearing?

9          MR. WILSON:  I have no basis to doubt his

10  competence, Your Honor.

11          THE COURT:  Thank you, Mr. Wilson.

12          Mr. Free, based on my personal observations here in

13  court, your answers to my questions, the information

14  available to the Court in the record, the representations of

15  your lawyer and the lawyer for the United States, I find that

16  you are competent to participate in today's proceedings.

17          While I'm quite confident all counsel carefully

18  reviewed the relevant matters that are in the court records

19  and on the docket of the Court, I'll highlight several of

20  them.

21          We're here today based on a Judgment and Remand

22  Order of the United States Court of Appeals for the Third

23  Circuit entered October 28, 2016, vacating the Court's prior

24  judgment of sentence and remanding the proceedings to this

25  Court for further proceedings consistent with the Court of

1    Appeals' opinion of that date.

2              Relative to sentencing, back on December 16, 2014,

3    a jury duly impaneled in this District at the conclusion of a

4    trial rendered verdicts of guilty on each of Counts 1 through

5    6 of the relevant charging document in this case, Counts 1

6    through 4 inclusive charging violations of Title 18 of the

7    United States Code, Sections 157 and 2; Count 5 charging a

8    violation of Title 18 of the United States Code, Section 152

9    Subsection 1 and Section 2 of Title 18; and Count 6 charging

10   a violation of Title 18 of the United States Code, Section

11   152 Subsection 2.

12             Thereafter, the Probation Department, which is

13   represented today by United States Probation Officer Stephen

14   Lowers, prepared and made available to all counsel and the

15   Court a presentence report on March 10, 2015, along with an

16   addendum to that report on March 31 of 2015.

17             Through counsel Mr. Free has filed position

18   statements relevant to sentencing on both July 13, 2015, and

19   then December 13, 2016, at the request of the Court after the

20   Remand Order from the Court of Appeals.

21             Mr. Wilson on behalf of the United States likewise

22   filed position statements relative to sentencing on July 13,

23   2015 and then again on December 28, 2016, also in response to

24   the directive of the Court.

25             The Court issued its tentative findings relative to

1    the initial sentencing proceeding on July 31, 2015.  The

2    Court issued tentative findings yesterday, January 25, 2017,

3    specifically related to today's sentencing hearing.

4          Mr. Wilson, sir, have you reviewed each of the

5    documents to which I've made reference?

6          MR. WILSON:  I have, Your Honor.

7          THE COURT:  And does the United States have any

8    objections to the matters stated in any of them?

9          MR. WILSON:  Are you referencing the Court's own

10   tentative findings?

11         THE COURT:  Including those, but anything else, the

12   presentence report, the addendum.

13         MR. WILSON:  Your Honor, I have a very, very minor

14   matter relative to the Court's tentative findings --

15         THE COURT:  Okay.  Happy to hear it, Mr. Wilson.

16         MR. WILSON:  At page 3 of Document 140, which is

17   the Court's most recent tentative findings, in the first full

18   paragraph on the page, the middle of the paragraph, the

19   sentence reads -- I'll wait for you to get there --

20         THE COURT:  I'm there.

21         MR. WILSON:  -- "the Court finds and concludes that

22   the Defendant purposely intended and sought to inflict

23   pecuniary harm in an amount of at least $400,000 on the

24   bankruptcy estate and ultimately the creditors," et cetera.

25         Your Honor, having read all of the Court's

1    tentative findings, I believe what the Court means is "of

2    more than $400,000."  And I reference 2B1.1(b)(1)(H) in that

3    regard.

4          All of the 2B1.1 dollar demarcations are relative

5    to more than a certain amount.  And I don't mean to be overly

6    picky here, Judge.  It's just that if it's left at $400,000,

7    I'm thinking of the record, and I don't want to afford a

8    foothold for an appellate issue that the Court didn't mean to

9    be there.

10         THE COURT:  I appreciate that, Mr. Wilson.  I'm

11   looking at -- and you're referencing Section 2B1.1, the loss

12   table contained at Subsection (b)(1) of that in the 2014

13   Guidelines Manual?

14         MR. WILSON:  Correct, Your Honor.

15         THE COURT:  And that appears on page 81 of the

16   purple 2014 Guidelines Manual.  I would -- based on all of

17   the tentative findings that are set forth in the specific

18   findings, including the finding that if the 2016 Guideline

19   Manual were applicable, the loss amount intended was of at

20   least $550,000, the Court corrects its tentative findings,

21   and on page 3 reflects that the amount of intended loss,

22   intended and sought to be inflicted in terms of pecuniary

23   harm, exceeded $400,000.

24         MR. WILSON:  Thank you, Your Honor.

25         THE COURT:  Anything else, Mr. Wilson?

```
 1              MR. WILSON:  Nothing.  Thank you.

 2              THE COURT:  Okay.  Mr. Dietz, have you reviewed

 3    each of the documents to which I've made reference, and have

 4    you reviewed each of them with your client, Mr. Free?

 5              MR. DIETZ:  I have, Your Honor.

 6              THE COURT:  Okay.  And Mr. Free, not that I doubt

 7    your lawyer, Mr. Dietz, at all, but just to confirm, have

 8    you, in fact, reviewed with your lawyer each of the documents

 9    I've made reference to, and in particular the presentence

10    report, the addendum to the presentence report and the

11    Court's tentative findings?

12              THE DEFENDANT:  Yes, Your Honor.

13              THE COURT:  Thank you, Mr. Free.

14              And Mr. Dietz, does the defense have any objection

15    to any of the matters set forth in the documents to which

16    I've made reference?

17              MR. DIETZ:  We do, Your Honor.  And I don't want to

18    rehash history because I think a lot of the issues -- our

19    objection is already preserved and litigated in the Third

20    Circuit, but we did have objections to the presentence

21    report.  We filed our objections.  You ruled on them.

22              More specifically, with respect to -- and as the

23    Court's aware, in the original tentative findings, we

24    objected to the loss amount, and we maintain our objection to

25    the loss amount today, Judge.
```

1          In the Court's tentative findings, I understand

2     that the Court has found that Mr. Free has intended a loss

3     of --

4          THE COURT:  Tentatively, subject to whatever --

5          MR. DIETZ:  Right, right.  Tentatively, but we do

6     object to those tentative findings with respect to the amount

7     of loss because we do still believe it's zero in this case.

8          Additionally, Judge, we -- even though this was a

9     tentative -- probably a tentative-tentative finding, with

10    respect to the end of the tentative findings, where the Court

11    indicated that even if the Court did find that the loss in

12    this case was zero, it believed that an upward departure

13    would be warranted in this case, and it would take with it

14    the advisory guideline range calculated by the Court.

15         We would -- just for purposes of right now, we

16    would object that an upward departure would be warranted if

17    that were the case.

18         THE COURT:  Understood, Mr. Dietz.  And we'll make

19    sure that we have an opportunity to hear from both you and

20    Mr. Wilson further in those regards later in the proceeding.

21         Let me ask a more precise question, Mr. Dietz.  And

22    I understand the objections that you've made to the Court's

23    calculation and use of the loss amount, the loss amount table

24    as set forth in the tentative findings.  We may hear more

25    from you on that.

1          You've objected to the Court's finding and
2    conclusion -- tentative finding and conclusion that if I
3    concluded that the loss amount should be treated as zero,
4    that the resulting advisory guideline range -- I've
5    tentatively noted in my belief that that would not be
6    sufficient to -- a sentence based on that would not be
7    sufficient to fulfill the purposes of sentencing.
8          Are there any factual matters recited in the
9    presentence report or otherwise of what happened that you
10   have an objection to at this time?
11         MR. DIETZ:  I don't believe so, Judge, subject to
12   any objections that I had previously made that were resolved.
13         THE COURT:  Okay.  That have already been resolved.
14         MR. DIETZ:  Yes. no additional objections.
15         THE COURT:  All right.  Are there any that -- so I
16   can make sure that I'm operating with the correct factual
17   premise, my belief at the moment in terms of the facts
18   reported in the presentence report of historical events
19   occurring, my understanding is that I can accept those as
20   being true.
21         The legal consequence of those historic facts were
22   the guts, if you will, of the Defendant's objections at the
23   first sentencing and perhaps today.  Is my understanding in
24   that regard correct?
25         MR. DIETZ:  That's correct, Judge.  I think -- and

1    I don't know if this helps or hurt, but I think, as we sit
2    here today, nothing has changed factually between the last
3    sentencing and today.  I don't know if that helps the Court.
4               THE COURT:  It helps.
5               MR. DIETZ:  That's my position.
6               THE COURT:  Okay.  That helps, Mr. Dietz.  What I
7    would ask is if during the course of the sentencing
8    proceeding there are particular facts as recited in the
9    presentence report, the addendum, the tentative findings of
10   the Court or anywhere else in the record that you believe are
11   inaccurate or the Court should not rely on, I'd ask you to
12   bring those specifically to the Court's attention so that I
13   can make sure that, one, I make some ruling, if one is
14   necessary or appropriate in that regard, and then, consistent
15   with any ruling that I make, that I give them the appropriate
16   weight and treatment in the context of the judgments to be
17   made today.  I appreciate that, Mr. Dietz.
18              I would confirm for the record that the sentencing
19   guidelines published and prepared by the United States
20   Sentencing Commission have by decisions of the Supreme Court
21   been declared to be advisory to the Court.  Among other
22   things, that means that those guidelines are no longer
23   mandatory, and a sentencing Court may not presume or take for
24   granted that the advisory guideline range or a particular
25   guideline sentence is reasonable in a specific case.

1          Therefore, the guidelines are not only no longer

2   mandatory, they're not presumed to be reasonable in a given

3   case.

4          Mr. Wilson and Mr. Dietz, the Court believes for

5   the reasons I've stated in the tentative findings in terms of

6   the mathematical calculation of the advisory guideline range

7   that the Court is obligated to consider and to utilize the

8   2014 Sentencing Guideline Manual -- is that correct,

9   Mr. Wilson?  Do you agree with that?

10          MR. WILSON:  I agree, Your Honor, and I would note

11   that my reference in my own submission to the Court about the

12   change in the guidelines was not consistent with Norwood, and

13   I yield to the Court's understanding in that regard.

14          THE COURT:  Okay.  Thank you, Mr. Wilson.

15          Mr. Dietz, do you agree that the operative

16   guideline manual for the arithmetical calculation of the

17   advisory guideline range and the consideration of application

18   notes and the like is the 2014 guideline manual?

19          MR. DIETZ:  I do, Your Honor.

20          THE COURT:  Mr. Wilson, for purposes of the Victim

21   Notification Act, are there any identifiable victims of the

22   crime for whom notice of today's hearing was required to be

23   given?  And if so, was such notice provided?

24          MR. WILSON:  Yes, Your Honor.

25          THE COURT:  Okay.  Thank you.  I would ask -- I

1    would make a public outcry in the courtroom.   Is there anyone

2    in the courtroom present today that is or is a representative

3    of a victim of the offenses of conviction here?

4              (No response.)

5              THE COURT:   The Court would note for the record

6    that in response to the Court's public outcry, there were no

7    such responses.

8              I would confirm for the record that I've reviewed

9    the complete file in this case.   That includes but is not

10   limited to the presentence report, the addendum, each and

11   every position statement submitted by the parties, the record

12   that was available to the Court based on the Court's being

13   the presiding judicial officer during the trial of the case,

14   the decisions of the United States Court of Appeals for the

15   Third Circuit, and the initial recommendation from the

16   probation office.

17             I would confirm and order, as I did at the first

18   sentencing hearing, pursuant to Federal Rule of Criminal

19   Procedure 32(e)(3) and the now applicable local rules of this

20   Court, that recommendation is not disclosed to counsel for

21   the United States or to the Defendant or his counsel.   But I

22   will confirm on the record, Mr. Free, and counsel, that I

23   have not considered and will not consider any factual or

24   legal matter that has not been disclosed to the Defendant and

25   to all counsel.

1          Mr. Wilson, does the United States have any motion

2     for a formal departure, as that term is used under the

3     sentencing guidelines?

4          MR. WILSON:  No, Your Honor.

5          THE COURT:  Mr. Dietz, does the Defendant have any

6     motion for a formal departure, as that term is used under the

7     sentencing guidelines?

8          MR. DIETZ:  No, Your Honor.

9          THE COURT:  Okay.  Mr. Wilson, based on the Court's

10    examination of the record, it does not appear that Congress

11    by statute has set any mandatory minimum term of imprisonment

12    as to any count of conviction in this case.  Do you believe

13    the Court's understanding is correct?

14         MR. WILSON:  Yes, Your Honor.

15         THE COURT:  Mr. Dietz, same question of you?

16         MR. DIETZ:  Yes, Your Honor.

17         THE COURT:  Okay.  Subject to the matters that may

18    be raised during the hearing today that would result in or

19    require a correction or amendment to them, the Court adopts

20    its tentative findings factually and as to the applicable

21    legal principles, subject to the arguments that will be made

22    by counsel today and hearing directly from Mr. Free during

23    allocution, and does likewise with the matters set forth in

24    the presentence report and the addendum.

25         At this time we'll hear from counsel regarding any

1   matters they want to bring to the Court's attention regarding

2   sentencing in this case.  We'll start with Mr. Dietz.

3          When Mr. Dietz tells me he's done, I'll then

4   address you personally and directly, Mr. Free.  That will be

5   your opportunity to tell the Court anything, absolutely

6   anything at all you want me to know or be aware of in making

7   any determination in this case.

8          We'll then make sure Mr. Dietz has any further

9   opportunity when you're done doing that.  And then I'll turn

10  to Mr. Wilson, and I'll hear from Mr. Wilson on behalf of the

11  United States, and we'll make sure that both Mr. Wilson and

12  Mr. Dietz have a full, final and complete opportunity to tell

13  the Court anything the Court should be aware of in terms of

14  sentencing.

15         So with that, Mr. Dietz, the floor is yours, sir.

16         MR. DIETZ:  Thank you, Your Honor.  Judge, at this

17  point I would just incorporate the position I previously

18  filed with respect to the sentencing factors, my memorandum

19  in aid of sentencing and the position statement that I

20  previously filed and any comments I made at the prior

21  sentencing.

22         Judge, in the tentative findings, the Court has

23  made a specific finding that Mr. Free intended to inflict

24  harm in the range of $400,000 to a million dollars by

25  concealing assets during the course of his bankruptcy case.

1    Judge, we don't agree with the Court.  I would like

2 to point out to the Court that originally Mr. Free filed a

3 bankruptcy petition under Chapter 13.  He was attempting to

4 reorganize.  That's what a Chapter 13 bankruptcy is.  I think

5 the record reflects that.  He wasn't seeking to discharge any

6 debt at that time.

7    And the jury verdict has spoken, and there's no

8 question that he did not disclose all his assets on his

9 original petitions.

10    I noted that in its tentative findings the Court

11 referenced the fact that on the original petitions Mr. Free

12 listed about $600,000 in debt.  And that's true, that the

13 overwhelming majority of that debt was based on mortgages he

14 had on the two properties.

15    What's interesting, Judge, he also listed assets of

16 a value of $1.6 million.  So even on that initial -- his

17 initial filings, he listed assets that were about a million

18 dollars in excess of the debts.

19    Shortly after he filed bankruptcy, the issues --

20 there was a settlement between the trustee and S&T Bank, and

21 those properties were removed from the bankruptcy.  So that

22 left about half a million dollars worth of assets, about

23 $70,000 worth of debt.

24    THE COURT:  How much in assets, Mr. Dietz?

25    MR. DIETZ:  Just around a half a million dollars

1   worth of assets.

2         And then, as the jury verdict reflects, I think

3   beginning around March of 2011, Mr. Free engaged in a manner

4   of conduct that concealed assets from the Bankruptcy Court.

5         This Court has made a finding that the assets -- by

6   virtue of the fact that he concealed these assets, he was

7   intending to cause pecuniary harm to the creditors.  And

8   Judge, I would point out the obvious that I probably beat

9   with a dead horse, every creditor was paid in this case.  So

10  we're not even talking about actual loss any more.

11        With respect to the harm to creditors, Judge, we

12  have a situation where Mr. Free prepares and files petitions,

13  lists his debts, lists his creditors, and I still submit,

14  Judge, from day one, there was no risk that his creditors

15  were not getting paid.

16        Regardless of whether you take the $600,000 worth

17  of debt or lowered that after those properties were settled

18  out of the Bankruptcy Court, there was still never any risk

19  that they wouldn't get paid.

20        Judge, I would submit by virtue of the fact that he

21  disclosed $250,000 worth of guns, some of which were sold,

22  that his intent -- and disclosing $250,000 worth of guns,

23  plus the property, knowing that there's only $70,000 worth of

24  debt left, was not to cause any pecuniary harm to a creditor.

25        THE COURT:  Let me ask you this, Mr. Dietz.  Along

1   those lines and I suspect some other lines that were laid out

2   in your sentencing memo, going back and rereading Feldman and

3   rereading Feldman in the context of Judge Fuentes' opinion in

4   this case, and what I've reflected in the tentative findings,

5   is that in Feldman, Judge Becker writing for the Court of

6   Appeals said that the inference of the intent to cause harm,

7   pecuniary harm, could be drawn from in that case at least two

8   and possibly a third factor:

9        One, what Judge Becker described as the large

10  amount of assets which were concealed, which I believe were

11  considerably less than the value here, but what he viewed as

12  a large amount, coupled with the fact that the bankrupt

13  debtor did not disclose two Jaguar automobiles, which tied in

14  with Mr. Feldman's explanation in his case that the reason

15  the assets were not disclosed was his belief that they were

16  exempt from the bankruptcy proceedings; and Judge Becker said

17  that Judge Kaufmann, who was the sentencing Judge in Feldman,

18  drew a permissible inference that the intention to cause

19  pecuniary harm could be drawn from the coupling of the large

20  amount of assets concealed and the fact the assets concealed

21  included two things that by no stretch came within the

22  explanation offered by Mr. Feldman, that is, what I didn't

23  disclose didn't have to be disclosed because it was exempt.

24       And then, although Judge Becker did not expressly

25  state it in Feldman, he then in some footnotes and elsewhere

1  in the opinion appears -- and I draw the inference that one

2  of the other things the Court was speaking of in Feldman is

3  that there appeared to be no factual or legal basis for

4  Mr. Feldman or anybody else to think that any of the assets

5  were exempt.  So it was sort of like the explanation didn't

6  hold water, if you will.

7           In this case, taking the numbers that you've laid

8  on the table as being correct, Mr. Free nonetheless concealed

9  under any standard, but certainly under the Feldman standard

10  from this Court's position, a large number of assets.

11          He then continued to do so, and I guess -- I don't

12  know whether this is allegorical or metaphorical to the

13  Jaguars in Feldman, after the trustee on the record reads

14  Mr. Free the riot act, if you will, and confirms the law, I

15  think I believe I said figuratively and literally that he

16  could not convert any of the assets, Mr. Free, as the jury

17  found beyond a reasonable doubt, continued to conceal the

18  assets.

19          And he sold assets, which I've indicated in the

20  tentative findings I believe leads to the inference that no

21  matter how mathematically and logically correct your

22  statement is, once that happened, he set on a course to take

23  absolutely no chances that he would forfeit control of his

24  assets.

25          And for the reasons that I've noted, based on

1    Trustee Walsh's testimony, I believe he said it was by a
2    factor of 15 if my recollection is correct, that the expenses
3    of the administration of the estate here soared, Mr. Free
4    intended to take no chances.

5            And the natural and probable consequence of that,
6    whether it actually occurred or not, was that the creditors
7    would be harmed; and Judge Fuentes in the case here directed
8    me, I believe, to also consider the gain to Mr. Free and that
9    no matter the mathematical ratios that you've identified
10   between then-existing debts and then-existing assets,
11   particularly after Mr. Walsh issued the stern, unequivocal
12   on-the-record warning, Mr. Free continued on.

13           And isn't that a basis from which the Court can and
14   should draw the fairly strong inference he intended to hurt
15   whoever needed to be hurt so long as he got to keep his
16   property, particularly the historic firearms?  And beyond
17   that and separately and distinctly, under what Judge Fuentes
18   has said in this case, relying on Feldman, that he intended
19   to cause that gain to himself in those valuations?  I mean
20   isn't that the inference?

21           MR. DIETZ:  Judge, if I may --

22           THE COURT:  Absolutely.  The floor is yours.

23           MR. DIETZ:  -- I view gain as I read these opinions
24   -- the trouble I have with just saying, hey, any time a
25   bankruptcy debtor conceals assets, he's trying to gain.  I

1    would submit that any bankruptcy debtor concealing any asset

2    is trying to gain something by that concealment.

3            So I think the Third Circuit's opinion in our case

4    says, hey, we can't just say that somebody concealing assets

5    is intending a loss --

6            THE COURT:  Agreed.

7            MR. DIETZ:  The one thing about -- I mean for

8    example, at the time Mr. Free is concealing assets, there's

9    only $70,000 worth of debt -- creditors in the bankruptcy

10   statement.  At the time he's doing that, there's only $70,000

11   out there.

12           So the question becomes -- and I'm going to break

13   them down.  I'm going to break it down as opposed to the

14   intended loss because the way I view it, if he knows he owes

15   $70,000 to the creditors, and he's claimed a half a million

16   dollars worth of assets, they're listed, twenty-some guns are

17   listed there, and he's concealing other assets, I don't

18   believe he's intending to cause any pecuniary harm to the

19   creditors because in his mind I have enough assets out there

20   to pay them back.

21           Now, I think as far as intended loss goes, I think

22   he intends the loss --

23           THE COURT:  I'm not disagreeing that that is an

24   inference, but there is nothing on the record as to what is

25   in Mr. Free's mind, and I do not say that in contradiction of

1    the critical portions of the Fifth Amendment.  You're saying

2    I should draw that inference, but it also relies to a degree

3    on a fact not in the evidentiary record, that is, what

4    Mr. Free's thinking was.

5              MR. DIETZ:  And I --

6              THE COURT:  I understand that.

7              MR. DIETZ:  This courthouse has fielded many, many

8    hearings based on intent.  That's for sure.  But I still

9    don't believe the record shows that he intended to defraud

10   his creditors, the $70,000 worth out there.

11             Now, gain, I'll concede gain is a little trickier.

12   It is a little trickier because I think you could make the

13   argument that any time anybody conceals an asset, they're

14   trying to derive some gain from that.  Is it a financial

15   gain?  I don't know, number one.

16             I don't -- and again, we don't know what's in

17   Mr. Free's head.  Or was it a desire to maintain his

18   priceless heirlooms?  I don't know the answer to that.

19   There's property involved also as well.  But --

20             THE COURT:  Well, let me stop you just on that

21   point.  Isn't it true that it could -- on the record now

22   before the Court, it could be both?

23             Certainly from the magnitude and precision with

24   which Mr. Free had accumulated and maintained his collection,

25   a fair inference is that his having that collection was of

1   some -- more a tangible benefit to him.  It was something

2   important to him, just as somebody that might choose to

3   collect coins, and other people may choose to collect other

4   items that are generally described as collectibles.

5           But isn't it also true that there's evidence in the

6   record of direct pecuniary gain in that Mr. Free sold for

7   cash a number of the concealed assets?

8           So beyond the emotional or psychic value of having

9   this really almost historic collection of firearms, there's

10  record evidence of conduct here of deriving direct pecuniary

11  gain and a desire to do that, as evidenced by his

12  post-warning, post-admonition sale of firearms that had not

13  yet been disclosed?  So isn't there evidence in the record of

14  both?

15          MR. DIETZ:  Well, I think that -- candidly there

16  may be, but I believe -- there's an additional step.  We're

17  talking about gain.

18          I believe there should be some link between that

19  gain causing a detriment to the creditors.  Even if he were

20  intending to achieve some sort of gain by concealing those

21  assets, I don't believe that gain caused any detriment to his

22  creditors.

23          THE COURT:  Under that theory, Mr. Dietz, though,

24  wouldn't the prosecution have to necessarily wait until the

25  final, conclusive termination of a bankruptcy proceeding,

1  because until it is done, ribbon tied, snugged up, we don't

2  know for sure in any case more broadly speaking -- now, based

3  on Trustee Walsh's testimony, which the Court found to be

4  credible, this case was exceptional in his experience in that

5  the energy devoted to administration and, therefore, the cost

6  of administration in some ways was growing like top seed,

7  derived in large measure from the conduct of Mr. Free?

8         So no one should be sanguined -- no matter the --

9  at any moment in time the ratio between debts and

10 liabilities, no reasonable person should have been sanguined

11 that the concealed assets wouldn't be necessary for the

12 trustee and for the creditors because until this case was

13 done, particularly given this concealing and duplicitous

14 activity, there could be no confidence of that.

15        And that's why the observation I made in the

16 tentative findings -- and I appreciate your reaction to it

17 and Mr. Wilson's when it's his turn -- that what became

18 clear -- would seem to be clear to the Court based on the

19 record testimony, the findings of the jury and all of the

20 other matters properly in the record, is that Mr. Free had

21 set about a course of conduct that, among other things, had

22 as its goal taking absolutely no chances.

23        And if that meant that the natural and probable

24 consequence of his conduct carried out was the creditors

25 could be left upside-down or the trustee's expenses unpaid,

1    that's the way the cookie crumbled.

2          MR. DIETZ:  I don't view it that way because -- and

3    the only reason is because the value of the creditors' claims

4    was so low.  By the time he's playing games with the trustee,

5    we're talking about $70,000 at this point.  And the trustee

6    had assets sufficient enough to pay those creditors.

7          THE COURT:  Doesn't that go to the impossibility

8    phraseology that's used in the intended loss, that it doesn't

9    matter if the loss is either improbable or even impossible?

10          MR. DIETZ:  Well, I don't think it applies in that

11    context.  I think that that area of law is basically designed

12    for somebody who thinks they can commit a fraud for a hundred

13    million dollars, sets it into place maybe to defraud a bank

14    or something like that.  And there's evidence that we clearly

15    intended to defraud this bank of $100 million, and they end

16    up getting $2 million.

17          I think in that case, because it would have been

18    impossible to get the $100 million, if they were intended to

19    obtain $100 million, I think it applies in that context.  I

20    don't think that --

21          THE COURT:  What if the bank or the rich person

22    doesn't have $100 million and the person wants to get $100

23    million, and it turns out that all the blood in the turnip,

24    if you will, is $2 million?  The fact that they were wrong,

25    that the victim of the trickster or, as Judge Fuentes said,

1    the fraudster, didn't have the money, doesn't really go to

2    intent.  It goes to whether they could have pulled it off;

3    doesn't it?

4              MR. DIETZ:  Well, if the intent was to obtain the

5    $100 million, I think it would go to intent.  The other

6    issue here --

7              THE COURT:  Well isn't the intent in that case to

8    get all you can?

9              MR. DIETZ:  Possibly.  My example was focused on

10   $100 million --

11             THE COURT:  Understood.

12             MR. DIETZ:  In that context, I would agree with the

13   Court.  But the one thing we know for sure in this case, we

14   know what the creditor debt was.  We know what that was.

15   There is -- there was no impossibility here.  There wasn't --

16   this isn't -- I mean we knew --

17             THE COURT:  But the cost of administration gets put

18   into the estate.  So whether it's the creditors or the cost

19   of administration, the assets are exposed to the final

20   reconciliation of the estate, which is the discharge of the

21   debts and the payments to the creditors and all of the

22   approved costs of administration which, if I recall, ran into

23   several hundreds of thousands of dollars here.

24             MR. DIETZ:  Right.  And the problem with that, and

25   what truly makes this case unique, is those expenses weren't

1  even cognizable until they discovered the concealment, and

2  those expenses only occurred after the concealment.  So I

3  don't think they would be reasonably foreseeable at that

4  point, but --

5            THE COURT:  I'm not so sure.

6            MR. DIETZ:  There's no question they occurred.

7            THE COURT:  And I understand that, Mr. Dietz.  And

8  noted -- and certainly this goes for Mr. Wilson also.  This

9  is a complex case factually and legally.  And no apologies

10  are needed either in advance or retrospectively from you or

11  Mr. Wilson for laying out the examples to go through this.

12            But it does seem to me that it's not unreasonable

13  for the law and the Court to conclude that if we have a

14  situation in which assets substantially exceed creditor debt,

15  and then somebody begins a campaign of chicanery, as I've

16  described it in the tentative findings, that not unexpectedly

17  at all it drives up the cost of administration, which is a

18  cost that can be and should be resolved through the

19  disposition of assets, that, in fact, if their fraud is

20  propelling those costs of administration skyward, if

21  anything, it increases the likelihood that those assets will

22  be necessary, that the stated assets will not be sufficient,

23  and that the concealed assets are now even more at risk.

24            So I'm not sure it resolves the question in a

25  Defendant's favor on intended loss to observe as a factual

1    matter that at a moment in time the debts were considerably

2    lower than the assets, a campaign of fraud begins, which

3    drives up costs chargeable against the assets akin to debt,

4    to say, well, you know, that was all after the fact.

5            I'm not saying you say it lightly or blithely

6    because I think, if anything, that shows a basis to conclude

7    there's even more urgency to conceal the assets because now

8    maybe there was a five percent chance they're at risk.

9            The more I conceal them and the more, you know,

10   sort of somebody that gets into criminal conduct and then

11   keeps on going, that the trustees' costs are accelerating,

12   which are chargeable against the assets, the same as a debt

13   for resolution of an estate, and drives the intent to further

14   conceal the assets, because now rather than being five

15   percent at risk, they're 25 percent at risk, 32 percent at

16   risk, and as we propel forward, the likelihood of them being

17   on the table gets higher; doesn't it?

18           MR. DIETZ:  Oh, absolutely.  Absolutely.  The -- I

19   guess one of the ironies in this case is that Mr. Free's

20   conduct after it was discovered ultimately funded the rest of

21   the administration as well.  I mean for what little this was

22   worth, there was no loss to anybody in this bankruptcy, even

23   with respect to the expenses of the administration.

24   Everything is paid.

25           THE COURT:  And I believe I've made the tentative

1   finding in the last footnote that it appears that after

2   everything's cashed out, there's still leftovers?

3            MR. DIETZ:  And one of the things I would like to

4   point out at this point, too, Your Honor, I mean I realize

5   this is probably more testimony than anything else, but out

6   of that $640,000 that was raised from the sale of those guns,

7   a substantial part of that money will be returned to

8   Mr. Free, and I only bring that up because it won't be used

9   for anything -- any bankruptcy expenses.

10            THE COURT:  It's part of the leftover.

11            MR. DIETZ:  Yeah.  It's the leftover; and at this

12   juncture, I mean I know that there are at least four

13   attorneys that aren't creditors of the bankruptcy estate that

14   are going to be paid out of that as well.  So --

15            THE COURT:  And based on the record before the

16   Court, I'm not -- it's not surprising that you would report

17   that, Mr. Dietz.

18            MR. DIETZ:  That's all I have, Your Honor.

19            THE COURT:  Okay.  I appreciate that, Mr. Dietz.

20   And we'll make sure you have a further opportunity to the

21   extent you believe it appropriate, and I sincerely mean that,

22   to say anything else.

23            Mr. Free, sir, I'll now address you personally and

24   directly.  This is your opportunity without limitation to

25   tell me anything, absolutely anything at all you want me to

1   know or be aware of relative to you or your case.  And the
2   floor is yours, Mr. Free.

3             THE DEFENDANT:  Your Honor, you can ask me any
4   questions you would like, and I would be glad to answer them.

5             I do have a few little things to say.  You know, my
6   problem is I want to retry the case and argue the case, which
7   is a moot point I guess at this point I guess.

8             But I would like to say, Your Honor, that I
9   recognize that I had made many, many mistakes.  And through
10  my past I may not be a very credible person to make the next
11  statement, but I have had plenty of time to reflect on all
12  this.  This bankruptcy and stuff has been going on for seven
13  years.  That's a long time.  So I have reflected on this, and
14  I am truly sorry for my conduct.

15            I never meant -- I swear to God, right hand to
16  God -- I never meant to hurt anybody, to conceal -- to not
17  pay anybody.

18            Judge, the only reason I filed bankruptcy, a lawyer
19  told me -- he said you can save this Monroeville property
20  that I've been paying on for 18 years.  And S&T came in, took
21  over Irwin Savings Bank, and they immediately started to
22  foreclose without even asking me a question.  Can we
23  refinance this?  Can we do anything?  No.  They just wanted
24  to foreclose on it.

25            So this attorney in Greensburg, Dave Colecchia,

1    told me you can file bankruptcy, and it will stop all that.

2    I was not bankrupt.  I could pay my debts and things.

3            I know I've offended this Court and other courts

4    and the U.S. Government.  And like I said, my goal in filing

5    bankruptcy and my only goal was to save a piece of property

6    that I had been paying on for 18 years.

7            I have very few creditors.  As a matter of fact, I

8    only had one creditor in a store that I owed money -- a

9    manufacturer that I owed money to and so on.  It was -- the

10   whole thing was to save the Monroeville property, and that's

11   the only reason I filed bankruptcy on the attorney's advice.

12           I'm not an attorney.  I'm not a smart guy.  I don't

13   even have a college education.  I'm just a hard working guy.

14           I've never taken Social Security -- I mean I've

15   never taken disability, and I'm entitled to it.  I've never

16   taken any Welfare or anything.  I've worked every day of my

17   life, and I've worked hard.  Nobody gave me anything.  I

18   didn't inherit anything.  I worked hard to get everything

19   that I obtained.

20           And unfortunately, through my actions and things,

21   I've lost almost everything.  I've lost my -- I appreciate

22   your comment on the extremely rare firearms and historical

23   firearms, which they were, no doubt about it.  They were some

24   of the rarest ones in the world that I was able to obtain.

25   And then I've lost most of my friends.

1        You know, I'm not a well person.  I have a lot of

2   security problems.  It hurts me to walk into the courtroom.

3   But yet, I come to this proceeding, and I've come to almost

4   every bankruptcy proceeding.

5        All I really wanted to do in to life was collect

6   antique firearms.  And I have a business selling firearms, it

7   was a business to buy and sell firearms, which I did.  Both

8   of these dreams are gone.  However I've run my life and my

9   store, that's gone.

10       I recognize the fact that this has cost in excess

11  of $1 million, and most of it is my fault.  I take full

12  responsibility for my actions.  And I'm truly sorry for my

13  actions, which I hope you believe me.

14       And I know I don't have much credibility I guess,

15  but I never, ever -- I said this to Mr. Colecchia the first

16  day I met with him, I said if I owe anybody money, I want to

17  pay them immediately.

18       And after the first sale the creditors were paid.

19  We had enough money to pay the creditors and so on.

20       Mr. Walsh has made over a half a million dollars.

21  Mr. Walsh doesn't want this to end.  It's been going on for

22  seven years.  This is ludicrous for it to go on this long,

23  and it's still going on.

24       Hopefully we're going to resolve this this year.

25  All of the -- we have enough money.  There's going to be some

1  excess money and things.

2         But also, Judge, if I'm incarcerated, I'm going to

3  lose the rest of my holdings, the little bit of property.  My

4  own home and stuff will be sheriff's sold.  It's a very, very

5  tough situation for me.

6         Instead of being in prison, I would like to be in a

7  hospital getting some of this medical care that I need

8  desperately and things.  If I'm in prison, I'm going to have

9  a really tough time.  No doubt about it.  I'm not saying I

10  don't deserve it.  I probably do I guess.

11         But I'm just throwing myself on the mercy of the

12  Court.  I'm not a bad guy.  I'm not a violent person.  I

13  never even raised my voice.  I don't have a temper.  I just

14  made a number of mistakes, Your Honor, and for that I

15  apologize.

16         I think that's all, Your Honor.  But I do take

17  responsibility for my actions.  I made a lot of mistakes, no

18  doubt about it.

19         THE COURT:  Thank you, Mr. Free.

20         THE DEFENDANT:  Mr. Dietz is going to have to tell

21  me to shut up --

22         THE COURT:  No.  Feel free to talk with Mr. Dietz.

23         (Private conference between Defendant and Mr.

24  Dietz.)

25         THE COURT:  Mr. Free?

1        THE DEFENDANT:  I think that's all, Your Honor.

2   Thank you very much.  If you have any questions, feel free to

3   ask me.  I'd be glad to answer them for you.

4        THE COURT:  I don't at the moment, Mr. Free, but I

5   appreciate the comments very much.

6        Mr. Dietz, before I turn to Mr. Wilson, is there

7   anything else you'd like to say at the moment?  I will make

8   sure you have a further opportunity.

9        MR. DIETZ:  No, Your Honor.

10        THE COURT:  Thank you, Mr. Dietz.  Thank you,

11   Mr. Free.

12        Mr. Wilson, sir?  The Court's pleased to hear from

13   you on behalf of the United States of America.

14        MR. WILSON:  Thank you, Your Honor.  A couple of

15   things.  I'll be brief.

16        THE COURT:  Take the time you need.

17        MR. WILSON:  Mr. Dietz, as he has throughout this

18   proceeding, talks about what we know relative to assets and

19   liabilities.

20        As to the stream of the bankruptcy proceeding, the

21   record before this Court is absolutely empty as to what the

22   Defendant knew at any point in time.  We have not a single

23   fact of record beyond the petitions themselves --

24        THE COURT:  The first -- the very first --

25        MR. WILSON:  -- that's right.  As to what the

1   Defendant knew or intended or what was in his mind,

2   particularly with regard to what Mr. Dietz has repeatedly

3   described as the $70,000 versus the pile of assets.  We don't

4   know if that was ever made known to him or not.  The record

5   is simply empty in that regard.  We know nothing.

6          Contrast that, Your Honor, which requires at least

7   a certain degree of speculation, with what is absolutely

8   known.  And by that I mean this.

9          If you look to first the issue of pecuniary loss or

10  pecuniary gain, the record is abundantly clear that the

11  Defendant had an immediate pecuniary gain in the course of

12  the bankruptcy of several hundred thousand dollars from the

13  firearms that the Government documented that he sold during

14  the pendency of the bankruptcy proceeding.

15         That's of the record, and the Court referenced

16  those numbers in its tentative findings and conclusions.

17  There's no speculation about that.

18         THE COURT:  Mr. Wilson, if I could ask you a

19  question about the gain -- and I alluded to it in the

20  tentative findings -- I didn't allude to it.  I said it.

21         I read Judge Fuentes' opinion in this case, and I

22  read Judge Becker's opinion in Feldman.  And each is, in the

23  Court's estimation, unequivocal and clear that in the

24  bankruptcy concealment context, in terms of intended loss,

25  I'm to look at intended pecuniary loss or intended pecuniary

1  gain.

2          What I'm about to say is not meant to be the least

3  bit critical of the Judges on the Court of Appeals.  I didn't

4  read either opinion as making a reference to the application

5  notes to 2B1.1, which seemed to indicate that I am to -- as a

6  Judge is to look at the concept of gain in those

7  circumstances where there's a finding of an actual loss,

8  coupled with an inability, due to complexity or other

9  matters, to come to any precise conclusion as to the

10  pecuniary loss.

11          In that case in essence pecuniary gain becomes a

12  proxy.  That limitation is not referenced in Feldman or in

13  the Court of Appeals' opinion in this case.  What, if

14  anything, does the United States think I should make of that?

15          MR. WILSON:  Very little, Your Honor, for this

16  reason.  I think the Court has alternative hooks on which you

17  can hang your robe relative to your decision in these

18  matters.

19          Pecuniary gain is explicit.  It's in the record.

20  The Court referenced it in the tentative findings in terms of

21  the repurchase of estate assets, and, as it were, a kind of

22  churning going on within the bankruptcy process, which the

23  Defendant clearly knew was impermissible.

24          The Court -- this Court may recall that the

25  Bankruptcy Court asked him repeatedly where did you get this

1   money?

2              THE COURT:   Friends and relatives.

3              MR. WILSON:   And he lied to the Judge repeatedly;

4   multiple inquiries by the Court.  So that in terms of record

5   findings for purposes of gain, there's no speculation at all.

6   There's at least the several hundred thousand dollar figure

7   that the Government cited to the Court previously and that

8   the Court has included in its tentative findings and

9   conclusions.

10              As to the pecuniary loss, I don't want to rehearse

11   all the arguments and discussions that we've had, but I'll

12   reference the Court to your own findings, again, at page 3.

13              But to me, Your Honor, you dispose of the issue in

14   a concise and straightforward way when you say "the credible

15   evidence in the record is that the Defendant knew at the time

16   of his repeated concealment of those assets and his

17   diversionary tactics regarding them that he would go to and

18   intended to go to any necessary length to protect his

19   concealed assets from any possibility of trustee

20   liquidation."

21              Your Honor, Feldman didn't change the law.  Loss

22   was either actual loss or intended loss.

23              The Court and Mr. Dietz just a few moments ago had

24   a discussion about the administrative costs and, well, what

25   could we have speculated about regarding whether or not these

1   other assets might actually have been needed to handle
2   administrative costs or creditors that might appear later on
3   in the process that were not contemplated when Mr. Dietz was
4   talking about the $70,000 and the pile of assets?

5          Your Honor, you don't need to speculate on that
6   either.  Here it became a situation where Trustee Walsh had
7   to have an auction of firearms to acquire more cash to handle
8   administrative costs and so forth.  So the very scenario
9   which the Court posits in some regard as hypothetical took
10  place here.  That happened.

11         Trustee Walsh had to liquidate assets way beyond
12  what were necessary apparently to satisfy creditor requests
13  or requirements.  So there's no speculation there either.
14  That took place.

15         I respectfully suggest, however, Your Honor, that
16  with regard both to pecuniary gain and pecuniary loss, those
17  issues, while real and tangible and ascertainable for
18  purposes of the Court's findings, in the very clear and
19  concise manner in which you set them forth, should be
20  secondary to what I think is the principal offense here, and
21  that is this Defendant's ungarnished and unrelenting
22  mendacity to both the Bankruptcy Court and this Court, to
23  Trustee Walsh and to his creditors.

24         That at all times when given the opportunity by the
25  judicial process to step forward and say, yes, there are

1  additional assets, when the deputy sheriffs from Westmoreland
2  County are there, there are 50-some more guns in a room in
3  the house he could have taken them to.

4         Nope.  You're not going to get them if you don't
5  find them.  That's the attitude and perspective Mr. Free
6  brought to this entire process.

7         And I appreciate the fact that today he talks to
8  the Court in terms of his good faith and his mistakes.  I'm
9  always a little leery of the use of the word mistakes to
10 cover deliberate and purposeful conduct.

11        But I understand what Mr. Free is saying.  It's
12 just that -- and perhaps it's simply because I've been an
13 officer of the Court for too long -- when you are told by a
14 Bankruptcy Court Judge to give the Court an inventory and an
15 accounting of any assets of the estate that you've sold, and
16 you come in under oath and say I don't need to give you an
17 accounting because no assets have been sold, and that day and
18 the day thereafter you're depositing checks from guns that
19 you've sold over the Internet, I find that to be an enormous
20 affront to the Court, one that is sufficient in and of itself
21 in the manner that I addressed in the memorandum that I gave
22 to the Court.

23        And I believe that the Circuit indicated repeatedly
24 in its most recent opinion, I think Judge Fuentes invited
25 this Court to make a finding relative to the Defendant's

1   nonmonetary conduct as a sufficient basis in and of itself
2   for a very substantial sentence.

3          That, Your Honor, is the grievance against the
4   process that the Government asks the Court to address in
5   whatever sentence the Court fashions as the appropriate
6   sentence in this case.

7          THE COURT:  Thank you very much, Mr. Wilson.
8   Mr. Wilson, if I could ask you a couple of questions, and I
9   may be asking similar questions to Mr. Dietz.

10          At the time of the first sentencing in this case,
11   the Court did not include in its judgment of sentence the
12   imposition of a fine.  Under the guidelines, as I understand
13   them, under either of the guideline manuals, the Court is
14   directed to impose a fine unless, among other things, the
15   Court concludes that a Defendant is not in a position to pay
16   a fine.

17          I believe what I articulated on the record at the
18   first sentencing was that I would not impose a fine, as I
19   believed there was a meaningful risk that the imposition of a
20   fine would require the liquidation of assets, which may have
21   been contrary to the interests of the administration of the
22   bankruptcy estate, the interests of creditors, costs of
23   administration.  So the judgment of sentence at the original
24   sentencing in this case did not include an imposition of a
25   fine.

1          I've not requested any updated information in terms

2     of the financial provisions of the presentence report.  Is

3     there anything you can put on the record or advise the Court

4     of regarding that issue?

5          MR. WILSON:  Only two very brief observations, Your

6     Honor.  One is it has been more or less the posture of the

7     defense throughout the trial and continuing up to today that

8     Mr. Free has plenty of assets to handle all the matters

9     relative to the bankruptcy estate with plenty left over.

10          So in terms of a fine in that sense, I don't

11     dispute what the defense has consistently represented.

12          Secondly, as the Court is well aware, there are

13     still many, many firearms in the possession of the FBI.  And

14     certainly a portion of those could be liquidated to satisfy

15     any fine that the Court might impose.

16          And I don't know the mechanism, but I know -- I

17     have raised the subject very briefly with Trustee Walsh, and

18     Trustee Walsh has indicated to me that can happen with the

19     appropriate Court Order, that assets of the estate can be

20     liquidated to satisfy a criminal fine under Title 18.

21          I would also note, Your Honor, the Defendant's

22     remark that Mr. Walsh doesn't want this case to end is very

23     much contrary to my interaction with Mr. Walsh, who assures

24     me repeatedly and consistently that there's nothing more that

25     he would like than for this case to end.

```
 1              THE COURT:  Thank you, Mr. Wilson.
 2              Mr. Dietz, sir, is there anything that you'd like
 3  -- and I don't mean to suggest the answer should be no.  It's
 4  a sincere question.  Is there anything else at all that you'd
 5  like to bring to the Court's attention or present?
 6              MR. DIETZ:  Just briefly --
 7              THE COURT:  Take the time you need.
 8              MR. DIETZ:  One thing I would like to point out is
 9  that when Mr. Free did sell guns that were not disclosed to
10  the bankruptcy trustee, one interesting fact is the proceeds
11  from the sale went back into the bankruptcy estate.
12              THE COURT:  Well, they weren't a donation.
13              MR. DIETZ:  But my point is this.  They did go --
14  instead of taking the money and hiding with it, he did at
15  least infuse it into the bankruptcy estate for the trustee to
16  use to pay off other debts.  He did get assets for it.
17              THE COURT:  The net worth of the estate didn't
18  change.  It was money in, property out.  I agree that the
19  cash column on the estate's balance sheet would have
20  increased by the amount of cash, that some noncash tangible
21  asset came out.  He went shopping at the estate rather than
22  at Macy's.
23              MR. DIETZ:  That's right.  And -- I mean if he
24  would have went to Macy's, I think that might even have been
25  a little more egregious.
```

1    But secondly, Judge, with respect to a fine, I
2  don't think the circumstances have changed.  His -- at the
3  risk of -- I don't want to offend my client, but his house
4  has even been described by agents as it's not in very good
5  shape.  His commercial property is dilapidated and run down.
6  He's not operating out of there.

7    He has used cars.  I know that.  The guns are
8  there.  No one knows what the value of those guns are.  They
9  are the less valuable of the guns that were in his
10  collection.  So from our perspective, nothing's changed in
11  his financial condition since the date of the last
12  sentencing.

13    THE COURT:  I appreciate that, Mr. Dietz.  Mr.
14  Dietz, I'll ask you this, and then I'll ask Mr. Wilson.  Is
15  there any representation that you can comfortably make on the
16  record as to the status of the closure of the bankruptcy
17  estate?

18    MR. DIETZ:  Judge, I'm one of those lawyers that
19  has a claim on the surplus.  So nobody wants it to be
20  resolved quicker than I do, and I'm on his bankruptcy lawyer
21  all the time for the status.

22    The only thing that is holding the bankruptcy
23  estate up now is when they sold these ten firearms, tax
24  returns needed to be filed.  Some of these firearms are so
25  old, Mr. Free bought them so long ago that he didn't have

1   documentation as to what the purchase price was --

2           THE COURT:  The basis.

3           MR. DIETZ:  The basis, right.  They've been

4   negotiating with the IRS and the Commonwealth of

5   Pennsylvania.  The IRS right around Christmastime issued a

6   letter saying we're going to accept the tax return as filed.

7           The only outstanding issue is they're negotiating

8   with the Commonwealth of Pennsylvania right now.  I can tell

9   you as of about two weeks ago a Court Order was filed.

10  They're hoping to have this resolved in March.

11          THE COURT:  Okay.  That's helpful, Mr. Dietz.  I

12  appreciate that.

13          MR. DIETZ:  So --

14          THE COURT:  That's helpful.  Very helpful.  I

15  appreciate that.

16          Mr. Wilson, anything you can add on that point or

17  anything else you would like to bring to the Court's

18  attention?

19          MR. WILSON:  Nothing.  Thank you, Your Honor.

20          THE COURT:  Okay.  I note that it's about five

21  minutes after three.  I would like to take a brief recess.

22  Let's plan on resuming at approximately 3:15.

23          Mr. Babik, if you'd recess the Court until

24  approximately 3:15.

25          MR. BABIK:  All rise.

1           (A recess was taken at 3:05 p.m.)

2           (3:24 p.m., in open court:)

3           THE COURT:  Please be seated, everyone.  We're back

4    on the record.  The Defendant, Mr. Free, is present

5    represented by counsel.  Mr. Wilson is present on behalf of

6    the United States of America.

7           Mr. Dietz, sir, is there anything further you'd

8    like to bring to the Court's attention?

9           MR. DIETZ:  No, Your Honor.

10          THE COURT:  Thank you, Mr. Dietz.  Mr. Wilson, same

11   question of you, sir?

12          MR. WILSON:  Nothing.  Thank you, Your Honor.

13          THE COURT:  Thank you, too, Mr. Wilson.  Just to

14   confirm for the record, these matters are set forth in the

15   Court's tentative findings, which the Court adopts as

16   corrected earlier in today's hearing.

17          There are six counts of conviction in this case.

18   They are grouped pursuant to the applicable grouping

19   provisions of the advisory guidelines.

20          The Court finds that the base offense level is 6,

21   that there are two adjustments, one for the conduct occurring

22   in the course of a bankruptcy proceeding, which is an upward

23   adjustment of two levels, and then an upward adjustment

24   totaling 14 levels based on the intended loss amount in this

25   case; or alternatively, separately and distinctly based on

1    the direction of the Court of Appeals in both its decision in

2    this case and in the Feldman case that I'm to separately and

3    distinctly consider the intended gain to the Defendant, I

4    find that they fall within the same range for purposes of the

5    2014 guidelines manual in an amount greater than $400,000 but

6    not in excess of one million dollars.

7          For the reasons that I've stated in the tentative

8    findings, I believe there is without any doubt that the

9    intended -- that the pecuniary value of the intended loss to

10   the bankruptcy estate and creditors fell within the range

11   that I've just stated, and the intended pecuniary gain to the

12   Defendant also and likewise fell within that range.

13         If the loss table from the 2016 Guideline Manual

14   were applicable, there would be in the Court's estimation the

15   same upward adjustment because it would be in an amount in

16   excess of $550,000 but not exceeding $1,500,000.

17         I make those specific findings for all of the

18   reasons that are set forth in the tentative findings.

19         In addition, I would note, as I noted in a footnote

20   note to the tentative findings, to the extent as a matter of

21   logic, and there is to a degree some language in the Feldman

22   opinion that could be read as capping the intended loss, not

23   the intended gain, but the intended loss at the amount of the

24   debt, the Court would note based on the credible evidence

25   that's in the record before the Court, that both the amount

1    of the debt at its highest and with the requisite evidentiary

2    standard, the amount of debt plus administrative expenses,

3    the Court finds by at least a preponderance of the evidence

4    in either case falls within that same range.

5            So for those reasons, the reasons stated in the

6    tentative findings and the specific findings I've already

7    made and am going to amplify on the record, I find that that

8    loss table adjustment is the appropriate one.

9            That yields a total offense level of 22.

10   Mr. Free's reported criminal history places him at criminal

11   history category 1.  It places the matter in Zone D of the

12   sentencing table.

13           The applicable advisory guidelines provide for a

14   recommended or advised range of imprisonment of 41 to 51

15   months.  Probation is authorized by statute of a term of at

16   least one year and not greater than five years, and each of

17   these are per count of conviction.

18           Probation is not recommended under the advisory

19   guidelines.  The Court is authorized to impose a term of

20   supervised release of not more than three years.

21           The maximum statutory fine is $250,000 per count of

22   conviction.  The advisory guidelines advise a fine in the

23   range of $7,500 to $75,000.

24           Restitution and forfeiture, as those terms are used

25   for sentencing purposes, appear not to be applicable in this

1    case.   Do you agree, Mr. Wilson?

2              MR. WILSON:   I do, Your Honor.

3              THE COURT:   Do you agree, Mr. Dietz?

4              MR. DIETZ:   Yes, Your Honor.

5              THE COURT:   And there is a special assessment of

6    $100 per count of conviction for a total of $600 in this

7    case.

8              The Court makes -- or amplifies the findings as

9    already made in the record as follows:   I find that Mr. Free,

10   the Defendant in this case, intended to inflict pecuniary

11   harm on the bankruptcy estate and ultimately the creditors by

12   any means that he could take, as evidenced by his conduct in

13   this case regarding the concealment of assets and his false

14   statements as found in this case.

15             I base that conclusion principally on the lack of

16   any evidence to the contrary, but beyond that, and perhaps

17   more singularly, the volume of the assets that were

18   concealed, the persistency of the efforts to conceal those

19   assets and to deceive the Bankruptcy Court and the trustee

20   even after clear, unequivocal and direct admonitions from the

21   bankruptcy trustee and the Bankruptcy Court.

22             The Court would also note, given the multiplication

23   of the costs of the bankruptcy administration, which were

24   accelerated principally, if not exclusively, by Mr. Free's

25   conduct in this case, be a natural and probable consequence

1  of the concealment, was an ever-increasing risk of harm to

2  the bankruptcy estate and to the creditors.

3  Irrespective of the ultimate reconciliation of the

4  books, if you will, nobody in Mr. Free's shoes should have

5  had any confidence or taken any comfort that the concealment

6  of the assets and his disposition of concealed assets in

7  exchange for currency would not have an impact on the

8  creditors and on the bankrupt estate.

9  No matter what the original differential was

10  between the assets and the debts or what counsel for Mr. Free

11  has reported, and I'm not doubting what counsel said, might

12  have been an intermediate variation and differential with

13  assets exceeding the debts, the bankruptcy expenses, the

14  administration of the bankruptcy estate, also would have been

15  a call against the assets of the estate properly payable from

16  them.

17  And particularly in light of the fact that

18  Mr. Free's conduct involving his persistent concealment of

19  the assets, conversion of the assets for his own benefit, and

20  similar conduct multiplied the administration and the

21  necessary expenses of administration, to the degree

22  Mr. Free's sentencing argument is based in whole or in part

23  on a degree of illogic that he could have ever intended there

24  to be a pecuniary harm, I find and conclude almost to the

25  opposite.

1            Given that Mr. Free's conduct was as persistent and

2    pervasive and consistent as it was, it demonstrated a clear

3    and profound intention to do whatever it took to make sure

4    the assets he held most dear were never exposed to the risk

5    of liquidation and that, as the bankruptcy continued, the

6    risk that they could be exposed to such liquidation, in fact,

7    increased on this record at the same time Mr. Free's efforts

8    in those regards were accelerated.

9            So for those reasons, which are consistent with the

10   decision of the Court of Appeals in Feldman, the direction of

11   the application notes to the relevant provisions of the

12   sentencing guidelines manual, I find and specifically

13   conclude that Mr. Free intended to inflict pecuniary harm on

14   the bankruptcy estate and, through the estate, the creditors

15   and anybody else that would have had a call on his assets

16   through that and out of that process in the range that I've

17   specifically found for the upward adjustment of 14 levels.

18           Separately and distinctly, consistent with the

19   opinion of the Court of Appeals in this case and what this

20   Court believes the Court held in Feldman, I believe that

21   there is evidence, not only by a preponderance of the

22   evidence, but by at least clear and convincing evidence, that

23   it was Mr. Free's intention to generate a direct pecuniary

24   gain to himself from the concealment of the assets and his

25   conduct in the administration of the bankruptcy estate with

1   his false statements to the trustee and to the Bankruptcy
2   Court.

3          First, there's considerable record evidence of an
4   actual, direct pecuniary gain to Mr. Free from his conduct.
5   He concealed portions of -- considerable portions of his
6   historic firearm collection, and then after being directly
7   told by the trustee that under no circumstances should he
8   sell or convert any of those assets, he did exactly that.  It
9   generated a considerable amount of cash, and that generated
10  an actual gain in currency.

11         However, beyond that, what the record has made
12  crystal clear to the Court in this case, it is the historic
13  nature of the firearms that were part and parcel of
14  Mr. Free's collection, which was plainly near and dear to
15  him, which was of considerable, considerable direct economic
16  value.

17         And the concealment, for instance, of the
18  considerable cache of firearms from the Westmoreland County
19  Sheriffs in a separate room within Mr. Free's house was a
20  direct effort to get, and, until it was discovered, actually
21  achieve a direct pecuniary gain by diverting from the control
22  of the bankruptcy trustee for the benefit of the estate items
23  of considerable and substantial monetary and pecuniary value.

24         They're substantial.  They're significant as
25  demonstrated by the auction of ten of the most valuable of

1 | firearms here.

2 |      Mr. Free had a direct, actual pecuniary gain

3 | resulting not only from the currency that he received from

4 | the post-admonition sales, but by his retention until the

5 | eleventh hour and their discovery of a considerable historic

6 | firearm collection, of the valuation based on the record

7 | evidence of this case, that places it at least squarely

8 | within the range that I've noted.

9 |      In addition, it appears from the record, and the

10 | Court finds by at least a preponderance of the evidence, that

11 | Mr. Free intended to and, in fact, achieved an actual

12 | pecuniary gain by using money from the sales of some of those

13 | firearms, which were directly contrary to the directions of

14 | the bankruptcy trustee, to then gain to himself out of the

15 | bankruptcy estate assets that otherwise would have been under

16 | the control of the trustee, by using the money from the sale

17 | of things he wasn't allowed to sell in order to buy things

18 | from the estate itself that obviously were of importance to

19 | him.

20 |      He in essence used purloined money.  It was money

21 | that was under the control and dominion under the law and

22 | factually of the bankruptcy trustee in order to gain for

23 | himself things of actual pecuniary value, namely the items

24 | that he purchased.

25 |      So separately and distinctly under Feldman and in

1    the Court of Appeals' decision in this case, beyond the

2    intent to inflict pecuniary harm I've noted above, I find by

3    clear and convincing evidence that he intended to have a

4    direct pecuniary actual gain to himself, and to a degree he

5    achieved that gain.

6         All in, the Court concludes with a high degree of

7    certainty, certainly to a preponderance of the evidence

8    level, but as to the gain by clear and convincing evidence,

9    that the loss amount of in excess of $400,000 up to and

10   including $1 million is at least the appropriate loss

11   calculation figure in this case.

12        Further, I would note to the extent as a matter of

13   logic if, under the Feldman opinion, there is in essence a

14   stop loss at the amount of the debts and expenses of

15   administration, it would appear that that amount falls within

16   that range also.

17        So the Court believes that that finding does not

18   only generate and is virtually compelled by the record here,

19   but falls within whatever constraints may exist on an upper

20   limit to that amount under at least one reading of the

21   Feldman opinion.

22        Mr. Free, I make the following additional findings

23   in this case.  I really wish there was another way to say

24   this, Mr. Free, and be accurate.  But in thinking about the

25   case, I can't come up with one.

1          You received a fair, clear, plain English warning
2     from the bankruptcy trustee in this case and then ultimately
3     the bankruptcy Judge as to what you were and weren't allowed
4     to do.  By any measure it was clear beyond all doubt.

5          You then engaged in a course of conduct that was
6     marked by your blatant deception and your disregard for those
7     directions.  You violated the Court Orders.

8          As I've noted in the Court's tentative findings, I
9     independently conclude that there would be a basis for a
10    further upward sentencing departure under the law and under
11    the sentencing notes.  I'm not applying that departure in
12    your case.  I'm considering it as part of the overall
13    sentencing factors.

14         You engaged in persistent efforts to evade your
15    obligations, which were made known to you clearly.  You
16    engaged in concealment and deception after you received fair
17    warning.

18         Coupled with the volume of the concealment, there's
19    a strong and the Court draws the inference of your intent to
20    inflict and cause harm to the bankruptcy estate and
21    creditors, and you well and truly knew, as any reasonable
22    person would, of the natural and probably consequences of
23    your conduct, and plainly you intended to engage in a
24    direct -- to achieve a direct pecuniary gain from your
25    conduct.

1         So I specifically make those findings for the

2   reasons I've stated on the record.

3         Mr. Free, in setting your sentence and any sentence

4   in Federal court, the Sentencing Reform Act, which is a

5   statute passed by Congress and signed into law by the

6   President, says that I'm to consider all of the information

7   that properly comes before the Court, and I've done so.

8         I'm to consider the nature and circumstances of the

9   offenses of conviction, as set forth in the records before

10  the Court.

11        I'm to consider your history and characteristics as

12  set forth in the presentence report and the addendum.  This

13  includes your family and personal history and data, physical

14  condition, mental and emotional health, educational and

15  vocational skills along with your employment record.

16        Ultimately, Mr. Free, in your case and in every

17  other that appears in this court, it's the obligation of the

18  Court to set a sentence that is sufficient but not greater

19  than necessary to comply with the purposes of sentencing.

20  I'll now state how each applies in this case.

21        The first is to reflect the seriousness of the

22  offenses of conviction.  For the reasons I've stated,

23  Mr. Free, and some I'm going to state, your conduct was of a

24  high level of seriousness.  It was intended to cause harm.

25  It was intended to and in actuality for a period of time

1 │ achieve a gain for you.

2 │        It's to your credit, and it's the nature and
3 │ circumstances of the offense, as the Court's noted in the
4 │ tentative findings, it does not involve physical violence or
5 │ threats of physical violence to others.

6 │        What your conduct did do, however, is do violence
7 │ to the system of justice that we have in the United States.
8 │ People are expected to come into court and tell the truth.
9 │ People interacting with the Government are expected to tell
10 │ the truth.  You can't be compelled to talk.  But if you do
11 │ speak, you have to tell the truth.  And why is that?

12 │        .  We have almost 325 million people that live in this
13 │ country.  We're a big, vibrant, bursting society and economy.
14 │ We rely every day on people telling the truth.  When it comes
15 │ to the legal system, that's all we have to go on.

16 │        As I indicated at the first sentencing, we in
17 │ essence don't have a cavalry that rides around and verifies
18 │ what people tell Judges or bankruptcy trustees or judicial
19 │ officers.  We have to rely on the truth.  Otherwise, the
20 │ system breaks down.  We can't operate.

21 │        And the hallmark of our republic is the rule of
22 │ law.  And the rule of law turns on the truth.

23 │        So it's to your credit that it's not an offense
24 │ that involves physical violence or threats of physical
25 │ violence, but it does do violence to the glue that holds much

1   of our society and our legal system together.

2          The second purpose of sentencing, Mr. Free, is to

3   promote respect for the law.  This one in the Court's

4   estimation cuts both ways in your case.

5          You come to Federal court as someone who's of some

6   years.  Hopefully you have a lot of them left, but you're not

7   a young, young person.  You don't have a criminal record of

8   any consequence to the Court.

9          You had one thing that happened when you were a

10  teenager that, based on the Court's reading of the record,

11  sounded like kind of a dumb thing that kids do.  It didn't

12  cause harm or violence of any consequence.  But you come to

13  the Court with a clean record.

14         You were a licensed federal firearms dealer for a

15  number of years.  That's not an easy status to obtain or to

16  keep.  It required you to abide by the law.  And all of that

17  is to your credit, Mr. Free.  And I don't mean to downplay it

18  by stating it that way.  It is to your credit.

19         On the flip side of the same coin is your counts of

20  conviction have at their core failure to respect the legal

21  system, to respect the law, to respect the authority of the

22  Bankruptcy Court and the trustee.  So that's a big deal, but

23  it does, as I've noted, for reasons stated, cut in your

24  direction to a degree.

25         Any sentence is to provide just and sound

1    punishment for the offenses.  The Court believes the sentence
2    as imposed will do that.

3              The fourth purpose of sentencing is to adequately
4    deter you and others in society from engaging in similar or
5    other criminal conduct.

6              Mr. Free, I think that to a large measure we can
7    all hope and, therefore, believe that past is prologue.  The
8    fact that no matter how dramatic this episode was, the rest
9    of your life was law abiding, that whatever you believed
10   would be the outcome when you began this bankruptcy process,
11   I would like to believe that you never envisioned yourself
12   sitting in the chair you're sitting in today.

13             I would also like to believe that you're not a risk
14   of engaging in similar conduct in the future, at least not
15   much of one.

16             It's always a bit of an open question I believe to
17   any Judge to have any sense of the degree to which a sentence
18   in a particular case deters others from being tempted to
19   engage in the same conduct.

20             In your case, because it goes to the system of
21   justice we have, I do believe that part of the sentencing in
22   your case, maybe more than in many other cases, does relate
23   to the necessity to deter others from being tempted to engage
24   in the same conduct for the reasons that I've stated.

25             I'm to consider the now advisory sentencing

1   guidelines and the applicable policy statements and

2   sentencing factors.

3          Mr. Free, I've concluded that the advisory

4   guideline sentence in this case, which is 41 to 51 months in

5   prison, would result in a sentence that is greater than

6   necessary to fulfill the purposes of sentencing in your case,

7   particularly in light of your personal history.

8          I am not saying it's not the correct application or

9   calculation of the advisory guidelines.  But I believe all of

10  the purposes of sentencing in this case can be met and

11  fulfilled with a sentence that is not at the level

12  recommended by the now-advisory guidelines.

13         I'm to consider the types and kinds of sentences

14  that are available, as I've indicated, by statute.  Both

15  incarceration and probation are available to the Court.

16         I conclude that if I don't include a period of

17  custody with the United States Bureau of Prisons, I would

18  fail as the Judge to set a sentence that fulfills the

19  purposes of sentencing.  So from the Court's estimation, a

20  probationary or non-custody sentence would fail to fulfill

21  those purposes.

22         The next purpose of sentencing is to protect the

23  public from the commission of further crimes by you.  I've

24  indicated at least what the Court's hopes are in regard to

25  your conduct down the line.

1      While not a direct purpose of the sentence, I am to

2   consider the need for any educational and vocational

3   training, medical care or other correctional treatment in the

4   most effective manner.

5      I will make a specific recommendation to the United

6   States Bureau of Prisons that you be placed at a facility

7   that provides the requisite level of medical care to be able

8   to address the afflictions to which you've noted, which were

9   reflected in the presentence report.

10      I'm to avoid in any sentence any undue or unjust

11   disparities in the sentence imposed in your case or in the

12   case of others who engage in similar conduct.

13      Mr. Free, it's the Court's fundamental obligation

14   to provide for a sentence that is sufficient but not greater

15   than necessary, which means the Court will set a sentence

16   that in the Court's judgment fulfills the purposes of

17   sentencing as described, but then goes no further.

18      Any sentence imposed must relate specifically to

19   you and to your situation and conduct.

20      The Court incorporates all the findings it's

21   previously made on the record.  The Court appreciates your

22   statements in open court today, Mr. Free.  I take them as

23   being sincere.  I take them as being direct.

24      I also would be less than candid with you if I also

25   didn't believe they reflected to a degree the fact that to

1    this very day I'm not sure you understand the seriousness or

2    the consequences of the conduct you engaged in, particularly

3    the idea that the bankruptcy trustee here, the implication of

4    it, that somehow there was an effort to expand or to prolong

5    this case.

6          I think the uncontradicted evidentiary record here,

7    Mr. Free, is it was your conduct that caused this case to

8    take on the size, the magnitude, the length, the complexity

9    that we have before us.  Otherwise, it would have been a

10    relatively rapidly administered bankrupt estate.

11          Based on all the matters before the Court,

12    Mr. Free, the Court finds and concludes that the following

13    sentence is appropriate as being sufficient but not greater

14    than necessary to fulfill the purposes of sentencing as I've

15    set forth and under the applicable law.

16          The sentence of the Court is concurrent as to each

17    count of conviction.  That means the sentence runs at the

18    same time rather than one after the other.  I find that that

19    is consistent with the Sentencing Reform Act and with the

20    sentencing guidelines.

21          Mr. Free, it is the sentence of the Court that you

22    be sentenced as follows:  Concurrent as to each of Counts 1

23    through 6 of conviction in this case, that you be remanded to

24    the custody of the United States Bureau of Prisons for a term

25    of custody and imprisonment of 24 months.

1    The Court will impose a fine because the Court
2    finds that an imposition of fine does not pose a risk to the
3    administration of the bankruptcy estate, to the payment of
4    legitimate claims against the bankruptcy estate or to the
5    creditors.  The Court will impose a fine in the amount of
6    $35,000.

7    Restitution and forfeiture are not applicable in
8    your case.  There is a mandatory special assessment totaling
9    $600.

10   You will be placed on a term of supervised release,
11   Mr. Free, of three years to run concurrently at each count.
12   That supervised release will come with a number of
13   conditions, rules and regulations that I'm going to go over
14   in a moment.

15   You'll be obligated while on supervised release to
16   follow each of those rules, regulations and conditions.
17   Should you not do so, that is, if you violate any of them,
18   that could be brought to the Court's attention.

19   The Court could be asked to revoke your supervised
20   release.  If your supervised release were revoked, you could
21   be sent back to Federal prison, and you would not receive any
22   credit for time you had already served on supervised release.
23   So it is essential, sir, that you abide by each of the
24   conditions of supervised release.

25   Within 72 hours after your release from custody of

1 | the Bureau of Prisons, you're to report in person to the
2 | probation office in the district to which you're released.
3 |      While on supervised release, you're going to have
4 | to comply with all of the standard conditions of supervision
5 | recommended by the Sentencing Commission or adopted by the
6 | Court.
7 |      In addition, you cannot commit any Federal, State
8 | or local crime.  You cannot illegally possess any controlled
9 | substance.  You cannot possess any firearm, ammunition,
10 | destructive device or dangerous weapon.
11 |      You have to provide the probation officers with
12 | access to any requested financial records or information and
13 | cooperate in the collection of DNA as directed.
14 |      I will waive, that is, not apply the periodic drug
15 | testing requirement mandated by the Violent Crime Control and
16 | Law Enforcement Act.  Your offense here is not drug related,
17 | and you have no current or past history of substance abuse
18 | that's relevant to the Court in sentencing.
19 |      I will require that you comply as a condition of
20 | supervised release with all directions and orders of the
21 | United States Bankruptcy Court for the Western District of
22 | Pennsylvania or any other Bankruptcy Court or District Court
23 | in which you have proceedings related in any way to your
24 | bankruptcy, along with all directions and orders of the
25 | trustee that may be appointed or who has responsibility for

1  any of those proceedings.

2       I am going to impose, given the nature of the

3  bankruptcy assets which were concealed here and the fact that

4  as a result of your felony conviction and as a condition of

5  supervised release, that you cannot possess any firearms,

6  ammunitions, destructive devices or other dangerous weapons.

7       I'm going to impose as a condition of supervised

8  release based on the specific facts, circumstances and nature

9  of the offense of conviction and of the assets involved here

10  a search condition.  You will be required to submit your

11  person, property, house, residence, vehicle, papers, business

12  or place of employment to a search conducted by the probation

13  office at any reasonable time in any reasonable manner based

14  on a reasonable suspicion of the presence of contraband or

15  other evidence of a violation of a condition of supervision.

16       Your failure to submit to such a search could in

17  and of itself be grounds for revocation.  You have to tell

18  other people who could be located at those locations that the

19  locations may be subject to searches pursuant to that

20  condition.

21       Mr. Free, I find that the sentence as imposed

22  fulfills the purposes of sentencing under the 3553(a)

23  factors, that it is sufficient but also not greater than

24  necessary to fulfill those purposes of sentencing.

25       I find that in the specific circumstances of the

1    case, principally the circumstances of you as an individual,

2    Mr. Free, as opposed to the seriousness of the offense, but a

3    sentence within the advisory guidelines is not necessary to

4    fulfill the purposes of sentencing.  I believe the deterrence

5    effects of the sentence will be fulfilled both as to you and

6    by others in society by a sentence of 24 months in Federal

7    prison with all of the other penalties and conditions which

8    have been applied.

9           Mr. Lowers, is there anything regarding the Court's

10   oral pronouncement of sentence that you believe needs

11   corrected, clarified or amended?

12          MR. LOWERS:  No, Your Honor.

13          THE COURT:  Thank you, Mr. Lowers.

14          Mr. Wilson, on behalf of the United States, I'll

15   ask you the same question.  Is there anything regarding the

16   Court's oral pronouncement of sentence that you believe needs

17   to be clarified, amended or corrected?  And secondly, does

18   the United States have any objection to the procedural

19   reasonableness of the sentence as imposed?

20          MR. WILSON:  I have no objections, Your Honor, and

21   I don't believe there's anything that needs to be further

22   clarified.

23          THE COURT:  Thank you, Mr. Wilson.  Mr. Dietz, sir,

24   the same two questions for you on behalf of Mr. Free?

25          MR. DIETZ:  My only comment, Your Honor, would be

1  that subject to any objections that I made on the record, we

2  have no further objections.

3          THE COURT:  Okay.  I appreciate that, Mr. Dietz.

4          Mr. Free, you have the right to appeal from all of

5  the orders of this Court, the judgment of guilt that's been

6  entered, the sentence that's been imposed by the Court.

7          Mr. Free, you have the right to be represented by a

8  lawyer in any appeal.  If you cannot afford a lawyer for an

9  appeal, one would be appointed for you at no cost to you.  Do

10  you understand that, sir?

11          THE DEFENDANT:  Yes, Your Honor.

12          THE COURT:  Mr. Free, if you can't afford to pay

13  the filing fees for an appeal, the Court will forgive you or

14  waive a payment of those filing fees.  Do you understand

15  that?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  Mr. Free, if you can't afford certified

18  copies of any necessary court records for an appeal, they'll

19  be furnished to you at no expense to you and instead at the

20  expense of the Federal Government.  Do you understand that?

21          THE DEFENDANT:  Yes, Your Honor.

22          THE COURT:  Mr. Free, I advise you if you do want

23  to appeal, you must do that, that is, appeal within 14 days

24  of today.  If you do not appeal within 14 days of today, you

25  would lose any rights to an appeal that you have.  Do you

1   understand that, sir?

2            THE DEFENDANT:  Yes, Your Honor.

3            THE COURT:  Okay.  And lastly, Mr. Free, I advise

4   you if you would request it, the Clerk of our Court here in

5   Pittsburgh would prepare and file a notice of appeal on your

6   behalf.  Do you understand that, sir?

7            THE DEFENDANT:  Yeah.  I would like to request

8   that.

9            THE COURT:  Okay.  So you're asking on the record

10  that the Clerk of our Court here in Pittsburgh prepare and

11  file a notice of appeal on your behalf?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  Okay.  Mr. Babik, I direct that you do

14  that.

15           Mr. Free, I will advise you that ordinarily there

16  is a fee to file a notice of appeal.  I believe that that fee

17  totals $505.  As I've stated earlier, if you can't afford to

18  pay the necessary filing fees for an appeal, they'll be

19  waived.  They'll be forgiven.

20           For that to happen, you have to file an appropriate

21  financial affidavit with the Court that reflects that you're

22  not in a position to pay that.  So we will take and note your

23  request that an appeal be filed.  I will direct our Clerk

24  file the notice of appeal.

25           If you believe you cannot pay the filing fees for

1    that appeal, you're going to have to prepare and put on the

2    record the affidavit and declaration that confirms why you

3    can't pay those fees.  But that's separate.  We're going to

4    take your direction that you want an appeal to be filed, and

5    we'll take that up.

6         Mr. Dietz, is there anything you want to say in

7    those regards?

8         MR. DIETZ:  No, Your Honor.

9         THE COURT:  Okay.  So Mr. Babik, I direct that you

10   file a notice of appeal on Mr. Free's behalf.

11        Mr. Dietz, sir, is there anything else that you

12   would like to bring to the Court's attention or that you

13   believe we need to take up today?

14        MR. DIETZ:  Your Honor, the only thing that I would

15   ask is that Mr. Free's bond be continued pending designation.

16        THE COURT:  On all of the existing conditions of

17   release?

18        MR. DIETZ:  Correct, Your Honor.

19        THE COURT:  Okay.  Anything else besides that?

20        MR. DIETZ:  No, Your Honor.

21        THE COURT:  Okay.  We'll come back to that in a

22   minute.

23        Mr. Wilson, sir, is there anything else the United

24   States believes the Court should take up today in addition to

25   stating whatever position you have relative to Mr. Dietz's

1   request?

2           MR. WILSON:  Nothing else, Your Honor, to bring to

3   the Court's attention.

4           THE COURT:  Okay.  Does the United States have a

5   position regarding allowing Mr. Free to self-report as

6   designated by the United States Bureau of Prisons?

7           MR. WILSON:  I have no objection to self-reporting,

8   Your Honor.

9           THE COURT:  Okay.  I --

10          MR. WILSON:  I do have -- should the matter arise,

11  the Government would object to bond pending appeal, but --

12          THE COURT:  If that comes up.

13          MR. WILSON:  Yes.

14          THE COURT:  Okay.  And certainly you reserve the

15  rights of the United States in that regard, as does Mr.

16  Dietz, should that circumstance arise.

17          Mr. Dietz, do you have any reason to believe that

18  Mr. Free has not been in full compliance with his terms and

19  conditions of release?

20          MR. DIETZ:  No, Judge.  I believe he has.  He's

21  remained in this area.  He's known this day's been coming for

22  a while, and I see no reason why --

23          THE COURT:  Mr. Wilson, has information come to

24  your attention that would indicate that Mr. Free poses some

25  significant risk of either flight or of harm to others or the

1  community?

2         MR. WILSON:  No, Your Honor.

3         THE COURT:  Okay.  Mr. Free, your lawyer, Mr.

4  Dietz, has requested that I allow you to remain on bond on

5  the conditions of release that you have now.  As you know

6  from the original sentencing in this case, in a few weeks

7  you'll receive a written communication from the Bureau of

8  Prisons directing you when and where to report.

9         If I grant your lawyer's request and allow you to

10  self-report, you at your expense, own expense, will have to

11  appear exactly when and where the Bureau of Prisons tells you

12  to do that.  Do you understand that, sir?

13         THE DEFENDANT:  I do, but previously, Your Honor,

14  we asked that I be incarcerated in Morgantown, West Virginia.

15         MR. DIETZ:  Judge, I'll come back to that.

16         THE COURT:  We'll come back to that.  We're taking

17  the issues one at a time.  Right now you understand --

18         THE DEFENDANT:  I do, sir --

19         THE COURT:  -- that I can't tell the Bureau of

20  Prisons where you should go, that I can make a

21  recommendation, and we'll talk about that in a minute.  But

22  the Bureau of Prisons isn't required by law to follow that

23  recommendation.  So for instance, it's possible the Bureau of

24  Prisons could direct that you appear and report in a distant

25  state, for instance, Alabama.  I'm just picking one out of

1   the air.

2            So if you self-report, and they say you're going to

3   Alabama, you're going to have to get there on your own on

4   your own dime no later than the date and time they tell you.

5   Do you understand that, sir?

6            THE DEFENDANT:  I do, Your Honor.

7            THE COURT:  Okay.  And Mr. Free, do you understand

8   if I grant your lawyer's motion, you have to abide by all of

9   the rules and regulations that are now in place regarding

10  your bond, that if you fail to appear as directed, either for

11  imposition of sentence or otherwise directed by the Court,

12  that would be treated as a violation of your bond.  Your bond

13  would be revoked.  You could be taken into custody

14  immediately, and in addition, you could be charged with an

15  additional federal crime over and above the ones you've been

16  convicted of, which would carry very substantial penalties

17  over and above the sentence that was imposed today.  Do you

18  understand that?

19           THE DEFENDANT:  I do, Your Honor.

20           THE COURT:  Okay.  Do I have your personal word,

21  Mr. Free, you're going to appear for execution of sentence,

22  that is, as directed by the Bureau of Prisons or otherwise by

23  the Court?

24           THE DEFENDANT:  Yes, Your Honor.

25           THE COURT:  Okay.  The Court finds by the requisite

1  evidentiary standard that it is appropriate to continue

2  Mr. Free's bond pending his reporting to the Bureau of

3  Prisons on all of the existing terms and conditions of

4  release.

5          Mr. Free, I'll authorize your self-report.  I will

6  also put in a sentencing judgment that you're to report to

7  the U.S. Marshal's Office on the second floor of this

8  building not later than noon, March 15, 2017, unless prior to

9  that you have been told otherwise by the Bureau of Prisons.

10  If you have been, you're to follow the directions you receive

11  from the Bureau of Prisons.

12          But if we get to March 15, 2017, and you haven't

13  gotten instructions from the Bureau of Prisons, then by noon

14  that day you're to report to the Marshal's office on the

15  second floor of this building.  Do you understand that, sir?

16          THE DEFENDANT:  Report in what manner?  For

17  incarceration at that point?

18          THE COURT:  Yes.

19          THE DEFENDANT:  Okay.  Now I understand.  Okay.

20  Yes, Your Honor.

21          THE COURT:  So if you haven't heard from the Bureau

22  of Prisons come March 15, at noon that day you report to the

23  Marshal's Office in this building.  They'll take you into

24  custody, and you'll be transmitted to the Bureau of Prisons.

25          However, if prior to that date, the Bureau of

 1    Prisons tells you to report to a certain location on a

 2    certain date, whatever it is, you're to follow the direction

 3    of the Bureau of Prisons.  Do you understand that, sir?

 4              THE DEFENDANT:  Yes, Your Honor.

 5              THE COURT:  Okay.  So bond and conditions of

 6    release pending designation by the Bureau of Prisons will be

 7    in place, and Mr. Free will be permitted to self-report.

 8              Mr. Dietz, sir, other matters that we should take

 9    up while we're here?

10              MR. DIETZ:  Just, Your Honor, I would just ask that

11    the Court -- as the Court already pointed out, Mr. Free knows

12    the Court can't bind the Bureau of Prisons, but if the Court

13    can make the recommendation that he serve his time at FCI

14    Morgantown, that would be appreciated.

15              THE COURT:  Mr. Wilson, does the United States have

16    any objection to the Court making that written

17    recommendation?

18              MR. WILSON:  I do not, Your Honor.

19              THE COURT:  I will make that written

20    recommendation, Mr. Dietz.  Mr. Free, as we've indicated,

21    those determinations are made by the Bureau of Prisons.  They

22    consider a number of factors.  But given the proximity to

23    your home here in Western Pennsylvania, the Court believes it

24    is an appropriate recommendation to make to the Bureau of

25    Prisons, and I will make that.

1          Mr. Dietz, sir, other matters that we should take

2     up while we're here?

3          MR. DIETZ:  No, Your Honor.

4          THE COURT:  Mr. Wilson, sir, other matters we

5     should take up while we're here today?

6          MR. WILSON:  Nothing.  Thank you, Your Honor.

7          THE COURT:  Mr. Lowers, sir, any other matters on

8     behalf of the Probation Office that you believe we should

9     address or take up while we're in court?

10          MR. LOWERS:  No, Your Honor.

11          THE COURT:  Thank you, Mr. Lowers.

12          Mr. Babik, do you have everything you need, sir?

13          MR. BABIK:  I do, Judge.

14          THE COURT:  Mr. Babik, sir, you may adjourn the

15     Court.  Thank you, Counsel.  I wish you luck, Mr. Free.

16     Thank you, Miss Rowe.

17          (Proceedings were concluded at 4:03 p.m.)

18                    -  -  -

19                C E R T I F I C A T E

20

21          I, Deborah Rowe, certify that the foregoing is

22     a correct transcript from the record of proceedings in the

23     above-titled matter.

24
       S/Deborah Rowe _____
25     Certified Realtime Reporter