1

1              IN THE UNITED STATES DISTRICT COURT
           FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3      UNITED STATES OF AMERICA,

4        vs.
                               Criminal No. 2:15-cr-00212
5      ABIGALE LEE MILLER,
                     Defendant.
6      _____

7

8            Transcript of proceedings on May 8, 2017 United
    States District Court, Pittsburgh, Pennsylvania, before Joy
9    Flowers Conti.

10                          VOLUME II

11      APPEARANCES:

12     For the Government:        U.S. Attorney's Office
                                  Gregory C. Melucci, Esquire
13                                U.S. Courthouse
                                  700 Grant Street
14                                Pittsburgh, Pennsylvania 15219

15     For the Defendant:         Clark Hill PLC
                                  Robert J. Ridge, Esquire
16                                Brandon J. Verdream, Esquire
                                  301 Grant Street
17                                One Oxford Centre, 14th Floor
                                  Pittsburgh, Pennsylvania
18                                15222-4895

19     Court Reporter:            Barbara Metz Leo, RPR, CRR
                                  700 Grant Street
20                                Suite 6260
                                  Pittsburgh, Pennsylvania 15219
21

22

23

24
            Proceedings recorded by mechanical stenography;
25    transcript produced by computer-aided transcription.

2

1                          I N D E X

2    <u>WITNESSES</u>                                    <u>PAGE</u>

3    SEAN LANGFORD

4        Direct Examination By Mr. Melucci           4
         Cross-Examination By Mr. Verdream          15
5        Redirect Examination By Mr. Melucci        67
         Recross-Examination By Mr. Verdream        75
6
     DAVID ZACHARY VALENCIK
7
         Direct Examination By Mr. Ridge            82
8        Cross-Examination By Mr. Melucci          112
         Redirect Examination By Mr. Ridge         142
9        Recross-Examination By Mr. Melucci        145

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2                         -  -  -

 3                        10:06 a.m.

 4          (In open court, Defendant present with counsel:)

 5          THE COURT:  Morning.  Please be seated.

 6              This is a continuation of the sentencing hearing in

 7      the criminal matter United States of America versus Abigale

 8      Lee Miller.  It's at criminal action Nos. 15-212 and 16-132.

 9      Will counsel reenter your appearance?

10          MR. MELUCCI:  Good morning, Your Honor.  Gregory

11      Melucci for the United States.

12          MR. RIDGE:  Morning, Your Honor.  Robert Ridge,

13      Brandon Verdream, Bill Price and Courtney Murphy from the law

14      firm of Clark Hill on behalf of Ms. Miller.

15          THE COURT:  The last hearing, we were addressing the

16      question of loss, and we have had some supplemental briefing

17      from that period of time.

18              Is there going to be further evidence, Mr. Melucci?

19          MR. MELUCCI:  Yes, there is, Your Honor.  If I may,

20      we had just about wrapped up with Mr. Langford at the end of

21      last hearing.

22          THE COURT:  Yes.

23          MR. MELUCCI:  With the court's permission, and I have

24      the consent of Mr. Verdream, I'd like to put Mr. Langford on

25      for a few more minutes with additional exhibits.
</pre>

4

1          THE COURT:  This is the accountant?

2          MR. MELUCCI:  Yes.  He's the FBI agent.

3          THE COURT:  He's the accountant?

4          MR. MELUCCI:  Correct.  And then I think, with that,

5   the government anticipates being done with its evidence, and

6   then the defense case.

7          THE COURT:  Okay.

8          MR. MELUCCI:  So, I would call Sean Langford to the

9   witness stand, please.

10          THE COURT:  The witness has previously been sworn in

11   this case, and you are instructed that you remain under oath.

12          SEAN LANGFORD, a witness herein, having been

13   previously duly sworn, was examined and testified as follows:

14                     DIRECT EXAMINATION

15   BY MR. MELUCCI:

16   Q.  Mr. Langford, good morning.

17   A.  Good morning.

18   Q.  I'd like to ask you some questions about your

19   investigation.

20       You interviewed somebody named Mark McCormick.  Do you

21   know who Mark McCormick is?

22   A.  Yes, I do.

23   Q.  Who is Mark McCormick?

24   A.  Mark McCormick is the partner for -- with Abby Lee Miller

25   for the Abby Lee Apparel.  He resides currently down in

1    Louisiana.

2    Q.  And what was the relationship, the professional

3    relationship, of course, between Mr. McCormick and Ms. Miller?

4    A.  Sure.  They had a joint venture together.  He would order

5    and organize a lot of the apparel that she was selling

6    merchandise-wise through the Internet and also at the events,

7    domestically and abroad.

8    Q.  And in your investigation, Mr. Langford, did you

9    categorize, as best you could, all of the sales that were

10   produced from the sales of those merchandise and incorporate

11   that as part of your calculations into unreported income?

12   A.  Correct, yes.

13   Q.  Now, in your investigation, you again obtained e-mails

14   from the show producer Collins Avenue, correct?

15   A.  Correct.

16   Q.  Did you learn something in reading e-mails that concerned

17   whether Collins was paying some of those expenses incurred by

18   the McCormick/Miller joint venture to buy merchandise, rather

19   than Ms. Miller being reimbursed for those expenses through

20   the show?

21   A.  That's exactly what we learned.

22           MR. MELUCCI:  May I have Exhibit No. 50, please?

23   Q.  I'm showing you, Mr. Langford, what's been marked as

24   Government Exhibit No. 50.  What is this?

25   A.  This is an e-mail from Ms. Miller to Michael Hammond and

1    Mark McCormick on November 15 about 6:42 in the afternoon.

2        Michael Hammond was a producer at Collins Avenue for the

3    show, and Mark McCormick, again, is the joint venture partner

4    for the Abby Lee apparel.

5    Q.  Do you recognize the e-mail address from Mark McCormick?

6    A.  I do, yes.

7    Q.  Would you read that e-mail into the record, please?

8    A.  The subject line for the e-mail is "Invoices."  Body of

9    the e-mail says, "Michael, thank you so much for taking the

10   time to pay these companies.  The less red flags I send up the

11   better, and I do mean better for the franchise and all

12   involved.  Invoices will follow from me as well as Mark

13   McCormick via e-mail."

14   Q.  Did you then see invoices that were sent directly to the

15   producer to pay directly?

16   A.  Yes, I did.

17   Q.  Now, the date of this e-mail is November 15, 2012.

18   A.  Correct.

19   Q.  Was this before the amended plan was presented for

20   approval to Judge Agresti?

21   A.  I'm not so sure as I'm sitting here of the date of the

22   amended plan.

23   Q.  If the plan confirmation hearing for the amended plan was

24   in December of 2012.

25   A.  Yes, that was before.

1          MR. MELUCCI:  Can I have, Ms. Wikert, Exhibit No. 51,

2     please?

3     Q.  Do you recognize what Exhibit 51 is?

4     A.  Yes.  This is another e-mail from Mark McCormick to Abby

5     Lee at her e-mail address and Michael Hammond at Collins

6     Avenue dated November 15 of 2012.

7          It says -- subject of the e-mail is "Invoice 2646."

8     There's an attachment to the invoice, invoice 2646, and it

9     reads, "Michael, please see invoices as per Abby," and it's

10    signed Mark.

11    Q.  You had just testified, Mr. Langford, about e-mails --

12    invoices being forwarded directly from Mr. McCormick to the

13    show producer.

14         Is this an e-mail that attaches such an invoice?

15    A.  Yes, it is.

16         MR. MELUCCI:  May I have the second page of that,

17    Ms. Wikert?  51A, excuse me.  I'm sorry.

18    Q.  Do you recognize this exhibit?

19    A.  I do, yes, sir.

20    Q.  What is this?

21    A.  This is the invoice that was attached to that e-mail from

22    Mr. McCormick.

23    Q.  And the total amount of that invoice?

24    A.  Invoice looks like $480.90.

25    Q.  And it was billed to what organization?

1    A.   The vendor is Winery Toggles, and it is invoice 2646 which

2    was dated September 7 of 2012.  The bill to and ship to is

3    Abby Lee Apparel at an address in Parker, Colorado, which is

4    where Mr. McCormick was residing at the time.

5              MR. MELUCCI:  Let me have Exhibit 52, please.

6    Q.   Do you recognize this e-mail?

7    A.   Yes.

8    Q.   And what is it dated?

9    A.   This e-mail is from Mark McCormick to Michael Hammond and

10   Abby Lee and it's dated November 16, 2012.

11   Q.   Does it also attach an invoice?

12   A.   It does, yes, sir.

13             MR. MELUCCI:  Exhibit 52A, please.

14   Q.   Is 52A the attachment to that invoice that went to Michael

15   Hammond?

16   A.   Yes, it is.

17   Q.   And the amount of that invoice is how much money?

18   A.   This invoice was $14,267.70, and again, it's billed to

19   Abby Lee Apparel and Mark McCormick.

20             MR. MELUCCI:  May I have Exhibit 53, please?

21   Q.   Do you recognize this e-mail?

22   A.   Yes, I do.

23   Q.   And it's from Mr. McCormick to who?

24   A.   It's to Yuya Su, who was an employee for Collins Avenue,

25   and cced Michael Hammond and Abby Lee.  It's dated December

1    18, 2012.  Subject is "Invoice 5306" with an attachment --

2    invoice from Baudier Marketing, invoice 5306.

3    Q.  The attachment -- there was an attachment to that e-mail?

4    A.  Yes, sir.

5    Q.  Is that Exhibit 53A, please?

6    A.  Yes, it is.

7    Q.  What is the amount of that invoice?

8    A.  This invoice was for $11,712.67.

9         MR. MELUCCI:  May I have Exhibit 54A, please?  54A

10   and 54B.

11   Q.  What is Exhibit 54A?

12   A.  54A is an invoice from Soccer N Stuff from North

13   Huntingdon, PA for apparel, totaling $1,939.

14   Q.  And was this sent to the show producer, Collins Avenue?

15   A.  Yes.  This one and I believe one other invoice.

16   Q.  And is that invoice 54B?

17   A.  Yes, sir, again, from Soccer N Stuff for $3,816.50.

18   Q.  Now, was this money that Collins Avenue was paying on

19   behalf of Ms. Miller accounted for in her monthly operating

20   reports?

21   A.  I don't believe it was, no.  You know, these were invoices

22   directly sent to Collins, and they either paid them out of

23   their own funds or they subtracted it from her talent fee in

24   order to pay these invoices.

25        You know, again, this was -- this would not have been

1    shown in any kind of compensation for a paycheck or an

2    accounts payable check provided to her in order to pay.  This

3    was a direct pay from Collins to the vendor.

4    Q.  So in the earlier e-mail that I showed you Exhibit No. 50,

5    the mention by Ms. Miller of avoiding raising red flags,

6    what's the significance of that?

7    A.  Right.  If Collins had paid her, directly to Abigale Lee

8    Miller, she would have had to negotiate that check, put it in

9    her bank account and pay these expenses from a bank account.

10        Theoretically, that bank account should have been the DIP

11   account which would have been disclosed on the monthly

12   operating reports.

13        In the absence of any payments directed to Ms. Miller

14   going into an account that the bankruptcy knew about, these

15   payments were being directly sent from Collins to the vendor

16   and weren't being picked up in any of the MORs.

17   Q.  Now, did you also obtain communications from Jeff Collins

18   who is the producer -- was the producer of the dance show

19   "Dance Moms," the TV show?

20   A.  Jeff Collins was an employee of Collins Avenue, yes.

21        MR. MELUCCI:  May I have Exhibit 56, please?

22   Q.  Do you recognize this e-mail, Mr. Langford?

23   A.  I do.

24   Q.  What is it?

25   A.  This is an e-mail from Jeff Collins to Michael Hammond

1   copying Abby Miller and Brian Raymond, her entertainment

2   attorney.

3             MR. RIDGE:  Objection, Your Honor.  This is hearsay.

4   This is substantive, and this is not just something that comes

5   in in a sentencing hearing.

6             MR. MELUCCI:  Your Honor, this is an e-mail sent by

7   Mr. Collins that was copied to Ms. Miller.  It was discovery

8   that was produced to Mr. Ridge and Mr. Verdream.

9             This, again, goes to the defendant's intent.  We know

10  hearsay is admissible.  We have been admitting these e-mails

11  routinely through the last hearing and today's hearing.

12            This, again, goes to the intent of Ms. Miller to

13  deceive the bankruptcy judge and to conceal assets.

14            MR. RIDGE:  She's not denying that she concealed

15  assets.  This is the first e-mail from Mr. Collins and I've

16  not had an opportunity to cross-examine Mr. Collins, and I

17  won't get one here.

18            MR. MELUCCI:  They can call Mr. Collins.

19            THE COURT:  This is a sentencing hearing.  Hearsay is

20  admissible and I'll give it whatever weight I feel is

21  appropriate.

22            MR. RIDGE:  Thank you, Your Honor.

23  BY MR. MELUCCI:

24  Q.  Mr. Langford, would you read this e-mail into the record,

25  please?

1    A.  The e-mail on the screen here starts on March 13, 2013.

2    Michael Hammond wrote -- is that where you want me to start?

3    Q.  Yes.

4    A.  "Abby, you will have a call time tomorrow.  If you do not

5    show up for work, I will then call your bankruptcy attorney

6    and tell him that we will be fining you for the cost of an

7    episode and hold any moneys due to you.  We can and will fine

8    you.  We will explain to him or any judge that you are not

9    living up to your contractual obligations.  Does he or the

10   judge even know about your Masterclass moneys in cash?  If you

11   do not perform you 'Dance Moms' duties, there will be no AUDC.

12   I advise you to show up for work and do your job properly and

13   stop sabotaging the show that actually allows you to make a

14   living.  Would five people show up for one of your

15   Masterclasses if not for the celebrity this show has turned

16   you into?"

17       And then above that, Jeff Collins is writing in response

18   to that e-mail, "Does the bankruptcy judge know about the cash

19   Masterclass business?"

20            MR. MELUCCI:  Now, let me have Exhibit 57, please,

21   Ms. Wikert.

22   Q.  Mr. Langford, Exhibit 57 is the front and back of a check,

23   and the amount of the check is $50,000 payable to Reign Dance

24   Productions.

25       Do you recognize this check?

1    A.   Yes, sir.

2    Q.   Where did you obtain this check?

3    A.   This check was obtained during the investigation as part

4    of bank records subpoenaed and also from Collins Avenue.

5    Q.   Now, what is the significance of this check?

6    A.   This is a check that -- Fly Girls, LLC was one of the

7    companies that Collins Avenue used to produce the show.  This

8    was one of a sequence of three checks to provide Ms. Miller

9    cumulatively $100,000 for studio renovations.

10   Q.   For the studio where?

11   A.   Penn Hills studio.  So one check was $10,000.  One check

12   was $40,000.  This check was $50,000.  The check is actually

13   dated January 31 of 2013.  It wasn't negotiated and cashed

14   until December 31 of 2013.

15   Q.   Now, is December 31, 2013 after Judge Agresti ultimately

16   approved the second amended plan in this bankruptcy case for

17   Ms. Miller?

18   A.   Yes.

19           THE COURT:  Microphone, please, Mr. Melucci.

20           MR. MELUCCI:  I understand, judge.  Thank you.

21   Q.   After the second amended plan?

22   A.   Correct.

23   Q.   So the date of this check is when?

24   A.   During the pendency of the bankruptcy, January 31 of 2013,

25   and she evidently held this check all year long and deposited

1    it on the last day of 2013.

2           MR. MELUCCI:  And Exhibit 57A, please, Ms. Wikert.

3    Q.  What is this, Mr. Langford?

4    A.  This is the authority for payment.  This is an internal

5    Collins Avenue document basically accounting for the $50,000

6    expenditure payable to Ms. Miller, Reign Dance Productions.

7         The invoice is -- or the authority for payment is dated

8    November 8 of 2012, and it says "Payment one of two."  If you

9    can blow that up a little bit.  "Payment one of two 50 percent

10   of $100,000 in network approved funds for studio improvements

11   in excess of initial budget."

12   Q.  This check was not deposited until January 20 --

13   A.  Until December 31st, 2013.

14          MR. MELUCCI:  I'd like to move for the admission of

15   Exhibits 50, 51, 51A, 52, 52A, 53, 53A, 54, 54A, 54B, 55, 56,

16   57 and 57A.

17          MR. VERDREAM:  Just subject to the hearsay objection,

18   Your Honor.

19          THE COURT:  Which I've already indicated would be

20   overruled, the exhibits with hearsay, and would be given the

21   appropriate weight.  On that basis, those exhibits would be

22   admitted.

23          MR. MELUCCI:  All right.  Before the government

24   closes, there were a couple exhibits that were offered but not

25   formally admitted from the last hearing.  I'm going to move

1    for the admission now of those.

2            THE COURT:  By the way, do you have hard copies of

3    those other exhibits?

4            MR. MELUCCI:  Yes, I do.  I can provide the court

5    with those.

6            THE COURT:  Just so we have them.

7            MR. MELUCCI:  They would be Exhibits 2, 3, 3A, and I

8    believe 49.

9            THE COURT:  Exhibit 49?

10           MR. MELUCCI:  49.

11           MR. VERDREAM:  No objection, Your Honor.

12           THE COURT:  They are admitted.

13           MR. MELUCCI:  I think with that, the government --

14           THE COURT:  We have to give an opportunity for

15   cross-examination.  I don't know if you'll have any further

16   redirect.

17           MR. MELUCCI:  Sure.  I understand.

18                          CROSS-EXAMINATION

19   BY MR. VERDREAM:

20   Q.  Good morning.

21   A.  Good morning.

22   Q.  As you know, I represent Ms. Miller.  I have some

23   questions for you today.

24   A.  Yes, sir.

25   Q.  You testified during the first day of the sentencing back

1    in January that Ms. Miller had undisclosed revenue of

2    approximately $700,000 during her bankruptcy?

3    A.  Correct.

4    Q.  And by the way, have you had a chance to review your

5    transcript from January?

6    A.  Briefly, yes.

7    Q.  Okay.

8    A.  It was a long time ago.

9    Q.  I understand.  If you need, we have a copy, if you need to

10   refresh your memory.

11   A.  Great.

12   Q.  So you testified that Ms. Miller had approximately

13   $700,000 of unreported income, and of that was $288,000 in

14   unreported Collins Avenue checks?

15   A.  Correct.

16   Q.  And then another part of that was $387,000 from four

17   sources, Square, Showclix, Paypal and Masterclasses?

18   A.  Correct.

19   Q.  Let's talk about the 288,000 in unreported Collins Avenue

20   revenue first.  This related to 49 checks that were dated in

21   December 2012, correct?

22   A.  Correct.

23   Q.  And these checks were deposited in January of 2013 in

24   Ms. Miller's bankruptcy counsel escrow account?

25   A.  Correct.

1   Q.  If we can, let's take a look at Government Exhibit 24D,

2   please.  You have that up in front of you?

3   A.  Yes, sir.

4   Q.  You created this chart, correct?

5   A.  Yes, sir.

6   Q.  And this is called a summary chart monthly operating

7   report pre-amended December 2012 to October 2013?

8   A.  Yes, sir.

9   Q.  I think that should probably be December 2010, correct?

10  A.  Correct.

11  Q.  Just wanted to clarify.

12  A.  You got it.

13  Q.  There are columns here for television revenue, Showclix,

14  Square, Masterclass/merchandise and Paypal?

15  A.  Correct.

16  Q.  And the chart purports to show what Ms. Miller disclosed

17  on her pre-amended monthly operating reports in bankruptcy?

18  A.  Correct.

19  Q.  And under the television revenue column, if you look down

20  to the December 2012 row, do you see that?

21  A.  Yes.

22  Q.  You have a zero balance, correct?

23  A.  Yes.

24  Q.  I'm going to show you what I've marked as Defense Exhibit

25  17.

1      Do you see that, Agent Langford?

2  A.  Yes, sir.

3  Q.  It's a little blurry on my screen, but do you recognize

4  that document?

5  A.  Yes, I do.

6  Q.  That is in fact the original monthly operating report for

7  December of 2012?

8  A.  Correct.

9  Q.  And that was filed on January 31st, 2013?

10  A.  Correct.

11      MR. VERDREAM:  I would move for the admission of

12  Defense Exhibit 17.

13      MR. MELUCCI:  No objection.

14      THE COURT:  It is admitted.

15  Q.  If you could, please, flip to page 3.

16  A.  Okay.

17  Q.  If you look in the middle to the right of that page,

18  there's a bold faced "Total Income."

19      Do you see that?

20  A.  Yes, sir.

21  Q.  And there it says $80,081.99?

22  A.  Correct.

23  Q.  So that doesn't include the 288,000 in checks?

24  A.  No, it does not.

25  Q.  Let's take a look though at the filing the very next day.

1    I'm going to show you what I've marked as Defense Exhibit 18.

2    A.  Yes, sir.

3    Q.  Have you seen that document before?

4    A.  Yes, sir.

5    Q.  This is in fact the amended monthly operating report for

6    December 2012, correct?

7    A.  The first amended December 2012.

8    Q.  That's right.  The first amended?

9    A.  There was another.

10   Q.  There was another in October which we'll get to, but this

11   one was filed on February 1st, 2013, correct?

12   A.  Correct.

13   Q.  That's one day after the original was filed?

14   A.  Correct.

15   Q.  And if you could, please, flip to page 3 again of that

16   document.

17   A.  Yes.

18   Q.  And if you look down toward that total income number in

19   bold, you see what looks to be a handwritten number in there

20   of 288,000?

21   A.  Yes, sir.

22   Q.  And that is in fact the 288,000 in Collins Avenue checks,

23   correct?

24   A.  Yes, sir.

25            MR. VERDREAM:  I'd move for the admission of Defense

1    Exhibit 18.

2            MR. MELUCCI:  No objection.

3    Q.  Let's go to Government Exhibit 4A.  Let me ask you this,

4    Agent Langford.  You're the lead investigator in this case?

5    A.  Yes.

6    Q.  During your investigation, you have become familiar with

7    these bankruptcy files?

8    A.  Somewhat familiar, yes.  Some more than others.

9    Q.  Some more than others.  You've looked at a lot of them?

10   A.  Sure.

11   Q.  Do you recognize Government Exhibit 4A?

12   A.  It says, "Second amended disclosure statement" that was

13   filed at docket 211 on January 18 of 2013.

14   Q.  So that's the second amended disclosure statement to the

15   second amended plan of reorganization, correct?

16   A.  Appears to be, yes.

17   Q.  And if you flip to page -- sorry.  My exhibits just got

18   out of order.  I'm sorry.  I've left it in the government

19   binder that we received.

20       So let's flip to page 11 of that document.  If you look in

21   the middle of that document, there's a bold faced line that

22   starts out "State source of funds for planned payments."

23       Do you see where that starts out?

24   A.  Yes, sir.

25   Q.  And then there's eventually a colon, and then the second

1    sentence after that colon, can you read that, please?

2    A.  Can you enlarge that for me, please?

3    Q.  It would be where it starts, "The debtor."

4    A.  "The debtor will fund the plan from operation of her dance

5    studio and income from the reality TV shows in which she is

6    cast.  The debtor has deposited $288,137.57 into the Calaiaro

7    & Corbett PC escrow account."

8    Q.  That's all you have to read unless you want to read more,

9    but that's fine.  That's all I need.

10        And the date of this?  Again, this was filed on January

11   18, 2013?

12   A.  Correct.

13   Q.  So that's 13 days prior to when that original monthly

14   operating report was filed on January 31st, 2013?

15   A.  Correct.

16   Q.  So let's go back to Exhibit 24D.

17             MR. MELUCCI:  Government 24D?

18             MR. VERDREAM:  Yes, Government Exhibit 24D.  Thank

19   you.

20   Q.  Again, looking at that December row under "Television

21   Revenue" which is a zero balance, as we've just discussed, the

22   $288,000 in Collins Avenue checks, they were disclosed on

23   January 18, 2013 as part of that disclosure statement, the

24   second amended plan, correct?

25   A.  It was detailed in the disclosure statement, yes.

1    Q.   And then it was -- I'm sorry.

2    A.   I would agree, yeah.

3    Q.   And then it was disclosed on an amended monthly operating

4    report, which was filed one day after the original was filed,

5    correct?

6    A.   Correct.   This summary chart was pre-amended MOR.   So this

7    was on an original MOR which says zero for December, which is

8    what she disclosed on her original MOR for December.

9    Q.   You would agree 13 days before she disclosed it in

10   bankruptcy court, and one day later, she filed an amended MOR

11   disclosing it?

12   A.   In the disclosure statement, yes, but let's don't forget

13   this was all revenue that was earned throughout 2012.

14   Q.   We'll get to that.   I just want to make sure we're clear

15   that this chart is fair to Ms. Miller because --

16   A.   But to be clear though, you know, that 288,000 technically

17   should have been disclosed on every MOR all throughout the

18   pendency of the bankruptcy before January 13.

19       Every one of those original MORs technically should have

20   had Collins revenue that was earned as part of the 288.

21   Q.   And we'll get to that, and Ms. Miller has already pleaded

22   guilty to failing to disclose on her bankruptcy report.

23   A.   Sure.

24   Q.   But just to bear with me here and just entertain me with

25   this.   If you drop that 288,000 into that December 2012 row,

1  and if you look at the bottom, looks like right now, it's

2  146,000?

3  A.  Right.

4  Q.  If you drop that 288, that would essentially triple that

5  number, correct?

6  A.  Yes, and there was another exhibit that I testified to

7  that talked about post-amended.

8  Q.  Just looking at Exhibit 24D, right?

9  A.  Yes, sir.

10 Q.  I'm going to show you now what I've marked as Defense

11 Exhibit 21.  Do you recognize this document?

12 A.  Yes.

13 Q.  You mentioned earlier this is the second amended monthly

14 operating report for December 2012, correct?

15 A.  Yes, sir.

16 Q.  And this was filed on October 4, 2013?

17 A.  Correct.

18       MR. VERDREAM:  I move for the admission of Defense

19 Exhibit 21.

20       MR. MELUCCI:  No objection.

21       THE COURT:  It is admitted.

22       MR. VERDREAM:  Thank you.

23 Q.  If you flip back to page 26, it's a little blurry, but can

24 you make out what's on the top of that page?  It says, "TAS

25 client trust ledger."

1    A.  Sure.  This is document 376 filed October 4, 2013, and

2    having dealt with this particular document, this appears to be

3    a ledger that was from the document, those checks, the 288

4    that were deposited to Ms. Miller's bankruptcy attorneys'

5    escrow account.

6    Q.  Escrow account; is that right?  In fact, there's a whole

7    page of them, correct, right there on page 26?

8    A.  Yes, sir.

9    Q.  And if you turn to page 27, it gets to -- almost to the

10   bottom, almost a whole other page?

11   A.  A lot of checks.

12   Q.  A lot of checks.  I would represent to you I counted this.

13   I'm not going to ask you to count them.  Those are in fact 49

14   checks that we've talked about.

15   A.  I'm familiar that all the checks were deposited into their

16   trust account yesterday.

17   Q.  And not only are there 49 checks totaling $288,000,

18   correct?

19   A.  This represents the $288,000.

20   Q.  Right.  Also on that first page though, if you look about

21   a third of the way down, there's a credit or deposit for

22   $40,000, correct?

23   A.  Yes.

24   Q.  And to the left of that, it says "Studio Improvements."

25   A.  Right, yes.

1  Q.  That one I want to keep in mind, but I want to make sure

2  we highlight it.  We'll come back to it.

3      Again, these were all -- all these checks were deposited

4  on January 7, 2013?

5  A.  Correct.

6  Q.  Now, the government subpoenaed and you received some

7  payroll records from PES, which I believe is Collins Avenue's

8  payroll company?

9  A.  One of them, yes.  There were several throughout that

10 Collins used for several different shows.  PES was one of

11 them.

12 Q.  PES was one?

13 A.  Correct.

14 Q.  Those records that you got from PES, you provided along to

15 us?

16 A.  Correct.

17 Q.  I'm going to show you what I've marked as Defense Exhibit

18 15.

19         MR. VERDREAM:  May I approach the witness, Your

20 Honor?

21         THE COURT:  Yes, you may.

22 Q.  It appears, Agent Langford, you have the redacted copy,

23 which if you're going to look at it on hard copy, you can have

24 this instead of the redacted.  I can actually take the

25 redacted back from you.

1    A.  Sure thing.

2    Q.  Because I don't think it needs to be redacted.  I'm sorry.

3    I may have asked this, but do you recognize this document?

4    A.  Somewhat familiar with these, yes.  These are the employee

5    pay histories for Ms. Miller for the period of January 1 of

6    '12 through December 31 of '12.

7    Q.  In fact, it says "Employee Pay History" at the top?

8    A.  It does, yes.

9    Q.  Top left-hand corner, it says "Abigale Miller."

10   A.  Correct.

11   Q.  Top left-hand corner, it says period January 1st, 2012 to

12   December 2012?

13   A.  Yes.

14   Q.  Now, you told the court back in January that those 49

15   checks, they were written either December 20th or December

16   21st they were written?

17   A.  They were cut, yes.  Created, dated, cut, yes, issued.

18   However you want to describe it.

19   Q.  So you'll see here on Defense Exhibit 15, which I'm not

20   sure if it shows how many pages there are, but if you look at

21   start -- if you start with the second row on the first page

22   and if we go all the way back to the first row of the last

23   page, you'll see 48 checks dated either December 20th or

24   December 21st.  I'll give you a chance to flip through that

25   now.

```
 1    A.  If you want me to verify them I will, but if you don't, I
 2    know that there was a number of these checks that were dated
 3    December 20th or December 21st.
 4    Q.  In fact, we have 48 checks, correct?
 5    A.  Sounds correct.
 6    Q.  And then the lone 49 check is the $40,000 we talked about
 7    before.  Again we'll come back to that.
 8    A.  $40,000.  Okay.
 9    Q.  Let's take a look at the first page.  If you look at the
10    second row, which is the first check, it says pay date of
11    December 20th, 2012.
12    A.  Okay.
13    Q.  Do you see that?
14    A.  Yes, sir.
15    Q.  And then right next to it, it says period July 22nd to
16    July 28, 2012.
17    A.  Yes, sir.
18    Q.  And then I'll let you flip through the remaining ones as
19    you have them.  They're all similar, right?  They show either
20    a check dated December 20th or December 21st, and then next to
21    it, there's an actual pay period.
22    A.  Yes, sir.
23    Q.  Typically -- in fact, always of a different date than the
24    date of the check?
25    A.  Correct.
```

1          MR. VERDREAM:  I move for the admission of Defense

2     Exhibit 15, please.

3          MR. MELUCCI:  No objection.

4          THE COURT:  It's admitted.

5     Q.  Now, in addition to this report that we just discussed,

6     and I'll let you look through the whole thing if you still

7     wanted to keep going.

8     A.  I'm fine.

9     Q.  In addition to the report we just discussed, you also

10    received a spreadsheet listing of checks from one of Collins

11    Avenue's payroll companies, correct?

12    A.  We received a lot of records from Collins and payroll

13    company.  We also were subpoenaing the banks for the same kind

14    of records so we received a lot of payroll records from

15    several sources.

16    Q.  Do you recall receiving a spreadsheet though from PES that

17    listed dates of checks and amounts, reference numbers for

18    Ms. Miller?

19    A.  We received a lot of spreadsheets with check dates and

20    documents.

21    Q.  I'll show you what I've marked so far as Defense Exhibit

22    14.

23    A.  Okay.

24    Q.  Now, this is a spreadsheet that you in fact provided to us

25    under the label of PES, and it actually -- the original

1  spreadsheet had a lot more rows and a lot more columns, but

2  what I did here is I isolated it to the checks that were pay

3  date December 20th or December 21st.

4      Do you see that?

5  A.  I see that.

6  Q.  And in fact, if you look in the left-hand column, the very

7  left-hand column, you'll see there are 48 checks.

8  A.  I see that.

9  Q.  And the balance of those checks total about 248,000.

10      Do you see that at the bottom?

11  A.  I see that, yes, sir.

12  Q.  And then there's the 40,000 which we've already referenced

13  which relates to studio improvement, so we have another check

14  there, the 49th check for 40,000, and if we can flip to the

15  next page of that exhibit, you get the 288,000 in checks.

16  A.  I see it there.

17  Q.  Do you see that?

18  A.  Yes, sir.

19  Q.  Now, I also added, using the prior exhibit which we marked

20  as Defense Exhibit 15, using that, if you look back up to the

21  next page, please.

22      Using that, I put in the workweeks for each check, and I

23  can show you in case it's not so clear on your screen because

24  it's slightly blurry on mine, I can show you what we have

25  here.

1          MR. VERDREAM:  May I approach again, Your Honor?

2          THE COURT:  Yes, you may.

3   Q.  If that's a little clearer for you, Agent Langford, and

4   you can compare those dates, if you would like, to the dates I

5   took from Exhibit 15, but I took those from the paid work

6   periods on Exhibit 15 and listed them to the right.

7       Do you see that?

8   A.  I see a check amount in the workweek.

9          THE COURT:  Is this a separate exhibit?

10         MR. VERDREAM:  Yes, Your Honor.

11  Q.  If you would, if you look at the workweek date of November

12  18, 2012.  It's, I think, about a third of the way down.

13  A.  Okay.

14  Q.  That's -- I'm just going to call it approximately 12,500,

15  correct?

16  A.  12,408.

17  Q.  I'm going to round it to 12,500.

18  A.  Sure.  I know which one you're talking about.

19  Q.  Right below that, there's one for December 9, 2012.

20  A.  I see it.

21  Q.  That's for $8,500.  I'm rounding.

22  A.  I see it.

23  Q.  We add those two together, that's 21 grand, correct?

24  A.  Roughly, yes.

25  Q.  Roughly 21 grand, approximately.  And let's go down toward

1    the bottom where it says October 7, 2012.

2    A.  Okay.

3    Q.  Let's highlight all the way down to the bottom where it

4    says workweek of December 2nd, 2012.  There, we have eight

5    checks for approximately $4,000.

6    A.  I see it.

7    Q.  So that would be $32,000 approximately?

8    A.  Yes, sir.

9    Q.  So if we took that $8,000 -- and again, those workweeks

10   for that 32,000 are between October and December 2012,

11   correct?

12   A.  I see it, yes.

13   Q.  So if we took that 32,000 for those and then the

14   approximately 21,000 above for November and December, that

15   would give us $53,000, correct?

16   A.  I see it, yes.

17   Q.  So that would be $53,000 for work performed either in

18   December of 2012 or within the two months prior to that?

19   A.  October, November, December of '12, yes.

20   Q.  Correct?

21   A.  For the workweeks as listed, correct.

22   Q.  So I want to keep that $53,000 in mind, but I think next

23   we're going to talk about that $40,000 check.

24        MR. VERDREAM:  But before that, I move for the

25   admission of Defense Exhibit 14.

1          MR. MELUCCI:  No objection.

2          THE COURT:  It's admitted.

3          MR. VERDREAM:  May I approach again, Your Honor?

4          THE COURT:  Yes, you may.

5          MR. VERDREAM:  I'll take that back, Sean, if you

6    don't mind.

7    Q.  I'm going to show you what we've marked as Defense Exhibit

8    19.  This is a two page document, but do you recognize the

9    first page of the document?

10   A.  Yes, sir.

11   Q.  And let's start at the bottom.  It's a copy of a check

12   from Fly Girls to Reign Dance Productions, correct?

13   A.  Yes, sir.

14   Q.  Reign Dance Productions is Ms. Miller's company, correct?

15   A.  Correct.

16   Q.  This is in the amount of $40,000?

17   A.  Yes, sir.

18   Q.  If you look at the top right, which looks like the check

19   stub of this first page, it says "Studio Improvements" under

20   "Description," correct?

21   A.  Correct.

22   Q.  Let's flip to the second page, please.  In the top

23   left-hand corner, it says "Authority For Payment."

24   A.  Correct.

25   Q.  At the bottom, it has Michael Hammond's name printed?

1    A.  Yes, sir.

2    Q.  And Yuya Su's name printed?

3    A.  Yes.

4    Q.  It looks like there are two signatures near each one of

5    their names -- one signature near each one of their names?

6    A.  Yes, sir.

7    Q.  Then let's go back to the middle left of that page.

8    Again, it says "Purpose of Expenditure."

9        Do you see that?

10   A.  Correct.

11   Q.  And it says "Final payment for studio improvements of

12   initial $100,000."

13   A.  I see it.

14   Q.  If we could, please flip back to the first page.  Again,

15   this is a copy of a check for $40,000 and it's dated December

16   27, 2012, correct?

17   A.  Yes, sir.

18           MR. VERDREAM:  I'd move for the admission of Defense

19   Exhibit 19.

20           MR. MELUCCI:  No objection.

21           THE COURT:  It is admitted.

22   Q.  Now, during your investigation, Agent Langford, you have

23   had a chance to look at some of the contracts in these -- in

24   this case, correct?

25   A.  Early on, but I would not say that that was a focus of my

1    investigation, no, but I'm familiar there was contracts, yes.

2    Q.  Okay.  Let's flip to Government Exhibit 16.  Have you seen

3    this document before?

4    A.  I know it as an A&E network looks like talent services

5    amendment agreements.

6    Q.  It's dated June 14, 2012?

7    A.  Yes, sir.

8    Q.  And in the re line, it talks about studio refurbishment

9    fee?

10   A.  Yes.

11   Q.  And then let's go down to the first numbered paragraph

12   where it says No. 1.

13       Do you see that?

14   A.  Yes.

15   Q.  And the first sentence, you don't have to read.  I'm

16   paraphrasing, but it says basically that AETV shall pay

17   $100,000 to cover studio improvements or improvement for

18   refurbishment costs for Reign Dance Studios?

19   A.  I see that.

20   Q.  I read that basically correctly?

21   A.  Sure.

22   Q.  Can you read the second sentence for us?

23   A.  "Participant acknowledges that producer shall tender

24   payment of the additional sum on AETV's behalf on or around

25   December 1, 2012."

1   Q.  On or around December 1 of 2012, right?

2   A.  That's what it says.

3   Q.  Ms. Miller was not due -- contractually due this

4   improvement fee until on or around December 1st, 2012?

5           MR. MELUCCI:  The only objection I would raise, Your

6   Honor, is he did not author this contract, so the contract

7   speaks for itself.

8           THE COURT:  The contract does speak for itself.

9           MR. VERDREAM:  Thank you, Your Honor.

10  Q.  In fact, though, if we flip back to the prior exhibit

11  which would have been Exhibit 19, Defense Exhibit 19, she in

12  fact received a check for $40,000 in December of 2012 for

13  studio improvement fee?

14  A.  There is a check for 40,000 for studio improvements.

15  Q.  And if we can, let's take one more quick look back at

16  Exhibit -- Defense Exhibit 14, please.

17      So, Agent Langford, if you recall a few minutes ago, we

18  talked about $53,000 in checks dated December 20 or December

19  21st for work done in either October, November or December,

20  correct?

21  A.  Paychecks.

22  Q.  Paychecks?

23  A.  Paychecks, yes, sir.

24  Q.  Then we have a $40,000 payment in December of 2012,

25  correct?

1    A.  That we just discussed.

2    Q.  That we just discussed, and we read the contract language

3    that said this is due on December 1st, 2012, correct?

4    A.  There is a check for 40,000 in December for studio

5    improvements, yes.

6    Q.  To be fair to Ms. Miller here, out of the $288,000 in

7    checks that you referred to as unreported Collins Avenue

8    income, we have at least $93,000 of it that was either earned

9    within December of 2012 or the prior two months or it related

10   to a studio improvement that a contract said was due in

11   December of 2012?

12   A.  Right.  I'm glad you said the last part because the

13   paychecks were earned but the 40,000 check was paid in

14   December of '12.

15   Q.  It was paid in December of 2012?

16   A.  Correct.

17   Q.  Along with those checks for the work from October,

18   November, December that we discussed.  They were also paid in

19   December of 2012?

20   A.  They were earned through October, November December and

21   paid in December, yes.

22   Q.  Let's go to what you recently discussed with Mr. Melucci,

23   Government Exhibit 57, please.  And I believe you mentioned

24   that this was a payment for $50,000 for studio improvement

25   fee, correct?

1  A.  I read what was issued on the check, yes, for studio

2  improvements, yes, $50,000.

3  Q.  And it was actually dated January of 2013, correct?

4  A.  Correct.

5  Q.  So to be fair to Ms. Miller, she, at best, received it at

6  the end of January but more likely received it or would have

7  received it sometime in February or shortly thereafter?

8           MR. MELUCCI:  Objection, Your Honor.  That would call

9  for speculation from the witness.

10          THE COURT:  Sustained.

11          MR. VERDREAM:  I'll withdraw the question.

12  Q.  We do know, though, that that check being cut and dated

13  December 31st, 2013, that's after the second amended plan was

14  filed, correct?

15  A.  Which was in December of 2012, correct.

16  Q.  The second amended plan.  That's January 18, 2013.

17  A.  Okay.  Yes.

18  Q.  And you said evidently that Ms. Miller held that all year

19  long; is that correct?

20  A.  I don't know what she did with it all year long.  I know

21  that it was cut in January of '13 and it wasn't deposited and

22  negotiated until December 31st.

23  Q.  You don't know if she actually received it though after it

24  was cut until any time in approximately December of 2013,

25  correct?

1          MR. MELUCCI:  Objection.  Again, Your Honor,

2      speculation.

3      Q.  Do you know when Ms. Miller received that check?

4      A.  I do not.

5      Q.  Let's take a look at Government Exhibit 1, please.  Do you

6      recognize that document?

7      A.  Yes.

8      Q.  This is the voluntary petition filed on behalf of

9      Ms. Miller in bankruptcy, correct?

10     A.  Correct.

11     Q.  And it's dated December 3rd, 2010?

12     A.  I can't see it, but I know on the top, yes, December 3rd,

13     2010, doc 1, yes.

14     Q.  Let's move to Government Exhibit 1A.  And do you recognize

15     this document?

16     A.  Summary of schedules, yes.

17     Q.  And this was filed on January 3rd, 2011, correct?

18     A.  Correct.

19     Q.  And at the bottom of it -- or in that chart that you see

20     in the middle of the page, there's a column there for assets,

21     correct?

22     A.  There is a column for assets, yes.

23     Q.  And at the bottom, it totals $326,000?

24     A.  Yes, roughly.

25     Q.  Approximately.  And then the next column over is

1    liabilities, correct?

2    A.  Yes, sir.

3    Q.  That totals approximately $356,000?

4    A.  Correct.

5    Q.  There's nothing in the indictment about the voluntary

6    petition being filed -- or, that was marked as Government

7    Exhibit 1, there's nothing in the indictment about that being

8    false, correct?

9    A.  Not that I recall, no.

10   Q.  And I can show you a copy of the indictment, but you don't

11   recall anything, correct?  I can give you the indictment.

12   A.  No, no, I don't recall.

13   Q.  And then similarly, nothing about schedule 1A --

14   Government Exhibit 1A, anything about that being false in the

15   indictment?

16   A.  Not that I recall.

17   Q.  Now, if I can, I want to set up a timeline of the plan

18   filings, the plans of reorganization just so we can keep them

19   together.  If we can, please go to Government Exhibit 2.

20       Do you recognize this document?

21   A.  Chapter 11 plan of reorganization, yes.

22   Q.  This is the original plan of reorganization.  It was filed

23   on February 24, 2012, correct?

24   A.  Yes.

25   Q.  And then let's go to Government Exhibit 3, please.  This

1  document is the amended plan of reorganization, correct?

2  A.  Yes.

3  Q.  And this was filed on August 27, 2012, correct?

4  A.  Correct.

5  Q.  Finally, let's go to Government Exhibit 4, please.  This

6  is the second amended plan of reorganization, right?

7  A.  Yes, sir.

8  Q.  And this was filed on January 18, 2013?

9  A.  Yes, sir.

10  Q.  So let's now go back to --

11         MR. VERDREAM:  And, Your Honor, if I may approach.

12  Q.  I'll give you this list just so you have it.  I just wrote

13  down the dates of the plans.  You may have them memorized by

14  now.

15  A.  Thank you.

16  Q.  Let's go back to Exhibit 24 -- Government Exhibit 24B,

17  please.  Agent Langford, when we first started talking today,

18  we talked about the $700,000 of unreported income, correct?

19  A.  Yes, sir.

20  Q.  We said part of that is the approximately 288,000 Collins

21  Avenue checks which we went over.

22  A.  That was one of the counts charged, yes.

23  Q.  That 288,000 makes up part of that 700,000, correct?

24  A.  Yes, it does.

25  Q.  Another part of it is this $387,000 from the four

1    different sources we previously talked about in what is shown

2    here on Exhibit 24B?

3    A.  4 through 7, yes, sir.

4    Q.  In counts 4 through 7 of the indictment?

5    A.  Yes, sir.

6    Q.  Looking again at 24B, we have four columns, right,

7    Showclix, Square, Paypal and Masterclass/merchandise?

8    A.  Yes, sir.

9    Q.  And as we look at these, at this chart -- you created this

10   chart, correct?

11   A.  I did, yes.

12   Q.  And this says "Post-Amended monthly operating reports

13   unreported income."

14   A.  Correct.

15   Q.  And as we look at this, I want to keep in mind those dates

16   of the plans that we've just talked about, but let's go from

17   top to bottom.

18       The first balance that we see is actually in the Showclix

19   column, correct?

20   A.  In June of '12, yes.

21   Q.  In June of '12.  I'm going to round up and that's $7,000.

22   A.  Okay.

23   Q.  Sounds good?

24   A.  I'll work with it.

25   Q.  Okay.  That's after the original plan of reorganization

42

1   was filed?

2   A.  On February 24th.

3   Q.  On February 24th, and then we have no activity in any of

4   the accounts, right, until after the amended plan of

5   reorganization was filed in August of 2012.

6   A.  Right.  There was the unreported income was -- there was

7   no unreported income from July of '12, August, September, from

8   those four categories.

9   Q.  Thank you for clarifying.

10  A.  Yes.

11  Q.  And again, the amended plan of reorganization, that was

12  filed August 27, 2012, correct?

13  A.  Correct.

14  Q.  And then for these four accounts, we have no activity or

15  no unreported income for September of 2012, correct?

16  A.  For Showclix, Square, PayPal and Masterclass.

17  Q.  So that's correct, right?

18  A.  Yes, correct.

19  Q.  Just quickly, let's jump to Government Exhibit 29, and

20  you discussed this e-mail back in January in the sentencing,

21  and if you read, this is an e-mail from Ms. Miller, right, to

22  Kathy McFaden?

23  A.  Correct.

24  Q.  And it's dated September 27, 2012, correct?

25  A.  Yes, sir.

1    Q.  And the first sentence, after the word says "Whoa Guys,"

2    it says, "I am almost out of bankruptcy," correct?

3    A.  Correct.

4    Q.  And again, that's September 27, 2012?

5    A.  Right.

6    Q.  Let's look back now to Exhibit 24B, please.  Now, we know

7    after the second amended plan -- or the first amended plan was

8    filed August of 2012, and after this e-mail from Ms. Miller

9    saying I'm almost out of bankruptcy in September of 2012, we

10   have some activity in October, November, and December of 2012,

11   correct?

12   A.  Correct.

13   Q.  And when I say "activity," we have reported/unreported

14   income on this chart?

15   A.  For Paypal and her Masterclass events.

16   Q.  Just for Paypal and for the Masterclasses?

17   A.  Correct.

18   Q.  And there are six numbers there, correct?  An unreported

19   amount for one each, October, November, December, one for

20   Paypal and one for Masterclass, right?

21   A.  Right.

22   Q.  And if we look at those six numbers, I'm just going to

23   round to the nearest thousand and we'll try to estimate what

24   this totals.  So I'm looking at 4,000 plus 6,000 plus 3,000

25   plus 8,000 plus 17,000; is that correct?

1   A.   Sure.

2   Q.   Rounding, and that gives me about $38,000 approximately?

3   A.   Correct.

4   Q.   And then -- just so we know, that's $38,000 after the

5   second amended plan was -- after the amended plan was filed

6   and after that e-mail that we just saw from Ms. Miller.

7        And then we know, based on our discussion a few minutes

8   ago, that the second amended plan of reorganization was filed

9   in January of 2013, correct?

10  A.   Correct.

11  Q.   So prior to that, we have approximately 38 grand, $38,000

12  which was after the amended plan, and then we have $7,000

13  which was after the original plan, correct, as we look at 24B?

14  A.   Say that one more time.

15  Q.   Sure.  We have $7,000 after the original plan was filed in

16  February 2012, right?

17  A.   Right.

18  Q.   And then we talked about those six numbers equaling

19  $38,000 that were filed before the end of 2012 but after the

20  amended plan.  $38,000, correct?

21  A.   Right.

22  Q.   That's $45,000, correct?

23  A.   Okay.

24  Q.   Approximately?

25  A.   Okay, yes.

1   Q.  You're agreeing that 7,000 plus 38,000 is $45,000,

2   correct?

3   A.  Yes.

4   Q.  After that, we have the second amended plan filed in

5   January of 2013, correct?

6   A.  Correct.

7   Q.  So the remaining numbers that are on this chart that we

8   haven't talked about yet, that's after the second amended plan

9   of reorganization, correct?

10  A.  Right, January '13 through October of '13.

11  Q.  Correct.  So in order to get -- so we don't have to add

12  all these numbers up here, I just want to take the $45,000 we

13  talked about before, and we can just subtract that from the

14  $387,000, correct?

15  A.  Okay.

16  Q.  Is that correct?  We can do that?

17  A.  Sure.

18  Q.  And in that case, what would that be?  387,000 minus

19  45,000.

20  A.  342.

21  Q.  About 342,000 of unreported revenue after the second

22  amended plan was filed, correct?

23  A.  Yes.

24  Q.  Now, just to be fair, these balances that are shown on

25  here of unreported revenue, these are all gross numbers,

1    correct?

2    A.   No.

3    Q.   They're net numbers?

4    A.   Correct.  These are what actually hit the bank accounts or

5    the Paypal accounts.

6    Q.   And the Paypal accounts?

7    A.   Correct.

8    Q.   Let's talk about --

9    A.   These are not paychecks.  They're not gross less any

10   taxes.  This is literally payments received for services that

11   are what they are.  There's no gross or net.  It is what it is

12   that hit the bank accounts.

13   Q.   Let me phrase that in a different way.  So for any travel

14   that would be associated with any of this revenue, any travel

15   costs, would they be deducted from these numbers?

16   A.   This is purely revenue.

17   Q.   Purely revenue?

18   A.   Purely revenue.

19   Q.   Not a net number?

20   A.   Net of expenses?

21   Q.   Net of expenses like travel?

22   A.   No.  This is purely revenue.

23   Q.   And then along those same lines, costs of merchandise, is

24   that deducted from these numbers?

25   A.   This is purely revenue.

1   Q.  That's a no, correct?

2   A.  No.  That's a no, right.  No expenses were factored in

3   creating this.  This is purely revenue.

4   Q.  You're saying this is unreported income on Ms. Miller's

5   monthly operating reports, correct?

6   A.  These were -- correct.  These were funds that were

7   deposited into the -- either held in Paypal that was never,

8   ever disclosed to the courts or was deposited in Wells Fargo

9   Bank accounts that did not have the approval, as far as I'm

10  aware of, to open and maintain from roughly the summer/fall

11  2012 and moving forward.

12  Q.  Answer my question.  This is unreported revenue that

13  wasn't -- that wasn't reported on monthly operating reports,

14  correct?

15  A.  Correct.

16  Q.  Likewise, any of those expenses that I talked about, those

17  weren't reported on the monthly operating reports either,

18  correct?

19  A.  I'm not so confident that they were, but this schedule

20  only shows revenue.  We charged her with revenue.

21  Q.  You never looked to see if there was any travel associated

22  with any of these amounts that was actually put on a monthly

23  operating report as an expense?

24  A.  No, I wouldn't say I never looked.  It's just that the

25  schedules showed a lot of the dance studio.  It was labeled

1    dance studio in Florida residence on her MORs, classifying the

2    expenses and that were reportedly matched up to the S&T DIP

3    account.

4    Q.  Okay.  Anything as far as merchandise sales that we have

5    that we've talked about here or Paypal which I think also was

6    used for merchandise, you didn't see any deductions for sales

7    of that merchandise.

8        She had a Tightspot and a -- I forget the other name, the

9    other entity that sold merchandise, correct?

10   A.  She had the studio in Pittsburgh that she maintained and

11   sold merchandise and had revenue and had expenses, and those,

12   more than likely, should have been disclosed to the DIP

13   account and on her MORs, yes, so revenues and expenses

14   theoretically should have been disclosed on her MORs.

15   Q.  And in fact, the Tightspot I think it was or the ones up

16   here, there were accounts, that Square account that actually

17   did report on to the -- first, it hit the S&T Bank and made it

18   on to the monthly operating reports.

19   A.  I did note some instances that there was another Square

20   account that was pointing to the S&T DIP account, yes.

21   Q.  And then this Masterclass/merchandise column, I want to

22   talk about that for a little bit.  This related to I think you

23   called it a joint venture that Ms. Miller had with Mark

24   McCormick.

25   A.  That was part of it, yes.

1    Q.   And Mark McCormick took an actual share of the revenue

2    that -- from those merchandise sales, correct?

3    A.   Sometimes, yes.

4    Q.   Is that deducted out of these numbers?

5    A.   Nope.  Again, this is purely revenue.

6    Q.   Okay.

7    A.   When I say "revenue," these were cash deposits into Wells

8    Fargo accounts that were not disclosed.  So if on site, she

9    has, say, for example, $20,000 collected but had to pay people

10   out of it, and from the remainder that was deposited in the

11   account, I don't know.

12   Q.   You --

13   A.   I'm going off of deposits that went into the bank account.

14   Does that make sense?

15   Q.   It does.  I understand what you're saying, yes.  Thank

16   you.

17       Mr. McCormick's percentage was 45 percent of the revenue,

18   correct?

19   A.   I don't recall what his actual percentage was.

20   Q.   You met Mr. McCormick?  You talked to him?

21   A.   I know there was an agreement with a certain percentage,

22   but I don't recall what the number was.

23   Q.   You've talked to Mr. McCormick on occasion?

24   A.   Yes.

25   Q.   How many times have you talked to him?

1   A.   Maybe five times over the course of the investigation.

2   Q.   And he -- you don't recall him telling you how much his

3   percentage was?

4   A.   I recall him telling me.  As I'm sitting here today, I

5   don't recall what the percentage was.  There was a percentage.

6   There was profit-sharing, yes.

7   Q.   Let's take what I've marked as Defense Exhibit 22.

8   A.   Yes, sir.

9   Q.   Do you recognize this document?

10  A.   I saw it last night at 8:30.

11  Q.   You've seen it though before that though, correct?

12  A.   Actually, I don't recall seeing this particular

13  spreadsheet.

14  Q.   You, in fact, received spreadsheets from Mark McCormick?

15  A.   I'm not denying that I received spreadsheets.  I just did

16  not look at this one.

17  Q.   You don't recall ever looking at this one.

18  A.   I don't recall when you sent it at 8:30 last night that I

19  saw it, but I have it now and I'll try to answer your

20  questions.

21  Q.   So if we can -- I think unfortunately I can't see -- we

22  can't see the tabs or the cell formulas.  Can we open that up

23  in Excel?  Can you see that, Agent Langford?

24  A.   Yes, I do.

25  Q.   That's a little bit better.  At the bottom of it, in the

1   tab, it says P&L, correct?

2   A.  Correct.

3   Q.  That's profit and loss?

4   A.  Typically, yes.

5   Q.  Typically it's profit and loss, right?

6   A.  Yes, sir.

7   Q.  Then let's look up at what would be cell AA, so it would

8   be row AA and the 4.

9           MR. MELUCCI:  Your Honor, the objection I'm going to

10  raise to this exhibit is that Mr. Langford did not create this

11  exhibit.  It's from a witness named Mark McCormick.

12          We've talked about Mark, I understand that.  I'm a

13  little concerned about Mr. Verdream asking questions about

14  this exhibit unless he's familiar with this exhibit.  This is

15  Mr. McCormick's creation, not Mr. Langford.

16          MR. VERDREAM:  In fact, it was Mr. McCormick's

17  creation that I received through Agent Langford in discovery

18  that Agent Langford provided.

19          MR. MELUCCI:  He didn't create the exhibit so I'm a

20  little concerned that he's not --

21          THE COURT:  If he doesn't have an answer, he can just

22  say I don't know or that's not within his realm of knowledge,

23  but if this is an exhibit that came from the government, this

24  is the government's agent that was responsible for the

25  gathering of the document, he will be able to testify to it.

 1              MR. MELUCCI:  That's fine.  Thank you.

 2              MR. VERDREAM:   Thank you, Your Honor.

 3    BY MR. VERDREAM:

 4    Q.  If we look at cell AA4 and that's AA3, Agent Langford, it

 5    actually says Mark, correct?

 6    A.  Correct.

 7    Q.  Underneath that, if you could move just the mouse away.

 8    It looks like it says $52,378.88, correct?

 9    A.  Correct.

10    Q.  If you look up at the formula, it says positive AG4 times

11    0.45, correct?

12    A.  Yes, I see that.

13    Q.  I read that correctly?

14    A.  Yes.

15    Q.  And let's look over at AG4.  That says $116,379.43,

16    correct?

17    A.  Okay, yes.

18    Q.  I'm correct?

19    A.  Yes.

20    Q.  Above that, it says net.

21    A.  Yes, it does, yes.

22    Q.  So then that number back in cell AA4, that's 45 percent of

23    that net number, correct?

24    A.  Yes.

25    Q.  Let's go back just briefly back to AB4.  The cell right

53

1   above that says Abby, correct?

2   A.  Yes.

3   Q.  She similarly has a formula that says AG4 multiplied by 55

4   percent, correct?

5   A.  Yes.

6   Q.  So that there, between those two, that's a 45/55 split,

7   correct?

8   A.  Yes, it appears to be.

9        MR. VERDREAM:  I move now for the admission of

10   Government Exhibit -- or Defense Exhibit 22, please.

11        MR. MELUCCI:  Well, Your Honor, again, the same

12   objection.  Subject to my objection.

13        THE COURT:  It will be admitted.

14        MR. VERDREAM:  Thank you.

15   Q.  You said you talked to Mr. McCormick about five times?

16   A.  Yes.

17   Q.  Did Mr. McCormick ever tell you that or did he ever

18   describe Ms. Miller as a Mustang sitting idle in a garage?

19        MR. MELUCCI:  I'm sorry.  I missed that.

20   Q.  Did he ever describe Ms. Miller to you as a Mustang

21   sitting idle in a garage?

22   A.  I never heard that one, I don't think.

23   Q.  He never said that much while she was still in bankruptcy

24   and had these opportunities before?

25   A.  I don't recall that.

1   Q.  During your investigation, you also had a chance to

2   interview Kathy McFaden?

3   A.  Yes.

4   Q.  How many times did you speak with Ms. McFaden, if you

5   recall?

6   A.  Three or four times, at least.

7   Q.  And she was Ms. Miller's accountant, correct?

8   A.  Yes.

9   Q.  And we've talked about, in some of the files here, about S

10  corporations that were set up for Ms. Miller, correct?

11  A.  Correct.

12  Q.  And Ms. McFaden actually facilitated that process of

13  setting up the S corporations?

14  A.  She was involved, yes.

15  Q.  And she actually put -- she actually spoke to attorneys

16  about this process?

17  A.  Yes.

18  Q.  And connected Ms. Miller with attorneys for this process?

19  A.  Yes.

20  Q.  And during your times when you talked -- did you talk to

21  Ms. McFaden about these S corporations?

22  A.  I'm sure I did.

23  Q.  Do you recall her telling you that Ms. Miller wanted to

24  set these S corporations up for tax purposes?

25  A.  That was part of it.  You could say that, yes.

1    Q.  She did say that, correct?

2    A.  She wanted payments from Collins to be paid to the S

3    corps.

4    Q.  And tax consequences was a reason for setting those up?

5    A.  Withholdings, right, withholdings.

6    Q.  When you say "withholdings," you mean in a tax sense?

7    A.  For individual payroll taxes, yes.

8    Q.  Got you.

9    A.  I recall Ms. Miller wanting her payments from Collins, her

10   paychecks to be submitted payable to the S corps to avoid the

11   tax consequences, so she would have more money coming to the S

12   corps is what I recall.

13   Q.  A tax planning strategy?

14   A.  Yeah, but ultimately Ms. McFaden told her that wouldn't

15   work for whatever reasons, workers' comp reasons or whatever.

16   Q.  Whether or not it worked, that was the goal?

17   A.  Right.

18   Q.  Let's look at Government Exhibit 35, please.  This is an

19   e-mail from Ms. Miller?

20   A.  Yes.

21   Q.  This is dated February 15, 2013, correct?

22   A.  Correct.

23   Q.  This is after that second amended plan of reorganization

24   was filed in January of 2013, correct?

25   A.  Correct.

1    Q.  And in fact, this was after Judge Agresti called

2    Ms. Miller into court and read her the riot act during the

3    bankruptcy?

4    A.  There were several of those, but yes.

5    Q.  You do recall one prior to this, to February 2013,

6    correct?  If you don't recall, that's fine.

7    A.  I don't recall specifically, but there were several

8    instances.

9    Q.  Okay.  In this e-mail, if you look, I don't even know if I

10   would call it the first or the second or third sentence, it

11   says, "I'm paying everyone I owe 100 percent back in one big

12   check.  Who does that?  Nobody in bankruptcy."

13        Do you see that?

14   A.  I do.

15   Q.  Now, did Ms. McFaden ever tell you that she actually heard

16   that same statement made by someone else, by an attorney in a

17   joking manner?

18   A.  No, I don't recall that.

19   Q.  Ms. McFaden never mentioned that to you?

20   A.  No.

21   Q.  Let's flip to Government Exhibits -- well, starting with

22   Government Exhibit 35.  We know that's after the second

23   amended plan was filed.

24        If we can, just flip to Exhibit 36, and I'm going to flip

25   through each one of these exhibits, Agent Langford.  I want to

1    make sure you can confirm these e-mails are after the second

2    amended plan was filed.

3    A.  Yes.

4    Q.  Exhibit 36 was after?

5    A.  Yes.

6    Q.  Exhibit 37?

7    A.  This top one, yes.

8    Q.  And Exhibit 38?

9    A.  Yes, March 14, after.

10   Q.  Same with Exhibit 39?

11   A.  Yes, March 29, after.

12   Q.  And Exhibit 40?

13   A.  Looks like May 2013.  That would be after.

14   Q.  41?

15   A.  Yes, May 7, after.

16   Q.  42?

17   A.  October of '13, after, yes.

18   Q.  And 43?

19   A.  Again, October of '13.

20   Q.  And then 44, please?

21   A.  Looks like October '13, after.

22   Q.  That's actually getting pretty close to the actual

23   discharge date in December of 2013, correct?

24   A.  Getting close.

25   Q.  And then if we can look at the newly admitted exhibits

1    from today.  Exhibit 55, please.  Again, we recall the second

2    amended plan was filed on January 18, 2013, correct?

3    A.  Correct.

4    Q.  And this e-mail is from -- top e-mail from Kathy McFaden

5    that's January 22nd, 2013?

6    A.  This e-mail is January 22nd of 2013.

7    Q.  And then if we can go to Exhibit 56, which is from -- the

8    e-mail we discussed earlier from Jeff Collins, that's March

9    14, 2013, correct?

10   A.  Correct.

11   Q.  So that's almost two months after the second amended plan

12   was filed, right?

13   A.  Right.

14   Q.  And then you talked about just today about Exhibits 50

15   through 54 relating to invoices that were paid, I think, by

16   Collins Avenue; is that correct?

17   A.  Right, yes, sir.

18   Q.  And you said though you weren't really sure how these were

19   treated, whether they were deducted from Ms. Miller's

20   paychecks or not.

21   A.  Right.  As I'm sitting here today, I don't recall if these

22   were paid out of Collins's bottom line company funds or if

23   these were deducted from any talent fee that she either had

24   earned or future earnings, and there were instances of both.

25        There were several throughout the investigation that we

1    know Collins paid for, but I do know that some of them were

2    deducted from her talent fee, costs and expenditures that they

3    paid.

4    Q.  Okay.  And you -- do you know if she was 1099ed or given a

5    W2 for any of these?

6    A.  I don't know.

7    Q.  You don't know.  Briefly, if we can, just flip through

8    Exhibit 50.  That's a November 2012 e-mail, correct?

9    A.  November 15, yes.

10   Q.  And 51 is a November 15, 2012 e-mail, correct?

11   A.  Yes, sir.

12   Q.  And 52, Exhibit 52 is a November 16, 2012 e-mail?

13   A.  Yes, sir.

14   Q.  And 53 is a December 18, 2012 e-mail, correct?

15   A.  Yes.

16   Q.  And 54 is the same, December 18, 2012, correct?

17   A.  Yes.

18   Q.  And so that's November or December 2012.  That's three or

19   four months after the amended plan of reorganization was

20   filed, correct?

21   A.  Back in August, yes.

22   Q.  And then if you remember that e-mail, we can go back to

23   it, from September of 2012 where she says "I am almost out of

24   bankruptcy," correct?

25   A.  I do recall the e-mail.

1    Q.  So do you recall the date though, September 2012?

2    A.  Yes.

3    Q.  So those exhibits we just talked about, those are two to

4    three months after that as well, correct?

5    A.  These exhibits are after that, yes.

6    Q.  Let's take a look at Government Exhibit 22, please.  This

7    was a PowerPoint that you put together, correct?

8    A.  Correct.

9    Q.  And I believe we marked the first page a zero, so page 1,

10   if you flip to the next page, that's actual -- that says "ALM

11   income sources" at the top, correct?

12   A.  I see it, yes.

13   Q.  And then if you flip to the next page, which would be page

14   2, this is entitled "Disclosed versus undisclosed on original

15   monthly operating reports," correct?

16   A.  Yes.

17   Q.  And in the left-hand column, you have -- or in the

18   left-hand side under the undisclosed area, you have the Square

19   account, correct?

20   A.  Correct.

21   Q.  You don't have this in the right-hand column for disclosed

22   on original MORs, correct?

23   A.  No.  We're talking about the undisclosed, the Square that

24   was set up in Rachael Thoma Dennison's name.

25   Q.  There was a Square account that was disclosed on the

1    original MORs?

2    A.  Yes, yes.

3    Q.  That's correct, right?

4    A.  Correct.

5    Q.  And those actually, I think, hit the S&T bank account?

6    A.  Correct.  They were part of the S&T account.

7    Q.  Also you have in the left-hand column as undisclosed you

8    have a Showclix identifier there, correct?

9    A.  Right.

10   Q.  But there was also a Showclix that was disclosed on the

11   original MORs, right?

12   A.  Summer recitals and a Canadian trip, if I recall, in the

13   fall of '12.

14   Q.  If you can turn to the next page, page 3.  Again, this is

15   just to be fair for the presentation for Ms. Miller, you don't

16   have Square or Showclix on the amended MORs, correct?  Under

17   the disclosed amended MORs column.

18   A.  We are not highlighting the S&T account.  That was going

19   towards the Square account.  That was going towards the S&T

20   account.  We're highlighting the Square, Paypal, Showclix.

21   That was all the Wells Fargo accounts, yes.

22   Q.  To be fair, there was a Square and Showclix that were

23   disclosed on the amended monthly operating reports?

24   A.  Yes.

25   Q.  Let's turn to page 5.  I think it would be two pages.

1    This is a chart again you created, correct?

2    A.  Right.

3    Q.  It says, "Unreported financial accounts to bankruptcy

4    court," correct?

5    A.  Right.

6    Q.  At the top.

7    A.  Right.

8    Q.  But if we go down -- I'm going to talk about Showclix and

9    Square.  That Showclix with account number 17128 and that

10   Square account with 4281072, those were in fact disclosed to

11   the bankruptcy court, correct?

12   A.  Right.

13   Q.  Let's turn to --

14   A.  Although there were some, if I recall, there were some --

15   for some reason, there were Showclix deposits from this 17128

16   that didn't fully get disclosed on her MORs or amended MORs,

17   if I recall.

18   Q.  And can you say that again?  I'm sorry.  I'm not sure I

19   follow that.

20   A.  When I was working up this particular information,

21   comparing Showclix revenue for both Showclix accounts, they

22   didn't fully match up with her amended MORs.  It wasn't even

23   really a timing difference.  She didn't report all of the

24   Showclix revenue, if I recall --

25   Q.  But the Showclix --

1   A.   -- from the summer recital account.

2   Q.   The Showclix revenue, there was actually -- there are

3   actually identified though -- Showclix revenue was actually

4   identified in the monthly operating report we just talked

5   about?

6   A.   For example, I believe in May of '13, the smaller Showclix

7   account 17128, there was only one May ACH deposit for 10,000

8   that was disclosed on the MOR.  There were two other May

9   transactions that didn't make it on her MORs.

10  Q.   You're recalling this from memory?

11  A.   And I'm looking at some reconciliations that I did.

12  Q.   Which page is that?

13  A.   What page?

14  Q.   That you're looking at.

15  A.   This would have been the unreported income for May of

16  2013, post-amendment $34,234.

17  Q.   May of 2013?

18  A.   '13.

19  Q.   After the second amended plan of reorganization was filed?

20  A.   You asked me if these were unreported financial accounts

21  and I had to think for a minute.  There were some undisclosed

22  Showclix deposits from the 17128 account that was pointing to

23  S&T, but now after my recollection, I believe there was some

24  deposits that weren't fully disclosed.

25  Q.   And there were deposits that were fully disclosed?

1  A.  Yes, but I thought I made a mistake on this, but for that

2  particular one, I believe it probably could be categorized as

3  unreported financial accounts, just to clarify.

4  Q.  Sure, sure.  Absolutely.  And then if we flip to page 11,

5  this says, "Masterclass cash receipts," correct?

6  A.  Yes.

7  Q.  And did you put this spreadsheet together?

8  A.  No.  This was the grand jury production from Showclix.

9  These were the events that were registered on Showclix and

10  that they collected revenue from, so I did not create the

11  spreadsheet, but that's in my PowerPoint.

12  Q.  If you look at the right-hand column, these are all dated

13  February 13 or later, correct?

14  A.  Correct.

15  Q.  And then Ms. Miller didn't even attend all of these events

16  though, correct?

17  A.  I don't know which ones she attended.

18  Q.  You never asked anyone which ones she attended or which

19  one she didn't?

20  A.  I never got to interview her.

21  Q.  You interviewed other people that attended these, correct?

22  A.  Right, but I don't recall which ones she attended, which

23  ones she didn't, how many she did or didn't.

24  Q.  The "For Teachers Only," do you see that?  It's back on

25  September 28, 2013.

1   A.   Okay.

2   Q.   And did anyone ever tell you that that's actually a free

3   event?

4   A.   I don't know if it was or not.  I was just looking that

5   these were registered events in Showclix.

6   Q.   Did anyone ever tell you though?

7   A.   No.

8   Q.   And similarly for that event, did anyone ever tell you

9   that Ms. Miller paid the expenses for that event?

10  A.   I have -- no.

11          MR. VERDREAM:  Your Honor, may I have a quick moment?

12          THE COURT:  Yes, you may.

13  Q.   I'm sorry, Agent Langford, but just to clarify, you

14  testified, right, that you don't know whether or not this is a

15  free event where it says "For Teachers Only"?

16  A.   I don't know anything about the event other than what's

17  listed on the slide.

18  Q.   Other than it says "For Teachers Only Ask Abby Dessert

19  Dish," correct?

20  A.   I read it just like you do.

21  Q.   At the top, you have cash receipts though, right?

22  A.   Yes.  These were for merchandise, Masterclass cash

23  receipts.  That includes not only the revenue for the tickets

24  but also merchandise that was sold.  I don't know if there's

25  any sold at that particular event or not.

1    Q.   That would be the same for --

2    A.   Right.  I don't know what the charge was, as I'm sitting

3    here.  I don't recall or know or if there was merchandise

4    bought there or not.

5         This was just an average.  There was 21 shows.  There was

6    8,000 in cash, because during the investigation, we were told

7    in many of these events, they charged a fee and she also sold

8    merchandise.

9    Q.   And you weren't -- you're not sure if she was even at all

10   of those events?

11   A.   I don't know which ones she attended.

12   Q.   During the course of your investigation, did you ever hear

13   about any problems with Ms. Miller actually collecting money

14   that was owed to her by Collins Avenue?

15   A.   No.

16   Q.   Never heard of a payment of $172,000 that she was owed

17   that Collins Avenue failed to pay for a significant period of

18   time?

19   A.   Owed by Collins Avenue?

20   Q.   To Ms. Miller.

21   A.   No.  We heard a lot about money that was owed to

22   Ms. Miller for payroll that she wasn't providing the

23   appropriate paperwork in order to get paid.  That's to the

24   extent we heard.

25   Q.   Appropriate paperwork?

1    A.   For paychecks.

2    Q.   S corps?

3    A.   Yes, and getting back to the December 21, December 20

4    checks.

5    Q.   Right, which we talked about earlier, correct?

6    A.   You were asking me about owed payments.

7    Q.   Okay.

8    A.   It was for her failure to request and do the proper

9    paperwork in order to get paid is the only recollection I have

10   from dealing with Collins.

11   Q.   Okay.

12   A.   You follow?

13   Q.   I do follow.

14        MR. VERDREAM:   Thank you.   That's all I have.   Thank

15   you very much.

16        MR. MELUCCI:   Just a couple quick follow-ups to

17   Mr. Verdream's questioning.

18                    REDIRECT EXAMINATION

19   BY MR. MELUCCI:

20   Q.   Mr. Langford, you were asked questions about the monthly

21   operating reports and many of the monthly operating reports

22   for December of 2012, right?

23   A.   Right.

24   Q.   You were asked specifically about the $288,000 in checks

25   that Ms. Miller received in December 2012, dated December

1    2012?

2    A.   Correct.

3    Q.   Do you recall reviewing those checks that were deposited

4    into the Calaiaro Corbett escrow account in January 2013?

5    A.   Yes.

6    Q.   There were many of those checks dated throughout the

7    entire calendar year?

8    A.   Yes, they were.   2012.

9    Q.   So because they were issued in December 2012 doesn't mean

10   she actually earned them on or in December 2012?

11   A.   No.   These were checks that she would have earned

12   throughout the year for those particular pay periods.

13   Q.   And just to clarify Mr. Verdream's examination, the first

14   time that the monthly operating reports disclosed by way of

15   attaching a spreadsheet of those checks totaling $288,000 was

16   not until October 2013?

17   A.   I don't recall if the escrow account was attached to the

18   amended December or if it was the second amended December.

19   Q.   Let me show you --

20        MR. MELUCCI:  May I approach the witness, Your Honor?

21        THE COURT:  Yes, you may.

22   Q.   Mr. Verdream marked as Defendant 21 which is the amended

23   December 2012 monthly operating report.

24        Is that the first time you see any statement disclosing

25   those paychecks?

1    A.   There were many -- in October of 2013, there were many

2    MORs that were amended to capture previously unreported

3    Collins Avenue.

4    Q.   That was just a month or two before the case was

5    discharged?

6    A.   Correct.  Not only for December 2012 but throughout the

7    pendency of the bankruptcy.

8    Q.   Which captured previously unreported income?

9    A.   Collins revenue, yes, only.

10   Q.   You had indicated towards the end of your

11   cross-examination that, with respect to those $288,000 in

12   checks, you interviewed the show producer?

13   A.   Yes.

14   Q.   That was Michael Hammond?

15   A.   Correct.

16   Q.   One of the assistant show producers, I assume, and you

17   questioned him about those checks?

18   A.   Yes.

19   Q.   What did he tell you?

20   A.   That throughout the year, they were aware that she had not

21   been paid for all these pay periods throughout 2012, and at

22   several points, Hammond was telling me that they were trying

23   to pay her for the income that she was due.

24        And again, as I spoke before, they were relying on her to

25   prepare timesheets and submit the requests for payment to

1   their internal accounting department, and throughout the year,

2   that didn't happen.

3       They wanted to pay her, and at the end of the year, they

4   wanted to close out their books and issue all these checks,

5   which was their explanation of why these checks were payable

6   on December 20th and December 21st to close out their books

7   and pay her the moneys that she earned and had not been paid

8   yet.

9   Q.  I'm going to turn your attention to -- can you pull up

10  Government Exhibit 22, and turn to page 1 of 3 of that,

11  please?

12          MR. MELUCCI:  Give me a moment, judge.

13  Q.  I'm showing you what was marked previously as Government

14  Exhibit 22, which is an e-mail dated September 27, 2012.

15  A.  Yes.

16  Q.  And that was before the December 2012 series of checks

17  that was sent by the producer to Ms. Miller, right?

18  A.  Correct.

19  Q.  Would you read that e-mail to the court, please?

20  A.  "Whoa, guys!  I am almost out of bankruptcy."

21  Q.  By the way, who's the e-mail from?

22  A.  It's from Ms. Miller to Kathy McFaden copying Brian

23  Raymond.

24  Q.  Ms. McFaden is her accountant?

25  A.  Right.

1   Q.  And Mr. Raymond was her entertainment attorney?

2   A.  Correct.

3   Q.  Go ahead.

4   A.  "Whoa, guys!  I am almost out of bankruptcy.  Collins

5   Avenue Entertainment, Michael Hammond is holding money at my

6   request.  I did receive checks every week during the ultimate

7   competition show.  This is how I lived in L.A. all summer

8   long."

9   Q.  Thank you.

10          MR. VERDREAM:  Greg, I think that's Exhibit 29.

11          MR. MELUCCI:  Thank you.  You're right.

12  Q.  Now, you were asked also about studio refurbishment fee

13  checks.  Do you recall that question?

14  A.  Yes.

15  Q.  And did you discover during your investigation,

16  Mr. Langford, that Ms. Miller was paid by the studio

17  approximately $100,000 to refurbish her Penn Hills studio?

18  A.  Correct.

19  Q.  I think they were issued in two separate checks.

20  A.  Three checks.

21  Q.  Three checks during the pendency of the bankruptcy.

22  A.  Yes, sir.

23  Q.  Between 2010 and 2013?

24  A.  10,000, 40,000 and $50,000 is what I understand from my

25  investigation, yes.

1   Q.  Did you see any of those checks deposited into the DIP

2   account during the pendency of the bankruptcy?

3   A.  The $40,000 check was deposited into her attorney trust

4   account.  The 50,000 check wasn't negotiated until she was out

5   of bankruptcy.  The $10,000 check, I don't recall where it was

6   deposited.

7   Q.  You were also asked about a spreadsheet prepared by

8   Mr. McCormick, which was Defendant's Exhibit 22?

9   A.  Yes.

10  Q.  This is a color coded spreadsheet Mr. Verdream asked you

11  questions about.

12  A.  Yes.

13  Q.  You got that last evening, correct?

14  A.  Correct.

15  Q.  You didn't prepare the spreadsheet?

16  A.  No, I did not.

17  Q.  Did you go ahead and prepare an accounting of the revenue

18  Ms. Miller earned by the color coded description on that

19  spreadsheet?

20  A.  Not necessarily an accounting of the revenue earned.  I

21  was making some brief notes off of the spreadsheet totaling up

22  some of the particular items.

23      In particular, in the column -- first of all, I spoke to

24  Mr. McCormick last night about this spreadsheet, as I had not

25  seen it before and did not recall seeing it before, and was

asking particulars about this particular spreadsheet, and there are a lot of colors and columns and, you know, descriptions.

One particular item that is of note is in the credit column -- first of all, this spreadsheet, according to my conversation with Mr. McCormick last night, is an attempt at an accounting of their joint venture for Abby Lee Apparel, which involved the Wells Fargo account 7083.

This spreadsheet starts September 21 of 2012, and the first line item is an initial Abby deposit of $10,000.  I believe that was a Collins check that she opened the account with, and then it progressively moves down the spreadsheet all the way through May of 2014, so it's the fall of '12, all of '13 and part of 2014.

The items that are of note that I was asking about, there are columns in the credit column which are highlighted in green, and asking Mr. McCormick what the significance of the green is.

He directed me to the column, the description column to the right of those particular numbers, and he described it as being cash earned at Masterclass events.

So, for example, if you look at September 28, line item, there's $1,385 there in green on the credit column.  To the very right, it says "Meet and greet in Jackson, Mississippi."

I reviewed the spreadsheet last night, and after talking

with Mr. McCormick, there are several items that are in green
that reference Square.  I did not count those.  There are
items in green that represent checks.  I did not count those.

I was strictly looking at cash and his explanation of
where he got the number and what it means.

In 2012, she collected 36,052 in cash according to this
spreadsheet.

Q.  This is the joint venture revenue?

A.  Yes, sir, the Masterclass events, the apparel.  In 2013,
she collected $167,000 in cash revenue and in 2014, it was
$68,000.

Q.  Where did that money go?

A.  Mr. McCormick didn't know.  He said the vast majority of
it, he never saw.  It was never deposited to the 7083 account,
and he described that often, you know, the joint venture, he
was paying a lot of these expenses on his own and using his
personal credit card, which is highlighted on his very
detailed spreadsheet.

The items in yellow were expenses that he paid himself,
and he very rarely was getting money from Ms. Miller or seeing
some of the revenue for the apparel deposited back into the
account.

So he could not give me a good answer for where all this
cash went, except he didn't see it and it didn't go in the
bank.

1    Q.  In your investigation, did you see deposits of cash by

2    Ms. Miller into the DIP account that are consistent with

3    36,000 in 2012, 167,000 in 2013 and 68,546 in 2014?

4    A.  No, sir.

5            MR. MELUCCI:  That's all I have, Your Honor.

6            MR. VERDREAM:  Just a few follow-up questions, Your

7    Honor.

8            THE COURT:  Yes, you may.

9            MR. VERDREAM:  I'll be brief.

10                       RECROSS-EXAMINATION

11   BY MR. VERDREAM:

12   Q.  If we go back to Defense Exhibit 14.  Again that actually

13   has the workweeks and when that work was performed, correct?

14   A.  It's listed there, yes.

15   Q.  And then could we pull up Defense Exhibit 22, please?  So

16   you talked about this spreadsheet with Mr. McCormick last

17   night, correct?

18   A.  I did.

19   Q.  Did he attend all these Masterclass events?

20   A.  He attended a few.

21   Q.  Did he attend all of them?

22   A.  No, he didn't attend all of them.

23   Q.  Did he tell you which ones he attended and which ones he

24   didn't?

25   A.  No.

1    Q.  As we look at that, at these numbers -- actually, could we

2    pull it up on the spreadsheet?  You were talking about the

3    green numbers, correct?

4    A.  Right, in the credit column.

5    Q.  Can you click on the first green number, please?  1385.

6    That's a hard input number, correct?

7    A.  Yes.

8    Q.  And did he show you the support for that number?

9    A.  I asked him where he got the figure from, and he said that

10   for these events, he was the one that was ordering the

11   apparel.  He knew how much it cost.  He had the invoices.  He

12   knew how many there were.  He knew where the shows were.

13       He either was providing them to Ms. Miller before she left

14   or was sending them to the event, and he would communicate

15   with her after the event or someone that was attending the

16   events to help out with the sale of merchandise, whether it

17   was the staff or the moms, and would get an accounting of the

18   inventory left over.

19       I asked him how do you know it was all cash.

20       He says, well, it was told to me it was all cash.

21   Q.  Someone else told him and --

22   A.  He knew how much went.  He knew what the number was left,

23   and he said he was in constant discussions with her about this

24   business, again, because he wasn't getting any money back in

25   return.

1    Q.   Did he tell you about all the boxes of merchandise that,

2    if they didn't sell, they just left it on the floor or gave it

3    away?

4    A.   He said that there was probably some of that, but again,

5    to the point where -- you know, I could only go off these

6    numbers and what he told us about, that it was cash.

7        But he did say it got so bad toward the end, if you scroll

8    down to the spreadsheet, you'll see some items in blue, where,

9    in 2013, he was ordering and shipping.  These items were being

10   sold and he wasn't getting any of the revenue back.

11       Those items in blue actually represents, in order to pay

12   some of the vendors, he was logging into Paypal and paying

13   through Paypal expenses because he wasn't getting any return

14   money back from the merchandise that was sold.

15   Q.   Or possibly given away?

16   A.   Possibly given away, but this was a joint venture, and it

17   was doing fairly well, and throughout the investigation, my

18   interviews, Ms. Miller was purported to always have cash

19   around and on hand.

20   Q.   If we could just scroll down a little bit farther.  Keep

21   going, please.  Keep scrolling a little bit further.  I'm

22   sorry.

23       If we go to the right, please.  Back up.  I'm sorry.  I'll

24   ask you.  There are payments on here though to Mr. McCormick,

25   correct, reflected?

1    A.   There were transfers from this account to his account so

2    that he could pay his credit card bills that were reflected --

3    the expenses were reflected in yellow where he was purchasing

4    merchandise and paying for these invoices with his credit

5    card.

6         So, yes, there were movements of moneys from his Wells

7    Fargo 7083 account to his personal account so he could pay his

8    bills.

9    Q.   Also to pay what he was owed as part of this joint

10   venture?

11   A.   He said it was, for the most part, a profitable business

12   and, yes, he was due a percentage.

13             MR. VERDREAM:   That's all I have.  Thank you, Your

14   Honor.

15             THE COURT:   Witness is excused.

16        (Witness excused.)

17             MR. MELUCCI:   Your Honor, that's all the evidence the

18   government has in its case in chief.

19             MR. RIDGE:   Your Honor, before the government rests,

20   there's something I just want to bring to the court's

21   attention.

22             I think I'm okay on it, but I want to make sure.  If

23   you recall, there was an objection to Mr. Wahlquist's

24   testimony at the last hearing and I reserved the right to

25   strike any substantive testimony that Mr. Wahlquist gave.

1          Eventually, the court said we're not going to have

2     testimony from this person as an expert.

3          THE COURT:  That is correct.

4          MR. RIDGE:  But before you did that, you asked him a

5     couple questions about how he got to those numbers.  I don't

6     think I need to move to strike that, but I'm going to just in

7     the interest of belt and suspenders, because I think what the

8     court was doing was trying to establish whether there was a

9     foundation for this testimony.

10         And then when you concluded there wasn't, you decided

11    that that testimony wasn't going to come in, but because we're

12    in a proceeding before the bench, I think I probably need to

13    move to strike before the government rests just so we're clear

14    on that.

15         THE COURT:  I think it's important to have a record

16    that there wasn't a foundation and there was a basis for the

17    court not to permit him to give what the court determined was

18    expert testimony.

19         MR. RIDGE:  Yes.  That's really what I thought, Your

20    Honor.  I just wanted to make sure.

21         THE COURT:  It's not evidence that the court will

22    consider, but it is part of the record to reflect why the

23    court made a determination that he couldn't be giving certain

24    of the testimony.

25         He was allowed to testify to other matters but not as

1    to what would be, in effect, an appropriate interest rate for

2    the unsecured creditors.  That's my recollection of that

3    testimony.

4              MR. RIDGE:  Yes.  Thank you, Your Honor.

5              THE COURT:  That's the expert testimony.

6              MR. RIDGE:  That's the clarification I need.  Thank

7    you.

8              MR. MELUCCI:  Nothing further, Your Honor.

9              THE COURT:  Okay.  Mr. Ridge, the government is going

10   to rest.  This is as to the loss?

11             MR. MELUCCI:  Yes.  On the issue with respect to --

12   that addresses the government's argument that there is an

13   intended economic harm.

14             THE COURT:  That's argument.  This is for that

15   aspect?

16             MR. MELUCCI:  Yes.

17             MR. RIDGE:  Your Honor, government would call David

18   Valencik.

19             MR. MELUCCI:  The government would?

20             MR. RIDGE:  I'm sorry.  Old habits die hard, Your

21   Honor.  I'm sorry.

22             Ms. Miller will call David Valencik.

23             THE COURT:  Will the witness please come forward,

24   stand in front of the court reporter to be sworn.  We'll go

25   until about 12:30.

1          MR. RIDGE:  May we come to sidebar, Your Honor?

2          THE COURT:  Yes, you may.

3          (At sidebar.)

4          MR. RIDGE:  Before Mr. Valencik testifies, he's

5    testified before the grand jury and he's also provided

6    information and he's provided all of that information subject

7    to a court order that Judge Fischer entered about the

8    parameters of the attorney-client privilege.

9          I'm going to reference that today and ask him to make

10   sure to stay within those parameters, but I thought the court

11   should have the order just in case there was a question about,

12   okay, is this something he testified to, is this something

13   that the parties agree is not subject to the attorney-client

14   privilege, or is this something the parties might have a

15   dispute about.

16         THE COURT:  All right.

17         MR. RIDGE:  We probably need to give you that order.

18         MR. MELUCCI:  Essentially, what the government's

19   position was, when Mr. Valencik was called before the grand

20   jury, Your Honor -- of course, we're familiar with the

21   attorney-client privilege.

22         However, with respect to matters that are intended to

23   be public communications, in this instance, Mr. Valencik was

24   Ms. Miller's bankruptcy counsel, so obviously, he filed -- he

25   and his firm filed multiple documents, schedules, reports on

82

1    her behalf.

2            With respect to those matters, the communications

3    that Ms. Miller provided to him that ultimately became either

4    part of the filed document or the document itself would not be

5    privileged.

6            THE COURT:  Okay.  That's what he's going to be

7    testifying about?

8            MR. RIDGE:  Yes, Your Honor.

9            MR. MELUCCI:  We're not going to invade any

10   privilege.  We understand.

11           THE COURT:  Is this for me?

12           MR. MELUCCI:  You may have that, judge.

13      (Witness sworn.)

14           DAVID ZACHARY VALENCIK, a witness herein, having been

15   first duly sworn, was examined and testified as follows:

16                        DIRECT EXAMINATION

17   BY MR. RIDGE:

18   Q.  Can you state your name for the record, please?

19   A.  David Zachary Valencik.

20   Q.  And what do you for a living?

21   A.  I'm an attorney with the office of Calaiaro & Valencik.

22   Q.  Can you describe for the court the nature of your

23   practice?

24   A.  Our primary practice is bankruptcy law.  We file

25   approximately 30 percent of the Chapter 11s in the whole

Western District of Pennsylvania.

Q.   Do you know how many Chapter 11s are filed in the Western District of Pennsylvania?

A.   I believe the "Pittsburgh Business Times" said that last year, 31 were filed and we filed ten of them.

Q.   Have you always worked as a bankruptcy practitioner, Mr. Valencik?

A.   I have.  I've worked for Mr. Calaiaro since I graduated from law school, and I started at Calaiaro & Corbett.  And when that firm dissolved, we became Calaiaro & Valencik.

Q.   When did you graduate from law school?

A.   I graduated from law school in 2009.

Q.   When were you admitted to the bar?

A.   In 2010.

Q.   Okay.  As I understand it, you also worked for a brief period of time before you passed the -- before you graduated from law school for a predecessor firm, right?

A.   I've worked for Calaiaro & Corbett from the time I graduated from law school, which was about a year before when I passed the bar.

Q.   Okay.  Mr. Calaiaro is the sort of common thread between both of those law firms?

A.   Right.

Q.   Now, Mr. Valencik, you have produced testimony and documents to Mr. Melucci concerning Abigale Lee Miller's

1    bankruptcy in the past, correct?

2    A.  Correct.

3    Q.  You're aware of an order that governs the scope of the

4    testimony and documents you could produce and the testimony

5    you could give, aren't you?

6    A.  I am.

7    Q.  And you and I have reviewed that order before you

8    testified here, correct?

9    A.  Correct.

10   Q.  And if anyone asks you a question that exceeds the bounds

11   of the attorney-client privilege or encroaches on that order,

12   would you be kind enough to bring it to the court's attention?

13   A.  I will.

14   Q.  Mr. Valencik, do you know Abigale Lee Miller?

15   A.  I do.

16   Q.  How do you know Ms. Miller?

17   A.  Ms. Miller came to my office in late 2010, I believe, with

18   financial problems and wanted to discuss filing a bankruptcy.

19   Q.  All right.  And can you describe for the court the nature

20   of the financial problems that Ms. Miller was encountering

21   when she came to you?

22   A.  Sure.  When she came to us, the most immediate threat was

23   a tax sale on her property here in Pittsburgh.  She was in

24   default of that mortgage.  She had not paid the taxes on it,

25   and I believe she was in default on the mortgage of a property

1   that she owned in Florida as well.

2   Q.  All right.  Now, do you remember which property was

3   subject to the tax sale?

4   A.  It was the Pennsylvania property here.  It was the dance

5   studio.

6   Q.  And was the commencement of the tax sale the precipitating

7   event that brought her to you?

8   A.  Yes.

9           MR. RIDGE:  May we have Government Exhibit's 2,

10  please?  I'm sorry.  Actually, I need Government Exhibit 1.

11  Q.  Mr. Valencik, I'm showing you what's been marked as

12  Government Exhibit 1 and I'll ask you if you recognize those

13  documents.

14  A.  It's blurry, but it looks like it's the petition of

15  Abigale Lee Miller.

16  Q.  Did you prepare the petition for bankruptcy filed on

17  behalf of Abigale Lee Miller?

18  A.  Either Don Calaiaro or myself would have worked on it and

19  prepared it, yes.

20  Q.  Did the other, whoever didn't sign it or execute it, did

21  the other person also work on that petition before it was

22  filed?

23  A.  Yes.

24  Q.  All right.  So you had some hand in filing the petition, I

25  take it?

1    A.  Correct.

2    Q.  If we can go to 1A, please.  Do you recognize 1A?

3    A.  Yes.

4    Q.  What is 1A?

5    A.  1A is a form that gets generated by the bankruptcy

6    program.  When you input the information into these schedules,

7    there's two major programs that you work with, and it

8    generates summaries, and this would have been summaries

9    generated from the information that was put into the

10   schedules.

11   Q.  If you'll take a look at 1B, Mr. Valencik.  Do you

12   recognize that document?

13   A.  Yeah.  That is Schedule D which lists the secured

14   creditors on the petition.

15   Q.  And the secured debt that was -- that is listed at account

16   No. 2718, do you see that?

17   A.  Yes.

18   Q.  That's the secured debt for 7123 Saltsburg Road,

19   Pittsburgh, Pennsylvania?

20   A.  That's correct.

21   Q.  You recognize that to be the dance studio?

22   A.  That is.

23   Q.  And the value of the property is what?

24   A.  The value is listed at $150,000.

25   Q.  And what's the outstanding claim on that property?

1    A.  At the time, I would think we believed it was

2    approximately $96,802.13.

3    Q.  What does that tell you about equity in that property?

4    A.  It tells us that there was equity in that property.

5    Q.  Was Ms. Miller the sole owner of that property?

6    A.  She was.

7    Q.  Now, let's take a look at Exhibit 2.  Mr. Valencik, I'm

8    showing you what's already in evidence as Government Exhibit

9    2, and I'll ask you if you recognize that document?

10   A.  I do.

11   Q.  And what do you recognize that document to be?

12   A.  That is one of our plans of reorganization.

13   Q.  Is this the first plan of reorganization that was filed in

14   Abigale Lee Miller's bankruptcy?

15   A.  I'm not sure.  It says the Chapter 11 plan.  I assume that

16   is the first one that was filed.

17   Q.  It's dated at the bottom February 24th of 2012.

18   A.  I believe that is the first one that was filed.

19   Q.  All right.  Would you be kind enough to describe for the

20   court the process that you and your firm go through before you

21   prepare a plan of reorganization for a Chapter 11 debtor?

22   A.  Sure.  When we go through a plan to prepare a plan for a

23   client, it comes from a lot of different areas.

24       One of the areas that we go through is we go through the

25   schedules.  That's where we start, because that tells you what

1    the secured creditors are going to be, what taxes might be

2    owed, and from there, we set up classes and we divide the

3    creditors into different classes.

4         In this case, what would happen is we divided the

5    creditors into classes based on each secured claim, the tax

6    claims, her exemption rights and the unsecured creditors.

7         We look at things like the monthly operating report, and

8    we try to determine what percentage would be paid back to

9    unsecured creditors as well as what equity might be in real

10   estate that they might have to pay creditors under a

11   liquidation alternative test.

12   Q.  And, Mr. Valencik, can you direct me to where in this plan

13   I might look to determine how a debtor proposes to treat her

14   creditors?

15   A.  There's several places.  We identify all of the creditors

16   and define them in class 3 -- or I mean, article 3, and then

17   their individual treatment would be in article 8 -- or article

18   7, I apologize.

19   Q.  So article 3 of the plan which is on page -- begins on

20   page 8, correct, that designates the classes of creditors; is

21   that right?

22   A.  That's correct.

23   Q.  And why do you have separate classes of creditors?

24   A.  Well, you have to have creditors vote on these plans, and

25   one of the things that we do is we try to put them into a

1    position where we have each class, each secured creditor

2    voting in one class, and their class either votes in favor of

3    the plan or it does not.

4        Now, to confirm a plan, you either have to have all the

5    consensual creditors voting in favor of the plan or you have a

6    cramdown hearing, which is a hearing where you actually try to

7    force the plan on to them, if you have at least one class

8    voting in favor of the plan.

9    Q.  Okay.  So you designated these classes in article 3?

10   A.  Correct.

11   Q.  And that's based on the decisions that you made about

12   which creditors should be included in the separate classes?

13   A.  Correct.  Each class has to be treated -- each creditor in

14   each class has to be treated similarly.

15   Q.  All right.  So when you put this plan together, it was

16   your purpose -- it was your intention to treat each creditor

17   in each class equally, correct?

18   A.  Each class individually has to be -- in other words, if

19   you were to put multiple creditors in one class, they all have

20   to be treated the same.

21   Q.  Now, if you turn to the next page, we see that there is

22   PNC Bank that is identified as class 2; is that correct?

23   A.  Correct.

24   Q.  Is that the secured debt that we talked about earlier that

25   was included on the original petition?

1    A.   That is.

2    Q.   All right.  How did you propose to treat the PNC Bank

3    debt?

4    A.   PNC Bank was proposed to take their debt and amortize it

5    over a new period of time with a new interest rate.  At the

6    time of the filing, that debt was in default.  That would cure

7    the default and allow her to go forward with a new

8    amortization and to continue with those payments.

9    Q.   Did you reach agreement with PNC Bank on the terms of that

10   new amortization?

11   A.   We did almost right away.  Within a few months.  They

12   filed a motion for relief from stay and they also had -- they

13   also had a UCC1 filing and a lien on her cash collateral, and

14   they filed a motion to prohibit the use of the cash collateral

15   in the case, which we worked out an agreement to use the cash

16   collateral going forward and to pay them on all of their

17   loans.

18   Q.   Is that a direct negotiation between you as bankruptcy

19   counsel and counsel for PNC Bank?

20   A.   Yes, that's correct.

21   Q.   That negotiation took place for each of these classes?

22   A.   That negotiation took place for most of these classes.

23   Are you talking about for this plan or just in general in the

24   case?

25   Q.   No, in the original plan.

1    A.   In the original plan, we could not get ahold of Chase, and

2    we did not have negotiation with Chase.  We just put that --

3    that was what we proposed how to modify them in our plan.

4    Q.   Let's take a look at Chase.  Chase is identified as class

5    3; is that right?

6    A.   That's correct.

7    Q.   And what was the interest or what was the nature of

8    Chase's interest?

9    A.   Chase had a mortgage on a property in Florida, and they

10   were owed $245,000 approximately, and what we proposed with

11   them was to cut them down in a 506 action, and we were going

12   to reamortize whatever the value of the collateral was over a

13   new period of time with a new interest rate.

14   Q.   So let's make sure I understand, because I don't practice

15   bankruptcy.  A 506 action is?

16   A.   506 action is an action under 506 of the bankruptcy code

17   where it allows you to remove a lien down to the value of the

18   collateral.

19        There has to be an adjudication from the court and a

20   bifurcation of that claim and a court order entered.  We never

21   got to that point in this plan.

22   Q.   Is that process though described somewhere in this plan?

23   A.   There is a portion in this plan that says if there's any

24   pending or contemplated litigation, and it does say in there

25   that we do anticipate to file an action under 506 against

1    Chase.  If you look at this plan --

2    Q.  Would it help if you had the actual plan in front of you?

3    A.  Sure.

4            MR. RIDGE:  May I, Your Honor?

5            THE COURT:  Yes, you may.

6    Q.  What I'll ask you to do, Mr. Valencik, is when you find

7    the page that you're testifying from, tell us what page it is

8    so we can call it up.

9    A.  Page 12 article 5.

10   Q.  So you're referencing section 5.2?

11   A.  Yes.  "Litigation necessary or possible to consummate the

12   plan."  This contemplates an action under part B of that that

13   says there's a determine -- an action to determine the secured

14   status of creditors on 226 Dolcetto Drive in Davenport,

15   Florida.

16   Q.  Why would you initiate an action like this with respect to

17   Chase's claim?

18   A.  Well, typically, in 2010, what happened a lot of times are

19   there were severely undersecured mortgages where the

20   properties were no longer worth what people had borrowed on

21   them because of the whole mortgage crisis that happened in

22   2008 and 2009.

23       One of the wonderful things that Chapter 11 allows you to

24   do is allows you to bifurcate that claim and cut down the

25   amount that's owed to that secured lender.  It cuts their

1    security off with the 506 action, and they can take -- these

2    adjustable rate mortgages could be changed to fixed rate

3    mortgages over time, and it really helped these people.

4         What usually happens is, once that claim is bifurcated and

5    it becomes a secured and unsecured portion, the unsecured

6    portion ends up in the unsecured creditor pool.

7    Q.  Is there a provision in this plan that references what

8    happens to that unsecured portion?

9    A.  I believe it is in --

10   Q.  Would you direct us to that?

11   A.  Sure.  If you would look at page 11, 3.8 in the general

12   unsecured creditor category.

13        The last paragraph of this says that "This class includes

14   the undersecured portions of any mortgage or judgment holder

15   whose claim is not secured by collateral and whose liens have

16   been avoided by adversary actions."

17   Q.  Let's go back to those classes.  You might have to direct

18   us to the right page, to those classes of creditors, because

19   you are now in possession of my plan.

20   A.  It would be page 9.

21   Q.  All right.  PNC Bank, do you remember what that credit

22   was?

23   A.  Yes.  There was, I believe, a promissory note that

24   Ms. Miller had.  It began with the amount of $20,000, and at

25   the time of filing, it was only -- it was down to about 9,500,

1   and that was what was secured by the UCC1 filing that I

2   mentioned earlier.  We agreed to pay that in full over time as

3   well.

4   Q.  Was that via negotiation with PNC Bank?

5   A.  That was part of the overall negotiation with the mortgage

6   and that claim as well.

7   Q.  How about the next item, PNC Merchant Services?

8   A.  PNC Merchant Services was a class we created because she

9   had a merchant services account with PNC that was attached to

10  one of her businesses, and what we did with the merchant

11  service account is I believe that there was a new machine that

12  she bought during the case, and we paid that amount, the

13  amount for that machine over time during the case.

14  Q.  And again, that's a negotiated resolution of that claim?

15  A.  It was.

16  Q.  That PNC accepted?

17  A.  It was.

18  Q.  Let's take a look at real estate and priority tax claims.

19  You have tax claims here.

20  A.  Correct.  Those tax claims, those would be the tax claims

21  of Penn Hills in Allegheny County that were -- the pressure to

22  file the case that there was potential sale of the property,

23  and then the priority claims would be any money that was owed

24  to the PA Department of Revenue, the IRS, if she had any IRS

25  debt, and it looks like the Bureau of Business Trust Fund

1    Taxes had filed a claim.

2    Q.   And in your plan of reorganization that was filed on

3    February 24th of 2012, how did you propose to resolve those

4    tax claims?

5    A.   Those claims are paid over five years with statutory

6    interest in full.

7    Q.   Can we go to the next page, please?  Then we have --

8    what's the exemption rights of the debtor?

9    A.   So a debtor gets exemption rights in every case where she

10   gets to exempt certain property from the estate.  It's

11   essentially untouchable by the creditors once a case is

12   confirmed.

13       Once it is confirmed, it reinvests back into the debtor.

14   We have always created a class to allow for those exemption

15   rights to reinvest back into the debtor.  We now changed our

16   plans.  We don't put them in a specific class any longer.  We

17   put them in article 5, but it does the same purpose.

18   Q.   The last item there is the general unsecured creditors.

19   Do you see that?

20   A.   Correct.

21   Q.   Who was contained in the general unsecured creditors?

22   A.   The general unsecured creditors would be any creditor that

23   we listed on our petition or filed a claim that it was not

24   secured by actual collateral.

25   Q.   Now, there are times when you can contest unsecured

1   claims, aren't there?

2   A.   You can dispute unsecured claims.  You can dispute any

3   claim if you don't think it's valid.

4   Q.   Were there any disputes of the unsecured claims in this

5   case?

6   A.   We listed Ascap, I believe, as disputed but we never filed

7   the claim objection to follow through with it.

8   Q.   What was the plan, this plan's proposal to address the

9   unsecured claims?

10  A.   This plan proposed to pay the unsecured claims that were

11  filed in the case and that were listed on her petition in full

12  over six years.

13  Q.   Okay.  Now, one of the things that you do in a plan, in

14  addition to identifying how you're going to deal with the

15  creditors, is you also explain why this plan is viable, don't

16  you?

17  A.   Correct.

18  Q.   Where do you do that?

19  A.   That would be part of the disclosure statement.

20  Q.   All right.  I think that's Exhibit 2B.  I'm sorry.  It's

21  2A, Mr. Valencik.  Can you direct us in Exhibit 2A to that

22  portion of the plan that explains how this matter will be

23  resolved?

24  A.   Well, first off, on the first page, if you look at No. 3,

25  it tells you how the -- what the debtor's employment and

1   business are, and that's what they're going to continue to do.

2   I think it says that.  It doesn't say they're going to

3   continue.  Give me a moment.

4   Q.  Take your time.

5   A.  If you look at page 2, part 6, it states the intention of

6   the debtor, and it says, "The debtor will continue to operate

7   her dance studio and intends to reorganize through the profits

8   of the business and income from the reality TV show."

9   Q.  All right.  Do you know, at the time you put this plan

10  together, how long had that reality TV show been part of

11  Ms. Miller's sort of professional portfolio?

12  A.  I don't believe for very long.

13  Q.  Did you make any additional references to that reality

14  television show in this disclosure statement?

15  A.  I believe so.

16  Q.  And would you mind showing us where those are?

17  A.  If you would look at page 10.

18  Q.  Page 10.  All right.  And can you tell the court, in

19  addition to what you're describing here, what you proposed to

20  advise creditors of or what you intended to advise creditors

21  of with respect to this reality television program?

22  A.  I think that the purpose of this was to tell them that

23  there was a reality TV program.  I believe the purpose of this

24  was to say that there would be -- the future of this program

25  was uncertain.

1    We say that there was no contract guaranteeing these

2    payments and she could be eliminated at any time and that any

3    additional seasons of the show will only guarantee the debtor

4    payment for an additional 12 weeks.

5        The problem becomes, in these cases, that they go on for

6    five or six years after you close the case out, so we're

7    worried about payments long into the future, not short term.

8    Q.  So that's why you reference the reality television program

9    but don't sort of -- well, strike that.

10       Let me ask the question in a more direct way.  How did you

11   approach this reality television program from the point of

12   view of planning for her treatment of creditors over the

13   course of her bankruptcy plan?

14   A.  We didn't think it was reliable.

15   Q.  And who made that decision?

16   A.  It probably was a conversation with everybody together.

17   Q.  All right.

18           MR. RIDGE:  Your Honor, I'm going to move to the next

19   plan.

20           THE COURT:  This would be a good time for us to take

21   a lunch recess.  Everyone please rise.

22       (Luncheon recess taken 12:29 p.m.-1:34 p.m.)

23           THE COURT:  Will the witness please take the stand?

24   I have to take a hard break for another matter at 2:00.

25   Please be seated.

1          MR. RIDGE:  Your Honor, I have to get my client.

2          THE COURT:  I did receive two letters written on

3    behalf of the defendant which I don't believe the government

4    will have seen, so I'm going to pass these down and they can

5    be returned.  The government can review them and the defense

6    too.  They have not seen them.

7          MR. MELUCCI:  Thank you.

8          MR. RIDGE:  May I, Your Honor?

9          THE COURT:  Yes, you may.

10   BY MR. RIDGE:

11   Q.  Mr. Valencik, when you prepared the plan of reorganization

12   that we were discussing, the first plan at 2A, did you also

13   prepare, along with the plan, a disclosure statement?

14   A.  We did.  You must file a disclosure statement with every

15   plan that you file.  The documents support in conjunction with

16   each other.  You don't get to file one without the other.

17   Q.  What's the purpose of a disclosure statement?

18   A.  Disclosure statement, a better name for that is a

19   financial statement.  It gives you insight into the debtor's

20   financial situation as of the day they were filed.

21        Now, it's a little bit confusing because you also put the

22   proposed plan treatment in there as well, but as for the

23   values of assets and whatnot, it's all about the day it was

24   filed.

25   Q.  Can you turn your attention to Exhibit 2A page 3, and

1    specifically item No. 10?

2    A.  Okay.

3        MR. RIDGE:  Can you bring up item No. 10, Ms. Murphy?

4    Q.  Item No. 10 is a question that asks about identifying all

5    executory contracts that are to be assumed or assumed and

6    assigned.

7        Do you see that?

8    A.  Yes, I do.

9    Q.  And you answered none.

10       Do you see that?

11   A.  Correct.

12   Q.  Can you explain to the court why you answered none there?

13   What are -- first, what are executory contracts?

14   A.  I believe an executory contract is a contract that is to

15   be performed or that has been performed prior to the filing of

16   the case, and here, there were no contracts that existed prior

17   to the filing of the case, so we marked it as none.

18   Q.  All right.  Now, Mr. Valencik, at the time you prepared

19   and filed this 2-24, 2012 plan of reorganization, did you

20   intend that any of Ms. Miller's creditors would be paid less

21   than the value of their claims?

22   A.  Could you reask that question?

23   Q.  Sure.  At the time you prepared and filed the 2-24-12 plan

24   of reorganization, did you intend that any of Ms. Miller's

25   creditors would be paid less than the value of their claims?

1    A.  Well, maybe it's the way you're asking the question.

2    Chase had filed a claim for $245,000.  Our plan did intend to

3    bifurcate that claim into a secured and unsecured portion, so

4    their claim as filed would not have been paid, but they would

5    have been paid in a different way.

6    Q.  Was --

7            THE COURT:  Before you go any further, did Chase file

8    a claim?

9            THE WITNESS:  Chase did file a claim, fully secured

10   claim.  There was no unsecured claim filed in the case.

11           THE COURT:  They were going to do an 1111(b)

12   election.

13           THE WITNESS:  They were actually very difficult to

14   get ahold of, Your Honor.  After they objected to our first

15   plan, they kind of went dark on us.  They didn't state

16   anything.

17           We wanted to work plans out with them, and we really

18   never got to it until towards the end of the case when a

19   different lawyer took over the case for the firm.

20           THE COURT:  Okay.

21           MR. RIDGE:  I'm going to touch on that, Your Honor,

22   when we talk about the second plan.  All right.

23   BY MR. RIDGE:

24   Q.  So whether Chase's debt was paid in a secured portion or

25   in an unsecured portion, your intention was, based on

1    paragraph 3.8, that their secured claim could be converted

2    to -- whatever was undersecured could be converted to an

3    unsecured claim?

4    A.   Correct.  Could be converted to an unsecured claim.  They

5    could have filed an unsecured claim.  The plan provided for

6    them to be included as an unsecured claim.

7    Q.   Is there a practical and legal reason why you would want

8    these creditors to be paid the full value of their claim in

9    this case?

10   A.   Well, she did have equity in her property at the dance

11   studio, and to keep that property, under the code, there's a

12   liquidation alternative test.  She had an exemption on it, but

13   we thought that she needed to pay her creditors in full.

14        That's why we always proposed a 100 percent plan to the

15   unsecured creditors, because without that, they could claim

16   that she can't keep that property and we have to liquidate it

17   for the equity.

18   Q.   Okay.  Now, Mr. Valencik, what was the ultimate fate of

19   this plan of reorganization?

20   A.   There were objections that were filed to this plan, one by

21   Chase.  I believe one by the U.S. Trustee's Office.  I'm not

22   sure if there were others.  The fate was that we asked the

23   court for time to propose a new plan.

24   Q.   Did you ultimately propose a new plan?

25   A.   We did.

1    Q.   Do you remember when it was that you proposed a new plan?

2    A.   I don't remember the date.

3    Q.   If you take a look at what's already been admitted as

4    Government's Exhibit 3, I'll ask you if you recognize that

5    document.

6    A.   Yes.  It looks like our amended Chapter 11 plan that was

7    filed, looks like, August 27 of 2012.

8    Q.   Did you participate in the preparation of that plan?

9    A.   I did.

10   Q.   I take it that you didn't work alone on that plan?  You

11   worked in conjunction with others at your law firm?

12   A.   Correct.  Mr. Calaiaro and myself.

13   Q.   Please describe briefly for the court, Mr. Valencik, how

14   the amended plan differed from the original?

15   A.   The major changes of this plan from the first plan came to

16   classes 3, class 5 and class 9.

17   Q.   Do you want to give us a page number, Mr. Valencik?

18   A.   Sure.  You can start with page 20 at 7.3.  Prior to filing

19   this plan, we had, after Chase had filed an objection, we had

20   reached out to Chase several times trying to work out some

21   sort of plan treatment with Chase.

22        Chase was very unresponsive, and we had extended, I

23   believe -- I think we extended the time to file this plan

24   several times, and we got to a point where we needed to file

25   the plan because we didn't think the court was going to give

1   us any more time.

2       So after some careful thought, we decided to surrender the

3   property in satisfaction of the debt in hopes to either -- the

4   problem is a creditor needs to vote on these plans, and even

5   if they ignore and don't vote, it's considered a no vote,

6   which will send it to a confirmation hearing and cramdown

7   fight.

8       Our goal was to try to make this so Chase was unimpaired,

9   so they would get their property back and we wouldn't have to

10  deal with them voting because they were not responding to

11  anything we were doing.

12  Q.  And can you tell the court how you tried to reach out to

13  Chase?

14  A.  I made several phone calls to Chase over a period of

15  months.

16  Q.  Was it your intention to, when you tendered back the

17  property to Chase, was that sort of a default proposition

18  because you couldn't get them to respond to you?

19  A.  That's correct.  My client wanted to keep the property,

20  but we couldn't get them to respond.  We couldn't work out

21  plan treatment as we had with PNC, and this is what we

22  proposed to do.

23  Q.  And the evidence that your client wanted you to keep the

24  property or wanted to keep the property as part of the plan of

25  reorganization is the original plan where she proposed to keep

1    the property?

2    A.   That's correct.  She did want to keep the property in the

3    original plan.

4    Q.   And by the way, the final plan, the second amended plan,

5    did that call for her to keep the property as well?

6    A.   That did call for her to keep the property.

7    Q.   All right.  Can you take a look at paragraph 5 of -- I'm

8    sorry, article 5, your description of the means for

9    implementation of the plan.  That's on page 12.

10   A.   Okay.

11   Q.   Has that changed from the first plan in February of 2012

12   until the second plan in August of 2012?

13   A.   I believe it does.

14   Q.   How does it change?

15   A.   I believe we add to the end of it that "The debtor is also

16   surrendering the real estate to help reduce expenses and fund

17   the plan reorganization."

18   Q.   The sentence before that as well?

19   A.   "The debtor believes that she will be able to fund this

20   plan in the future from the combined income of the television

21   show and the operation of her dance studio."

22   Q.   And had you made any reference to the income from the

23   television show in the original plan?  I'm sorry.

24       Had you made any reference to relying on the income from

25   the television show?  And you can feel free to look back at

1  section 5 of Exhibit 2.

2  A.  No.  I believe what we say in the first plan is the debtor

3  is proposing a plan that can be funded without the volatile

4  income from the show.

5  Q.  So the second plan differs how?

6  A.  The second plan says that she will be able to fund the

7  plan in the future from a combined income of the TV show and

8  operation of her studio.

9  Q.  All right.  Mr. Valencik, even though you had filed the

10  plan, this amended plan of reorganization, were you still

11  going to discuss Chase's debt and to enter into some agreement

12  with Chase about reformulating their debt?

13  A.  Yes.  And that happens quite often in Chapter 11s where we

14  file stipulations prior to confirmation when somebody has the

15  objection to the treatment we've put in the plan.

16  Q.  After you filed this plan in August of 2012, do you

17  remember if Chase had any objection?

18  A.  I don't believe they did.

19  Q.  Did you get any response from Chase?

20  A.  We did not.  I called both the attorney that filed the

21  objection and the attorney that entered their appearance in

22  the case for Chase.

23  Q.  Mr. Valencik, did there come a time when -- by the way,

24  let's take a look at the disclosure statement, 3A, and in

25  particular, paragraph 10.  That's on page 3.

1   A.   Okay.

2   Q.   That again is a question about executory contracts, and

3   your answer at the time is still none?

4   A.   Correct.

5   Q.   And that's because you understood that there were no

6   executory contracts at the time of the filing of the petition?

7   A.   That's correct.

8   Q.   All right.  Did there come a time -- tell me what happened

9   to this plan of reorganization.  What was the status of this

10  plan?

11  A.   This plan, I believe, that the disclosure statement was

12  approved, but prior to filing the plan, we filed a new plan, I

13  believe, because of the funds that we received from Ms. Miller

14  in December.

15       I believe this plan was filed in August, and by December,

16  we got those funds and we said we would file a new plan to

17  identify those funds and use them to pay people in full.

18  Q.   Could you turn your attention to Government's Exhibit 4?

19       Now, can you explain generally for the court how this plan

20  differed -- by the way, I should go back.

21       With respect to the unsecured creditors and how they were

22  treated under the amended plan, was there a different

23  treatment of the unsecured creditors under the amended plan as

24  opposed to the original plan?

25  A.   They were being paid in five years rather than six.

1    Q.  Okay.  By the way, did any of the unsecured creditors ever

2    file an objection?

3    A.  No, I don't believe so.

4    Q.  Was there an unsecured creditors committee in this case?

5    A.  There was not.

6    Q.  Do you know why?

7    A.  I don't know why.  I mean, the creditors have to get --

8    find lawyers to band together to create a committee.  It's not

9    something that we do.

10   Q.  Okay.  Can you take a look at Exhibit 4?  Government's

11   Exhibit 4.  I'll ask you if you recognize that document.

12   A.  I do.

13   Q.  What is that document?

14   A.  That looks to be the second amended plan of

15   reorganization.

16   Q.  Now, let's take a look at 5.1, I think it is where you

17   describe the means, and can you tell the court how this plan

18   differs from the amended plan that you filed in August of

19   2012?

20   A.  As to part 5?

21   Q.  Yes, as to part 5.

22   A.  In this one, it says, "The debtor will fund this plan from

23   the income from the TV show to pay for the classes 1, 7 and 9

24   in full on the plan effective date.  Her future role in these

25   TV reality shows will not impact this plan's feasibility."

Q.   Okay.  And what did you mean by that, her future role in

these television shows won't impact the plan's feasibility?

A.   She was -- had enough money to pay the unsecured creditors

and the taxes and people that were proposed to be paid over

the next five years in full, so they were no longer going to

be paying them over time.  She would be paying them in one

payment, so they weren't going to affect those creditors any

longer.

Q.   The unsecured creditors were $43,000, right?

A.   Yes.

Q.   The taxes were what?  About 37?

A.   That sounds correct.

Q.   So she had -- that's roughly about $80,000?

A.   Correct.

Q.   She had $208,000 more than that that had already been

deposited in your escrow account, correct?

A.   Correct.

Q.   One of the things that is striking about these three

plans, Mr. Valencik, just staying with 5.1 for a minute, much

of that language is very similar to the original plan and the

amended plan.

A.   That's true.

Q.   Can you tell the court why that is?

A.   It was probably just carried over from another plan, you

know.  We take the original plan and create a new file with it

1    and change what we need to change for an amended plan.

2    Q.  And the other information that's included in the plan, I

3    take it, you continue to resubmit in support of your latest

4    iteration of the plan?

5    A.  Correct.

6    Q.  By the way, did you get a reaction from Chase to this

7    plan?

8    A.  To this plan, the third plan, I believe so.  I believe at

9    some point, I don't know if it was 2013 or late 2012, the

10   attorney of record changed and that attorney was responsive.

11   Q.  Can you explain a little more detail to the court what the

12   problem was, what you later learned the problem was with

13   Chase's unresponsiveness?

14   A.  I found out later that one of the attorneys for that firm

15   left and went to another firm when the other attorney entered

16   his appearance, and I can only assume that the reason she was

17   unresponsive is because she was leaving.

18   Q.  I see.  So they didn't file a substitution of counsel?

19   A.  Did not.

20   Q.  And they didn't notify you that new counsel had entered

21   the case?

22   A.  Did not.

23   Q.  All right.  Mr. Valencik, was it your intention with

24   respect to this third plan -- by the way, you were telling us,

25   and I interrupted you, about how you managed to finally get

1    Chase to respond to your proposed plan.

2    A.   When the new attorney became involved with Chase, we

3    reached out to them.  Actually, we filed this plan and it

4    wasn't until closer to this plan being confirmed that we

5    finally got ahold of Mr. DeNardo from Shapiro & DeNardo, and

6    they agreed that they were fine with this plan treatment and

7    they ended up voting in favor of this plan.

8    Q.   You had to file this plan as well before you got a

9    response?

10   A.   Correct.

11   Q.   And I take it, this plan is designed to pay all of the

12   creditors the value of their claims, the full value of their

13   claims?

14   A.   This plan is, yes.

15   Q.   Mr. Valencik, what was the date of Ms. Miller's discharge

16   from bankruptcy?

17   A.   It was in December of 2013.  I don't have the order in

18   front of me with the exact date.

19   Q.   All right.  Between the dates of the second amended plan

20   and the date of the discharge in bankruptcy, did you actually

21   petition the court to pay the unsecured creditors ahead of the

22   scheduled time?

23   A.   I believe we did.

24   Q.   And why did you do that?

25   A.   We had the money.  There was no reason not to pay them.

1   Q.  And did the court agree, and were you able to pay the

2   unsecured creditors in advance?

3   A.  I believe the court did grant that motion and we did pay

4   them.

5           MR. RIDGE:  May I have a moment, Your Honor?

6           Your Honor, I have no further questions for

7   Mr. Valencik.

8           MR. MELUCCI:  Do you want me to begin or do you need

9   to break at 2:00?

10          THE COURT:  I have to break at 2:00.  You can get a

11  start.

12                      CROSS-EXAMINATION

13  BY MR. MELUCCI:

14  Q.  Good afternoon, Mr. Valencik.  We met before.  You know

15  I'm Gregory Melucci.

16  A.  Good afternoon, Mr. Melucci.

17  Q.  Let me ask you some questions to follow up on the exam by

18  Mr. Ridge.

19      You have been practicing in the field of bankruptcy since

20  about 2010?

21  A.  Correct.

22  Q.  And I think you said the bulk of your practice is

23  bankruptcy law?

24  A.  Correct.

25  Q.  So I would assume that it's fair to say that you've seen a

1    lot in terms of debtors and creditors and petitions and

2    schedules.  You're fairly familiar with a lot of that stuff,

3    correct?

4    A.  Correct.

5    Q.  I'm sure you heard the expression that bankruptcy is

6    designed to protect the honest but unfortunate debtor.

7        Have you heard that expression?

8    A.  I don't believe I've heard that expression.

9    Q.  Does it make sense to protect the honest but unfortunate

10   debtor?

11   A.  Sure.

12   Q.  I mean, I think it's fair to assume that honesty is a

13   hallmark of the bankruptcy practice, right, by a debtor?

14   A.  Sure.

15   Q.  That honesty in terms of disclosure of assets, honesty in

16   terms of the financial condition of a debtor is extremely

17   important both to the trustee, right?

18   A.  Correct.

19   Q.  To the court?  Bankruptcy judge?  The court, correct?

20   A.  Correct.

21   Q.  And creditors?

22   A.  Correct.

23   Q.  And there's a consequence when a debtor is not honest,

24   right?

25   A.  I believe so, yes.

1    Q.   You as -- you're primarily debtor counsel, correct?

2    A.   Correct.

3    Q.   It's important that, when you represent a debtor, I'm sure

4    your advice to a debtor is you need to provide, whether it be

5    a Chapter 7, correct, or Chapter 11, to provide full

6    information about your financial condition to me so that I

7    can make a fair representation about your condition to the

8    court?

9    A.   Correct.

10   Q.   And debtors know that, correct?

11   A.   We tell them.

12   Q.   I assume that that financial condition includes not only

13   your assets, personal assets, correct?

14   A.   Correct.

15   Q.   But income as well?

16   A.   Correct.

17   Q.   And there's a consequence when the information that's not

18   given to you isn't accurate?  That is, it affects the

19   creditor, right?

20   A.   Correct.

21   Q.   Because what's happening is the creditor makes a claim of

22   a debt owed by the debtor?

23   A.   They do.

24   Q.   The debtor represents its debts.  The creditor files

25   proofs of claim?

1    A.   They don't have to file proofs of claim in Chapter 11, but

2    sometimes they do.

3    Q.   But the idea is, whether it be a Chapter 7 or Chapter 11,

4    that somehow you, as bankruptcy counsel, to negotiate between

5    the debtor and creditor counsel to resolve the claim?

6    A.   Correct.

7    Q.   Whether it be extinguished in a Chapter 7 or reorganized

8    in a Chapter 11?

9    A.   Correct.

10   Q.   If the information that's contained on schedules filed by

11   the petitioner or the debtor is not accurate, the creditor

12   works at a disadvantage, right?

13   A.   I guess you could say that.

14   Q.   Well, I mean, it is that, because if they don't know or

15   understand --

16            MR. RIDGE:  Objection.  Argumentation.

17            MR. MELUCCI:  I'm not arguing.

18            MR. RIDGE:  The witness just said, "I guess you could

19   say that."

20            THE COURT:  Finish the question.

21            MR. MELUCCI:  Thank you, Your Honor.

22   Q.   So when the creditor doesn't have full knowledge or

23   information about the financial condition of a debtor, that

24   can affect the creditor's bargaining power or bargaining

25   position with the debtor?

1    A.   Conceivably, it could.

2    Q.   Now, if in fact the debtor is not accurate in the

3    representations about their financial condition, it can have

4    an economic effect on the creditor as well?

5    A.   I'm not sure I follow you.

6    Q.   If the creditor was owed $100,000, and the debtor

7    hypothetically has assets to pay the 100,000 but misrepresents

8    in schedules that they do not have the assets to pay 100,000,

9    the creditor is forced maybe to take less on the dollar than

10   they would otherwise have taken had they known the true

11   condition of the debtor's financial statement?

12   A.   I guess it depends on the creditor.

13   Q.   Well, just generally.

14   A.   I don't think it works like that.  I mean, when you have a

15   secured claim, they have their claim on that property.

16   Q.   I'm not talking about a secured claim.  I'm speaking

17   generally about a debt.

18   A.   But there's different kinds of debts.

19   Q.   Ordinary debt.

20   A.   Sir, are you talking about an unsecured claim?

21   Q.   Let's say an unsecured claim.

22   A.   An unsecured claim, potentially, yes, that could be

23   affected.

24   Q.   Because they don't get what they might have obtained had

25   the debtor fully represented their condition?

1    A.   The debtor may have paid less than 100 cents on the dollar

2    based on the monthly operating reports.

3    Q.   And that causes a harm to the creditor?

4    A.   It could, yes.  They would get less money.

5    Q.   Now --

6            THE COURT:  We'll need to take our quick break right

7    now.

8        (Recess taken.)

9            THE COURT:  Please be seated.  I have received an

10   additional two letters that I will hand over to the

11   government, and if you can share them with the defense.

12           MR. MELUCCI:  Thank you, Your Honor.

13           THE COURT:  We need to wait for counsel for the

14   defendant.

15           MR. VERDREAM:  He just excused himself briefly.

16   He'll be right back.

17           THE COURT:  That's okay.

18   BY MR. MELUCCI:

19   Q.   So if I recall where I was, I think I was asking you about

20   the impact of concealed assets on creditors, the trustee and

21   the court.

22   A.   I believe that's correct.  I believe you were asking me

23   about the impact of income on creditors.

24   Q.   Okay.  So if in fact a plan is approved by a bankruptcy

25   judge, and of course let's assume hypothetically that a debtor

1    has concealed assets.  That has an impact too on creditors,

2    right?

3    A.  Again, where I'm having a problem is where you say

4    creditors in general, because there's different kind of

5    creditors.  A priority creditor has to be paid in full over

6    five years.

7    Q.  I understand that.  My point is, the effect of that, of a

8    creditor not receiving full payment because a debtor has not

9    made full disclosure of assets, has an economic impact upon

10   the creditor?

11   A.  I would think only the unsecured creditor.

12   Q.  Only unsecured.  Well, if you're a secured creditor who's

13   owed, let's say, as we have in this case, Chase, $245,000, and

14   a debtor proposes a plan in which they either agree to cram

15   down -- you're familiar with that term?

16   A.  Correct.

17   Q.  -- or surrender, as it was in the amended plan, the asset,

18   that has an economic impact on the creditor?

19   A.  If they were crammed down, they would be paid through the

20   unsecured class.  If it's surrendered, they get to sell the

21   property.

22   Q.  Assuming they make a profit, but they take the property

23   back?

24   A.  They take the property back, and then there's laws they

25   have to comply with of deficiency judgment actions that, if

1   they don't comply with them, then they are deemed satisfied.

2   Q.  But the debtor, of course, has an enormous savings because

3   they are excused from paying full debt.  In other words,

4   whatever the proof of claim is, if they don't pay the full

5   balance, they get a savings?

6   A.  There would be a loss if they didn't comply with those

7   laws.

8   Q.  If the creditor didn't comply?

9   A.  If the creditor didn't comply with the deficiency judgment

10  laws, under Pennsylvania law, they have to file an action to

11  get a judgment within six months after foreclosure or their

12  debt is deemed satisfied after the sale.

13  Q.  Let me ask you about, in your experience as bankruptcy

14  counsel, the ways in which debtors are able to misrepresent

15  the truth of their financial condition to the court.

16      Have you become familiar in your past, Mr. Valencik, with

17  the ways in which debtors do conceal assets from the

18  bankruptcy trustee?

19          MR. RIDGE:  Objection.  Your Honor, he's a fact

20  witness.

21          THE COURT:  Sustained.

22  Q.  Well, hiding assets is a way in which creditors can

23  conceal assets.

24          MR. RIDGE:  Same objection.

25          THE COURT:  Sustained.

1          MR. MELUCCI:  I'm not sure I understand.  I'm not

2     asking for opinion, Your Honor.  I'm just asking him, in his

3     experience as bankruptcy counsel, whether he's familiar with

4     the ways in which --

5          THE COURT:  You have to relate it to this case,

6     because he's called as a fact witness on the filings in the

7     underlying bankruptcy.

8     BY MR. MELUCCI:

9     Q.  In this case, you're obviously more knowledgeable now,

10    Mr. Valencik, about the condition of Ms. Miller's assets than

11    you were during the time that you and the law firm represented

12    her?

13    A.  Correct.

14    Q.  You've read the indictment in the case?

15    A.  I've read parts of it.  I tried to stay out of the media

16    and what's been going on.

17    Q.  I understand.  You have seen from the allegations in the

18    indictment that she's accused of hiding over $700,000 in

19    assets.

20    A.  I've seen that, yes.

21    Q.  If you had known while you represented her that those

22    assets were concealed, would your advice to her have been you

23    need to disclose those assets?

24          MR. RIDGE:  Objection, Your Honor.

25          THE COURT:  Sustained.  This is the attorney-client

1   privilege issue.

2          MR. MELUCCI:  I'm speaking hypothetically.  I'm not

3   asking for whether he actually did.  I'm asking

4   hypothetically.

5          THE COURT:  It would still be attorney-client.

6   Q.  Did you learn that she concealed assets from creditors?

7   A.  During the case?

8   Q.  During the pen -- now, have you learned that she concealed

9   assets from creditors?

10  A.  From the pleadings that we've seen through this

11  indictment, yes.

12  Q.  Did you learn that she was scheming to create subchapter S

13  corporations in order to deposit revenue that she earned

14  during the bankruptcy?

15  A.  No.

16  Q.  You didn't learn that in any e-mail communications that

17  were shown to you?

18  A.  I never learned that she was scheming to hide anything.

19  Q.  I'm not saying during the pendency of the bankruptcy, but

20  subsequently now, have you learned that?

21  A.  I still don't know if there was scheming.  I learned that

22  she did try to start subchapter S corporations.

23  Q.  If somebody tried to start a subchapter S corporation like

24  she did in order to deposit revenue, that would have been

25  revenue that should have been disclosed to the bankruptcy

1    court?

2    A.  I'm sorry.  Can you rephrase your question?

3    Q.  If somebody, like in her case, was planning on diverting

4    revenue to another entity, that should have been revenue that

5    would have been disclosed, should have been disclosed to the

6    bankruptcy court?

7    A.  It's kind of a compound question.  That's why I'm

8    confused.  She could start a company and open a business

9    during a Chapter 11.

10   Q.  With approval by the court?

11   A.  Not necessarily.  If it's within the ordinary course of

12   her business, yes.  She doesn't have to have it approved by

13   the court.  Then any income that she received from that

14   business, any profit, would then need to be reported on to her

15   monthly operating.

16   Q.  If the plan was to put money into a corporation so as to

17   avoid disclosure to the court, that would be improper?

18   A.  Money due to the debtor?

19   Q.  Yes.

20   A.  Probably, yes.

21   Q.  If somebody is setting up related parties in order to

22   divert revenue, would that be improper?

23   A.  It would really depend on the situation.  I mean, again,

24   if you're asking hypothetically, I'm not an expert, but I

25   think any time you're trying to -- you're using the terms

1    divert revenue.

2        Again, I don't know if you're talking about diverting from

3    moneys that are owed to the debtor or where you're coming

4    from.

5    Q.  Moneys owed to creditors.  I'm speaking generally, of

6    course.

7    A.  Again, I don't know if you're talking about ordinary

8    income from whatever that partnership is or if you're talking

9    about money that somebody was earning from the operation of

10   their business.  That's why I'm confused with your question.

11   Q.  Let me just -- I'm trying to make this as plain as

12   possible.  If a debtor like Ms. Miller is trying to conceal

13   income by placing it with a third party without disclosing it

14   to the court, reporting it in an MOR, that would be improper?

15   A.  When you say "placing," you mean just giving somebody --

16   Q.  Yes.

17   A.  I would say that's improper, yes.

18   Q.  You've learned, I assume now, that Ms. Miller opened bank

19   accounts at Wells Fargo Banks and other entities in order to

20   deposit revenue she earned during the pendency of the

21   bankruptcy.

22   A.  That's correct.

23   Q.  Accounts you did not know were existence when you

24   represented her?

25   A.  Correct.

1   Q.  You have seen contracts now that Ms. Miller entered into

2   with a network and with the producer in order to generate

3   revenue from the TV show that you did not see until probably

4   December or January 2013?

5   A.  That is correct.

6   Q.  You have seen communications now or you were shown

7   communications, such as e-mail communications, in which

8   Ms. Miller was instructing others associates, colleagues, to

9   not put money in the bank.

10  A.  I believe I saw one of those e-mails, yes.

11  Q.  You've seen an e-mail where Ms. Miller instructed the

12  producer to hold checks until the bankruptcy was over?

13  A.  I just saw that today, I believe, yes.

14  Q.  If you had known these events when you represented her,

15  Mr. Valencik, I assume you would have -- you would have to

16  determine this to be improper?

17  A.  Actions like this, yes, I would have said they were

18  improper.

19  Q.  Now, you mentioned when you talked about the plans of

20  reorganization, that the object of the plan is to, when

21  representing a debtor, is to enable her to pay off her debts

22  presumably with the least financial impact to the debtor as

23  possible?

24  A.  Well, it's a push and pull, because your duty is to the

25  estate and you're trying to get people paid based on different

1    tests, based on a disposable income test, a liquidation

2    alternative test, and that's for the unsecured creditors

3    obviously.

4         And then you're trying to modify secured debt through what

5    the code allows you to do.  It's not necessarily the least

6    impact to the debtor.  It's, you know -- it's really a

7    negotiation between all of the creditors and her.

8    Q.  But the end is to try to satisfy the debt even if it does

9    cause an economic impact to the creditors?

10   A.  Sometimes the result is an economic impact to the

11   creditors.  For instance, there are cases where the disposable

12   income test says that they don't have to -- they would have to

13   pay five percent to their unsecured creditors.  Those plans

14   get confirmed.

15   Q.  Now, let's just talk briefly about the plans that you

16   worked with Ms. Miller on.  So I understand, the information

17   that's contained in the plans, that is the disclosure

18   statement, the attachments to the disclosure statement which

19   talk about earned income, projected revenue, you're familiar

20   with those attachments?

21   A.  I know what you're talking about, yes.

22   Q.  All that information largely, I suppose, comes from the

23   debtor?

24   A.  The information on the projections mostly comes from the

25   monthly operating reports, and I believe one of them is even

1    called a historical summary, which comes directly from the

2    monthly operating reports.

3    Q.  That is, the debtor counsel doesn't go out and conduct his

4    own due diligence to validate the truth of what's contained in

5    the representations on the schedules?

6    A.  No.

7    Q.  So when the representations made in the schedule, such as

8    the disclosure statement, about the condition of the debtor

9    and the debtor's ability to pay creditors in the future based

10   on her income or assets, that comes from the debtor?

11   A.  Correct.

12   Q.  And that is something that's significant, because that's

13   what creditors rely on in trying to determine whether the

14   proposed plan is a feasible plan and whether they believe

15   they're receiving the value for which they had on their claim?

16   A.  That is what they receive.  They receive the disclosure

17   statement first, and then if the disclosure statement is

18   approved, they do receive the plan after that for voting.

19   Q.  Now, one of the representations made throughout the

20   disclosure statements was that Ms. Miller, and I believe you

21   indicated this in your direct examination, that Ms. Miller

22   represented in the disclosure statement that the income

23   projection for the TV show, which at the time was, I believe,

24   her primary source of revenue.

25   A.  The television show?  When she first came to me, the

1   primary source of revenue was the studio.

2   Q.  As the original plan and amended plan were filed, both in

3   February and August of 2012, the debtor, I assume, was

4   increasingly earning revenue from the TV show?

5   A.  At some point, the revenue from the TV show was driving

6   the case.

7   Q.  That representation -- strike that question.

8       The representation about the volatile nature of that

9   revenue, do you recall that representation in the plan?  We

10  can pull it up if necessary.

11  A.  I'm trying to look.

12           MR. MELUCCI:  Let me have, Ms. Wikert, Exhibit 2A,

13  please.  Actually it's Exhibit 2, page 12, section 5.1,

14  please.

15  Q.  There is -- you see this language, Mr. Valencik?  Article

16  5, "Means for implementation of the plan."

17  A.  I see it, yes.

18  Q.  There's representation here that there is not -- and I

19  believe it's intended to be there is no contract guaranteeing

20  these payments and the debtor can be eliminated any time with

21  no further payments?

22  A.  Yes, that's what it says.

23  Q.  Did that information come from the debtor?

24  A.  It probably came from the debtor.  I can't be sure if it

25  came from the debtor or from one of her employees.

1   Q.  But you believe it came from the debtor?

2   A.  Or one of her employees, her team.

3   Q.  When you filed this plan in February 2012, I assume you

4   never saw any contracts between Ms. Miller and the network or

5   the show producer?

6   A.  No.

7   Q.  Subsequently, you did become aware of those contracts in

8   December, roughly, of 2012?

9   A.  That's correct.

10   Q.  And you, the attorney, and Mr. Calaiaro were ordered to

11   produce those contracts to the court immediately in December

12   2012 when the amended plan confirmation hearing was postponed

13   by Judge Agresti?

14   A.  That's correct.

15   Q.  I think you indicated in direct examination that when you

16   were asked by Mr. Ridge whether you would have produced those,

17   I think your answer was no, we did not view those as

18   produceable because you consider them to be executory

19   contracts.

20   A.  I don't believe that's what I said.  I believe what he

21   asked was -- he asked questions about executory contracts.  I

22   don't think he asked about those specifically.

23   Q.  I think your answer was you believe these not to be

24   executory contracts.

25   A.  That's my belief.  My belief is that executory contracts

1    are contracts that existed prior to filing the case.

2    Q.  Judge Agresti believed otherwise, right, and he ordered

3    the production of those?

4    A.  Judge Agresti has his own rules and, yes, he ordered them.

5    Q.  That's what Judge Agresti ordered?

6    A.  Yes.  He put in an order he wanted to see them.

7    Q.  In your second amended plan filed in January of 2013, you

8    indicated yes to the existence of executory contracts?

9    A.  We did do that.

10   Q.  If you had seen those contracts during the time Ms. Miller

11   negotiated them, would you have stated the same opinion with

12   respect to the feasibility of the plan and the guaranteeing

13   the income projection for the TV show?

14   A.  I think it would have been similar.  I think there were

15   still provisions that she could be terminated.

16   Q.  But her income projection was high?

17   A.  Her income projection was definitely higher, so this would

18   have been similar but different, yes.

19   Q.  And you would have disclosed to the court or creditors

20   certainly that, look, she was projected to earn significantly

21   more than what she was reporting on her MOR and the

22   attachments to the disclosure statement?

23   A.  Those would have changed, yes.

24   Q.  You indicated that, going back to the amended plan, this

25   was the plan that was in existence and pending before the

1    court when Judge Agresti was channel surfing, found additional

2    program, commercial for additional episodes of "Dance Moms" or

3    "Abby's Ultimate Dance Competition," correct?

4    A.  Could you restate the question?

5    Q.  You saw the -- this was the plan -- the amended plan was

6    the pending plan?

7    A.  Correct.  The second plan, the amended plan, was the one

8    pending at that time.

9    Q.  That was, I believe, filed in August 2012?

10   A.  That sounds correct.

11   Q.  At that point in time, I believe Ms. Miller had executed

12   about four or five agreements with the network or the producer

13   for upcoming episodes of "Dance Moms" or spinoff or related

14   TV shows?

15   A.  I don't know the dates of the execution of the contracts.

16   Q.  There were several contracts you saw?

17   A.  There were contracts, yeah.  They could have been

18   executed.

19   Q.  They were immediately produced by the court -- to the

20   court?

21   A.  The ones I produced when I got them, yes.

22   Q.  Now, at the time when the hearing was canceled, there was

23   a plan in place that proposed to deal with both secured and

24   unsecured debt?

25   A.  Correct.

1    Q.  And you've talked about that with Mr. Ridge, and I want to

2    ask you a few questions about the proposed plan.

3         The big debt that Ms. Miller had was the secured debt that

4    she owed to Chase Mortgage and to PNC Bank?

5    A.  Correct.

6    Q.  Let's talk about the Chase mortgage debt for a minute.

7    This plan proposed to surrender the $245,000 proof of claim

8    that is her home in Florida to Chase Bank?

9    A.  Correct.

10   Q.  The consequence of that surrender, if the plan had been

11   approved, would have been that she would have saved $245,000

12   with the surrender of that proof of claim?

13   A.  Sure, but she loses an asset also.

14   Q.  But she would have saved herself $245,000?

15   A.  I don't necessarily agree with that.  She wouldn't have

16   paid $245,000, but she also would not have the asset that went

17   along with it.

18   Q.  No, but she would have been excused from paying the debt

19   on that asset.

20   A.  She would not have paid that debt under that plan.

21   Q.  The impact of that would have been that Chase Bank would

22   have eaten or accepted a home that was, as you said in your

23   direct examination, probably under water?

24   A.  Maybe.

25   Q.  The only way they can profit from eating or accepting that

1    property is if they can sell it at a profit for at least

2    $245,000 declared debt?

3    A.   They lend the money.  They don't have to profit on it, but

4    to get repaid, they have to sell it, and again, they would

5    have to do a deficiency judgment action or they would be

6    deemed satisfied by operation of law.

7    Q.   Not going to deficiency judgment.  Let's just -- would

8    still have an economic debt to the creditor?

9              MR. RIDGE:  Objection, Your Honor.  The witness is

10   trying to answer the question.

11             THE COURT:  You'll need to rephrase your question.

12   The witness and you are talking over each other in terms of

13   understanding.

14   Q.   All I'm asking is the consequence of surrendering that

15   asset could have created an economic debt to Chase Bank?

16   A.   Could have.

17   Q.   Also she agreed to -- there was an agreement with respect

18   PNC Mortgage, correct?

19   A.   Yes, there was.

20   Q.   That is that she was able to -- I'm sorry.  Let me go back

21   to -- strike that.

22        There was an agreement -- this was the same for the

23   original plan -- to reduce the PNC mortgage by $811 per

24   month?

25   A.   I don't know the exact numbers but, yes, the plan was to

1    reamortize it over a new period with a new interest rate, and

2    that would lower the amount owed, because she currently at the

3    time owed significantly less than when she borrowed money to,

4    I believe, build the studio.

5    Q.  That would have been a cost savings to her, right?

6    A.  Well, yeah.  That's the purpose of the Chapter 11 plan is

7    to reorganize the debt.

8    Q.  And to PNC Bank, they -- again, I'm not asking for

9    complicated accounting or understanding.  It's simply that

10   they would have lost a percent of interest on what they had

11   loaned her from the original agreement, because they

12   renegotiated the debt?

13   A.  I don't know the answer to that only because we took over

14   a new term and new period.  If we extended it longer, possibly

15   not.  I don't know.

16   Q.  Assuming they had renegotiated a new term that reduced the

17   principal -- reduced the interest rate.

18   A.  But if it's for a longer time, they may still end up with

19   more money.  I don't know the accounting of it.

20   Q.  This was the plan that would have been in effect but for

21   Judge Agresti uncovering the concealment of the assets?

22   A.  If he had not rescheduled that hearing, yes, that would be

23   the plan that would have been in effect.  Now, whether it

24   would have been confirmed is another story altogether.

25   Q.  There were no, at that time, no objections to the amended

1    plan filed in August of 2012, right?

2    A.  I believe you're correct.

3    Q.  I mean, you were essentially on the eve of a plan

4    confirmation hearing in December of 2012 when Judge Agresti

5    issued the order canceling the hearing, right?

6    A.  Yes, but Chase had not voted.

7    Q.  Chase had not voted.

8    A.  Which is a no vote, which means the plan can't get

9    confirmed.

10   Q.  There were no indications up to that point in time that

11   any of the creditors objected to the proposed plan?

12   A.  No, I don't believe they had objected, no.

13   Q.  Now, when that plan is proposed, the amended plan, have

14   you learned since then that in fact Ms. Miller was beginning

15   to conceal assets and had concealed assets that would have

16   affected the representations about what her financial

17   condition was to those creditors?

18   A.  Yes.

19   Q.  And certainly, speaking as an attorney, you understand

20   that this would have impacted both PNC and Chase Bank's

21   leverage in negotiating a resolution of that debt?

22   A.  I don't necessarily agree with that.  We have -- there's

23   lot of cases where we still amortize -- in a Chapter 11, we

24   take them over time.  We take the loans over time, no matter

25   what.

1    I would have never advised for her to say pay them in full

2    in one payment, because when you have a loan, I mean, that's

3    part of having a loan.

4    Q.  I understand, but Chase Bank and PNC Bank, had they known

5    the full financial condition at the time the amended plan was

6    filed, may have responded differently to whether they would

7    accept the surrender both of the Chase debt and a reamortizing

8    of the PNC debt.

9    A.  PNC amortized their debt.  We worked out an agreement with

10   PNC within the first three months of the case.  We were

11   current under payments with them, and I don't think anything

12   would have changed their position.

13       They were locked in with a court order of what their plan

14   treatment was to be.

15   Q.  But Chase's position might have changed?

16   A.  Chase wasn't responsive to anything, so I don't know what

17   they would have done.

18   Q.  You indicated that the second amended plan, the one that

19   was filed in January of 2013, was filed -- I think your words

20   were -- because some additional funds were suddenly made

21   available by Ms. Miller?

22   A.  The second amended plan?

23   Q.  Yes.

24   A.  Yes.

25   Q.  But it was more than just some additional funds.  It was

1    $288,000?

2    A.  It was.

3    Q.  I believe at this time, you were beginning to learn that

4    maybe Ms. Miller had sources of revenue that were not being

5    disclosed?

6    A.  I wouldn't say that.

7    Q.  If you knew she did, you certainly would not have allowed

8    her to file a plan?

9    A.  Correct.

10   Q.  Did you read Judge Agresti's transcript -- by the way,

11   were you at the hearing on February 1st, 2013 where your

12   client and Mr. Calaiaro were in attendance to discuss the

13   sudden revelation about the concealed cash?

14   A.  I think I was, but I don't remember, to be perfectly

15   honest.

16   Q.  Judge Agresti was fairly upset about this, wasn't he?

17   A.  I believe so, yes.

18   Q.  And this prompted you to, I assume, contact the producer

19   and other parties to try to figure out the complete source of

20   Ms. Miller's assets?

21   A.  It's when we sent the order around, yes, Judge Agresti

22   order.

23   Q.  And throughout 2013, there was this pending plan.  The

24   second amended plan was still pending until it was approved in

25   December 2013?

1    A.   That's correct.

2    Q.   Now, that was about 11 months, right?

3    A.   Correct.

4    Q.   None of the creditors raised objections to that plan?

5    A.   I don't believe so.

6    Q.   And that plan called for the, again, with the Chase Bank,

7    the reduction of interest from 7.875 percent to a fixed 4

8    percent rate?

9    A.   That is correct.

10   Q.   Why didn't, if you can tell us, you agree to continue to

11   surrender the property?  Why did it vary from the amended plan

12   to the second amended plan?

13   A.   Well, she had always wanted to keep the property.

14   Q.   But she didn't with the amended plan?

15   A.   We didn't know if it was feasible for her to keep it.

16   Q.   But now was it because you see that she has additional

17   income, the creditors likely are going to reject, especially

18   with Chase, accepting that home because they know she has

19   additional income which was not -- which was not reported?

20   A.   No.  I think with the payment of the unsecured creditors

21   and the alleviation of that debt going forward on a monthly

22   basis, we thought it was more feasible for her to keep that

23   property.

24   Q.   Now you decided to keep the property?  Reamortize the

25   debt?

1    A.   Correct.

2    Q.   At a lower interest rate?

3    A.   Correct.

4    Q.   Which is a cost savings to her, of course?

5    A.   Correct.  We do that in every Chapter 11, because a lot of

6    these interest rates are high when these people get them,

7    variable rates.

8    Q.   Has an economic impact to Chase?

9    A.   It does.

10   Q.   You said you looked at the indictment, and you saw that

11   between February 2013 -- excuse me, January of 2013 when the

12   second amended plan was filed until it was approved in

13   December 2013, Ms. Miller continued to earn income from

14   different sources, correct?

15   A.   I learned that later, yes.

16   Q.   You learned it later?

17   A.   Yes.

18   Q.   And I believe the summary charts that have been put into

19   evidence show about 340 some thousand dollars in unreported

20   income?

21   A.   I know they show unreported income.  I don't know the

22   dollar amounts.

23   Q.   This information was not available to Chase, to PNC or to

24   any of the creditors, secured creditors when they agreed to

25   accept those -- the second amended plan in December 2013?

1    A.   I don't believe so.

2    Q.   With respect to the unsecured creditors, I believe the

3    original plan and the amended plan proposed to pay the

4    unsecured debt over the course of six years from the original

5    plan with no interest?

6    A.   That's correct.

7    Q.   And then to five years with the amended plan?

8    A.   Correct.

9    Q.   And then of course with the second amended plan filed in

10   January 2013, to pay in full, right, immediately?

11   A.   That's correct.

12   Q.   That was prompted because she's got money, I suppose?

13   A.   We had the money, yes.

14   Q.   You had the money?

15   A.   Yeah.

16   Q.   In the first two plans, the original and the amended plan,

17   there was no -- there was no consideration to paying interest

18   to those creditors who were owed the money on the unsecured

19   debt.  It was without interest?

20   A.   Correct.  It was always without interest to the unsecured

21   creditors.

22   Q.   Those creditors lose the time value of money over five or

23   six years by giving Ms. Miller the opportunity to repay them

24   back on her terms?

25   A.   Conceivably, yes.

1   Q.  And again, when they agree to that second amended plan,

2   these unsecured creditors did not have the benefit of knowing

3   the actual financial condition of Ms. Miller?

4   A.  That's correct.

5   Q.  What would the interest rate be typically for unsecured

6   debt?

7   A.  There's only been one case in seven years that I paid

8   interest to unsecured creditors.

9   Q.  And what was that rate, Mr. Valencik?

10  A.  I don't remember off the top of my head.

11  Q.  Is 12 percent --

12  A.  I don't believe so.  I don't believe it would ever be that

13  high.

14  Q.  What was the -- the unsecured portion, I know there was

15  some discussion about this in the examination by Mr. Ridge,

16  the unsecured portion of Chase's debt, you had proposed the

17  cramdown, leaving an unsecured balance of about 60 some

18  thousand dollars, I think you had proposed was going to go to

19  the unsecured claims?

20  A.  I'm not sure what the dollar amount was, but yes, in the

21  first plan, it says that if we do a cramdown, the unsecured

22  portion, if any, because, again, we don't know what it would

23  end up being, you have to go through a whole trial on the

24  value of this piece of real estate and prove what its value

25  is, but any unsecured portion would have then been captured by

1   the unsecured creditor pool.

2   Q.  And would Chase have received that 65,000?

3   A.  Yes.

4   Q.  Interest free?

5   A.  Again, I don't know what the dollar amount was, but yes,

6   whatever that portion was, they would have.

7   Q.  Interest free?

8   A.  Yes.  The plan proposed to pay the unsecured creditors

9   interest free, yes.

10  Q.  They would have lost the time value of that debt?

11  A.  Yes.

12  Q.  Let me ask -- I don't want to play law school professor,

13  but you had testified that you believe an executory contract

14  was a contract that had already been performed or performed

15  prior to the filing of a petition?

16  A.  That had been performed prior to or still needed to be

17  performed but was in existence at the time.

18          MR. MELUCCI:  I would the court to take judicial

19  notice of what an executory contract is.  Under Black's Law

20  Dictionary, it's defined as --

21          MR. RIDGE:  Objection.  I don't care what Black's Law

22  Dictionary says about this.  We're operating under

23  the bankruptcy code.

24          THE COURT:  I know what an executory contract is.

25          MR. MELUCCI:  Does the court still want to hear what

1   the definition is?

2            THE COURT:  It's not what Black's Dictionary says it

3   is.  It's what the bankruptcy code says it is, and then you

4   would be better off with one of the bankruptcy treatises that

5   give you a definition.

6            It's not a contract that's been performed.  If it's

7   fully performed, it's not executory.

8            THE WITNESS:  Thank you, Your Honor.

9            MR. MELUCCI:  Let me have a minute, Your Honor, if I

10  may.  I think, Your Honor, that's all I have with

11  Mr. Valencik.

12           THE COURT:  Mr. Ridge, do you have follow-up?

13           MR. RIDGE:  Yes, Your Honor, just a bit.

14                        REDIRECT EXAMINATION

15  BY MR. RIDGE:

16  Q.  Mr. Valencik, this is going to sound like a potentially

17  silly question.  A creditor can only be paid what it's owed,

18  right?

19  A.  That's correct.

20  Q.  If a creditor gets 100 cents on the dollar, it doesn't

21  matter what's concealed, the creditor is paid?

22  A.  I don't know if it doesn't matter what's concealed, but I

23  mean, the creditor, if they get 100 cents on the dollar,

24  they're paid.

25  Q.  You're right, and I should have been more careful.

1    If the creditor is paid 100 cents on the dollar, then the

2    creditor's claim is extinguished?

3    A.   That's correct.

4    Q.   All right.   PNC and -- you negotiated the terms of the

5    renegotiated, reamortized debt for PNC, correct?

6    A.   That's correct.

7    Q.   You did that when?

8    A.   I believe it was -- I believe it was in March of '11,

9    which would have been, I think, the first couple of months

10   that we were in the bankruptcy case.

11   Q.   And Ms. Miller signed a contract, a participation

12   agreement in April of '11.  Do you know that?

13   A.   I don't know the date that she signed it.

14   Q.   Okay.   In all of the successive plans of reorganization

15   that you filed, did you provide notice of those plans to PNC?

16   A.   Yes.   They would have been served to their attorney.

17   Q.   So when you advised PNC of this additional income that was

18   related to the television show, did PNC ever come back and ask

19   to renegotiate?

20   A.   No, they did not.

21   Q.   And in fact, PNC was entitled to a higher interest rate

22   under the renegotiated terms, right?

23   A.   Higher than what?

24   Q.   Than the original note.

25   A.   I don't remember what the original note was.

1    Q.   Okay.

2    A.   I believe the renegotiated amount was seven and a half

3    percent.

4    Q.   Mr. Melucci asked you about Chase's -- under the

5    likelihood that Chase would have some unsecured claim if they

6    were to cram down, Chase would lose its interest.

7         Do you remember him asking that question?

8    A.   Vaguely.

9    Q.   Do you remember what the term was on the Chase note?

10   A.   I do not actually.

11   Q.   Do you know if it was longer than five years?

12   A.   I believe it was.  I believe it was a standard mortgage

13   for commercial property.

14   Q.   And do you remember when she entered into it?

15   A.   Unfortunately, I do not.

16   Q.   But it was longer than five years?

17   A.   I believe it was.

18   Q.   And the unsecured claims would have been paid out over

19   what?

20   A.   The original plan, six years; the second plan, five

21   years.

22              MR. RIDGE:  May I have a moment, Your Honor?

23   Q.   Mr. Valencik, as it relates to the Florida home, even the

24   amended plan which calls for you to surrender the collateral,

25   that's the plan filed in August of 2012, that was done -- it

1   was not Ms. Miller's intention to surrender that collateral,

2   was it?

3   A.   No.   She always wanted to keep it.

4   Q.   That was at your recommendation because you weren't sure

5   she could afford it?

6   A.   That's correct.

7            MR. RIDGE:  I don't have anything further, Your

8   Honor.

9            THE COURT:  I think the questioning is over.

10            MR. MELUCCI:  I have one redirect, Your Honor.

11            THE COURT:  Okay.

12            MR. MELUCCI:  If I may.  Thank you.

13                      RECROSS EXAMINATION

14   BY MR. MELUCCI:

15   Q.   One redirect.  Mr. Valencik, when you are negotiating the

16   plans for a debtor, as you did for Ms. Miller, the plan that

17   is proposed that has a cost savings to the debtor, that is, I

18   assume, the intent of the debtor?  That is, it's the debtor's

19   plan through the attorney, right?

20   A.   They have the final say in what we do, yes.

21   Q.   So the debtor, Ms. Miller, would have reviewed these plans

22   before they were submitted by you?

23   A.   Well, if we were up against a deadline, not necessarily,

24   but we would have discussed the treatment of the claims.

25            MR. MELUCCI:  Thank you, Your Honor.  That's all I

1    have.

2              THE COURT:  Just a couple questions.  There are no

3    exemptions that were at issue in this Chapter 11?

4              THE WITNESS:  No, I don't believe so.  Nobody

5    objected to any.

6              THE COURT:  And how was the value of the Chase

7    property determined?

8              THE WITNESS:  The value never was determined, Your

9    Honor.

10              THE COURT:  There was a value set forth in the

11    schedules.

12              THE WITNESS:  The debtor's value was her opinion.

13              THE COURT:  And the projections that were filed with

14    the plan, they always show that she would be able to pay 100

15    cents on the dollar to the unsecured creditors?

16              THE WITNESS:  I believe so, Your Honor.

17              THE COURT:  And the liquidation value, do you recall

18    that?

19              THE WITNESS:  I do, Your Honor.

20              THE COURT:  Do you recall how that would have shaped

21    up?

22              THE WITNESS:  Well, the liquidation alternative, as

23    you know, it's a form that we have to use with the court, and

24    the problem with that form is that it asks for all of the

25    value of your Chapter 7 estate, and then it asks for the

1    secured debt.

2           And what it doesn't take into consideration is that

3    the secured debt was higher because of the Chase loan, and it

4    basically eliminates the equity from the property in the --

5    the property here in Pittsburgh.

6           So the liquidation alternative turned out to be a

7    zero as well, but if you really -- if somebody really drilled

8    down on it, they might object to it and say, wait, there's

9    still equity in this one piece of real estate.

10           THE COURT:  For the unsecured creditors?

11           THE WITNESS:  For the unsecured creditors.

12           THE COURT:  It would have meant Chase would have to

13    take less than the full amount?

14           THE WITNESS:  That's possible, yes.

15           THE COURT:  But there's still -- what would be the

16    rough delta at the end; do you recall?

17           THE WITNESS:  I believe that there was somewhere

18    between 20 to $50,000 in equity in that piece of real estate.

19           THE COURT:  I'm saying in terms of the difference

20    between the -- what would be the liquidation value for the

21    unsecured creditors?

22           THE WITNESS:  I think the liquidation value as filed

23    said it was a zero.

24           THE COURT:  That was for $43,000 worth of debt?

25           THE WITNESS:  Right, correct.

1          THE COURT:  It maybe also would have paid off all the
2     administrative claims?
3          THE WITNESS:  Probably not.
4          THE COURT:  Thank you.
5          THE WITNESS:  Thank you, Your Honor.
6          MR. MELUCCI:  Nothing further.
7          MR. RIDGE:  I have nothing, Your Honor.
8          THE COURT:  The witness is excused.
9       (Witness excused.)
10          MR. RIDGE:  Your Honor, may I have a moment?
11          THE COURT:  Yes.
12          MR. RIDGE:  Thank you, Your Honor.
13          MR. MELUCCI:  Your Honor, I don't have any rebuttal
14     evidence and so we're prepared to proceed as the court wishes.
15          THE COURT:  Okay.  Just want to take a quick minute
16     with my law clerk.
17       (Discussion off the record.)
18          THE COURT:  Would you like to make any argument?
19     I'll start with the government first with respect to the
20     amount of loss.
21          MR. MELUCCI:  Yes, Your Honor.  Thank you.  Your
22     Honor, if you give me a moment.
23          From the outset, Your Honor, on this case, it's been
24     the government's position that there are two controlling cases
25     that would assist this court in determining the loss level of

1    the case.

2           Of course, you know the loss level is determined

3    under 2B1.1.  It's been our contention, Your Honor, that the

4    evidence that the government has presented shows by a

5    reasonable preponderance as dictated by the Free court and the

6    Feldman court that clearly Ms. Miller intended to deceive and

7    to cause economic harm to creditors.

8           I'm not talking about an actual loss.  I know there's

9    been much discussion about the fact that claims have been paid

10   in full, although the government has disputed some of that in

11   terms of the time value of the money and the fact that some of

12   the secured claims were negotiated at lower interest rates,

13   but the government's position has never been that this is an

14   actual loss case.

15          So when the court looks at how does it determine what

16   the intended loss is, the court has to focus on what evidence

17   was there that showed that Ms. Miller intended to cause an

18   economic harm.

19          The evidence we presented, Your Honor, I think

20   through the trustee, through Mr. Langford, shows by a

21   preponderance of the evidence that she clearly intended to do

22   that.

23          Number one, we've shown that, in fact, throughout the

24   course of the bankruptcy proceeding, Ms. Miller concealed over

25   $750,000 in income that she earned from multiple sources.  She

1    primarily earned income from her status as the featured talent

2    on the "Dance Moms" television show.

3            She earned income from the merchandising and sale of

4    merchandise that she produced in a joint venture with Mark

5    McCormick.  She earned substantial revenue, Your Honor, from

6    the Masterclass shows that she was performing both nationwide

7    and overseas, but nationwide she was earning revenue from

8    these Masterclass shows where she could charge significantly

9    high ticket prices for individuals to attend the show, moms

10   and their daughters.

11           That concealment began in 2012 and proceeded through

12   2013 until the plan -- the second amended plan was approved in

13   December 2013.

14           In fact, as we've seen from the evidence, Ms. Miller

15   was scheming to do this as early as the fall of 2012.  Not

16   only were the MORs not disclosing television revenue, but in

17   fact, the e-mail chains that we have seen between her and her

18   accountant and other associates of hers show that she had a

19   plan.

20           And the plan was to divert revenue from the income

21   she earned from either the TV show or Masterclass -- in most

22   of the cases, it was Masterclass revenue -- into accounts that

23   she created at Wells Fargo Bank outside of the DIP account

24   which she was directed by the court to deposit all revenue,

25   and the purpose of that is obvious.

1           She did not want the court to know about this

2    additional income.  Now, you know, the question -- it begs the

3    question why doesn't a debtor want the court to know.  I think

4    the reason is obvious.  Because a debtor, whether it's true or

5    not, believes that, by disclosing or revealing income that

6    would be sufficient to satisfy her debts, might be taken by

7    the court.

8           Now, in this case, her stated claims were 365 or

9    $356,000 based on her petition.

10          But over the course of the two years, 2012-2013,

11   Ms. Miller earned -- concealed over $750,000 in income.

12   There's a huge incentive to divert that revenue to other

13   sources and not to have the court know about that.

14          So what is the evidence that she intended to cause

15   the economic harm?  Number one, she created these accounts at

16   Wells Fargo Bank to funnel, as we've stated in the indictment,

17   to funnel this revenue so the court wouldn't know about it.

18          She entered into agreements with the network and the

19   TV show producer such that none of these agreements were

20   disclosed until Judge Agresti demanded them in his February --

21   I'm sorry, December 2012 order when he uncovered the

22   concealment.

23          She was instructing associates of hers not to deposit

24   money in the bank, and the court may recall that infamous

25   e-mail where she says to her associates and for Showclix

1      income, and this was the income that was primarily designated

2      for the Masterclass shows through the ticket retailer list, do

3      not deposit the money in the bank.

4             And then we have another classic e-mail that this

5      court saw that was in February of 2013.  This was about a

6      month after -- I'm sorry, two weeks after the sentencing --

7      not sentencing, but rather the bankruptcy hearing on February

8      1st where Judge Agresti had uncovered the fraud and contacted

9      all parties and brought them into court, and the court was

10     very upset about the concealment.

11            We saw the e-mail in response where Ms. Miller was

12     e-mailing her accountant, Kathy McFaden, and of course makes

13     the profane remark about the judge and says I have to pay 100

14     percent on the dollar in bankruptcy.  Who does that?  Who does

15     that?

16            If there is any more revealing evidence of somebody's

17     intent not to pay creditors their due, that's it.  And it's

18     not just that there's one piece of evidence.  There is a

19     series of e-mails and a series of acts by Ms. Miller in which

20     she is designing to hide assets, divert assets, funnel assets

21     and create the subchapter S corporations or the S corporations

22     while we have the plans pending.

23            The fact is that amended plan which was filed in

24     August 2012 and was on the eve of being approved, had it been

25     approved, creditors would never have known about the

1    agreements that she entered into where she was projected to

2    earn significant income, Your Honor, upwards of $25,000 per

3    show on the TV show, spinoffs, related shows.

4          She became a very successful talent for A&E Network,

5    and she was prized by A&E Network because obviously it had

6    enormous ratings and enormous following, and she was making a

7    lot of money.

8          Yet knowing this, and in the situation that she was

9    in when she filed bankruptcy, and I'm not suggesting and I

10   never have, that at the time she filed a petition in

11   bankruptcy, that was the plan, but as she began to earn money

12   in late 2011 and into 2012, the opportunity was there for her

13   now to change that plan.

14         If there was ever an intent early on to pay creditors

15   in full, that plan changed.  That plan changed when she

16   started to earn money in 2012 and then into 2013.

17         That's really all the Free court and the Feldman

18   court asked the court to do, and I was thinking about this the

19   other night, Your Honor, as I'm anticipating this argument.

20   One of the things that the parties have gotten kind of bogged

21   down is kind of conflating loss and economic harm.

22         The instruction by the court in Free that was just

23   handed down last fall and then of course the resentencing

24   occurred a couple months ago was that it was only the burden

25   of the government to show that at some point in time, the

1   debtor intended to cause an economic or pecuniary harm to a

2   creditor.

3           It doesn't demand that the government produce an

4   actual harm, just an intended pecuniary harm.  More

5   poignantly, Your Honor, it did not tell the government that it

6   had to show an economic loss.  Only an economic harm, because

7   loss and economic harm have parallels but they're not the

8   same.

9           You can cause and intend to cause an economic harm,

10  and in the end not actually cause it because, as in this case,

11  a fraud is uncovered, and then the debtor makes a complete 180

12  and decides to pay everybody in full, as the debtor did in the

13  Michael Free case, which was something that the third circuit

14  noted that would be evidence of somebody's intent to cause

15  pecuniary harm, the sudden revelation of the fraud and then a

16  complete 180 in paying the debt back.

17          So again, the analysis, I believe, by the court is

18  not whether in fact it caused an economic loss as loss is

19  defined under the guidelines, but whether the debtor intended

20  to cause an economic harm.

21          As Your Honor well knows being on the bench all these

22  years, another point is that the success of the scheme, and I

23  emphasize this in my brief, Your Honor, is immaterial to

24  whether a fraud has occurred.

25          In other words, the fact that in the end Ms. Miller's

1     scheme to avoid paying creditors fails because it's uncovered

2     does not mean a fraud has not occurred or that there wasn't

3     intent to cause a fraud.

4              As you know, ordinary third circuit model jury

5     instructions on intent and fraud, there has to be evidence of

6     an intent to commit a fraud, not that the fraud actually

7     occurred.

8              And as you think about it, Your Honor, if in fact the

9     government was stuck in a sense with only being able to prove

10    a harm by showing an actual loss, you know, you can imagine

11    the impunity a debtor might have in filing bankruptcy

12    petitions.

13             In other words, if I'm a debtor and let's say I have

14    hypothetically a million dollars in assets and I owe a quarter

15    million dollars in debt.  I want to extinguish the debt, but I

16    don't want to show the million dollars in assets, so I

17    reorganize, I pay the 250 in debt, but I concealed a million

18    dollars.

19             Can the debtor walk away and say, wow, I pulled a

20    fast one?  I not only was able to pay off my 250, but because

21    there was no actual harm to creditors, therefore, I walk away

22    scot-free.

23             I don't think that's what the third circuit in -- the

24    sentencing commission had in mind or the Free court or the

25    Feldman court had in mind when they, you know, authored

1    opinions or gave lower courts guidance on how to measure loss.

2         Feldman and Free are the same.  There's nothing in

3    Free that's not in Feldman.  Feldman and Free both said if the

4    government at any point in time can prove an intended economic

5    harm, not a loss, but an intended economic harm, that is

6    satisfactory.

7         Now, how does the court attach a loss figure to that?

8    Historically there have been two approaches.  There has been

9    the categorical approach, which essentially has said, and

10   these are cases out of the eighth circuit, Holthaus, there

11   have been a couple others, which said in cases where there's

12   been no actual economic harm but there is evidence of an

13   intent to cause economic harm given the size of the

14   concealment, the loss is the lesser of the concealed assets or

15   the stated liabilities.

16        That's what the Holthaus opinion says.  Feldman

17   discussed it also, but the third circuit never formally

18   adopted that.  The third circuit went further --

19        THE COURT:  In Free, didn't the court really say to

20   the contrary?

21        MR. MELUCCI:  It said in fact if you can prove a

22   loss, a concealment of $1 million, that's the fraud loss.

23        THE COURT:  Where does it say that in Free?

24        MR. MELUCCI:  It says it in Feldman.

25        THE COURT:  But Feldman -- we've been over this

1    before.  It was a very different situation in Feldman because

2    that was a Chapter 7 case.

3           MR. MELUCCI:  I understand, but I'm not so sure

4    there's a real distinction in terms of 7 and 11 for purposes

5    of --

6           THE COURT:  Free is the most recent statement on

7    this, and the court in Free, I'm trying to find the quote

8    where they really sort of chastise the lower court for

9    reaching to find just the highest possible loss.

10          And they said that, you know, that is not

11   appropriate.

12          MR. MELUCCI:  Well, they chastise the lower court

13   only because Judge Hornak, in their opinion, did not formulate

14   specific evidence or show specific evidence in the record of

15   an intent to cause an economic harm.  They didn't say that

16   we're discounting Feldman.  All they said was we agree with

17   Feldman, Feldman is the precedent, but Judge Hornak, you

18   didn't do what we think you should have done in formulating

19   the reasons why you arrived at a loss level of about

20   $1 million, because your emphasis was on, rather than economic

21   loss, you were more focused on the harm to the judiciary, the

22   bankruptcy court, by the defendant's mendacity in lying to the

23   court, hiding assets.

24          The court simply said do it again, Judge Hornak, and

25   he did it again back in January, except this time, he was very

specific about why he reached the loss level that he did.  And
he looked at two factors which persuaded him, speaking of
Judge Hornak now, why he determined that there was a loss
range of 400,000 to $1 million.

Number one, he said this is a massive concealment
scheme.  Michael Free had weapons and historic World War II
guns that were valued over $1 million that he concealed from
the court.

Secondly, Judge Hornak determined that there were
acts by Michael Free, in the words of Judge Hornak, take no
chances to hide those assets, so throughout the evidence that
was presented at trial in that case, there was evidence that
Michael Free, you know, hid the sale of those guns.  In fact,
he took some of those guns, sold them and got profit from
those guns.  He lied to the trustee, lied to the court.  Not
entirely unlike Ms. Miller.

So there were two controlling factors, the size of
the concealment and the ways in which he concealed those
assets were the motivating reasons for Judge Hornak in
determining that there was an intent to cause an economic
harm.

In Free, there was no actual economic loss.  All
creditors were paid, but Judge Hornak said, look, I can look
at loss one of two ways.  He intended to cause an economic
harm because the stated liabilities were $671,000, or I can

1    take how he profited from the resale of those guns as gain,

2    which was close to a million dollars, but as Judge Hornak said

3    in a footnote, he felt confident that the --

4              THE COURT:  We're only talking about loss.

5              MR. MELUCCI:  I understand, but I'm --

6              THE COURT:  We haven't focused at all on any gain.

7              MR. MELUCCI:  I understand.  I'm telling you what he

8    looked at.

9              THE COURT:  I understand, but I can't look at that.

10   That's not what we have here.  I'm looking at the Free

11   decision, and on page 321, the court talks about, while it may

12   indeed be appropriate to punish a bankruptcy fraudster more

13   severely when that person conceals assets of greater value,

14   the guidelines seem to indicate that, in the absence of any

15   pecuniary harm to the victim, the mechanism for realizing that

16   goal is an upward departure rather than a more severe loss

17   calculation in the first instance.

18             And the court looks to pecuniary harm, which means

19   harm that is monetary or that is otherwise readily measurable

20   in money.  Accordingly, you know, you can't get emotional

21   distress, harmful reputation, et cetera.

22             And intended loss is the pecuniary harm that was

23   intended to result from the offense, and it includes intended

24   pecuniary harm that would have been impossible or unlikely to

25   occur.  So the fact that, you know, it was a sting or --

1          MR. MELUCCI:  Insurance fraud.

2          THE COURT:  Right.

3          -- that still qualifies as an -- there still has to

4     be a pecuniary loss intended to the victim.

5          MR. MELUCCI:  Exactly.  I don't disagree with that.

6     There has to be evidence.

7          THE COURT:  How do you show that in a case like this,

8     when there are, in a worst case scenario in a bankruptcy, the

9     case converts to a Chapter 7 and there's a liquidation, and

10    then the value of the assets held by the estate are available

11    to the creditors to be paid?

12         Here there are assets that are available, and I've

13    run the calculations based on the amended plan which I think

14    is the one that is most pertinent here, and the delta between

15    the assets which were valued at $295,528 and I don't have

16    any -- no one has taken issue with that valuation, the debts

17    that are there would be $146,728, and so when you -- that's

18    what the loss would be then.

19         MR. MELUCCI:  Again, I'm not disagreeing.  What I'm

20    saying, Your Honor --

21         THE COURT:  I mean, that's the worst case.  That's

22    not even the case that we have here where you have -- it's

23    never converted to a Chapter 11 -- I mean, to a Chapter 7.

24    It's always a Chapter 11 case, and when you look through, as I

25    have done here, if you try to look -- I'm taking the debtor's

1   opinion on the value of her assets.  The party you have to

2   focus on is Chase, because in the amended plan, Chase was not

3   going to be paid 100 cents on the principal.  Chase was going

4   to be paid -- just was going to be given back the property,

5   which was valued at -- I think it was $120,000.

6            MR. MELUCCI:  150, I think.

7            THE COURT:  I think in that plan, it was --

8            MR. MELUCCI:  The principal was $210,000 and the

9   proof of claim was 245.

10            THE COURT:  Right.

11            MR. MELUCCI:  But again, I'm not arguing --

12            THE COURT:  So what Chase is getting back is property

13   that's valued, and I'm trying to get to that value for Chase.

14   I think it was listed at -- at least in this one, the

15   Davenport, Florida was listed at $120,000 in value.

16            MR. MELUCCI:  That's the Chase property.

17            THE COURT:  That's the Chase property.  Chase had a

18   debt of 245, so if you say that principal amount of that would

19   have been 210,000 was the principal amount of that, when you

20   take that and you subtract the value that Chase was being

21   given, because you could argue that Chase would have gone out

22   and sold it on the market, that's what Chase would have

23   received, so Chase would have lost, in terms of pecuniary

24   harm -- we're not talking about, well, is it a deficiency or

25   not a deficiency?

1        Those are statutory provisions that deal with how

2    secured creditors who have mortgages on property can look to

3    determine whether there's a deficiency.

4        What I'm looking at here is what's an intended

5    pecuniary harm.  What's the intended loss here?  If you have

6    210,000 in principal and 120,000 in value, you're looking at

7    about $90,000 worth of difference there.

8        MR. MELUCCI:  Okay.  I don't disagree with that, Your

9    Honor, except that --

10        THE COURT:  You know, it may be higher than that.

11        MR. MELUCCI:  I'm happy to supplement.

12        THE COURT:  Unless we know what the value of the

13    principal value was owed to Chase.

14        MR. MELUCCI:  The principal value was $210,000.

15    That's not disputed.  That's Exhibit No. 49.  So that's not

16    disputed.  That's in evidence.  The rest were fees and

17    interest that accumulated on the $210,000.

18        You could use that, Your Honor, as a baseline for

19    what number do we attach if I find that there was an intent to

20    cause an economic harm, but the Free and Feldman courts made

21    it easier.  Particularly, the Feldman court said, look, you

22    can look at stated liabilities.  You can look at the concealed

23    assets, because you don't have to perform the calculation of

24    what the actual loss is if you believe that the stated

25    liabilities exceed that.

1          THE COURT:  How in any kind of rational world would

2     you be able to say the intended loss was $700,000 in this

3     case?

4          I mean, when you're talking about a situation where

5     there are assets in the estate, and you've not disputed that

6     as the government, that she had these two properties and they

7     were worth a certain amount of money, and they would be going

8     to pay the creditors, and if there was equity in the property

9     for -- of PNC, that would be available for unsecured

10    creditors.

11         And when you look at lumping them all together, even

12    on a liquidation, you get up to 149,000 at most based on those

13    values.  So it could never be 700,000, and I don't think a

14    court under the Free decision can just say, oh, you know,

15    there's a million dollars at stake here.  There's 700,000.

16    That's so conjectural.

17         I certainly have authority, depending on the

18    egregiousness of the conduct, to depart upward if the court

19    determines it to be appropriate.  I don't think, as I

20    initially did, that this case is one where there was no

21    intended loss, because now I clearly better understand how

22    Chase was proposed to be treated, and quite frankly, had Chase

23    gone along with plan No. 2, I have no reason to doubt that the

24    defendant wouldn't have willingly surrendered that property as

25    part of the plan and walked away from the $90,000 worth of

1    principal that would otherwise have been due.

2            Unfortunately under the guidelines, the court doesn't

3    get to include the interest component.

4            MR. MELUCCI:  I understand.

5            THE COURT:  That would drive it up really high, and

6    that would be affecting the unsecured creditors.

7            MR. MELUCCI:  We've never disputed that also.  I'm

8    not asking for $700,000.

9            THE COURT:  I'm constrained by the guidelines and

10   also constrained by what the court has said.  I've got to look

11   at what was the intended pecuniary loss to the victims.

12           MR. MELUCCI:  The harm.

13           THE COURT:  The pecuniary harm which is a money

14   concept, and so I have to look at not what they actually lost.

15   We all agree they didn't lose anything here as far as the

16   guidelines would be concerned, but there is an intended harm,

17   and even though her original plan was going to pay 100 cents

18   on the dollar, it wasn't necessarily going to pay Chase 100

19   cents on the dollar.  That was unclear under the plan, even

20   though they said they would have the 506 assessment done, and

21   theoretically that could have resulted in increased claims,

22   but there was also a disclaimer in the plan that was 100 cents

23   on the dollar depending on the size of the claim, so if Chase

24   had dropped down there, who knows what the distribution would

25   be.

1          But it's quite clear in the next plan that Chase was

2     not going to get paid the full amount of the principal.  It

3     was the intent to turn over property valued at $120,000.  So

4     that's where I can see, and that's based on the debtor's

5     opinion on what the value of the property was and based on

6     what clearly the plan was saying would be paid, so at a

7     minimum, you're looking at, I think, a $90,000 loss.

8          MR. MELUCCI:  Well, the principal would have been 210

9     on the Chase mortgage.

10         THE COURT:  Right.  So it's 210 getting property, at

11    best, 120.  You're looking at 90,000.

12         MR. MELUCCI:  Well, again, I understand that.  You're

13    performing a calculation, but my belief would be that when

14    she's offering to surrender the Chase property, Chase loses

15    210, because they're swallowing the home.

16         THE COURT:  They're not swallowing the home.  They're

17    getting a value.  They're getting property worth $210,000 -- I

18    mean, the property worth $120,000.

19         Now, if you want to quarrel with the value of that

20    property, that would be a different issue, but you've not

21    taken that on or challenged it.

22         MR. MELUCCI:  No, but I'm relieved to see that the

23    court does recognize that there was an intent to cause an

24    economic harm by Ms. Miller's conduct.

25         THE COURT:  I'll hear from Mr. Ridge.

1            MR. MELUCCI:  All right.  The only reason -- there is

2    another side to the case, of course, which is the other term

3    of conviction, Your Honor.

4            THE COURT:  We're going to go over that next.  That

5    may be what drives the offense level.

6            MR. MELUCCI:  Yes.

7            MR. RIDGE:  Your Honor, it seems to me that we are in

8    a situation where we have first taken actual loss off the

9    table because there hasn't been any sustained, so we're left

10   only with the question about what the debtor's intent was, and

11   the only evidence we have of the debtor's intent comes from

12   three places:  The original plan, the amended plan and the

13   second amended plan.

14           THE COURT:  But I can't take the second amended plan

15   into account, because the game was up at that time.  The court

16   knew then, you know, that she had not fully disclosed.  She

17   was compelled to do it.  All of a sudden, $288,000 is made

18   available to her creditors.

19           So I cannot take that into account in determining

20   what her intent was with respect to the concealment that was

21   taking place prior to that time, because by that time, there

22   was no longer that level of concealment, let's put it that

23   way, that there had been previously.

24           MR. RIDGE:  What you can take into account is the

25   testimony of her lawyer who was the person responsible for

1    preparing at least the original plan and the amended plan, and

2    his testimony in this case was that she always intended to

3    retain the house, and that the only reason he filed the

4    amended plan is because he couldn't get a response from

5    Chase.

6            THE COURT:  No, because he felt that she couldn't

7    pay -- she wouldn't be able to fund the plan if she kept that

8    property.  That's at least what I heard him say.  She wanted

9    to retain it, but the view was, to get the plan through, she

10   would have to give up the property.

11           MR. RIDGE:  I think that's right.

12           THE COURT:  That's what I heard, and so she's giving

13   up the property, but she's walking away under those

14   circumstances from approximately $90,000 worth of principal.

15           MR. RIDGE:  I understand where the court is getting

16   that from Mr. Valencik's testimony.  I think what the court --

17   what Mr. Valencik said though was her intention was to keep

18   the property, but what we concluded based on the existence of

19   the objections was that we couldn't get --

20           THE COURT:  And what she was telling them was her

21   income.  She wasn't truthful with her counsel, so they were

22   giving her apparently the advice that they had based on what

23   her income was.

24           MR. RIDGE:  Well, that's another interesting aspect

25   of this, Your Honor, because when we talk about --

1         THE COURT:  You're telling me she wouldn't have taken

2     that deal, that amended plan if it had gone through?

3         MR. RIDGE:  I'm sorry?

4         THE COURT:  She wouldn't have taken that amended plan

5     if it went through and turned that property over?

6         MR. RIDGE:  It wasn't her intention to do that.

7         THE COURT:  That's what the plan said.

8         MR. RIDGE:  I understand that's what the plan said.

9     I think Mr. Valencik has explained why it was the way it was.

10         THE COURT:  I can only look at what I can see, you

11     know, from what she agreed to be submitted, the plan was

12     filed, and it was based on something she had agreed to.

13         MR. RIDGE:  Well, I don't think there's any question

14     she --

15         THE COURT:  Everybody would maybe like to keep all

16     the property that they can have even though you can't afford

17     it.  If you have a sudden loss of income and you can't afford

18     to keep your house and you have to give it up, you don't

19     intend to do that, but it's a reality, and you may have to, so

20     it's a different kind of intent.

21         It's a desire, you know, as opposed to being what I

22     can see in the papers she was actually intending to do to

23     Chase.

24         MR. RIDGE:  Your Honor, the only point I would make

25     in response to that is if we look at actually when these

1   additional dollars started to come in, they are after she

2   files for the amended -- she files the amended plan and is

3   waiting her emergence from bankruptcy.

4           So I understand the court's point of view on the

5   liquidation of the Chase property, but the truth of the matter

6   is those additional funds come in after that property is

7   already --

8           THE COURT:  I understand, but it was coming up to the

9   day that the plan was going to be confirmed.  There had been

10  no objections, and if that plan could have been confirmed, she

11  would have turned over the property and Chase would have been

12  out $90,000, according to her valuations, her opinions, as to

13  what that property was worth.

14          MR. RIDGE:  I understand that, Your Honor.  I would

15  point out though, and I do think this is not something

16  that's -- you know, we can't go back and make Chase

17  participate, and that's really what Mr. Valencik has testified

18  to.  If given the chance, he would have continued to negotiate

19  with Chase, but you just can't when they won't respond.

20          THE COURT:  I understand, but you have to look at

21  what actually happened, and I have to make an assessment of

22  what her subjective intention was, and the best that I can do,

23  based on everything that's been presented, is that at the

24  time, on the eve of the confirmation of her plan, it was still

25  proceeding.

1           There wasn't any notification to her counsel, oh,

2   let's do something different.  I have more money now.  I

3   really want to keep that Florida property.  Let's redo it.

4   Let's do something different.  It was to move forward with

5   that.

6           Assets are being concealed.  The effect on Chase, if

7   the plan would have been confirmed -- and it doesn't have to

8   be a probable loss, you know.  It just has to be something

9   that would be intended by her.  If the plan could have gone

10  through on the way it was stated, Chase would have suffered a

11  pecuniary harm in the amount of $90,000.

12          MR. RIDGE:  Yes, Your Honor.  I understand the

13  court's point.

14          THE COURT:  That's my point.  I understand the

15  argument that it should be zero because she was really going

16  to -- wanted to pay everybody in full, but based on the

17  documentation and the way the bankruptcy case proceeded and

18  the fact that the concealment was taking place leading up to

19  the December of -- I think it was 2013 -- 2012, December 2012,

20  that concealment was already taking place up to that period of

21  time.

22          She didn't tell the lawyers.  The court was not

23  informed.  The creditors were not informed.  And if the plan

24  had gone through, that's the consequences that would have

25  flowed.

1          So it's not speculation.  It's not just trying to

2     look for the largest amount.  It's trying to see what her

3     intention was in terms of causing this pecuniary harm.

4          MR. RIDGE:  I understand, Your Honor.  I would make

5     one other point, Your Honor.  I do think it's a point that's

6     worth making.

7          I know the court has practiced in bankruptcy before

8     and there is that tendency for debtors who are about to emerge

9     to try and sort of set the stage for emergence from bankruptcy

10    before they do, and I'm not suggesting that it is reasonable

11    or appropriate, but what I am suggesting is I think all of the

12    evidence that's been presented here today suggests that's what

13    her expectation was is that, look, I don't want to do anything

14    to upset the apple cart.  I'm almost out of bankruptcy.  Let

15    me get out of bankruptcy and we can do this.

16         At some level, Your Honor, I think this is a very

17    unique circumstance.  I know the court has been around

18    bankruptcy cases for a long time.

19         It's very infrequent that a bankrupt debtor who's

20    legitimately bankrupt at the time they file, there's no

21    dispute about that here, suddenly their fortunes take an

22    incredible turn for the better.

23         I'm not trying to minimize the fact that she didn't

24    disclose these things, but what I am trying to point out to

25    the court is you can see in the pattern of when that

1    disclosure began or when -- I'm sorry, when that concealment

2    began, she's actually sort of setting the stage to emerge from

3    the bankruptcy.

4         THE COURT:  The problem is she is still in

5    bankruptcy, and you cannot excuse somebody from filing false

6    monthly operating reports where you're not disclosing your

7    income, and it's not like a case where a debtor will say,

8    okay, I'm going to be emerging from bankruptcy, you know, in

9    two months.  I have an opportunity to enter into a contract to

10   do this job.  I'm going to hold off, and then I'll do

11   something later.

12        You know, you may be foregoing some opportunities,

13   but you are not lying on your -- on what you've actually

14   earned already, and that's where the problem is.

15        MR. RIDGE:  I understand that.

16        THE COURT:  That's unfortunate that the defendant

17   chose to do this, but she stands here having pled guilty, and

18   it's my job to try to determine what the intended loss is.

19        Having heard the parties, I just want to note that

20   the -- what the court is determining at this stage is the

21   amount of loss pursuant to section 2B1.1 of the United States

22   Sentencing Guidelines.  For purposes of this enhancement, loss

23   is the greater of actual loss or intended loss.

24        Here the government is not arguing that there's an

25   actual loss, but wanted the court to find that there was an

1    intended loss of $356,466.52 which is the total amount of debt

2    on the date that the debtor filed for bankruptcy, when the

3    defendant filed for bankruptcy.

4            Conversely, the defendant is arguing that the amount

5    of loss is zero because the defendant intended to pay the

6    creditors 100 cents on the dollar.

7            Now, determining loss is a question of fact.

8    United States versus Himler, 355 Fed. 3d 735 (Third Circuit

9    2004).  In estimating loss, the application notes advise the

10   court need only make a reasonable estimate of the loss.  The

11   sentencing judge is in a unique position to assess the

12   evidence and estimate the loss based upon that evidence.

13   United States Sentencing Guidelines section 2B1.1(b)(1)

14   application note 3(C).

15           And as the sentencing guidelines point out, if this

16   case goes on appeal, the court's loss determination is

17   entitled to appropriate deference.

18           Now, though the government bears the burden of proof

19   in guideline situations, the burden of production may shift to

20   the defendant once the government presents prima facie

21   evidence of a given loss figure.  United States versus

22   Geevers, 226 Fed. 3d 186 (Third Circuit 2000).

23           However, the government always bears the burden of

24   proving by a preponderance of the evidence that the facts

25   supporting sentencing enhancement and the defendant does not

1    have to prove the negative to avoid the enhanced sentence.

2    United States versus Diallo, 710 Fed. 3d 147 (Third Circuit

3    2013).

4            As noted, this is a fact driven inquiry.  The

5    question is how much money, if any, did defendant intend to

6    deprive her creditors of through her unlawful conduct, and the

7    district court must determine the defendant's subjective

8    expectation, not the risk of loss to which he may have exposed

9    his victims.  United States versus Yeaman, 194 Fed. 3d 442

10   (Third Circuit 1999).

11           Because intended loss focuses on the defendant's

12   subjective intention, not on the possible or potential harm

13   defendant could have caused, the district court errs when it

14   simply equates potential loss with intended loss without

15   deeper analysis.  United States versus Geevers, 226 Fed. 3d

16   186 (Third Circuit 2000).

17           Intended loss, however, is not necessarily the amount

18   the defendant expects to obtain or deprive others of.  While a

19   defendant may not expect to obtain the full value of his

20   fraudulent scheme, expectation is not synonymous with intent

21   when a criminal does not know what he may expect to attain but

22   intends to take what he can get, what he can.

23           This is why, when I focused on the disclosure

24   statement for the amended plan where there was a proposal in

25   the plan to treat Chase by providing Chase with the property

1    valued at $120,000 according to the debtor's opinion when the
2    amount of the principal was $210,000, so this is -- the court
3    would consider that to be an intention to take what she could
4    from them.
5              MR. RIDGE:  May I ask the court one question about
6    that?
7              THE COURT:  Yes.
8              MR. RIDGE:  There is equity in the other property, in
9    the PNC property.
10             THE COURT:  Chase wasn't getting that.  The intent
11   was -- I read the plan very carefully, and the plan said that
12   Chase was going to take that in full satisfaction and would
13   not have a deficiency.
14             MR. RIDGE:  I know that's not the language in the
15   plan.
16             THE COURT:  That's what the plan says.
17             MR. RIDGE:  But the other language in the plan, and I
18   did point this out for Mr. Valencik is 3.8, the language in
19   that paragraph remains the same, saying that if your secured
20   claim is reduced and you have an unsecured portion that that
21   would be considered as part of the unsecured claims.
22             THE COURT:  I understand that, but that's trumped by,
23   at least in my view, the more specific provisions as to how
24   Chase was going to be dealt with, and that appeared to the
25   court to be the intention of the plan.

1          Whether or not it was a realistic expectation is

2    something that may be different, but if it could have gone

3    through, would she have taken it?  My best guess is -- not

4    guess, but my best estimate would be that she would have, and

5    it's confirmed by the e-mail saying, you know, I'm getting

6    ready to come out.  Let's all be quiet, you know.

7          This would not have been something that would have

8    been ruffled by stating, oh, let's take Chase's unsecured

9    amount and put it into the unsecured creditors amount, because

10   then you would have to adjust would they be able to be paid

11   100 cents on the dollar with the projections that would go

12   into that particular plan which does not take into account the

13   assets that had been accumulated and not disclosed to the

14   court, which we now know was $288,000 at a minimum.

15         Those are where the court would -- what the court's

16   finding would be that here, the intended loss is $90,000.

17         MR. RIDGE:  All right, Your Honor.

18         THE COURT:  So based on that, just to run through the

19   guidelines, how it would affect the guidelines.  If the loss

20   amount, the base amount -- the base offense level is six, and

21   under Section 2B1.1(b)(9)(B) for criminal act committed during

22   bankruptcy proceedings, you add two levels.

23         That brings it up to an offense level of eight.  When

24   the loss amount is between $40,000 and $94,999, you add six

25   points, so that would be -- six levels, I'm sorry, that brings

1   you up to an offense level of 14.

2          There is an acceptance of responsibility which

3   reduces it two levels, so the total offense level would be 12.

4   Criminal history category is Roman numeral I, zero criminal

5   history points.  The sentencing range is 10 to 16 months.

6   Term of supervised release is one to three years and the fine

7   is $5,555 to $55,000.

8          Now we need to talk about the calculations with

9   respect to the other offense.  Mr. Melucci?

10          MR. MELUCCI:  Yes, Your Honor.

11          THE COURT:  Is this --

12          MR. MELUCCI:  This is the count of conviction that --

13   31 USC Section 5324(c)(1).

14          THE COURT:  We have stipulations that will deal with

15   this.

16          MR. MELUCCI:  So I think, Your Honor, your intended

17   findings adequately calculate the -- sufficiently calculate --

18          THE COURT:  I didn't think they did.

19          MR. MELUCCI:  Except as to the loss.  We have a

20   stipulation that there was a money judgment of $120,000 and

21   that the -- presumably, therefore, the loss was in excess of

22   $100,000 which occurred over the course of a year.

23          And so your guideline calculation -- my guideline

24   calculation, I think, is as follows:  Base offense level of

25   six.  2S1.1 directs us to look at the loss under 2B1.1 which

1    is an additional eight levels.

2            THE COURT:  Don't we have to increase it by two

3    levels because of bulk cash smuggling?

4            MR. MELUCCI:  Yes.

5            THE COURT:  That's United States Sentencing

6    Guidelines Section 2S1.3(b)(1)(B).

7            MR. MELUCCI:  That's correct.

8            THE COURT:  And they stipulated to the --

9            MR. MELUCCI:  Loss range is between -- 2B1.1 is 95 to

10   $150,000, so that's an additional eight levels.

11           THE COURT:  Is there the enhancement under Section

12   2S1.3(b)(2) where there's a pattern of unlawful activity

13   involving more than 12 -- $100,000 in a 12 month period?

14           MR. MELUCCI:  Yes, there is.

15           THE COURT:  Is there evidence that this took place on

16   at least two occasions?

17           MR. MELUCCI:  Well, there's a stipulation, Your

18   Honor, that we entered into the record at the beginning of the

19   hearing that Ms. Miller was transporting in excess of $100,000

20   in foreign currency into the United States during a 12 month

21   period pursuant to 2S1.3(b)(2).

22           THE COURT:  Was it at least two times?

23           MR. MELUCCI:  Yes, it would be two times, because we

24   have two trips that the evidence would have shown, the trip to

25   Australia.

1          THE COURT:  Does the defendant agree with that?

2          MR. RIDGE:  Yes, Your Honor.

3          THE COURT:  So that is another two level enhancement

4     under Section 2S1.3(b)(2).

5          MR. MELUCCI:  Correct.

6          THE COURT:  So you get six, two.

7          MR. MELUCCI:  Eight for loss.

8          THE COURT:  Eight for loss.  Gets you up to an 18.

9          MR. MELUCCI:  Correct.

10         THE COURT:  We take away three for the acceptance of

11    responsibility.

12         MR. MELUCCI:  Correct.

13         THE COURT:  And that brings you down to 15.

14         MR. MELUCCI:  18 to 24 months.  Now, you had

15    indicated in your tentative findings the use of a minor.

16         THE COURT:  But that's gone now because --

17         MR. MELUCCI:  I negotiated that.

18         THE COURT:  You negotiated that as part of this, so

19    here under -- for Count 1 under criminal action No. 16-132,

20    the adjusted offense level is 15.  The criminal history

21    category is Roman numeral I because there is zero criminal

22    history points.  The sentencing range is 18 to 24 months.  The

23    term of supervised release is one to three years, and the fine

24    is $7,500 to $75,000.

25         And when the counts are grouped, the court takes the

1     count that yields the highest offense level so regardless --

2     unless the court would have found, you know, a much higher

3     loss level on the bankruptcy fraud count, that is lower than

4     the guidelines for Count 1 at criminal No. 16-132, so it's

5     that guideline that will control.

6          So the guidelines here are 18 to 24 months.  The term

7     of supervised release is one to three years, and the fine is

8     $7,500 to $75,000, and my recollection is that the statutory

9     maximum term of imprisonment is five years and the maximum

10    term of supervised release, I believe, is three years.

11         MR. MELUCCI:  Yes.  Also, there is a money judgment

12    as part of it.

13         THE COURT:  That you've agreed to for --

14         MR. MELUCCI:  $120,000.

15         THE COURT:  So what the court needs to hear now is

16    evidence or argument as to what the sentence ought to be.

17         Those will be my final findings with respect to the

18    guidelines, so now would be the time for -- it's about quarter

19    after 4:00 now.  I don't know -- we can go to 4:30 today or we

20    can come back tomorrow and start this phase of it unless you

21    have some witnesses that can't be here tomorrow.

22         MR. MELUCCI:  Your Honor, the government doesn't have

23    any witnesses at this point.

24         MR. RIDGE:  May I have one moment, Your Honor?

25         THE COURT:  Yes, you may.

1          MR. VERDREAM:  Excuse me, Your Honor.  These are

2     letters that were just sent directly to the court.

3          THE COURT:  Yes, there were four of them now.  You

4     need to give them back to me.

5          MR. VERDREAM:  Don't file them.

6          THE COURT:  They should be filed of record.

7          MR. VERDREAM:  I received actually more this weekend.

8          THE COURT:  I need to see them if you want me to

9     consider them.

10         MR. VERDREAM:  Absolutely.  I'll file them as soon as

11    I go back to the office.

12         THE COURT:  Okay.

13         MR. VERDREAM:  As well as these two that were sent

14    directly to the court.

15         THE COURT:  We can take a break at 4:30 and continue

16    it tonight and finish it up tonight.

17         MR. RIDGE:  Your Honor, if we're going to break at

18    4:30 tonight, let's meet tomorrow morning, because I do have

19    several character witnesses that I want to put on, and I'm

20    sure the defendant wants a chance --

21         THE COURT:  We reserved time for tomorrow.

22         MR. RIDGE:  The defendant wants a chance to present

23    to the court and so do I, so for my point of view, Your Honor,

24    it's probably best that we break today and come back tomorrow

25    morning.

1            THE COURT:  We'll be back here at 10:00 o'clock

2    tomorrow.

3            THE DEPUTY:  All rise.

4        (At 4:18 p.m., the proceedings were adjourned.)

5                    C E R T I F I C A T E

6            I, BARBARA METZ LEO, RPR, CRR, certify that the
     foregoing is a correct transcript from the record of
7    proceedings in the above-entitled case.

8

9     \s\ Barbara Metz Leo                    06/26/2017
      BARBARA METZ LEO, RPR, CRR              Date of Certification
10    Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25