1                    IN THE UNITED STATES DISTRICT COURT
                  FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3         UNITED STATES OF AMERICA,

4            vs.
                                        Criminal No:
5         ABIGALE LEE MILLER,           2:15-cr-00212
                        Defendant.
6         _____

7

8             Transcript of proceedings on May 9, 2017 United
     States District Court, Pittsburgh, Pennsylvania, before Joy
9    Flowers Conti.

10                            VOLUME III

11       APPEARANCES:

12     For the Government:        U.S. Attorney's Office
                                  Gregory C. Melucci, Esquire
13                                U.S. Courthouse
                                  700 Grant Street
14                                Pittsburgh, Pennsylvania 15219

15     For the Defendant:         Clark Hill PLC
                                  Robert J. Ridge, Esquire
16                                Brandon J. Verdream, Esquire
                                  301 Grant Street
17                                One Oxford Centre, 14th Floor
                                  Pittsburgh, Pennsylvania
18                                15222-4895

19     Court Reporter:            Barbara Metz Leo, RPR, CRR
                                  700 Grant Street
20                                Suite 6260
                                  Pittsburgh, Pennsylvania 15219
21

22

23

24

25        Proceedings recorded by mechanical stenography;
     transcript produced by computer-aided transcription.

1                         I N D E X

2    WITNESSES                                        PAGE

3    SANDRA POWERS

4        Direct Examination By Mr. Ridge                6
         Cross Examination By Mr. Melucci              12
5
     GERALD ROSS
6
         Direct Examination By Mr. Ridge              13
7        Cross Examination By Mr. Melucci             18

8    DIANA CORBETT

9        Direct Examination By Mr. Ridge              20

10   DENISE PIETRUSINSKI

11       Direct Examination By Mr. Ridge              23
         Cross-Examination By Mr. Melucci             28
12
     MINDY ROSSI-STABLER
13
         Direct Examination By Mr. Ridge              29
14

15

16

17

18

19

20

21

22

23

24

25

1               P R O C E E D I N G S

2                      - - -

3                   10:08 a.m.

4        (In open court, Defendant present with counsel:)

5            THE COURT:  This is a continuation of the sentencing

6    hearing of United States of America versus Abigale Lee Miller

7    at criminal action No. 15-212 and 16-132.

8            Will counsel please reenter their appearance?

9            MR. MELUCCI:  Good morning, Your Honor.  Gregory

10   Melucci for the United States.

11           MR. RIDGE:  Robert Ridge, Brandon Verdream and

12   William Price from the law firm of Clark Hill on behalf of

13   Ms. Miller.

14           THE COURT:  Now is the time for any argument or

15   additional information to be brought to the court's attention

16   with respect to all of the 3553(a) factors.  I normally start

17   with defense counsel and then prosecution will have an

18   opportunity, and then if the defendant would like to address

19   the court, she'll have an opportunity to do so.

20           MR. RIDGE:  Your Honor, before we do that, may I

21   clarify one thing?  Yesterday, when you were running through

22   the sentencing guideline findings that you made, I wanted to

23   make sure that the court understood that the government, in

24   the plea agreement, had agreed not to seek the bulk cash

25   smuggling enhancement.

4

1          THE COURT:  Okay.  So we have to take the two points

2     off?

3          MR. MELUCCI:  The two levels, Your Honor, so --

4          THE COURT:  The guidelines would be the same for each

5     offense?

6          MR. MELUCCI:  15 to 21 months.

7          THE COURT:  Okay.  I thought they would be 10 to 16.

8          MR. MELUCCI:  10 to 16 on the bankruptcy fraud

9     conviction.  15 to 21 months on the structuring.

10         THE COURT:  Let me meet with the probation officer

11    for a moment.

12         MR. MELUCCI:  Sure.

13       (Discussion off the record.)

14         THE COURT:  Mr. Ridge, thank you for bringing that to

15    my attention.  I'll just go through what the guideline

16    calculation would be for Count 1 at criminal action No.

17    16-132, so it's on the record.

18         The base offense level is 6.  Pursuant to Section

19    2S1.3(a)(2) of the guidelines, there's an eight level

20    enhancement to bring the total offense level to 14.  There is

21    no bulk cash smuggling pursuant to the agreement with the

22    government.

23         There is an enhancement of two levels under Section

24    2S1.3(b)(1) for pattern of unlawful activity.

25         There is two level -- that would bring it to a level

16.   Then there is the three points for the acceptance of responsibility and the assistance to authorities, and that brings the total offense level to 13, with zero criminal history points for criminal history of Roman numeral I category, the sentencing range is 12 to 18 months.

The term of supervised release under the guidelines would be one to three years, and the fine level is $5,500 to $55,000, so that is the range.

Does everyone agree with that?

MR. MELUCCI:  Yes, Your Honor.

MR. RIDGE:  Yes, Your Honor.

THE COURT:  Thanks for bringing that to my attention.

MR. RIDGE:  You're welcome.  Let me go back, because I was preoccupied with that.  The order that you would like to see us proceed is from my remarks --

THE COURT:  Any additional information you have, any witnesses you wish to call, and then the government will have an opportunity to make a presentation.  You know, sometimes there's some response by the defense counsel to the government's remarks, but at the end, the last person I would like to hear from is the defendant.

MR. RIDGE:  Understood, Your Honor.  If it's all right with you, Your Honor, I'd like to call the character witnesses first and then I'll give you my thoughts on it after they have testified.

1          THE COURT:  Sure.  Sure.

2          MR. RIDGE:  First witness we would like to call, Your

3   Honor, is Sandra Powers.

4          THE COURT:  If the witness could please come forward.

5          Do you expect there will be cross-examination?

6          MR. MELUCCI:  I don't anticipate any, Your Honor.

7       (Witness sworn.)

8          THE COURT:  Would you please take the witness stand?

9          SANDRA POWERS, a witness herein, having been first

10   duly sworn, was examined and testified as follows:

11                      DIRECT EXAMINATION

12   BY MR. RIDGE:

13   Q.  Go ahead.

14   A.  My name is Sandra Powers.  As a young mother, I enrolled

15   my daughters in dance class at the Maryen Lorrain Dance

16   Studio.  I never imagined how that decision would affect the

17   rest of my life.  Maryen Lorrain, the owner, was Abby's

18   mother.

19          THE COURT:  Would you mind bringing the mic down and

20   speaking into it because the court reporter needs to take down

21   your remarks?

22   A.  Maryen Lorrain, the owner, was Abby's mother and the

23   creative force, while her father, George, handled the business

24   aspect.  Abby was always around taking class or watching her

25   mother teach and just taking everything in.  Absorbing

1     everything that was available to her.

2         And at the age of 14, she convinced her mother to allow

3     her to start a competition team with a few of the students.

4     My eight-year-old daughter was chosen to be one of those

5     students.  It was a new trend in the dance world to go to

6     competition.  Even at that young age, Abby was very focused

7     and driven.

8         She chose the music, selected the costumes and

9     choreographed the routine, and they took the first competition

10    and they won and the Abby Lee Dance Company was born.

11        Since I knew how to sew, I volunteered to help Abby with

12    the costuming.  I watched while she designed costumes that not

13    only suited each child's style of dance but also flattered

14    their body type, never letting any detail go unnoticed.

15        I loved being involved in that creative process.  We

16    worked well together, often late into the night, selecting

17    fabrics and trim and dying fabric to match exactly so every

18    child turned out perfect.

19        I learned so much during those long nights of work and

20    gained a lifelong friend in the process.

21        I never failed to be amazed by what she could accomplish

22    and how she encouraged those around her to do more than they

23    ever thought possible.  Something amazing was happening there,

24    and I got to be a part of it.

25        As the team grew bigger, she entered them in competitions

that often involved traveling out of state, and every trip
included learning a little bit about that particular city and
visiting local attractions.  She saw to it that they had a
party to celebrate their victories or to bring them together
if they were defeated.  She never missed an opportunity to
show her students that there was a lot of world out there and
they needed to be part of it.  Her zest for life could be
contagious.

If a competition included the opportunity to earn a title
and a scholarship was involved, she worked tirelessly to
prepare her dancer.  When they went before the judges for
their interview, they not only looked polished and
professional, they knew to shake hands with each one, how to
sit properly, enter the room, make eye contact and answer the
questions intelligently and without stammering.

They weren't just learning to dance or earning a title,
they were learning valuable life skills that they still use
today.

And the artsy kids that maybe didn't quite fit in in
school or were bullied or shy, they found a very safe place at
Abby's studio.  There they could be themselves and excel at
something that they loved to do.  They gained so much
confidence performing before an audience that they still
continue to excel today.

And upon graduation, if a student was interested in a

dance career, Abby used all of her contacts and influence to see to it that they got the interview or the audition and encouraged them to get in their car or in a plane or whatever they had to do to go out and go for it.

But they left knowing that she was just a phone call away if they needed advice, had a question or just needed a shoulder to cry on when they didn't get the job.  To her, these students were the children she never had.

She has continued on that path for the last 37 years, producing numerous hard-working, employable performers.  Her students have gone on to careers in motion pictures, television and on the Broadway stage.  They perform on cruise ships, music videos and Radio City Rockettes.  They've even performed for dignitaries at the Kennedy Center Honors in Washington, D.C.  They are cast in shows all over the world.

She has the ability to see the potential in people and encourages them to realize that potential, often having more ambition for them than they have for themselves.

Even students that follow a different career path, as my daughter has, have been encouraged by Abby to be strong, independent and confident young women.

When I became a widow at the age of 40, she even showed me how to be strong, independent and self-reliant.  I have been fortunate to have worked with her all these years.  First, as the president of the dance company parents association and

1    even helping her father run the everyday operations of her
2    busy dance studio.
3        And I know firsthand that she spends so much of her time
4    focusing on the creative element, that she must trust the
5    people around her to handle her financial and clerical
6    aspects.  There just aren't enough hours in the day to do it
7    all.
8        I realize that at times, she seemed harsh and demanding,
9    but it's only because she cares so very much about the end
10   product.  Sometimes that's what is needed to get the job done.
11   While being harsh and demanding isn't very pleasant, it also
12   isn't a crime.
13       To this day, any time an ALDC alumni attends a live
14   performance show, they have Abby to thank for introducing them
15   to the theater, and any time one of them earns a paycheck
16   doing what they love to do, again, they have Abby to thank for
17   that opportunity.
18       And any time one of their mothers earns a paycheck when
19   they have no skill or ability, they have Abby to thank for
20   that opportunity.  Any teacher would be proud to have
21   accomplished even half of what Abby Lee Miller has in her
22   career.  Thank you.
23   Q.  Ms. Powers, before you step down, can you at least tell
24   Judge Conti how long you've known Ms. Miller?
25   A.  I've known her since she was eight years old, so 40.  I

1    don't know.  I can't do the math.

2    Q.  We'll just say since she was eight years old.

3    A.  Yes.

4    Q.  Is there anything else you want to tell Judge Conti other

5    than your written remarks about Abby Miller and the impact

6    she's had on your life?  I know you and she worked together on

7    many of these projects.

8    A.  Absolutely.  Her zest for life was so contagious.  She

9    doesn't do anything halfway.  These kids are so prepared, and

10   she sees to it that those young women, particularly because

11   that's mostly what we get at the studio, that they have --

12   they don't always have the confidence to go out, but she

13   pushes them.

14       She sees to it that they have the opportunities, and she

15   won't take no for an answer.  You go.  You do that audition.

16   You'll be fine.

17       They're kind of unsure, but they do.  I mean, my own

18   granddaughter, I sent to California at the age of 12, because

19   I knew Abby was going to be on the other end and give her some

20   opportunities to just experience what was out there and to see

21   the world.

22       I mean, she takes these kids all over the world.  The

23   things they've gotten to do are amazing, absolutely amazing,

24   and they learn so much more than they do in the classroom.

25       It would just be sad to see that end, because she has a

1    lot to offer youth and a lot to offer young girls to go out

2    and pursue and let them know that there's nothing to stop them

3    if they're confident enough.

4    Q.  Thank you, Ms. Powers.

5             MR. RIDGE:  I don't have any additional questions.

6             THE COURT:  Any questions?

7             MR. MELUCCI:  Yes, if I may ask one question.

8                      CROSS-EXAMINATION

9    BY MR. MELUCCI:

10   Q.  Ms. Powers, did your daughter ever travel overseas with

11   Ms. Miller?

12   A.  No.

13   Q.  Did you ever hear that Ms. Miller asked cast member

14   children to bring money into the United States from overseas?

15   A.  No, I did not.

16             MR. MELUCCI:  Thank you.

17        (Witness excused.)

18             MR. RIDGE:  The next witness, Your Honor, is Jerry

19   Ross.

20             THE COURT:  Please come forward and stand in front of

21   the court reporter to be sworn.

22        (Witness sworn.)

23             THE COURT:  Thank you.  Please take the witness

24   stand.

25                           - - -

1          GERALD ROSS, a witness herein, having been first duly

2     sworn, was examined and testified as follows:

3                         DIRECT EXAMINATION

4     BY MR. RIDGE:

5     Q.  Mr. Ross, can you state your name and address for the

6     record, please?

7     A.  Yeah.  My name is Gerald Ross.

8               THE COURT:  Pull yourself closer to the bench and

9     speak into the mic.

10    A.  My name is Gerald Ross.  It's Jerry, and I live in

11    Monroeville, 302 Altaview Drive.

12    Q.  What do you do for a living, Mr. Ross?

13    A.  I'm a dance teacher at the Creative and Performing Arts

14    High School, and I'm a pharmacist, part-time pharmacist.

15    Q.  And the Creative and Performing Arts High School, that's

16    CAPA?

17    A.  Right down the street, right.

18    Q.  How long have you been employed as a dance instructor at

19    CAPA?

20    A.  At CAPA, I think officially 23 years, and on the sub list

21    for like four years beyond that.

22    Q.  What about as a pharmacist?

23    A.  Since 1983.

24    Q.  All right.  Mr. Ross, do you know Abigale Lee Miller?

25    A.  Yes.

1    Q.  How do you know her?

2    A.  Well, I started with Abby's mom in late high school and

3    early college.  I was student teaching for her and she was my

4    teacher, and I was with her for a few years there, about four

5    years.

6    Q.  And did you meet Abigale Miller during the time you worked

7    for her mother?

8    A.  Yeah.  Not very well, but I did.  During the '90s, Abby

9    called me back to teach for her in the mid '90s.

10   Q.  So 25 to 30 years, you have known Ms. Miller?

11   A.  Yeah.  I taught for her, once she called me back, for

12   about 12 or 13 years.  It finally got to be too much to juggle

13   part-time pharmacy, the creative arts high school and the

14   studio all at the same time.

15   Q.  You understand, Mr. Ross, that we're here today for the

16   purpose of sentencing Abigale Lee Miller?

17   A.  Yes.

18   Q.  Is there anything you want to share with Judge Conti about

19   your experiences with Ms. Miller over the last 30 years that

20   you think might be relevant to her decisions with respect to

21   sentencing?

22   A.  Well, it was really interesting getting back with Abby

23   after all these years, because the dance world had changed,

24   and I wasn't familiar with the competition circuit, and seeing

25   what she had done with her students was really amazing to me.

1    Where to start?

2          MR. MELUCCI:  Your Honor, I'm sorry.  I don't mean to

3    interject in the middle of his testimony.

4          The only comment I'd like to make is if Mr. Ridge is

5    calling these witnesses as character witnesses that they kind

6    of limit their statement to truth and honesty.

7          I'm a little concerned that the witnesses will just

8    testify for, you know, 15, 20 minutes about all the works

9    Ms. Miller did.  I mean, I imagine, sure, she did some good

10   deeds.

11         THE COURT:  This isn't just about truth and honesty

12   at the sentencing hearing, so I'm not going to limit it.

13   Q.  Go ahead, Mr. Ross.

14   A.  It was really apparent from right when I started back with

15   Abby that her primary concern was the success of her students.

16   That's always what drove her.

17      The motivating factor was success of the kids, and I was

18   there watching all the time she invested in these kids beyond

19   the actual classroom and teaching the kids how to -- we both

20   taught acrobatics and teaching them how to tumble and kick

21   their leg up.

22      I was there to watch her search for the right piece of

23   music for a student, and that was back in the day before

24   YouTube when you actually had to buy a CD and unwrap a CD and

25   listen to it and hope there's a song on that CD.

1          I've seen the hours she spent finding just the right piece

2     of music.  Once she did find the piece of music to suit a

3     student, how she would go through the whole costuming process,

4     designing the costume, buying the fabric, going on trips.

5          She's called me in New York and said I need you to run

6     down to the garment district.  I need you to get this for me.

7          MR. MELUCCI:  Your Honor, this is what I just

8     mentioned.  I think we're going beyond.

9          THE COURT:  I'll see you at sidebar.

10          (At sidebar.)

11          THE COURT:  At a sentencing hearing, the sentencing

12     factors are not limited to truth and honesty.  You know, they

13     include understanding the background of the person, other good

14     works the person has done in their life so the court can have

15     a total picture.  Now at some point if it becomes cumulative,

16     that would be a different situation.

17          MR. MELUCCI:  I understand that, judge.

18          THE COURT:  For you to keep interrupting like this is

19     really not appropriate, Mr. Melucci.  You're operating on the

20     wrong theory as to how you should be limiting these things.

21     We've already invested two days already, so to take an extra

22     or hour or so, it's not -- I mean, she's entitled.

23          MR. MELUCCI:  I understand.

24          MR. RIDGE:  Just to let everybody know, Your Honor,

25     you know, you've received all these letters.  There are

1    countless number of letters.  I've limited this to five or six

2    witnesses.

3              THE COURT:  I think it's inappropriate for the

4    government to try to cut it off.

5              MR. MELUCCI:  Thank you, Your Honor.

6              MR. RIDGE:  Thank you, Your Honor.

7              (Sidebar conference concluded.)

8              (In open court:)

9    BY MR. RIDGE:

10   Q.  You were explaining how you feel about or what you think

11   your experiences with Ms. Miller might be important for Judge

12   Conti to know as she prepares to sentence her.

13   A.  I think it's very important to know that Abby's motivation

14   was the good of her students.  I've never known her to be

15   malicious.  I've never known her to have a nefarious bone in

16   her body.

17       It was always about the kids.  I can only say how I've

18   known these things.  I've known it for how many years now,

19   that the good of her students was always the motivating

20   factor, picking fabric, designing the costumes for the kids to

21   wear.

22       She had an amazing gift for matching a student's costume

23   and their musical piece to their interview suits, if they were

24   going to be on the title circuit, down to the right shoes.

25       These student learned from an early age how important it

1    was to dress for an interview.  They could speak to adults in

2    a confident manner.  They knew what fork to use in a

3    restaurant, which is not something I learned until I went to

4    college.  They learned this at an early age.

5        They could order off a menu.  There was a sense of, when

6    you represented the dance company, when you were out in

7    public, that you were expected to maintain a sense of decorum,

8    and these kids know how to act.  They knew they were

9    representing Abby and themselves whenever they went in public

10   at an early, early age.

11       I think that's just an amazing thing.  Those are part of

12   her gifts that don't come out when you're crunching numbers.

13   That's the part of her that I knew and that I respect and I

14   admire and I love.

15   Q.  Thank you, Mr. Ross.

16            MR. RIDGE:  Your Honor, I don't have any other

17   questions for this witness.

18            MR. MELUCCI:  If I may.

19                      CROSS-EXAMINATION

20   BY MR. MELUCCI:

21   Q.  Mr. Ross, did you read the allegations in the indictment

22   against Ms. Miller?

23   A.  No.

24   Q.  You're aware, of course, that she has been convicted of

25   concealing assets from the bankruptcy court?

1    A.  Yes.

2    Q.  And you're aware that she has been convicted of smuggling,

3    rather, transporting currency from overseas into the

4    United States without reporting it?

5    A.  Yes.

6    Q.  How does that make you feel about her now?

7    A.  It's pretty shocking, because that's not the woman I know.

8    Whatever has changed from when I stopped teaching for her

9    until now, it's astounding to me.  It's completely shocking.

10   It's so out of the character of the woman I know.

11   Q.  Did that begin to change when she started her television

12   show?

13   A.  I really wasn't in the picture when the television show

14   started.  That was right around the time when I took my

15   sabbatical.

16          MR. MELUCCI:  Thank you, Your Honor.

17          MR. RIDGE:  I have nothing further, Your Honor.

18          THE COURT:  Thank you.

19      (Witness excused.)

20          MR. RIDGE:  The next witness, Your Honor, is Diana

21   Corbett.

22          Your Honor, I think Ms. Corbett might feel more

23   comfortable right here.  I think it would be easier for her to

24   speak from the podium, Your Honor.

25          THE COURT:  Okay.

1          (Witness sworn.)

2               DIANA CORBETT, a witness herein, having been first

3     duly sworn, was examined and testified as follows:

4                         DIRECT EXAMINATION

5     BY MR. RIDGE:

6     Q.   Would you state your name and address, please?

7     A.   Diana Corbett, 105 Glenfield Drive.

8     Q.   What do you do for a living, Ms. Corbett?

9     A.   I work for local real estate company and I'm leasing

10    director there.

11    Q.   Do you know Abigale Lee Miller?

12    A.   Yes, I do.

13    Q.   How long have you known her?

14    A.   30, over 30 years.

15    Q.   And you understand that we're here today for the purpose

16    of sentencing Abigale Lee Miller?

17    A.   Yes.

18    Q.   Do you think that you have something to share with Judge

19    Conti that might be helpful in her decisions about how to

20    sentence Ms. Miller?

21    A.   Yes.

22    Q.   Would you go ahead and share that with Judge Conti?

23    A.   As I said, I'm Diana Corbett and Abby Lee Miller entered

24    my life when I began --

25               THE COURT:  Take your time.

1    A.   -- when I began taking my daughter Alyssa to dance class

2    over 30 years ago.  That was in 1984.

3         I consider Alyssa and myself fortunate.  When I enrolled

4    my daughter in dance classes, Abby was a role model for my

5    daughter for 15 years.  Abby is an advocate for structure and

6    discipline and she's a very good motivator.

7         I've remained friends with Abby even after we left the

8    Abby Lee Dance Company 17 years ago.

9         A solid friendship was formed, and in the 30 plus years,

10   I've known her to be a good, dignified and giving person.

11   Abby has always been a truly loyal friend.  Is this loud?

12   Q.   No.  You're okay.  You're okay.

13   A.   Both Abby's mom and dad were a great inspiration to her.

14   They mentored her, loved her and to follow her dreams of

15   choreography.

16        I watched her father, George Miller, as he ran the

17   business and the studio, and I assisted him from time to time

18   when necessary with the books.  George Miller was the glue

19   that kept the studio together, running the daily affairs of

20   the dance studio.

21        Her mother, Maryen Lorrain, taught the students the daily

22   classes that attended the studio.

23        They both lovingly inspired Abby to follow her dreams.  At

24   the studio, Abby would help countless families who otherwise

25   could not afford to dance.  She did it by paying for their

1    lessons, if they needed a pair of tap shoes or even helping

2    fund our trips away.  Abby was very focused and never lost

3    sight of her goals.

4        Abby is a very dignified woman with integrity and her

5    willingness to always help others, whether it was dance or a

6    personal problem somebody was having.

7        It is my personal belief that Abby should continue to give

8    her gift of dance to help other young students nurture their

9    dreams of dance in just the same way as their parents -- her

10   parents had helped her.  Abby has danced in the hearts of

11   thousands of children and moved all of our souls with dance.

12   Q.  One question that I have, in addition to your statement,

13   Ms. Corbett, is when you were working with Mr. Miller on the

14   business side of the dance studio, was Abby an active

15   participant in that business side of the studio?

16   A.  No, no.  She was too busy doing the creative work with the

17   children.

18            MR. RIDGE:  I have nothing further for Ms. Corbett,

19   Your Honor.

20            MR. MELUCCI:  No questions.

21            THE COURT:  Thank you.

22       (Witness excused.)

23            MR. RIDGE:  Your Honor, our next witness is Denise

24   Pietrusinski, and I think I mispronounced it, but we'll get

25   clarification.

1        (Witness sworn.)

2            THE COURT:  Would you please take the witness stand?

3            DENISE PIETRUSINSKI, a witness herein, having been

4    first duly sworn, was examined and testified as follows:

5                        DIRECT EXAMINATION

6    BY MR. RIDGE:

7    Q.  Can you pull that closer to you so we catch what you're

8    saying?

9    A.  Is that good?

10   Q.  In your case, Ms. Pietrusinski, I'm going to ask you not

11   only to state your name but to spell it.

12   A.  My name is Denise Pietrusinski.  That's spelled

13   P-i-e-t-r-u-s-i-n-s-k-i.

14   Q.  And where do you live, Ms. Pietrusinski?

15   A.  339 Woodhaven Drive, Monroeville, Pennsylvania.

16   Q.  What do you do for a living?

17   A.  I'm a special ed paraprofessional.

18   Q.  Do you know Abigale Lee Miller?

19   A.  Indeed I do.

20   Q.  And how long have you known Abigale Lee Miller?

21   A.  I'd say 40 years.

22   Q.  And do you understand that we're here today for the

23   purpose of sentencing Abigale Lee Miller?

24   A.  I do.

25   Q.  And do you think that you have something to share with

1    Judge Conti that might be important for her to hear as she

2    prepares to sentence Ms. Miller?

3    A.  Yes, I do.

4    Q.  Go ahead.

5    A.  I've known Abby Miller for most of my life.  We first met

6    when we were both nine years old and in the same dance class

7    at her mother's dancing school.  While my dance days were

8    brief, I cheered Abby on when she started her own dance

9    company when we were only 14.

10       My sister was a member of Abby's original team and danced

11   for her for ten years.  My mom helped organize the first Abby

12   Lee Dance Company parent organization, designed and sewed

13   countless costumes and head pieces and eventually went on to

14   run the dance studio front desk after Abby's dad died.

15       Through all this, Abby became part of our family.  We

16   vacationed together, spent holidays together, celebrated

17   life's happiest moments and mourned life's saddest times

18   together.

19       Our kitchen table became a place to brainstorm music for

20   the next recital or dye fabric for someone's solo costume.

21   Abby was and still is funny and exciting to be around.

22       She has a unique ability to bring out talent you didn't

23   know you had or to push you to do something you didn't know

24   you were capable of doing.

25       As an example, I remember one time attending a fashion

show in which her students were modeling.  She rushed up to me

and said the emcee for the show hadn't shown up, thrust a

microphone in my hand, gave me a shove, and before I knew it,

I was on stage hosting the show.

Needless to say, I was way out of my comfort zone, but

Abby's confidence in me was far greater than my own.  I still

marvel when I remember that day.

Abby has an unparalleled sense of generosity.  She gives

and gives of herself, never expecting much in return.  28

years ago, my father died very unexpectedly and Abby was the

first one on our doorstep.

Q.  Ms. Pietrusinski, before you go on, are you related to

Ms. Powers?

A.  Yes.  That's my mother.

Q.  Okay.  Go ahead.

A.  Sure.  28 years ago -- Abby was the first one on our

doorstep.  She took over the many details for picking family

up at the airport, to coordinating meals, even shopping for

the clothing we would wear to the funeral.  She was our

family's rock at our darkest time and was my mother's greatest

champion as she had to begin a new life.

We then rallied around her when her father was diagnosed

with cancer.  Her family had become our family, and we shared

her pain with his passing.  Just a few years ago, when Abby's

mom became ill, we were lucky enough to spend special times

1  with her and be there for Abby when she passed.

2      24 years ago, my daughter Olivia was born.  Also born that

3  day was an amazing fairy godmother.  Abby was in love with my

4  daughter from day one.  She spoiled Olivia in every way

5  possible.  She would show up with a teddy bear too big to fit

6  through the front door.  She would bring miniature pianos,

7  party dresses, sparkly shoes, even gave her horseback riding

8  lessons.  Her generosity knew no bounds and it continued as

9  the years progressed.

10     Abby took Olivia to her first Broadway show at three years

11  old, bought her her first makeup and even opened a savings

12  account for her for her first car.

13     Likewise, she spoiled my son six years later when he was

14  born.  She showed up at the hospital the day he was born with

15  a pair of ballet shoes she dyed baby blue.

16     Every year, she would always celebrate a birthday with the

17  biggest, loudest, messiest, most fun present.  Even though she

18  could never talk him into taking dance classes, she definitely

19  instilled a love of the arts in him.  Nick absolutely adores

20  Abby to this day and looks forward to any time he gets to

21  spend with her.

22     When our third child was born, we decided to make the

23  fairy godmother title official and asked Abby to be Madeline's

24  godmother.  We couldn't have made a better choice.  From the

25  beginning, Abby threw herself into the role of fairy

1    godmother.

2        She and Madeline share a special bond, they're kindred

3    spirits and share a passion for the art of dance.  Abby is

4    Madeline's biggest cheerleader and has opened so many doors

5    for her.  I'm honored by the opportunity she has provided

6    Madeline and will be forever grateful.

7        But I want to be clear that it is not only material

8    objects she so generously gives my children.  She teaches them

9    valuable life lessons as well.  Abby is a born teacher, and as

10   such, she's taught them the importance of hard work and

11   perseverance.

12       She leads by example, demonstrating any obstacle can be

13   overcome.  She inspires them to just go for it and don't be

14   afraid to fail.  Such lessons are important in today's

15   competitive world more than ever.

16       On the more practical level, she has stressed the

17   importance of manners, of putting your napkin in your lap,

18   letting others off the elevator before you get on.  She

19   explained how important it is to look someone in the eye when

20   speaking to them, showed them how to hail a taxi, figure a tip

21   in a restaurant, the importance of always saying thank you.

22       Thanks to Abby's examples, my children are well on the way

23   of becoming capable and confident young men and women.

24       As Abby has unfailingly been a true friend to my family

25   and myself, I'm so glad to be here for her in her time of

1  need.  I only wish you could know the Abby that I know.

2  Passionate, creative, generous.  Not the persona you see on

3  TV.

4      I can't begin to count the people Abby has touched in her

5  life so far and truly look forward to seeing many more that

6  reach great heights in the future, thanks to her faith and

7  motivation.  That is Abby's true gift.  Seeing the potential

8  in someone and inspiring them to be the best they can be.

9  Q.  Thank you, Ms. Pietrusinski.

10      MR. RIDGE:  I have no further questions for this

11  witness.

12      MR. MELUCCI:  If I may, Your Honor.

13                      CROSS-EXAMINATION

14  BY MR. MELUCCI:

15  Q.  Ms. Pietrusinski, you've seen her television show?

16  A.  Yes.

17  Q.  Is that a side of Abby that you did not know about for the

18  past 30 years?

19  A.  I've known every side of her.  I can tell you that what

20  you see on TV is not necessarily the real her.

21  Q.  I see.  What about pleading guilty to crimes of lying to a

22  judge and concealing assets or structuring currency in the

23  United States?  Is that her or not her?

24  A.  That is not her.  She did that on advice to try to

25  minimize the impact to the children.

1    Q.  Whose advice was that?

2    A.  Attorney's advice.

3    Q.  The attorney advised her to do that?

4    A.  To my knowledge.  I was not there, but just so the

5    children didn't have to go through as much.

6             MR. MELUCCI:  Thank you very much.

7             MR. RIDGE:  One more witness, Your Honor.

8         (Witness excused.)

9             MR. RIDGE:  Mindy Rossi-Stabler.

10        (Witness sworn.)

11            THE COURT:  Please take the witness stand.

12            MINDY ROSSI-STABLER, a witness herein, having been

13   first duly sworn, was examined and testified as follows:

14                      DIRECT EXAMINATION

15   BY MR. RIDGE:

16   Q.  Good morning.

17   A.  Good morning.

18   Q.  Would you state your name for the record, please?

19   A.  Mindy Rossi-Stabler.

20   Q.  What's your address?

21   A.  1228 Lancaster Avenue, Regent Square.

22   Q.  And what do you do for a living?

23   A.  I am the theater department chair at Pittsburgh CAPA 6-12.

24   Q.  Do you know Abigale Lee Miller?

25   A.  I do.

1   Q.   How do you know Ms. Miller?

2   A.   I met Abby, I guess, in the late '80s or early '90s in my

3   capacity at CAPA.  I was directing a show and I got to know

4   Abby.  I went to see a couple of her recitals and was amazed

5   at the dancers' abilities and the choreography.

6        A lot of choreographers just give steps.  Abby really

7   dances.  Those kids dance, and I actually had several of her

8   students -- I needed some young students for a show that I was

9   directing, and I used about 15 of Abby's students.  They

10  danced better at four than some of the kids in the show that

11  were my students.

12       And I got to know her through that, and several of those

13  students, many of them, that was not the only time that that

14  happened.  I used them again a couple of times, and several of

15  those students came to CAPA because of their exposure.  And

16  several other students that didn't -- that didn't have

17  exposure with me and CAPA, Abby would gear them toward the

18  theater department because she would see that they could sing

19  and act and should go probably into musical theater.

20       So, you know, it was a marriage made in heaven, because

21  they were just focused and honest and caring, gracious kids

22  that were beyond their years really in their ability to

23  communicate and to just conduct themselves in the world.

24  Q.   Now, Ms. Rossi-Stabler, you understand we're here today

25  for the purpose of sentencing Abigale Lee Miller?

A.   I do.

Q.   Is there anything you want to share with Judge Conti that
you think might be important when she considers a potential
sentence for Ms. Miller?

A.   I do.  The most important thing that I've learned from
Abby -- I'm finishing my 30th year at CAPA, so I've been
teaching students a long time, and her students, when they
interacted with my students, were such a positive influence on
them, just because of their poise and their -- the stuff they
learned from Abby.

I will tell you, it was always about the kids with Abby.
Always about her students.  One of my students who studied
with her and actually went to Tokyo Disney from a very
underprivileged family, that was back when we were in Homewood
before we moved down here, and he -- his sister was shot and
killed, and it was a pretty rough neighborhood, and Abby
facilitated him getting back here.

His family couldn't get him back here.  She got him out of
his contract with Tokyo Disney.  I think she paid for him.
I'm not certain about that, but it was never about things for
Abby.  It was always about those kids.  She knew Ira had to be
here, and it was things like that that she did for her
students all the time.

And I just think she has such a creative and caring
ability.  She's tough.  I don't deny that.  She's not the

1    person on "Dance Moms."  That's not the woman I know at all,

2    and I've known Abby.  I even taught acting for her for a

3    little bit.  It was just too much for me all day at CAPA and

4    then going out there, but she's recommended me for acting

5    coachings, and I've worked with many of her students in that

6    capacity, and her students are a delight to work with.

7        And it's because she cares so much and focuses their

8    energies toward positive things.  Her students are doing

9    amazing things all over the world really, and that isn't

10   because Abby wanted fame for herself.  She wanted those kids

11   to succeed.

12       She has -- it's hard to put your finger on it.  She has a

13   gift for seeing a foot that is a foot that can be developed

14   into a gorgeous dancer, and she knows the right choreography

15   to put on that student, and she cares enough to, whatever

16   their family situation is, to get that student and enable them

17   to really develop their passion, because she has that passion.

18       So it's a voice that I would hate to see leave the dance

19   world for any amount of time.  I think it would be a sadder

20   place without Abby Lee Miller teaching dance.

21           MR. RIDGE:  Thank you.  I have no further questions.

22           MR. MELUCCI:  No questions, Your Honor.

23           THE COURT:  Thank you.

24       (Witness excused.)

25           MR. RIDGE:  I would like to make a few remarks before

Mr. Melucci makes his, and I don't want to repeat what our

character witnesses have said, but I do think it's important

to understand that on December 10 of 2010, a person entered

bankruptcy, and by the time that person emerged from

bankruptcy 36 months later, she had become a brand.

Now, that is part of the facts in this case.  I'm not

denying that.  There was a 36 month period with monumental

changes in the life of this person that you've heard these

character witnesses talk about, but at the time she entered

bankruptcy, she was trying to save that studio, which was the

only job she had ever had.  It was the culmination of her

parents' lives' work, and it was the only world she had ever

known.

This was a woman who, by all accounts, at the time

she was 45 and entered bankruptcy, she had essentially a world

view that, while it was focused on her kids and her dance

studio, it wasn't much bigger than Penn Hills.

And when she got to -- and I don't know if the court

understands exactly how it is that she came to be a star in

this television program, so if I'm boring you with this, let

me know if you've heard it before, but the truth of the matter

was she wasn't supposed to be on this program.

This program was filmed as a pilot at her studio

using her studio.  An interaction with a patron took place

that happened to be captured on film by the production crew,

1    and the network at that point said yes, we want that woman on

2    the show.

3         That was the beginning of "Dance Moms."  So this is a

4    woman who wasn't seeking the notoriety that she found.  I'm

5    not suggesting that she would give it up for any reason, but

6    I'm suggesting she wasn't seeking the notoriety that she

7    found, and there's no question, Your Honor, she was

8    ill-equipped to deal with the brand she became.

9         She entered into bankruptcy, but at the time she

10   entered into bankruptcy, her financial circumstances were

11   significantly different.  You've seen the chart, so you know

12   that the proof of the assets concealed -- and she's not

13   denying that she did this.  I know Mr. Melucci is focused on

14   the facts of the case.  She's admitted those.

15        At the time that she began concealing any assets at

16   all, it was during the time she was hoping to get out.  She

17   jumped the gun.  It's a mistake.  It's an error in judgment.

18   It was bad, bad judgment.

19        And she's made several other bad decisions.  That's

20   why she's here, but one of the things that I think happens to

21   us is that we attribute to people who achieved some level of

22   notoriety attributes that they don't really possess.  We

23   attribute to them business savvy.  We attribute to them common

24   sense.  We attribute to them the wisdom of ages, and that

25   isn't always the case, and it wasn't the case here.

1          She had no background in the business of running this

2     dance studio.  She almost lost it after the passing of her

3     father, and it's only by the grace of God that she got this

4     opportunity to perform in "Dance Moms" and make enough money

5     to satisfy her creditors and keep the dance studio.

6          So I think when we look at this, we have to put it in

7     context.  This is a person who was ill-equipped for this fame.

8          One of the things that comes with fame, in addition,

9     as the court well knows, is the attention of others, and

10    sometimes that attention is just because people who

11    acknowledge your fame want to bask in your reflective glory.

12         That's the best of intentions, because frequently,

13    the intentions are that people want to profit from your

14    success.

15         There's some of that in this case too, and I think

16    the court is aware of that, and so there was an urgency to

17    Abigale Lee Miller moving through this bankruptcy and starting

18    on these projects, and the urgency is that everyone involved

19    understood that her fame was fleeting.

20         She made the worst choices about how to achieve that

21    goal.  The worst.  I'm not denying it.  But as we look back

22    and look at what happened here, I don't want you, and I don't

23    think the court would do this, but I don't want the court to

24    assume that the person who entered bankruptcy, the person who

25    was embarking on this journey with the "Dance Moms" television

1    show was really the same person who's sitting here today.

2         That's six years of cram course in business, in, you

3    know, the way of the business world and how things work.  I

4    think it's been invaluable to Ms. Miller, and the thing that

5    she's done that I think is most important for the court to

6    understand is she has surrounded herself with professionals

7    that are capable and are willing to give her advice she

8    doesn't want to hear.

9         I happen to be one of them, but they're willing to

10   give her advice she doesn't want to hear.  She has a very fine

11   entertainment lawyer in David Markman from Greenberg Traurig.

12   She's retained the accounting personnel so she could get her

13   business affairs on track.  She has retained a publicist, all

14   of this because, frankly, she's finally come to the

15   realization that she can't handle all this herself.

16        Because initially, Your Honor, when this all was sort

17   of opening up for her, she was working, by all accounts -- I

18   don't think this is to be disputed -- 10 to 12 hours a day,

19   six days a week.  She was being confronted repeatedly with

20   these contracts.

21        Frankly, a lot of these contracts, and I pointed it

22   out with Mr. Wahlquist, are just unilateral renewals so she

23   doesn't even understand, okay, here we go.  We're rolling on

24   the next season.

25        So throughout all of this, I think it's been an

1    education.  I think what you've heard from these character

2    witnesses is that the judgments that were made that were made

3    in 2012 and 2013 were very poor judgments.  They were the

4    kinds of judgments that come about because people suddenly

5    actually believe they've earned their fame.  That's not always

6    the case.

7            And when we look at the 3553(a) factors, and I think

8    this is where this actually comes into play, Your Honor, we

9    have to look at those and say to ourselves, okay, who are we?

10   What kind of progress is this person making in their own life

11   so that we can look at those factors and decide how we want to

12   manage those.

13           I think, Your Honor, if you look at the question of

14   whether we want to protect the public from other crimes of the

15   defendant, I think the court can rest assured that Ms. Miller

16   is not a threat to commit additional crimes.

17           First of all, we know that the United States

18   Sentencing Guidelines Commission, and we've cited this in our

19   presentencing memorandum, has identified that category of

20   defendant into which Ms. Miller fits as the least likely or

21   close to the least likely to recidivate of all the categories

22   of people.  She's a woman.  She's middle aged.  She has no

23   prior offenses.  She's employed.

24           So she has all of those things going for her which

25   makes her far less likely to recidivate than anyone else who

1    shows up on those matrices.

2          We also have to be sensitive to -- and I understand

3    the court is trying to balance all of these things.  The court

4    has to be sensitive to the need to afford adequate deterrence

5    to criminal conduct.  I do think that's important here, but

6    what I'm concerned about, and I don't think the court is going

7    to do this, I myself though find myself struggling against it,

8    to make sure that we're sentencing the person instead of her

9    celebrity, because it's an inclination to seize on her

10   celebrity to make a point, and frankly, that's not always fair

11   to her.

12         I think she will -- she has been convicted of a

13   felony.  You will impose a sentence of some sort on her, and

14   that sentence, judging by the number of people in this room,

15   is going to get some very wide attention.

16         So I want the court to understand that I appreciate

17   the fact that there's a deterrent value here, and I'm certain

18   that Mr. Melucci is going to bring that to the court's

19   attention, but we shouldn't take advantage of Abigale Lee

20   Miller to make a point for the greater world, because remember

21   that the 3553(a) factors all come after that reference to the

22   idea that we should sentence her in a manner that is

23   consistent with the factors but not more than necessary to

24   achieve their goals.

25         I do think as well that the court needs to focus its

attention on reflecting the seriousness of this offense, and I

want to say to the court I know that we have argued for a zero

loss in this bankruptcy from the time that the case -- the

plea agreement was entered and throughout our pleadings.

I don't want the court to misconstrue that as any

effort on our part to minimize the significance of this

conduct.

I think we have all been mindful of the fact that

Judge Agresti had sort of hit his limit, and it's rare that --

with some judges more rare than with others, but it's rare

that people in a federal courthouse get a judge to sort of hit

his limit like that, so I'm not less than sensitive to the

idea that we have to do something that shows that she is

respectful of the court.

I'm not suggesting that Mr. Valencik or Mr. Calaiaro

did anything wrong in this case.  I think the circumstances

made this case more difficult to administer.  She's on the

move all the time.  She's working endlessly.  She's not very

good at the business side of this thing, and at the time, I

don't think she had the money to hire people to do it.

So from my point of view, it's a different person

today than it was -- than she was in 2010 when she entered

into bankruptcy, and I do think that a sentence that the court

imposes here, because she's pled guilty, because she

acknowledged I did this thing and it was wrong, and by the

1    way, on the currency transaction reporting side of this, which

2    I know is the place we're moving, you know, Your Honor, that's

3    the hardest thing for me to explain, and I'll tell you why.

4         It's a crime without a purpose.  Usually when I'm

5    standing here talking to you, I have a defendant who I can

6    say, well, you know, the objective here was to do A, B, C or

7    D.  This is all legitimately earned money.  Just reporting it

8    on the declaration, the customs declaration would have been so

9    simple.  It would have been so simple, but I think that's a

10   reflection, Your Honor, on the lack of capacity to do things

11   the right way.

12        It's almost like kids in high school who skip class

13   so they can spend time in study hall.  What's the purpose?

14   What are you really trying to do here?

15        So from my point of view, I think there's no question

16   that it was criminal conduct.  There's no question she's pled

17   guilty to it, but I do think, at some level, it lacks that

18   nefarious component that comes with that charge when the

19   conduct is related to hiding funds that were illegally

20   obtained.  We don't have that here.

21        So, Your Honor, I think when we look at both the

22   currency transaction issue and the bankruptcy issue, we have

23   to take into account the circumstances that Ms. Miller was

24   operating under at the time.  I'm not making an excuse for

25   her.  I don't think she's making an excuse for herself, but I

1    do think it's one of those things you have to understand.

2         For that reason, I know we've already argued for a

3    probationary sentence.  One of the things that I think I would

4    be remiss if I didn't mention, because all of these witnesses

5    have mentioned it, is the role Ms. Miller plays in the dance

6    world.

7         I understand that's the motivating factor in her

8    life.  She is essentially without support beyond that dance

9    world, and I think one of the things that the court can and

10   should consider is any supervised release, any probationary

11   period that the court wants to impose on Ms. Miller, I think

12   making a condition of that that she provide services like

13   dance services to disadvantaged children is certainly

14   something that should be considered, because let's at least

15   give her a chance to give back and to give back what she does

16   well.

17        You know, with those thoughts in mind, Your Honor,

18   I'll turn it over to Mr. Melucci, but I do want to end my

19   remarks by saying I don't think there are many people in the

20   world that will actually experience the meteoric rise to fame

21   that Ms. Miller experienced.

22        I also don't think there are many people in the world

23   who are as ill-equipped to manage it.  I have been impressed,

24   in the last two or three years, with her commitment to

25   actually listening to people's advice.  I have been impressed

42

1    with the amount, just in the last two or three years that I've

2    known her, that she's grown in her understanding of how things

3    work and how things operate, and I have been impressed with

4    her appreciation for the error that she made in this case.

5          And I think she was quick to acknowledge that these

6    were mistakes and that she didn't have anybody to blame for

7    those but her, and I think that's something that the court

8    should keep in mind when you're considering the sentence in

9    this case.  Thank you, Your Honor.

10         MR. MELUCCI:  Your Honor, if I may.  Mr. Ridge.  Your

11   Honor.  When I grew up, there were three institutions which I

12   quickly learned were extraordinarily important to the

13   character of a person, and this is something I learned growing

14   up one of five siblings of my family, four boys and a girl.

15         There were three significant institutions that were

16   important.  First was family, and I was always taught to honor

17   father and mother.  The second institution was faith.  It was

18   always church on Sunday and a tie, and the last institution

19   which we were always instructed to respect was government.

20         And by government, I speak of law enforcement, by the

21   judicial system, by the judges, by the people who enforce the

22   laws, and in order to develop a sound character, you needed to

23   have these three institutions well grounded in your life.

24         As I was preparing for this argument today, the one

25   institution where I believe Ms. Miller failed at was

respecting government.  In doing so, she continually, as we

saw through the bankruptcy, disrespected the judiciary,

disrespected the bankruptcy court, disrespected creditors and

the trustee.

Here was a woman who, back in early 2010 -- rather,

late 2010, December of 2010 was down and out in her life.  She

was struggling.  She had a failing dance studio.  She needed a

hand to help her.  That hand was the bankruptcy court.  And

the bankruptcy court offers benefits and protections that

really a struggling financial business or individual can't get

elsewhere.

She had enormous debts.  She needed protection from

those debts, and the court was there to help her.  However,

Ms. Miller, in reaching the hand that helped pull her out of

debt, in an attempt to reorganize this debt was stealing with

her other hand from the pocket of the bankruptcy court and

creditors.

So instead of being the honest and unfortunate

debtor, as a debtor is when they file a Chapter 11 bankruptcy,

she quickly became the dishonest debtor, and so over the

course of two years, as this court heard through the testimony

of Mr. Wahlquist and Mr. Langford, Ms. Miller capitalized and

schemed to conceal assets which she earned, which she rightly

earned, but did not want to disclose to the bankruptcy court.

And so the pattern, as we have seen, is not just a

1    bad judgment or an error, as Mr. Ridge has said.  This is an

2    adult who engaged private counsel, a professional to assist

3    her in filing a bankruptcy petition, had the assistance of the

4    trustee, had the assistance of courts, became wealthy enough

5    to hire an accountant, have an accounting done for her

6    bankruptcy estate.

7            She had all the resources available to her to do the

8    right thing, but instead of doing the right thing, she chose

9    to do the wrong thing, which was conceal these assets and

10   scheme to hide them from creditors.

11           All she had to do was tell the truth.  The reason she

12   didn't do that was because she was quickly becoming such a

13   well-known celebrity and a star, she believed the money was

14   hers and not for anyone else to take, and so this court has

15   seen these e-mails which reveal her state of mind and show

16   that this is not just somebody who's committing poor judgment,

17   exercising poor judgment.  This is somebody who had a plan, a

18   plan, in effect, to hide these assets.

19           And it wasn't just one asset that she was hiding.

20   She was concealing multiple assets from different sources, and

21   in doing so, Your Honor, she had to go before the court and

22   address the court with her attorneys about the existence of

23   those assets, and as you read and it was presented in

24   testimony through the statements and the hearing by Judge

25   Agresti, he was very upset by the fact that he suspected these

1   assets existed, but she did not disclose them, and what was

2   more troubling, even after the amended plan was approved, the

3   plan that was before the court that was going to be approved

4   until Judge Agresti discovered the fraud, she would have

5   gotten away with this, and ultimately, at the end of the

6   second amended plan, which was confirmed in December 2013, she

7   did get away with it.

8          When that plan was confirmed, Your Honor, in December

9   2013, there was an additional almost $350,000 of concealed

10  assets which the court never knew about.  Now, knowing the

11  tenor of Judge Agresti and knowing how upset he was when he

12  discovered there was $288,000 that was concealed and not

13  reported, you can imagine how upset Judge Agresti would have

14  been had he found out there was an additional $350,000.

15         And what's disturbing is that Ms. Miller had the

16  advice of counsel.  She knew what her obligations were

17  beginning in 2013, and she ignored those obligations.  She

18  ignored the warnings from the court.  She ignored the warnings

19  from the trustee, and that shows an enormous disrespect to the

20  court, and in doing so, she's lying to the court.

21         And despite this, throughout 2013, you saw the

22  e-mails, Your Honor, she is still scheming to conceal those

23  assets.

24         This is not a young person, as Mr. Ridge says, who

25  might have -- might be naive or lack business expertise.

46

1    Maybe she does, but that's not an excuse for committing a

2    crime.  These aren't simply bad judgments or errors.  She had

3    all the resources to make sure it was done right, but she did

4    not want to make sure it was done right, because if she

5    revealed that to people who could have helped her, they would

6    have told her, no, you cannot do that.  You may not conceal

7    assets.

8         So she did it clandestinely.  She e-mailed her

9    accountant.  She attempted to set up S corporations.  She set

10   up Wells Fargo accounts to deposit money.  She instructed

11   others to do things for her, and that is another, I consider

12   to be alarming behavior by her, and concealing these assets,

13   she brought in other people that were close to her to help her

14   commit her crime.

15        Now, I'm not suggesting these other persons are

16   conspirators, but she put them at serious risk.  In fact, the

17   government has to investigate all those people to find out

18   what role they played in this, her attorneys, her

19   entertainment attorney, her accountant.  All of them were

20   copied on e-mails, even the show producer.

21        She put all of them at risk for criminal

22   investigation simply to accomplish the sole aim of satisfying

23   enormous greed which was to keep the money that she was

24   earning, and it's also arrogance, Your Honor.  It's extreme

25   arrogance.

1          If she was the person that the character witnesses

2     talked about, a loving and caring person, she would have said,

3     look, I'm not this kind of person.  I'm not going to conceal

4     assets.  I'm not going to scheme to defraud others.  I'm not

5     going to scheme to defraud the bankruptcy court.  I'm going to

6     come clean in this and report all the income I have.  She had

7     earned sufficient income by the end of 2012 to pay off all

8     these creditors.

9          Now, in the meantime, there are victims in the

10    bankruptcy process.  You have the school districts that were

11    owed taxes.  We have the secured lenders, the unsecured

12    lenders.  They had to wait.  They had to wait until the

13    confirmation of the plan before they could even think about

14    getting paid.

15         While she owes them debts and had earned and

16    concealed $755,000 during the pendency of her bankruptcy, that

17    money was two or three times as much as what was available to

18    pay off her debts.

19         She could have stroked a check and said to her

20    attorney, you know what, I have the money now.  I'm

21    successful.  I'm making money on the show.  I'm selling

22    merchandise.  I can just pay everybody off.

23         But she continued to do this despite having the

24    resources and the knowledge to take care of the problem, and

25    that is what's troubling.  She persisted in the scheme,

1    despite being told by the courts, by the trustee not to do

2    this, even though she had the resources, and that is

3    extraordinarily troubling, because it shows a real disdain for

4    what the bankruptcy process is.

5        Your Honor, one of the -- the irony of all of this,

6    of course, is that the TV show which gave her the real success

7    in life was the same program that uncovered all the problems,

8    because it was Judge Agresti that was watching the program

9    and, but for the TV show, this never would have been

10   uncovered.

11       That is what -- it's not just that we have the one

12   crime, Your Honor.  If that had not been uncovered, she would

13   have pulled off a massive concealment scheme, a hugely

14   enormous bankruptcy fraud.  She would have walked away with

15   reorganizing $356,000 in debt but for that one innocuous night

16   that Judge Agresti saw the TV show.

17       But if that wasn't enough, Your Honor, it persisted

18   beyond the close of the bankruptcy case.  So when Ms. Miller

19   had determined, look, you know, I was able to hide all this

20   money and still get my plan approved, she engaged in another

21   scheme and she brought in others and put them at risk for

22   doing it.

23       So as she started to travel overseas and domestically

24   with the Masterclass programs and earning quite a bit of money

25   doing that, she realized, you know what, I'm making money

1    overseas.  I need to get it back into the United States.

2          So how does she do that?  They believed that they

3    couldn't carry more than 10,000, so they divided up the money

4    and had individuals, including the cast show members who were

5    minors, bring money back into the country.

6          She once again put others at risk for her own gain.

7    Now, Mr. Ridge says it's a crime without a purpose.  There is

8    a purpose.  You only have to report the income that the IRS

9    knows about.  Once again, she is concealing.  She's committing

10   a crime.

11         If the concealment of the bankruptcy fraud crime

12   wasn't enough, she had to go ahead and conceal more, and this

13   is extraordinarily troubling.  It would have to be troubling

14   to the court that here's a person who didn't learn her lesson

15   through the bankruptcy fraud.  Now goes ahead in 2014 and

16   tries another fraud.

17         What if the government had not caught that?  It would

18   have been fraud after fraud after fraud until somebody steps

19   up and says no, and the only person that can step up and say

20   no at this point is this court.

21         One of the observations I made, Your Honor, in the

22   investigation, in talking to the victims and other people who

23   were witnesses, is that they were concerned about two things.

24   The bankruptcy court was concerned about the way the court may

25   treat bankruptcy crimes.

1          Bankruptcy crimes typically aren't the flashy crimes

2     that get all of the attention, and so the concern was will

3     this woman be punished for concealing all these assets.  In

4     the view of the bankruptcy court trustee and the office,

5     here's a woman that they see who concealed $750,000 from the

6     court and may somehow walk away with no jail time, no

7     incarceration, almost scot-free.  Can we let that happen?

8          The concern of the bankruptcy court is -- this is

9     what I mentioned the other day -- the impunity with which a

10    debtor may engage in bankruptcy cases by concealing enormous

11    assets, disclosing minimal assets which are used to pay the

12    debts and yet walk away with an enormous concealment scheme

13    with no punishment because of the way the guidelines are

14    structured for loss.

15         This court is aware, of course, that we have had

16    other cases in this district in which there are circumstances

17    that warrant the court taking into consideration the mendacity

18    of a debtor who persists in fraud schemes and persists in

19    concealing and persists in lying to the court about assets as

20    a 3553 factor in imposing a just sentence.

21         That's what the bankruptcy trustee and the court is

22    concerned about, that individuals who commit bankruptcy fraud

23    can walk away from these schemes, who hide three-quarters of a

24    million dollars, and not receive adequate punishment.

25         The second concern, Your Honor, that I experienced in

1    this meeting with individuals in the case is that there's, of

2    course, this TV show that this court is aware that has made

3    Ms. Miller famous, and you heard some of the testimony from

4    the character witnesses.

5            They describe her on the show as not the person I

6    know, this bombastically, garrulous figure, coarse, crude

7    stuff.  I mean, that gets angry, if you have ever seen the

8    show.

9            The problem is that many of those moms are concerned

10   that, once again, Abby may get away with something.  This is a

11   concern of theirs that she can just walk away from this.  She

12   almost got away with the bankruptcy fraud until the court

13   uncovered it, and of course the government uncovered the

14   structuring fraud.  Their concern is that she'll pull it off

15   again.

16           This is not the end of Abby's career.  No matter what

17   happens, she's going to resume her dance career, maybe a TV

18   show elsewhere.  This is not the end for her, but the message

19   can't be that she got away with it.  That's the concern of the

20   trustee and the bankruptcy court and the concern of people

21   around her.

22           Now one thing I've noticed about the character

23   witnesses that the defense called, none of them were present

24   cast members of the show or former cast members.  They're not

25   here.  These are the people who work with her almost every day

1      for the past four or five years.  Many have left the show.

2      Many have gone on to different careers.  You would think they

3      might be obvious character references, but there's a reason

4      for that, which I think the court can conclude may not be in

5      the best interest of the defendant.  There have been spats,

6      and in the process of committing these frauds and using others

7      to try to accomplish her fraud, she's alienated people.

8              She's alienated cast members.  She alienated the

9      producer.  Recently she alienated the network by canceling the

10     show and where does that leave her?  Leaves her alone.

11             When you do what she did and put others at risk, you

12     alienate others, and you find yourself alone.  I respect what

13     the character witnesses said.  They've known her for many

14     years.  I'm sure there are good character aspects about

15     Ms. Miller, but here's a woman, when she saw the opportunity,

16     she seized it because of greed and arrogance and got away with

17     what she could get away with, and it wasn't going to stop

18     until somebody says no more, and that person who's saying no

19     more is this court.

20             Now, I'm not asking, and I don't disagree with

21     Mr. Ridge, I'm not saying she should be punished simply

22     because of her celebrity status.  It is important because

23     there is media attention in this case, and there are going to

24     be people that are going to be happy with the sentence and

25     there are going to be people who are disappointed with the

1    sentence.

2          The fact of the matter is this is what she brought to

3    the court on herself.  She committed this crime.  Nobody did

4    it for her.  She knew what she was doing when she sent those

5    e-mails.  She knew what she was doing when she hid the money.

6    She knew what she was doing when she brought the money from

7    overseas.  She knew what she was doing when she was using

8    others to do these things.

9          It was not isolated conduct which can be attributable

10   to other factors.  This is a woman who had a plan in place.

11   As she became more famous, the arrogance, the greed enlarged,

12   and she went, in my opinion, Your Honor, from dance mom

13   throughout the bankruptcy case to dance con, because that's in

14   the end what happened.  It was a big con.

15         She tried to con the bankruptcy court.  She tried to

16   con the IRS by concealing assets that she brought into the

17   country.  This cannot go on.  This court respectfully, I ask

18   that it needs to take into consideration not just deterrence,

19   but to promote respect for the law and just punishment,

20   because if you look at this case and all the facts, this is a

21   woman who has trouble respecting the law and that is what --

22   something that I find most striking about her behavior in this

23   case.

24         She refuses to accept the law, respect the law and

25   behave in a way the law wants you to behave when she's told

1    that she's got to disclose assets and report what she needs to

2    report in order to be truthful to the court and to the

3    Internal Revenue Service.

4         Your Honor, the guidelines give you options.  I

5    believe the guideline in this case requires a sentence of jail

6    time.  There has to be sufficient punishment for what she did.

7         My belief is that an ordinary sentence of probation

8    does not provide sufficient deterrence and clearly not

9    sufficient punishment for committing two crimes, two counts of

10   conviction, two serious felonies.

11        Otherwise, as the bankruptcy court might say or

12   others who have known her might say, Abby got away with

13   another one, and we don't want that to happen understandably.

14   We want her to pay the price that she purposed by committing

15   these crimes.  Thank you, Your Honor.

16        MR. RIDGE:  Your Honor, I'm going to bring Ms. Miller

17   up now, but before she speaks, I did want to address a couple

18   things that Mr. Melucci raised.

19        First of all, he said that the creditors had to wait

20   to get paid.  I think Mr. Valencik testified yesterday that he

21   made a motion to pay early her creditors and that it was

22   granted and that they were paid.

23        THE COURT:  But I think my understanding from

24   Mr. Melucci is that they had to wait from the day the

25   bankruptcy was filed which was, I believe, in 2010 until they

1    were finally paid sometime in 2013.

2             MR. RIDGE:  And I'm --

3             THE COURT:  You know, I'm not taking him to say that,

4    you know, that the waiting went until the plan was actually

5    confirmed, because that's inconsistent with what we know the

6    facts to be.

7             MR. RIDGE:  The other thing that I know Mr. Melucci

8    made at least two references to the IRS.  This is not an IRS

9    case, and my recollection of the spreadsheet that we saw

10   yesterday indicated that Mr. McCormick was keeping track of

11   cash.  That's why we have the little clicker where we had to

12   go on and identify the cash, so Mr. McCormick was doing the

13   accounting for this joint venture.

14            The next thing I really do think, and I have worked

15   with Mr. Melucci on any number of occasions, so I mean him no

16   disrespect for this, but the one thing I don't think this

17   court should concern itself with is settling some reality

18   television score.

19            I really don't, and I don't think the court should

20   care, whether the other mothers on this television show think

21   that Ms. Miller got away with something.  I don't know.  I

22   haven't explored their conduct --

23            THE COURT:  I haven't heard from them here in court,

24   so I can't give it any weight.

25            MR. RIDGE:  Finally, the last thing I want to bring

1 to the court's attention is Mr. Melucci mentioned on several

2 occasions that any sentence of probation in this case would

3 suggest that Ms. Miller got away scot-free.

4   That's not the law.  I think the Supreme Court has

5 come down in the last couple of years with some law that

6 indicated very clearly a sentence of probation is a meaningful

7 restraint on liberty.

8   So there isn't any way, no matter what the court does

9 today, that Ms. Miller is going to walk out the door and get

10 away scot-free.  I know that and the court knows that, but I

11 wanted to make sure that I clarified that for purposes of the

12 record, because I do think it's important that we do -- we

13 have a person here who has admitted to these crimes and is

14 going to stand before you now to be sentenced for them.

15   With those clarifications, Your Honor, I think I'm

16 ready to bring Ms. Miller up.

17   She wants me to move away.  I'm sorry.  Go ahead.

18   THE DEFENDANT:  Your Honor, I am certainly ashamed --

19   THE COURT:  I just want to remind you that you have

20 been sworn in this case originally and you remain sworn.

21   THE DEFENDANT:  Your Honor, I certainly am ashamed,

22 ashamed to be meeting you the first time in this manner.  I

23 wish you could take my class or come to one of my events and

24 see how much I love what I do, firsthand.

25   I really want to go to lunch with you right after

1    this and answer every one of these questions and take you

2    through it from day one.

3            Viewers, they think they know who I am because they

4    see me on TV.  They don't get to meet the real me.  They don't

5    see the human being or the teacher.  I pride myself on

6    instructing my students to dance big and dream big, and you

7    heard a lot of that.

8            But I teach correct technique, body alignment,

9    terminology, everything, and life lessons, the value of

10   determination, dedication and discipline.  How passion and

11   perseverance are essential in a competitive field and how the

12   old punctuality, responsibility and giving 110 percent are

13   truly the keys to success.

14           For 25 years, I had envisioned my students achieving

15   success far greater than they ever imagined.  One day, I

16   arrived at my studio, my home away from home, to find a

17   sheriff's sale notice taped to my front door.  How could this

18   be?  I borrowed $535,000 at like nine something percent

19   interest to build my building.  My dad and mom gave me the

20   $80,000 they had to buy the land.  My dad maxed out every

21   credit card he could fill out for 20 grand for the interiors

22   of my building.

23           Needless to say, I was alarmed, I was embarrassed and

24   I was confused.  I built the building.  The taxes were always

25   included.  I paid the mortgage.  I was desperate to save my

building and humiliated beyond belief because some of the
parents got to the studio before I did and saw it.  It was all
the buzz.

And without telling anybody or discussing it, I found
a bankruptcy attorney, and I went late one evening and I told
them my story, and I thought that filing for bankruptcy was
the only way to protect my studio, my livelihood and my
parents' life's work.

So on December 3rd, 2010, I filed for Chapter 11.  I
always wanted to pay everybody back.  My dad had perfect
credit.  He just didn't teach me about anything about the
books.  I told Mr. Calaiaro and Mr. Valencik that I wanted to
pay everybody back in full.  I just needed some time.

I didn't realize that when you enter into bankruptcy,
it's like signing up for more homework.  I had to do these
monthly operating reports.  I had to fill out profit and loss
statements.  I had to learn about accounting principles, and I
worked hard on those.

I did spend time on those monthly operating reports,
and it was wrong.  I'd do the first month, and it was wrong.
I had my mom drive them into town and drop them off, and no
sooner did she get home and pull in the driveway that I found
out something was wrong again.  If the math was right, it was
in the wrong columns.  If the columns were right, the math was
wrong.

1            Instead of just facing the challenge head on and

2    maybe saying, you know what, you got to give me somebody that

3    works here to help me do these, or I need to sit in your

4    office and do these with you or something, I just delegated

5    out the work to anybody that would do it.

6            And I concentrated on what I did well.  People like

7    things that come easy to them and that's what I did.

8            So four months into the bankruptcy, an opportunity of

9    a lifetime came my way.  I never thought anyone would watch

10   the show, let alone the six episodes they first ordered.  I

11   wasn't on it.  I was a choreographer.  I was getting nothing,

12   and I was letting them use my studio because I'm an idiot.

13           Once I was actually filmed on the show because I had

14   to call the police on a mother, another random mom that was at

15   my studio, and they filmed it, and they sent it to Lifetime,

16   and they were like, This is crazy.  What is this?  Who is

17   this?

18           And that's how it happened.  I was at a dance

19   competition in the dark down on the floor, and the stage was

20   about bust high, and I was rehearsing a number on the stage

21   for the cameras, and a piece of paper was put in front of me

22   with a pen, and they said sign this.

23           And I said what is that.  I'm not signing that.

24           It's just an appearance release.  Everybody in this

25   whole room had to sign one.

1       Okay.  I took the pen and I signed a four year

2   contract with a four year option without an attorney.

3       Looking back on it all, I know the TV show changed my

4   life, but it was not without its burdens.  I was not prepared

5   in any way, shape or form for what came next.  Shooting a TV

6   show 12 hours a day, six days a week, and this was in addition

7   to running my studio, choreographing, doing costumes and

8   pictures and programs and trying to salvage the rest of the

9   business, you know.  Those five little lucky girls caused a

10  lot of other kids to quit that didn't get on the show.

11      So I was a grown adult.  I was the sole proprietor.

12  I was the boss, and now I was nothing.  I was just an equal

13  cast member, and I had to answer to the bankruptcy court, my

14  bankruptcy attorneys, executive networks, the production

15  company and the producers in the field, and it was Abby, work,

16  work, work, work.  A camera in my face every minute.

17      I felt like I was stripped of all control.  This

18  Mr. Hammonds that they mentioned took the kids' contracts that

19  I had with them, the parents have to sign that's about respect

20  and about just following the rules and, you know, language and

21  not smoking or swearing or anything like that, and he ripped

22  them up right in front of my face and said you don't need

23  these anymore.  The girls work for us now.

24      Okay.  I was, like I said, I was stripped of all

25  control in my own studio, and I think what suffered the most,

1    just because they were there and they were sitting next to me

2    and they were with me every moment was the bankruptcy.  It was

3    out of sight; out of mind.

4          Your Honor, I knew that all of my creditors would be

5    paid in full with or without a TV show.  I never wanted to

6    stiff anybody.  My mom and dad had a lifetime of trying to

7    collect money from people every month.  I lived that.

8          I watched people drop their kids off at the end of

9    the driveway so they wouldn't have to come in because they

10   owed money.  I don't do that to anyone.  I didn't want to do

11   that to anyone.  That's not who I am.

12         "Dance Moms" became a hit and I became a laughing

13   stock of reality TV.  I had to prove that I was a good

14   teacher.  It was important to me that the world know that and

15   that wasn't shown on the edited version with the crazy person

16   yelling at the mothers.

17         The best way I knew how to flip the audience's

18   perception of me was for these people to see me teach.  I went

19   to Lifetime and said, Can you give me a little web thing at

20   the end?  Can you put something across the screen and I can

21   have my own little web series where I would teach a step from

22   the show that week so that people could see and the kids

23   watching could see that I really am teaching, that I'm good at

24   what I do?

25         No, no, no, no.  They wanted the screaming, yelling

1    and fighting and all that.  That's the demographic.  I turned

2    that into a children's dance show.  It was a housewives show.

3         So now with the new found success of the show and the

4    girls' popularity, I knew that we could host events, and these

5    events would be both fun and educational.

6         Some of the other moms were going around and having

7    meet and greets and they charged 100 bucks to meet their

8    child.  I thought that was absurd.  Why would you charge

9    somebody money to meet you?

10         But I could teach a class, a real class, and the kids

11    would get something out of it like going to a dance

12    convention, so I set up these Masterclasses, and I would teach

13    the dances.  Gianna would assist me.  The girls would

14    demonstrate.  They performed, and the moms would sell the

15    merchandise and chitchat with the parents.

16         And a lot of those parents would come in and sit on

17    the sidelines and watch, and they had a completely different

18    perspective of me when they walked out of there.

19         Now, each time the show aired in another country --

20    currently we're in 134 countries -- those people in that

21    country begged us to come there through social media or e-mail

22    from dance teachers.  Would you come and teach?  Will you do a

23    Masterclass?

24         So for the first time, I had the chance to travel

25    abroad.  I never had the chance to do that before.  I was

1    always at Disney or New York with my students every summer,

2    and now we had a chance to go.  We.  And the moms and the

3    girls and I all were going to make money.  Not just me.  They

4    didn't go for free.

5         I contacted a hotel, a big hotel that had enough

6    ballroom space, and I got my insurance to give me an insurance

7    certificate for the hotel to book the space to cover the girls

8    performing.  I gave them my credit card information, and away

9    we went.  That was it.  I didn't know anything about

10   international business.  I didn't know anything about setting

11   up businesses overseas.

12        I just didn't take the time to learn how that all

13   works.  It was fast and furious and I did seek advice.  I did.

14   I just didn't seek it from the right people that knew about

15   international law and knew about international business.

16        Things were looking up.  I had all of these

17   opportunities coming at me, clothing deals, dance wear lines,

18   endorsements, branding agents, and I thought I had to be out

19   of bankruptcy first, or when those people came to me and I was

20   honest with them and said, hey, I'm in bankruptcy right now,

21   oh, well, okay.  We'll wait until you're out.

22        So I had to sit idle while cast members were

23   capitalizing on all this fame of the show -- with the show.

24        And then after awhile, I became frustrated with the

25   bankruptcy court and -- I forgot where I was going here.

1   There was something mentioned too.  I asked many times, once I

2   had like so much money, can we pay this person?  Can we pay

3   that person?  But there's enough money to pay that one person.

4   Pay them.

5           No, it doesn't work like that in bankruptcy.  We

6   can't do that.  You can't just get enough money and pay one

7   person.  You have to wait until you have it all and pay all

8   the creditors.  Okay.  Because I did ask.  I tried.

9           So you said earlier I jumped the gun.  I opened the

10  bank account without permission in L.A.  I did that because,

11  just in my mind, I knew all my creditors were being paid, and

12  I didn't see the harm, and now I do.  Now I get it.  I get how

13  it works.  I've been over it a million times.  I know.  I know

14  when I did the wrong thing.  I know what I did that was wrong.

15          It was meant to expedite things, to take advantage of

16  opportunities.  Never to hurt anyone else, ever.  I realize

17  now that I could have done everything I wanted if I just would

18  have done it the right way, and that kills me.

19          Every day I've gone to work and I've done what I do

20  best.  I create award-winning dance routines for television,

21  and I produce incredible young dancers, professionals, and

22  every day I regret my decisions.

23          What if I had done this?  What if I would have done

24  that?  Why didn't I hold myself to the same standard that I

25  hold my dancers to?  Had I done that, I wouldn't be here

1    today.

2         And I could have easily disclosed any other source of

3    income.  I didn't want the bookkeeper at my dance studio

4    talking about it to everybody in my business, and now the

5    whole world knows my business.  The whole world.

6         I am very sorry for what I have done and the

7    inconvenience I've caused others.  My friends and colleagues

8    have shed tears because of my careless mistakes.  I have

9    accepted responsibility for my actions and pled guilty to the

10   two charges, the two charges against me.

11        My name has been dragged through the mud, and the

12   Abby Lee Dance Company no longer exists in the very building

13   that I was trying to save, and I know that my future is

14   uncertain.  I can only assure you that I will never be in

15   front of a criminal court again.  Thank you for your time.

16        THE COURT:  May I see the probation officer, please?

17     (Discussion off the record.)

18        THE COURT:  Ms. Miller, this is the hardest job that

19   a judge has to do, and I have to take a lot of factors into

20   account, and the sentence will be imposed, and then I'll

21   explain the reasons for the court's sentence.

22        Pursuant to the Sentencing Reform Act of 1984, it's

23   the judgment of the court that the defendant, Abigale Lee

24   Miller, is hereby sentenced to a term of imprisonment of a

25   year and a day.  Upon release from imprisonment, the defendant

1   shall be placed on supervised release for a term of two years.

2   Within 72 hours of release from the custody of the Bureau of

3   Prisons, the defendant shall report in person to the probation

4   office in the district to which the defendant is released.

5          Now while on supervised release, the defendant shall

6   not commit another federal, state or local crime, shall comply

7   with the conditions recommended by the sentencing commission

8   and adopted by this court and shall comply with the following

9   standard conditions:

10          One, the defendant shall report to the probation

11   office in the federal judicial district where she is

12   authorized to reside within 72 hours of her release from

13   imprisonment unless the probation officer instructs her to

14   report to a different probation office or within a different

15   time frame.

16          This is important because I'm aware, you know, you

17   have some different residences, and so you're going to have to

18   choose, you know, your official residence and give that

19   address to the probation office, because if it's going to be

20   somewhere outside this district, then we need to make

21   arrangements to be sure that you can be supervised in that

22   district, and you can only be supervised in one district, so

23   we need to have here an accurate address for purposes of

24   making this determination.

25          And that also brings me to another question I have,

1    and that's if you would like to be incarcerated closer to

2    Pittsburgh or Florida or LA, where your support would be

3    strongest is what I typically would do.

4           MR. RIDGE:  Your Honor, we have discussed that, and

5    the dance studio that she operates now is in Los Angeles.

6           THE COURT:  So as close to Los Angeles as possible?

7           MR. RIDGE:  She needs to be as close to Los Angeles

8    as possible.

9           THE COURT:  I'll make that recommendation on your

10   behalf.

11          Now, secondly, the second condition is that after

12   initially reporting to the probation office, the defendant

13   shall receive instructions from the court or probation officer

14   about how and when she must report to the probation officer,

15   and the defendant shall report to the probation officer as

16   instructed.

17          Three, the defendant shall not knowingly leave the

18   federal judicial district where she is authorized to reside

19   without first obtaining permission from the court or the

20   probation officer.

21          Fourth, the defendant shall answer truthfully all

22   questions asked by the probation officer.

23          Five, the defendant shall live at a place approved by

24   the probation officer.  If the defendant plans to change where

25   she lives or anything about her living arrangements, such as

1    the people she lives with, the defendant shall notify the

2    probation officer at least ten days before the change.

3         If notifying the probation officer at least ten days

4    in advance is not possible due to unanticipated circumstances,

5    the defendant shall notify the probation officer within 72

6    hours of becoming aware of a change or expected change.

7         And I do hope you understand, you know, that, in

8    order to avoid problems in the future, you really have to

9    comply with these conditions, because they are the rules that

10   you are going to be subject to while you are on supervised

11   release.

12        So it's very important that if you want to change

13   where you live, you have to let people know in advance.  If

14   you want to travel outside the district where you are being

15   supervised, you need to get permission to do so.

16        And you need to also make sure that if you're asked

17   questions, you are truthful when you answer, questions by the

18   probation officer, and this is another aspect of the judicial

19   system where we have to rely on people to be truthful so that

20   we can have them properly supervised.  This will be very

21   important that you follow all of these conditions.

22        Sixth, the defendant shall allow the probation

23   officer to visit the defendant at any time at her home or

24   elsewhere, and the defendant shall permit the probation

25   officer to take any items prohibited by the conditions of her

1    supervision that he or she observes in plain view.

2         Seven, the defendant must work full-time at least 30

3    hours per week at a type of lawful employment unless the

4    probation officer excuses the defendant from doing so.  If the

5    defendant does not have full-time employment, she shall try to

6    find full-time employment unless the probation officer excuses

7    the defendant from doing so.

8         If the defendant plans to change where the defendant

9    works or anything about her work such as the position or the

10   job responsibilities, the defendant shall notify the probation

11   officer at least ten days before the change.  If notifying the

12   probation officer at least ten days in advance is not possible

13   due to unanticipated circumstances, the defendant shall notify

14   the probation officer within 72 hours of becoming aware of a

15   change or expected change.

16        Eight, the defendant shall not communicate or

17   interact with someone the defendant knows is engaged in

18   criminal activity.  If the defendant knows someone who has

19   been convicted of a felony, the defendant shall not knowingly

20   communicate or interact with that person without first getting

21   the permission of the probation officer.

22        Nine, if the defendant is arrested or questioned by a

23   law enforcement officer, the defendant shall notify the

24   probation officer within 72 hours.

25        Ten, the defendant shall not own, possess or have

1    access to a firearm, ammunition, destructive device or

2    dangerous weapon.  That is, anything that was designed or is

3    modified for the specific purpose of causing bodily injury or

4    death to another person.

5           Eleven, the defendant shall not act or make any

6    agreement with a law enforcement agency to act as a

7    confidential human source or informant without first getting

8    the permission of the court.

9           Twelve, if the probation officer determines that the

10   defendant poses a risk to another person, including an

11   organization, the probation officer may require the defendant

12   to notify the person about the risk and the defendant shall

13   comply with that instruction.

14          The probation officer may contact the person and

15   confirm that the defendant has notified the person about the

16   risk.

17          Thirteen, the defendant shall follow the instruction

18   of the probation officer related to the conditions of the

19   supervision.

20          There are additional special conditions.

21          One, the defendant shall not illegally possess a

22   controlled substance.  That would be cocaine, heroin,

23   marijuana.  You cannot possess those.

24          Two, the defendant shall not possess a firearm,

25   ammunition, destructive device or any other dangerous weapon.

1          Three, the defendant shall report any change of

2     address within 30 days to the United States Attorneys Office

3     while any portion of the fine remains outstanding.  We'll deal

4     with the fine shortly.

5          Four, the periodic drug testing mandated by the

6     Violent Crime Control and Law Enforcement Act of 1994 is

7     hereby waived.  The court finds these offenses are not drug

8     related and this defendant has no current or past history of

9     substance abuse.

10          Five, the defendant shall cooperate in the collection

11     of DNA as directed by the probation officer pursuant to 28

12     Code of Federal Regulations section 28.12, the DNA Fingerprint

13     Act of 2005 and the Adam Walsh Child Protection and Safety Act

14     of 2006.

15          A forfeiture money judgment shall be entered against

16     the defendant in favor of the United States in the amount of

17     $120,000.  Has that been paid?

18          MR. RIDGE:  No, Your Honor.

19          THE COURT:  The defendant shall satisfy that judgment

20     within 30 days after the entry of this order.  The court

21     further finds, based upon the presentence report and the

22     parties' statements to the probation office, that the

23     defendant is able to pay all or part of the fine required by

24     the guidelines.  Therefore, a fine of $40,000 is imposed.

25          The defendant shall pay the fine to the clerk of the

72

1    United States District Court, attention finance department,

2    700 Grant Street, Suite 3110 Pittsburgh, PA 15210.  The fine

3    must be paid within 30 days of the judgment being entered or

4    interest will become due and payable.

5         It is further ordered that the defendant shall pay to

6    the United States a special assessment of $200 which shall be

7    immediately due.

8         I'm now going to go through the 3553(a) factors and

9    explain the reasons for the sentencing and note your initial

10   request, you know, from your counsel and followed up again

11   today was that there be probation, but I think it's really the

12   first factor that I'm going to discuss that will explain why

13   the court felt it was not the appropriate sentence in this

14   case.

15        It has to do with the nature and circumstances of the

16   offenses and the history and characteristics of the defendant.

17   It's really that first part, the nature and circumstances of

18   the offenses.

19        There were two offenses here, but with respect to the

20   bankruptcy offenses, there were really 20 of them altogether

21   and you pled guilty to one of them, but I was able to take

22   into account all the conduct that was involved in those.

23        I mean, as has been expressed by Judge Agresti and

24   the prosecutor here, when someone commits, you know, a

25   bankruptcy offense, it isn't just that one case that's

affected.  It affects the entirety of the system, and it's a
very serious situation when someone who files for bankruptcy
isn't truthful with the court and doesn't fully report the
assets.

And I didn't go high in the guidelines in this case
because I did want to acknowledge that, when you went into
bankruptcy, I couldn't find that you had initial intent to do
anything wrong, and it was only as things developed, which
were fortuitous in your life, that gave you the opportunity to
acquire significant income and also the fame that went along
with it.

And as your counsel noted fame is fleeting, and if
you don't take advantage of opportunities, you know, they'll
go away, so I do understand why you wanted to take advantage
of those opportunities, but the problem was that you weren't
truthful with the court, and it could have all ended, as you
know now, much differently if you just would have told us.
The bankruptcy case could have been closed quickly when the
funds became available, and life would be so much -- would
have been very different for you.

But you didn't choose that path.  You know, you
weren't truthful, and when I looked at the circumstances here,
it wasn't that you weren't just truthful before Judge Agresti
learned about what you did, but afterwards, even when you knew
you were supposed to tell everything that you had, you still

1    didn't completely disclose everything, and that only came to

2    light as a result of the incident investigation leading to

3    this offense.

4         So that is very troublesome for the court, because

5    once you have a federal judge who tells you, you know, you

6    need to tell everything, you need to actually, you know,

7    disclose everything and you still didn't disclose the totality

8    of your income, and then once you know that you're in trouble

9    with the bankruptcy court, you go abroad and you choose to

10   bring in the money in a way that's illegal, you get in trouble

11   again.

12        You know, it's just all of those offenses, you know.

13   Once you know you've done something wrong and you're facing

14   potentially serious consequences, and then you commit another

15   offense, and not only is that offense something that affects

16   you, but you got other people involved with it.  Somebody is

17   carrying money for someone else, falsely making declarations,

18   you put those people at risk.

19        I mean, for me, that's a serious problem, and I have

20   to look at that as the characteristics of the offense of what

21   you were doing.  These are very serious issues.

22        You're obviously, when I look at your history and

23   characteristics, you're hard-working, you're hard-driving.

24   You obviously have a very devoted family, and I could tell

25   that you loved your mother and father, they loved you, you

1    have close friends.  You had a real support mechanism here,

2    and you did a lot of good things from what they told me about

3    your past, but somehow you got caught up in this world of fame

4    and you got sidetracked, you know, and lost your moral

5    compass, and I think that's what you told me here today.

6         If you would have done exactly the way you expect

7    your students to act, that's having a moral compass, knowing

8    that you're not going to harm someone else while you're trying

9    to advantage yourself and it overtook you.

10        So I took those factors into account and I sentenced

11   you at the low end of the guidelines, and I also sentenced you

12   in the midrange of the supervision, you know, so I didn't go

13   to the highest level here, but there had to be some very

14   serious consequences in light of the next factor which falls

15   into this.

16        It has to reflect the seriousness of the offense.  It

17   has to promote respect for the law and provide just punishment

18   for the offense.  With this type of sentence, I'm sure your

19   counsel will tell you that it's the kind of sentence where it

20   actually winds up, you know, if you conduct yourself

21   appropriately, follow all the rules, you know, you would be

22   looking at ten months of imprisonment, and usually you'll go

23   into a halfway house as part of that.

24        So it's the kind of sentence where you'll serve time

25   in prison, but you'll have time to come out and you can live a

long and productive life, but there has to be serious

consequences here, and that means a time of imprisonment, and

that's something that, because it just wasn't the bankruptcy.

There was other conduct that continued on, and if the court

didn't do this, I just feel that it would not reflect how

serious these offenses were.

And promoting respect for the law.  I mean, the

bankruptcy, you just didn't disclose what you needed to

disclose when you should have and then you didn't even

completely do it even though you knew you had to do it.  So

how do I encourage respect for the law?

You know, if I don't impose at least a guideline

sentence, which is what this is, this is a guideline sentence,

and you have to provide just punishment for the offense.

I think when I consider everything here with the

monetary judgment, the fine, the term of supervised release,

sentencing you at the low end of the guideline range, you

know, considering your personal history and characteristics, I

think will accomplish those goals.

It also has to afford adequate deterrence to criminal

conduct, and I know there's been a lot said here, you know,

about the fame that comes with the show.  People read about

this.  You know, a lot of times judges are asked to send a

message.

This really isn't so much about sending a message,

1    but it's just to -- this is the same sentence that should be

2    entered in any circumstance when these kinds of offenses are

3    committed, so it's not about the fame.

4         It's really about anyone who is going to commit

5    bankruptcy fraud, is going to be bringing funds in from

6    abroad, you just have to know there are serious, serious

7    consequences, and with the amount of money that was brought in

8    from abroad, that is what has driven the guidelines in this

9    case.

10        And in order to deter people from doing that,

11   sentencing within the guidelines is an appropriate sentence.

12   You have to protect the public from further crimes of the

13   defendant.

14        It's really up to you now, you know.  You are going

15   to have to comply with the law.  You know, there's no path for

16   somebody who says I'm just busy, I'm tired.  You know,

17   everybody in this country needs to comply with the law.  No

18   one is above it.

19        And it's important for you to follow the rules, just

20   like you would have your students do, and from what you told

21   me, I am confident that, after you've served this sentence,

22   you are going to do that.

23        It has to provide the defendant with needed

24   educational and vocational training, medical care, other

25   correctional treatment in the most effective manner, and

1    that's not really applicable in your case.

2             The next factor is the kind of sentences available.

3    I did give serious consideration to your counsel's request for

4    probation, but I just found for the reasons I've set forth

5    that imprisonment was a required -- was the appropriate

6    sentence in this case.

7             I also considered a fine.  Given your financial

8    resources, you did have the ability to pay it, and again, I

9    chose somewhere in the midrange of that in light of the fact

10   that you'll also be paying the $120,000 judgment.

11            Next factor, the kinds of sentences in the sentencing

12   range established in the United States Sentencing Guidelines.

13   I gave this very serious consideration.  We had two days of

14   hearings trying to determine what was the appropriate

15   guideline range for your case.

16            I've made that determination and I've sentenced you

17   within that guideline range, and quite frankly, you're

18   fortunate, you know, because you did have the plea agreement

19   where the government made some concessions, and that was

20   factored in this, which resulted in probably a much lower

21   range that might otherwise have been the case.

22            You know, that was something that I took into

23   account, but it was an agreement that I felt was appropriate,

24   under all of the circumstances, and so I think, given that the

25   guideline provisions -- this was appropriate for a guideline

1    sentence.

2         The next factor is any pertinent policy statement

3    issued by the sentencing commission.  Now, there wasn't really

4    one that's applicable in this particular case.

5         Next is the need to avoid unwarranted sentence

6    disparities among defendants with similar records who have

7    been found guilty of similar conduct.  This is another factor

8    I think that weighed.

9         Remember I told you, you know, this isn't about

10   somebody who's famous or not famous.  It's really about what

11   would happen if someone else was in these circumstances with

12   these same kinds of offenses, same kind of relevant conduct

13   and the circumstances that I've already addressed, so there

14   isn't going to be, in my judgment, applying a guideline

15   sentence that would cause a sentence disparity to be created

16   here.

17        Finally, the need to provide restitution to any

18   victims of the offense, and that really wasn't a factor here,

19   but I will note that there is a judgment that's being

20   entered.

21        So I've taken all of those factors into account,

22   Ms. Miller, and I'm sentencing you to a term of imprisonment

23   of a year and a day, to be followed by a term of supervised

24   release of two years with all the conditions that have been

25   stated.

1          You have the fine that the court has noted, the money

2     judgment in the amount of $120,000, as well as the special

3     assessment of $200.  The court has determined that this

4     sentence addresses the goals of punishment, rehabilitation and

5     deterrence.

6          Are counsel aware of any reason why the sentence

7     should not be imposed as stated?

8          MR. MELUCCI:  No, Your Honor.

9          MR. RIDGE:  No, Your Honor.

10         THE COURT:  Court hereby orders the sentence imposed

11    as stated.  Ms. Miller, I'm going to review your appeal rights

12    with you, so please listen carefully.

13         Subject to any limitations to which you may have

14    agreed, you can appeal your conviction if you believe that

15    your guilty pleas were somehow unlawful or involuntary or if

16    there were some other fundamental defect in the proceedings

17    that was not waived by your guilty pleas.

18         You will also have a statutory right to appeal your

19    sentence under certain circumstances, particularly if you

20    think the sentence is contrary to law.

21         With few exceptions, any notice of appeal must be

22    filed within 14 days of judgment being entered in your case.

23    If you are unable to pay the cost of an appeal, you may apply

24    for leave to appeal in forma pauperis.

25         If you so request, the clerk of court will prepare

1    and file a notice of appeal on your behalf.

2              Do you understand your appeal rights?

3              THE DEFENDANT:  Yes, I do.

4              THE COURT:  Pursuant to the law, you must be detained

5    unless the court finds, by clear and convincing evidence, that

6    you are not likely to flee or pose a danger to the safety of

7    any other person or the community if released pending

8    execution of sentence, and the burden is on the defendant at

9    this stage.

10             Mr. Melucci, is it permissible for the defense to

11   proceed by way of proffer?

12             MR. MELUCCI:  Yes, Your Honor.

13             MR. RIDGE:  Your Honor, Ms. Miller has been

14   responsive to the court's requests throughout the course of

15   this event.  Her livelihood is in California.  She doesn't

16   have anything in the world other than what is in California.

17             Her home is there, her studio, all of her -- what

18   she's invested her life in.  The chances that she would, based

19   on this sentence, try and abscond rather than serve her time,

20   it seems to me would be to forfeit what is the true sort of --

21   the culmination of her life's work, and I don't think there's

22   any question that she will respond when the Bureau of Prisons

23   requests that she respond, Your Honor.

24             THE COURT:  Okay.  Mr. Melucci, do you wish to be

25   heard on that?

82

1          MR. MELUCCI:  Your Honor, first of all, I do not

2    object to the defendant self-reporting so she can report 45

3    days, as is customary, but there is a matter that I think,

4    just for clarification, the sentence that you imposed on

5    Ms. Miller --

6          THE COURT:  It's going to be concurrent on both

7    counts.  I should have said that earlier.  It will be

8    concurrent on both counts.

9          MR. MELUCCI:  Okay.

10         THE COURT:  Based on the proffer and the background

11   information that I've already reviewed and the government's

12   non-objection, the court is determined that the defense has

13   met the burden.

14         Ms. Miller, you will be able to self-report.  I'm

15   going to ask that you go down with your counsel to the

16   marshal's office, because it's very important the marshals

17   have your correct address, so that you will be receiving a

18   notice from the marshal about where you are to report.

19         And you do understand that, when you get that notice,

20   you have to report to the institution to which you are

21   designated and you need to go there on your own.

22         Do you understand that?

23         THE DEFENDANT:  I do understand that, but my question

24   is, does the notice come hand delivered?  Does it come

25   certified mail?

1          THE COURT:  It comes in the mail.

2          THE DEFENDANT:  Just in the mail?

3          THE COURT:  Yeah, you can go down and check with the

4   marshals.  It's very important -- I don't know.  Maybe you get

5   a lot of mail, but maybe your counsel can monitor some of that

6   for you and help you, because you don't want to miss it,

7   because if you don't show up, you know, that's another

8   criminal violation.

9          MR. RIDGE:  Your Honor, I will make sure that we get

10   that mail.

11          THE COURT:  Make sure it goes to an appropriate

12   address where she will make sure she gets notice of it.

13          Once you arrive voluntarily to commence service of

14   sentence, your term of imprisonment will commence in

15   accordance with 18 United States Code Section 3585(a).

16          Now, is there another matter to come before the

17   court?

18          MR. MELUCCI:  Yes, Your Honor.  Move to dismiss

19   counts of docket No. 15-212, Counts 1 through 4 and 6 through

20   20.

21          THE COURT:  Okay.  That motion will be granted.  Is

22   there anything else?

23          MR. RIDGE:  I don't believe so, Your Honor.

24          THE COURT:  I believe once this is over, Ms. Miller,

25   you know, the stars will be aligned for you and everything

84

1    will go well.

2            THE DEFENDANT:  Thank you.

3            MR. RIDGE:  Thank you, Your Honor.

4        (At 12:25 p.m., the proceedings were adjourned.)

5                    C E R T I F I C A T E

6            I, BARBARA METZ LEO, RPR, CRR, certify that the
     foregoing is a correct transcript from the record of
7    proceedings in the above-entitled case.

8

9     \s\ Barbara Metz Leo                    06/26/2017
     BARBARA METZ LEO, RPR, CRR            Date of Certification
10   Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25